**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BENEVIS CORP.,[1] | ) Case No. 20-33918 (MI) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

**DECLARATION OF SCOTT MELL, CHIEF RESTRUCTURING OFFICER, IN
SUPPORT OF THE CHAPTER 11 PETITIONS AND THE FIRST DAY MOTIONS**

I, Scott Mell, being duly sworn, depose and say:

1.      I am the Chief Restructuring Officer of Benevis Corp. ("Benevis") and certain of its affiliates and subsidiaries, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors").  I also serve as a member of the Executive Committee of the Debtor, along with the Chief Dental Officer and Chief Financial Officer. I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.      I have served as the Chief Restructuring Officer of the Debtors since June 5, 2020. Since then, I have become generally familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

3.      I am also a Managing Director at Conway MacKenzie, Inc., part of Riveron ("Conway MacKenzie"), a global management consulting and financial advisory firm with expertise in financial and operational restructurings, valuation and opinion services, transaction services, investment banking, case management, and litigation support services. I am a seasoned

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as follows: Benevis Corp. (0242); LT Smile Corporation (2818); Benevis Holding Corp. (0222); Benevis Affiliates, LLC (7420); Benevis, LLC (5524); Benevis Informatics, LLC (7833). The address of the Debtors' headquarters is 1090 Northchase Parkway S.E., Suite 150, Marietta, GA 30067.

business transformation leader with over 25 years of diverse experience developing comprehensive strategic solutions for organizations undergoing rapid change.  My background includes large and complex financial restructurings, operational transformations, distressed mergers and acquisitions, interim management, debt and equity capital raises and formal reorganizations including more than 15 Chapter 11 proceedings.

4.      Over the course of my twenty-six (26) year career, I have served in several C-Suite roles including Chief Financial Officer, Chief Transformation Officer and Chief Restructuring Officer.  Prior to joining Conway MacKenzie, I was Managing Director at Ernst & Young ("EY") where I specialized in working with underperforming companies and their stakeholders. Prior to EY, I held senior leadership roles within McKinsey & Company, and AlixPartners, LLC where I focused on restructuring and transformation assignments.   My experience includes global engagements across a broad range of industries including healthcare, automotive, oil & gas, industrial products, mining, and energy.

5.      To minimize any disruption to the Debtors' operations and to ensure a smooth transition into chapter 11, the Debtors intend to request various types of relief in "first day" motions (collectively, the "First Day Pleadings") in connection with these chapter 11 cases (the "Chapter 11 Cases").[2] I submit this Declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings.

6.      This Declaration is divided into two parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures, and the

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

circumstances surrounding the commencement of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I - BACKGROUND

### A.    The Debtors' Background

7.     The Debtors make up a leading Dental Support Organization that provides non-clinical business support services to 150+ dental offices in 16 states and the District of Columbia. These supported dental offices treat over 2 million patients annually.  The supported dental practices offer patients general dentistry and specialty care, including orthodontics and oral surgery.  The Debtors supported practices serve the pediatric Medicaid and commercial payor markets; approximately 70% of 2019 revenue was generated from state Medicaid and Children's Health Insurance Program ("CHIP") programs.

8.     The Debtors are the national market leader in the fragmented and underserved $17 billion Medicaid pediatric dental services market. Under Medicaid and CHIP, over 35 million children are eligible to receive oral health screening, diagnosis, and treatment services. The Debtors are pioneers in this market and have developed strong relationships with state Medicaid programs and Medicaid managed care organizations serving the dental care needs of these underserved pediatric populations.

9.     The Debtors are led by a seasoned management team that is supported by deep investments in clinical quality, regulatory compliance, patient marketing, provider recruitment and retention, finance, and information systems. As a result, the Debtors' supported practices deliver cost effective and high-quality patient care. Within the communities they serve, the Debtors are recognized for their excellent reputation, high patient satisfaction, and positive patient outcomes and experiences.

**B.      Corporate Structure and Operations**

10.     The Debtors provide non-clinical business support services to the 150+ dental offices, each owned and operated by 56 non-debtor professional corporations (each a "PC"), pursuant to Practice Business Services Agreements (the "PBSAs"), which the Debtors into enters into with each PC. Specifically, Benevis Affiliates, LLC enters into PBSAs with the PCs in the commercial payor market (the "Commercial PCs") and Benevis, LLC enters into PBSAs with the PCs in the Medicaid payor market (the "Medicaid PCs"). The Debtors' full corporate structure is reflected below.



**\*\*NON-DEBTOR**

11.     Under the PBSAs, the Debtors provide the PCs with various services, as explained below.

- Consulting Services

  o     provide office space through a sublease;

  o     provide furnishings and equipment and assist with procurement of dental equipment;

  o     provide office supplies and assist with procurement of dental supplies;

  o     assist with recruiting and other personnel matters (the PC is solely responsible for selection, compensation, supervision, and termination of its personnel); and

  o     review and analysis of available health insurance plans, consultation with the PCs regarding the feasibility/profitability of establishing new office locations, assistance in preparing strategic business plans, and consultation with the PC regarding protocols for the PC's practice (though the decisions concerning all protocols are at all times subject to PC control and direction).

- Administrative Services

  o     provide or arrange for a practice business software system and information technology system;

  o     provide or arrange for a call center to schedule patient appointments;

  o     assist with implementation of a training program for Dental Professionals (as defined in the PBSAs);

  o     assist with evaluation and development of quality assurance and utilization review programs;

  o     provide bookkeeping and financial reporting services; and

  o     provide other business and administrative services that may be reasonably required by the PC (for example, office administrative services, general administrative services, and fiscal management services).

- <u>Marketing Services</u>

    o   assist in development of advertising, public relations, and promotion plans and materials for the PC's practice; and

    o   license to use certain logos, trademarks, trade names, service marks, proprietary documentation, and other intellectual property.

- <u>Billing and Collections Services</u>

    o   provide billing and collection information relevant to all claims and/or billings for all dental services rendered by the PC;

    o   assist and provide advice regarding the PC's processing of all Claims (as defined in the PBSAs) in connection with the PC's practice, including processing and submitting Claims on behalf of the PC, seeking to collect the accounts, billing, and using appropriate efforts to collect any patient deductibles and co-payments amounts, and submitting PC Claims for payment of its services to arbitration; and

    o   maintain records of the above transactions, which are available to the PCs.

- <u>Disbursements</u>

    o   assist the PCs in disbursement of funds for payment of the operating expenses and accounts payable.

12.     The Debtors also provide internal management and administrative services under a management services agreement. Specifically, Debtor Benevis Corp. provides the management services to the PCs through its Debtor subsidiaries, Benevis, LLC and Benevis Affiliates, LLC, pursuant to that certain Management and Administrative Services Agreement, dated December 31, 2015.

## C.     The Debtors' Prepetition Capital Structure

13.     The Debtors are parties to the prepetition Credit Agreement dated March 15, 2018 (as amended by that certain First Amendment to Credit Agreement, dated as of March 29, 2019, and as further amended by that certain Second Amendment to Credit

Agreement and First Amendment to Forbearance Agreement, dated as of June 5, 2020, the "Prepetition Credit Agreement"), between LT Smile Acquisition Corporation (merged with and into Benevis Holding Corp., with Benevis Holding Corp. being the surviving entity), as Borrower (the "Borrower") , LT Smile Corporation, as a Guarantor, the Subsidiary Guarantors, [3] and certain financial institutions party thereto as Lenders (the "Prepetition Lenders"), and BMO Harris Bank, N.A., as Administrative Agent.

14.     The Prepetition Credit Agreement provided the Debtors with a revolving credit facility in the maximum principal amount at any time outstanding of $25,000,000, including a swingline facility sublimit of $3,000,000 and a letter of credit sublimit of $5,000,000, and a term loan facility in the original aggregate principal amount of $152,500,000. Each of the revolving credit facility and the term loan facility have a maturity date of March 15, 2024. As detailed below, commitments by certain Prepetition Lenders to provide an additional $20 million of term loans to the Borrower were provided under amendments to the Prepetition Credit Agreement by some of the Prepetition Lenders, including $5,000,000 of "rescue financing" provided by New Mountain Finance Corporation ("New Mountain") on June 5, 2020 to provide needed liquidity while the Debtors worked to prepare the Chapter 11 Cases.    As of the Petition Date, approximately $200,500,500 of principal, interest and fees was outstanding under the Prepetition Credit Agreement.

15.     In connection with the Prepetition Credit Agreement, LT Smile Corporation, Benevis Corp., Benevis Informatics, LLC, Benevis Affiliates, LLC and Benevis, LLC provided a

---

[3] For purposes herein, each of the foregoing are individually, a "Subsidiary Guarantor", and collectively, the "Subsidiary Guarantors": Benevis Corp., Benevis Informatics, LLC, Benevis Affiliates, LLC, and Benevis, LLC.

guaranty to the Agent and the Prepetition Lenders, which was embedded in the Prepetition Credit Agreement.

16.     The Debtors have, from time to time, addressed issues arising under the Prepetition Credit Agreement with the Prepetition Lenders. Specifically, the Debtors entered into the following:

     a.    <u>March 29, 2019, First Amendment</u> – Benevis Holding Corp., LT Smile Corporation, the other Guarantors, the Agent, and the Prepetition Lenders entered into the First Amendment to Credit Agreement, pursuant to which the Agent and Prepetition Lenders agreed to increase their commitments by up to an additional $15,000,000 in the form of delayed draw term loans (with any borrowings incurred under the delayed draw term loan facility automatically becoming part of the term loan facility) and to amend the leverage ratio covenant, and required the contribution of additional capital from its equity holders or the sale or issuance of additional equity interests of LT Smile Corporation.

     b.    <u>April 30, 2020, First Forbearance Agreement</u> – Benevis Holding Corp., LT Smile Corporation, the other Guarantors, the Agent, and the Prepetition Lenders entered into the Forbearance Agreement, dated April 30, 2020, pursuant to which the Prepetition Lenders agreed to, among other things, forbear from exercising certain rights and remedies under the Prepetition Credit Agreement (including exercising rights of set off and conversion, and refusal to permit additional extensions of credit, as applicable).

     c.    <u>May 20, 2020, Forbearance Extension</u> – Pursuant to an email received from counsel to New Mountain and sent on behalf of the Administrative Agent and the Prepetition Lenders, the Prepetition Lenders and the Administrative Agent agreed to extend the Forbearance Period (as defined in the Forbearance Agreement) to the earlier of (a) May 29, 2020 at 11:59 p.m. New York City time, (b) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Termination shall have occurred, and (c) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Default under the Credit Agreement (other than the Anticipated Defaults) shall have occurred (following the expiration of any cure period specified in the Credit Agreement or as set forth herein).

     d.    <u>May 28, 2020, Forbearance Extension</u> – Pursuant to an email received from counsel to New Mountain and sent on behalf of the Administrative Agent and the Prepetition Lenders, the Prepetition Lenders and the Administrative Agent agreed to extend the Forbearance Period (as defined in the Forbearance Agreement) to the earlier of (a) June 5, 2020 at 11:59 p.m. New

York City time, (b) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Termination shall have occurred, and (c) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Default under the Credit Agreement (other than the Anticipated Defaults) shall have occurred (following the expiration of any cure period specified in the Credit Agreement or as set forth herein).

e.  <u>June 5, 2020, Forbearance Extension</u> – Pursuant to an email received from counsel to New Mountain and sent on behalf of the Administrative Agent and the Prepetition Lenders, the Prepetition Lenders and the Administrative Agent agreed to extend the Forbearance Period (as defined in the Forbearance Agreement) to the earlier of (a) July 20, 2020 at 11:59 p.m. New York City time, (b) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Termination shall have occurred, and (c) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Default under the Credit Agreement (other than the Anticipated Defaults) shall have occurred (following the expiration of any cure period specified in the Credit Agreement or as set forth herein).

f.  <u>June 5, 2020, First Amendment to Forbearance Agreement</u> – Benevis Holding Corp., LT Smile Corporation, the Prepetition Lenders, and the Administrative Agent entered into the Second Amendment to Credit Agreement and First Amendment to Forbearance Agreement, dated June 5, 2020, pursuant to which the Agent and Prepetition Lenders agreed to provide additional delayed draw term loan commitments of up to $5,000,000 that were available during the period from June 5, 2020 until July 31, 2020 (with any borrowings incurred under this delayed draw term loan facility automatically becoming part of the term loan facility), and consented to a change of control as a result of the acquisition by an affiliate of New Mountain of all of the equity interests of LT Smile Corporation and the payment of 50% of the interest with respect to the loans that were due and payable on June 2, 2020 and June 5, 2020 on June 8, 2020 and the remaining 50% on June 15, 2020, and waived the event of default resulting from the change of control and the failure to pay such interest when due.

g.  <u>June 30, 2020, Second Amendment to Forbearance Agreement</u> – Benevis Holding Corp., LT Smile Corporation, the Prepetition Lenders, and the Administrative Agent entered into the Second Amendment to Forbearance Agreement, dated June 30, 2020, pursuant to which the Prepetition Lenders agreed to include additional events of default to the definition of "Existing and Anticipated Events of Default" in the Forbearance Agreement.

h.  <u>July 27, 2020, Forbearance Extension</u> – Pursuant to an email received from counsel to New Mountain and sent on behalf of the Administrative Agent and the Prepetition Lenders, the Prepetition Lenders and the Administrative Agent agreed to extend the Forbearance Period (as defined in the

Forbearance Agreement) to the earlier of (a) August 3, 2020 at 11:59 p.m. New York City time, (b) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Termination shall have occurred, and (c) upon notice from the Required Lenders to the Borrower on or after the date on which any Event of Default under the Credit Agreement (other than the Anticipated Defaults) shall have occurred (following the expiration of any cure period specified in the Credit Agreement or as set forth herein).

**D.      Events Leading to the Chapter 11 Cases**

17.      Prior to the COVID-19 pandemic, the Debtors anticipated liquidity issues on account of general dentistry patient declines during the second half of 2019 and costs associated with the April 2019 acquisition and integration of six (6) supported practices and COVID-19 exacerbated the Debtors' distress. In the twelve-month period immediately prior to COVID-19, the Debtors generated $360 million in net revenue and approximately $25 million in EBITDA. Due to the COVID-19 pandemic, all 16 states in which the PCs' practices are located and the District of Columbia, were shut down for a period of time by local government officials.  The pandemic and these shut-downs halted the Debtors' operations and significantly slowed the PCs' practices.  Primarily as a result of COVID-19, the Debtors' total revenue for the months of March, April and May 2020 was approximately 68% lower than for the same period in 2019.

18.      As each of the 16 states and the District of Columbia began allowing dental practice to resume their practices, as the Debtors were forced to navigate these unprecedented times. The PCs have reopened and implemented new safety protocols, which closely follow the recommendations of the Center for Disease Control and Prevention and their local and federal government officials, in order to ensure safe dental practices.  The Debtors expect operations and patient volumes to return to pre-COVID-19 levels in the near term.  General dentistry production for the month of July 2020 was approximately 80% of pre-COVID-19 levels.

19.     Facing defaults and liquidity challenges, the Prepetition Lenders negotiated with the Debtors and their principal shareholders—LittleJohn & Co. and Tailwind Management LP (collectively, the "Prior Sponsors")—regarding potential amendments to the Prepetition Credit Agreement in exchange for capital infusions from the Prior Sponsors.  The Prepetition Lenders entered into the First Forbearance Agreement on April 30, 2020 where they agreed to, among other things, forbear from exercising their rights and remedies as a result of events of default under the Prepetition Credit Agreement.  The Prepetition Lenders extended the forbearance period at least five times.

20.     Despite good faith negotiations, the parties were unable to reach consensus with the Prior Sponsors. As a result the Prior Sponsors were threatening to file a chapter 7 liquidation. As an alternative, the Prior Sponsors expressed a desire to exit their controlling equity status in the Debtors.  New Mountain ultimately agreed to a two-step process where it would *first* "purchase" the equity of LT Smile Corporation (the "HoldCo Equity") from the Prior Sponsors for nominal consideration and *second*, negotiate a more holistic restructuring of the Debtors in chapter 11.  On June 5, 2020, New LT Smile Holdings, LLC ("New LT Smile I") and New LT Smile Holdings II, LLC ("New LT Smile II", collectively with New LT Smile I, "New LT Smile"), a newly formed entity affiliated with NM, acquired the HoldCo Equity.

21.     Although New Mountain has technically been the sole shareholder for roughly seven weeks, New Mountain acquired the HoldCo Equity because the Prior Sponsors left it no other viable option to preserve the going concern business and avoid the alternative: chapter 7 liquidation. New Mountain continues to act as a secured lender and not as a shareholder.  New Mountain has no board representative and has instead appointed an independent director, Michael Sullivan, as the sole director of New LT Smile and each of the Debtors.  Among other powers, Mr.

11

Sullivan is vested with sole authority to commence a bankruptcy proceeding for any of the Debtors.[4]

22.     New Mountain continues to support the Debtors and has agreed to provide post-petition financing and a stalking horse bid for the purchase substantially all of the Debtors' assets to preserve the Debtors' business and relationships with employees and vendors.  Prior to the Petition Date, the Debtors and each of the Prepetition Lenders executed a Restructuring Support Agreement, a copy of which is attached at **Exhibit A**, under which all parties agreed (subject to the Debtors' fiduciary out) to pursue a sale of the Debtors' assets, including selecting a New Mountain affiliate as the stalking horse bidder under the APA (as defined below) and to obtain DIP Financing (as defined below) from the Prepetition Lenders on the terms set forth in the DIP Credit Agreement (as defined below).

**E.      Debtors in Possession Financing**

23.     To facilitate the sale of substantially all of the Debtors' assets through these chapter 11 cases, the Debtors have negotiated debtor in possession financing (the "DIP Financing"). The Secured Superpriority Debtor-in-Possession Credit Agreement, by and among Benevis Holding Corp., LT Smile Corporation, as a guarantor, the Subsidiary Guarantors, BMO Harris Bank, N.A., as administrative agent (the "DIP Agent") and the Lenders party thereto (the "DIP Lenders"), provides the Debtors with a priming superpriority debtor-in-possession credit facility in an aggregate principal amount of up to $30,000,000, consisting of a delayed draw term loan facility of up to $25,000,000 and a roll-up term loans of $5,000,000. Prior to the Petition Date, the Debtors

---

[4] For purposes of these chapter 11 cases, Mr. Sullivan has delegated this authority to the Debtors' CRO, Scott Mell, the Debtors' senior vice president, general counsel, and secretary, Jerry Perchick, and the Debtors' Chief Financial Officer and vice president, Scott Hornbuckle.

and New Mountain (and their respective advisors) engaged in arms'-length negotiations regarding

the terms and conditions of the proposed DIP Financing.

- not later than **August 3, 2020**, commence the Debtors' Chapter 11 Cases in the Bankruptcy Court (the date of commencement of the Chapter 11 Cases, the "<u>Petition Date</u>") and file the DIP Motion, and other First Day Motions;

- not later than **August 5, 2020**, obtain entry of the Interim DIP Order;

- not later than **August 3, 2020**, file the Sales Motion and Bid Procedures Motion;

- not later than **August 27, 2020**, obtain entry of the Bid Procedures Order;

- not later than **August 27, 2020**, obtain entry of the Final DIP Order by the Bankruptcy Court;

- not later than **September 10, 2020**, initial bids for the Debtors' assets shall be due pursuant to the Bid Procedures Order;

- not later than **September 14, 2020**, hold an auction for the sale of the Debtors' assets pursuant to the Bid Procedures Order;

- not later than **September 16, 2020**, obtain entry of the order authorizing the sale of substantially all of the Debtors' assets;

- not later than **September 18, 2020**, consummate a sale of substantially all of the Debtors' assets.

24. On June 18, 2020, the Debtors retained Lincoln Partners Advisors LLC

("<u>Lincoln</u>"), a multinational investment banking firm with approximately 500 professionals in

more than 22 offices around the world, to conduct a marketing and sale process for all or

substantially all of the Debtors and to conduct a search to identify potential alternative lenders to

provide DIP financing to the Debtors with terms more favorable to the Debtors than those offered

by New Mountain. Lincoln and its senior professionals have extensive experience in providing

investment banking services to various parties in complex situations, including both in- and out-

of-court. After the search, the Debtors concluded that no other party could provide alternative

financing on as or more favorable terms than those provided by the Debtors' existing Prepetition Lenders.

**F.      The Debtors' Plan for these Chapter 11 Cases**

25.     The Debtors filed these Chapter 11 cases to sell substantially all of their assets. Pursuant to its engagement, Lincoln assessed the Debtors' capital structure and liquidity needs and commenced a marketing effort to obtain alternative post-petition financing. On July 14, 2020, Lincoln launched a formal marketing process on behalf of the Debtors to identify potential alternative sources of debtor-in-possession financing. Lincoln contacted 12 financial institutions to gauge their interest in providing DIP financing.  After detailed feedback from prospective lenders, Lincoln and the Debtors concluded that no other party could provide alternative financing on more favorable terms than those provided by New Mountain, citing various reasons including, but not limited to, unwillingness to provide financing on a junior basis behind the current level of pre-petition debt and higher required interest rates and fees than were being offered by New Mountain to justify the risk levels of the investment.

26.     Additionally, the Debtors and their professionals negotiated a stalking horse agreement with New Mountain for the sale of substantially all of the Debtors' assets. In an effort to maximize the enterprise value of the Debtors, a comprehensive sales process was launched in June 2020.  These efforts included engaging in discussions with the Debtors' Prepetition Lenders as well as Lincoln launching a broad marketing process with both financial and strategic buyers. Over the 45 (forty-five) days immediately preceding the Petition date, Lincoln contacted 68 strategic and financial parties as part of a robust marketing outreach.  Of the potential bidders contacted by Lincoln, 48 executed confidentiality agreements and received a Confidential Information Presentation ("CIP"), representing a "take rate" of over 71%.  These efforts included, but were not limited to, in-depth calls with management and telephonic calls with Lincoln.

Interested parties who executed confidentiality agreements received a CIP prepared by Lincoln and were provided access to an extensive data room and other detailed information on the Debtor. During the pre-petition marketing sale process, the Debtors received multiple non-binding Indications of Interest to acquire all or substantially all of the Debtors' assets. Based upon a comprehensive review of the proposals received, the Debtors concluded that no other party could provide an Asset Purchase Agreement ("APA") on as or more favorable terms than those provided by a New Mountain affiliate (the "Stalking Horse Bidder"). It was determined that the Stalking Horse Bidder would serve as the "stalking horse bidder" subject to higher offers in accordance with the bidding procedures to be approved by the Court. Lincoln plans to continue the Debtors' marketing effort during the Chapter 11 Case to secure higher and better offers for the Debtors' assets. The post-petition marketing efforts will include all strategic and financial parties contacted pre-petition and additional buyers that may have interest in the opportunity.

G.      **Outstanding Vendor and Lessor Obligations**

27.      The Debtors utilize certain vendors to supply the PC offices, provide corporate office services, marketing services, and various dental practice support services. The Debtors are also parties to certain real estate leases under which the Debtors pay various lease obligations, including CAM. These vendors are critical to the operation of Benevis and the PCs. In addition to physically supplying the offices, these vendors provide lab services, dental implant manufacture, and IT services. The Debtors use some of the largest nationwide vendors which are able to provide the most competitive pricing and the most comprehensive access to supplies and services. On the Petition Date, the Debtors' aggregate accounts payable to vendors and lessors is approximately $15.3 million.

15

### H.        The Debtors' Leases and Executory Contracts

28.        <u>Real Property and Equipment Leases</u>.  The Debtors are parties to certain real property leases, both as lessees and sub-lessors. The Debtors lease space for the PCs and sublease the dental offices to the PCs. To preserve and maximize the value of their estates, which will inure to the benefit of all creditors, the Debtors will seek to reject certain leases during the course of these bankruptcy cases.  Prior to commencing these chapter 11 cases, the Debtors initiated a comprehensive review and analysis of their dental practice portfolio.  As a result of the initial phases of this analysis, the Debtors, in their reasonable business judgment, have decided to permanently cease operations at nine (9) underperforming dental practice locations as of the Petition Date.  Additional review and analysis of the Debtors' dental practice portfolio is ongoing and additional real property leases may be rejected throughout the course of these chapter 11 cases.

29.        The Debtors are additionally parties on certain leases for equipment that the Debtors use at their offices and some equipment that the PCs use in their practices.  Leased equipment includes computers, computer peripherals and CAD/CAM manufacturing machines, and CEREC machines, which design and create crowns.

30.        <u>Executory Contracts</u>.  The Debtors are additionally parties to certain executory contracts in the ordinary course of their business operations.  The Debtors have determined that several of the executory contracts are no longer necessary to the Debtors or their estates.  The Debtors therefore seek to reject certain executory contracts as of the Petition Date.  It is necessary to reject these executory contracts to ensure that the Debtors are able to shed unnecessary contracts and administrative expense claims.  Additional review and analysis of the Debtors' executory contracts is ongoing and more executory contracts may be rejected throughout the course of these chapter 11 cases.

## I.     The Debtors' Material Litigation

31.     The Debtors are involved, as both Plaintiffs and Defendants, respectively, in various litigation. The most significant litigation is summarized as follows:

> a.     _Gastelum v. Kool Smiles et al._, case no. 2019-cv-331049, is a medical malpractice case against certain of the Debtors, pending in the Superior Court of Fulton County in Georgia. This case has been pending since September 2018. On March 9, 2020, the court granted dismissal of Dr. Tran, Kool Smiles, PC, and Kool Smiles Holding Corp., but denied dismissal of Benevis Holding Corp. Benevis Holding Corp. has filed a motion for summary judgment and a partial motion for summary judgment as to Dr. Marc Auerbach. Both motions are pending.

> b.     Office of Inspector General ("OIG") Investigation.  This investigation has been pending since June 2018. The Debtors have produced all documents responsive to a subpoena and are waiting to hear back from the OIG with questions or concerns.

### PART II- FIRST DAY PLEADINGS

32.     I have reviewed each of the First Day Pleadings and proposed orders (including any attached exhibits) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. I believe the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum disruption to their business and minimum loss of productivity or value and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

## A.     Administrative and Procedural First Day Pleadings

33.     **Joint Administration Motion**. I believe that joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration. I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee and other parties in interest, which will, in

turn, result in substantial savings for the Debtors' estates. I do not believe that the rights of the Debtors' creditors will be adversely affected by joint administration of the Chapter 11.

34.     **Application to Appoint Claims and Noticing Agent**.   Omni Agent Solution's ("Omni") retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases. I am informed that Omni has acted as the claims and noticing agent in numerous cases of comparable size.

35.     Omni's retention to act as an agent of the Court, as an independent third party with significant experience in this role, is in the best interests of the Debtors as well as their estates and creditors.

36.     **Extend Time to File Schedules and Consolidate Creditors**. To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to claims, assets, and contracts from each Debtor entity.  Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

37.     Although the Debtors' management, key personnel, and professionals have diligently prepared for these chapter 11 cases, preparing the Schedules and Statements was not practicable until the Debtors' books close as of the Petition Date.

38.     **File a Consolidated Creditor Matrix, Top 30 List, Redact Personal Information, and Serve Notice of Commencement**.  Given the structure of the Debtors'

business, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.  Because a large number of creditors may be shared amongst the Debtors, the Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "Top 30 List").  The Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.  Cause exists to authorize the Debtors to redact address information of individual creditors—many of whom are former independent contractors—from the Creditor Matrix because such information could be used to perpetrate identity theft or unlawful injury to an individual.  Service of the single Notice of Commencement on the Creditor Matrix will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Creditor Matrix.  Service of a single Notice of Commencement is warranted.

**B.**     **Operational First Day Pleadings**

39.     **Motion to Provide Adequate Assurance for Utilities**.  Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these chapter 11 cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations and safety procedures could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

40.     The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.  The Debtors believe that cash held on hand by the Debtors and generated in the ordinary course of business will provide sufficient liquidity to pay the Utility Providers for Utility Services in accordance with prepetition practice during the pendency of their chapter 11 cases.

41.     To provide additional assurance of payment, the Debtors propose to segregate $130k (the "Adequate Assurance Deposit") within the master Benevis LLC account. The Adequate Assurance Deposit is equal to approximately one half of the Debtors' average monthly cost of Utility Services, calculated based on a historical monthly average of payments to the Utility Providers, excluding any prepaid amounts or Prepetition Deposit held by the Utility Provider.

42.     The Adequate Assurance Deposit, in conjunction with the Debtors' cash flow from operations and cash on hand, demonstrates their ability to pay for future Utility Services in accordance with prepetition practice and constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

43.     **Authorizing Payment of 503(b)(9) Claims, Other Vendor Claims, and Confirming Administrative Expense Priority of Outstanding Purchase Orders**.  The Debtors' vendors and suppliers are a critical component of the Debtors' ability to stock their supported dental offices and corporate office, conduct marketing, and provide dental support services. Even minor disruptions in the supply chain could have potential ripple effects on not only the Debtors, but also their employees, the PCs, and the dental practice patients.

44.     The Debtors may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the 20 days before the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts. Rather, the Debtors often obtain supplies on an order-by-order basis.   As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims. The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery, with a negative impact on the Debtors' liquidity.

Amounts owed to such parties may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code (each, a "503(b)(9) Claim").

45.     In the ordinary course of business, the Debtors incur obligations to suppliers (such  suppliers, the "Other Vendors") of goods and services utilized in the Debtors' operations, payment of which is reasonably necessary to ensure the health, safety, environmental, and regulatory compliance of the Company's operations or to otherwise maintain the integrity of the Debtors' operations but which are not 503(b)(9) Claims.  With respect to safety, the Debtors utilize medical waste vendors, fire alarm, sprinkler, and fire extinguisher repair and inspection services, and fire alarm monitoring.  The Debtors contract with service providers to comply with waste disposal and environmental regulations.  The Other Vendors also include IT and other operational vendors who provide goods and services key to maintaining the integrity of the Debtors' operations.  Examples of such operationally essential goods and services provided by the Other Vendors include medical suppliers, maintenance of offsite servers, hardware, and software, provide data security, marketing, and dental support services, such as x-ray imaging and lab services.  Such goods and services are key to maintaining business continuity. The Debtors need to satisfy the Other Vendors in the ordinary course to ensure the health, safety, environmental, and regulatory compliance of the Company's operations or to otherwise maintain the integrity of the Debtors' operations.

46.     Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Purchase Orders").  To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Purchase Orders

unless the Debtors issue substitute purchase orders post-petition. Receiving delivery of Outstanding Purchase Orders is critical to preventing any disruption to the Debtors' business operations.

47.     **Cash Management**.   To support their operations, the Debtors maintain a centralized cash management system to facilitate cash flow between Debtor entities and the non-debtor PCs, while minimizing costs (the "Cash Management System").

48.     On a daily basis, the Debtors process deposits, withdrawals, and other transfers in accordance with ordinary course practices. The Debtors maintain records of all transactions to track the funds involved in the Debtors' operations and efficiently manage their resources. This system enables the Debtors to satisfy their operating needs, ensure cash availability and liquidity, pay material debt obligations in the ordinary course and reduce administrative expenses by facilitating the efficient movement of funds. The Cash Management System is a critical component of the Debtors' overall business.

49.     **Motion to Maintain Insurance Obligations**.   In the ordinary course of business, the Debtors (and certain non-Debtor affiliates) maintain various insurance policies (collectively, the "Insurance Policies") with various insurance carriers (the "Insurance Carriers"). These policies provide coverage for, among other things, the Debtors' property, certain potential losses, and the Debtors' retentions under general liability, professional liability, directors and officers liability, automobile liability, workers' compensation insurance, crime, and cyber liability.

50.     The Debtors finance their property and cyber insurance policies through a premium financing agreement with First Insurance Funding (the "First Insurance Premium Financing Agreement").   The Debtors finance their remaining Insurance Policies through a premium financing agreement with AFCO Credit Corporation (the "AFCO Premium Financing Agreement"

and, together with the First Insurance Premium Financing Agreement, (the "Premium Financing Agreements").

51.     The Debtors obtain the Insurance Policies primarily through insurance brokers Lockton, Inc. and Alliant Insurance Services, Inc. (the "Insurance Brokers"). The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods.

52.     Maintaining the Premium Finance Agreements and the Sponsored Captive and continuation of the Insurance Policies and entry into new insurance policies and premium financing agreements are essential to the preservation of the value of the Debtors' businesses and operations.  In many instances, the coverage provided by the Insurance Policies is required by the regulations, laws, credit documents, customer contracts, and other arrangements that govern the Debtors' operations, as well as the Bankruptcy Code and the requirement of the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") as provided in the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").   The Debtors request authority to maintain their existing Insurance Policies, pay prepetition obligations related thereto and the Premium Financing Agreements, and to renew, supplement, or enter into new insurance policies and premium financing agreements, as applicable, in the ordinary course of business to ensure uninterrupted coverage under their Insurance Policies.

53.     **Motion to Approve DIP Financing and Approve Use of Cash Collateral**.  The DIP Lenders have agreed to provide the DIP Financing necessary to fund the Debtors' operations,

including the costs associated with the Debtors' bankruptcy proceeding, pending confirmation and consummation of the Plan.  The Debtors will obtain postpetition financing under a superpriority, priming, debtor-in-possession multi-draw term loan facility pursuant to the terms and conditions of the DIP Agreement consisting of (a) the Interim Amount of $10,000,000 upon entry of the Interim Order, (b) the Final Amount of $15,000,000 upon entry of the Final order; and (c) the Roll-Up in the amount of $5,000,000 of Prepetition Obligations, which shall roll up and convert on a cashless dollar-for-dollar basis into loans under the DIP Facility upon entry of the Interim Order.

54.    The terms of the DIP Financing were the result of arms' length negotiations between sophisticated parties represented by experienced counsel.  In the exercise of the Debtors' business judgment, the Debtors believe that the terms of the DIP Financing are fair, equitable, and in the best interest of the Debtors' estates.

55.    The proposed financing will provide the Debtors with the liquidity they need to through Chapter 11 in order to, among other things: (i) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases, (ii) fund any obligations benefitting from the Carve-Out, (iii) permit the orderly continuation of the operation of their businesses, (iv) maintain business relationships with customers, vendors and suppliers, (v) make payroll, and (vi) satisfy other working capital and operational needs.  The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.  The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The adequate protection provided in the Interim Order and other benefits and

privileges contained herein are consistent with and authorized by the Bankruptcy Code.  The Debtors believe that the DIP Financing will maximize the value of the Debtors' estates for the benefit of all parties.

56.     Based on Lincoln's efforts to find alternative financing, I do not believe that there are any parties willing to provide financing on terms more favorable than those contained in the proposed financing, including financing in the form of unsecured credit allowable under Section 503(b)(1) or as an administrative expense under Section 364(a) or (b). Approval of the DIP Financing on the terms set forth in the DIP Agreement will provide the Debtors with immediate access to funds necessary to pay current and ongoing operating expenses, including postpetition wages, lease payments, and critical trade invoices for postpetition goods and services.  Without access to sufficient funds to pay these costs, the Debtors cannot continue to operate.  Cessation of operations would destroy the Debtors' value as a going concern to the detriment of all parties in interest, including the Debtors' employees and creditors. The DIP Financing is necessary in order to preserve the value of the Debtors' estates and to avoid the harm that would result from the termination and piecemeal liquidation of the Debtors' operations.

57.     **Motion to Pay Prepetition Employee Wages**.  As of the Petition Date, the Debtors employ a workforce of approximately 265 individuals in Arizona, Connecticut, Maryland, Ohio, Georgia, Texas, Florida, and Virginia (the "Employees").  Approximately 137 Employees are compensated on an hourly or daily basis, while approximately 124 Employees are salaried.

58.     The Employees perform a wide variety of corporate and other job functions— including human resources, finance, marketing, compliance, legal, and government relations. Benevis Employees are familiar with the corporate structure and are crucial to continued smooth operation of the Debtors' business.

59.     In addition to the Employees, the Debtors retain specialized individuals on a contract basis (the "Independent Contractors").   The Independent Contractors are employed primarily to perform audit and compliance job duties.  The Debtors also employ one doctor as a consultant on a contract basis.   As of the Petition Date, the Debtors retained approximately 4 Independent Contractors.

60.     The Employees and the Independent Contractors rely on their compensation and benefits to pay their daily living expenses.  These individuals could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits.  The relief requested herein is necessary and appropriate.

61.     The Debtors request authority to pay any outstanding amounts of Unpaid Compensation that may exist.  The Debtors seek authority to pay any outstanding obligations to the Independent Contractors and to continue to pay the Independent Contractors in the ordinary course of business on a postpetition basis.

62.     The Debtors maintain incentive plans to motivate, reward, and retain certain of their non-insider Employees and Independent Contractors as an additional component of overall compensation.   The Debtors believe the Incentive Plan drives employee performance, aligns Employees' interests with those of the Debtors generally, and promotes the overall efficiency and safety of the Debtors' operations.  Out of an abundance of caution, however, to safeguard employee morale and optimize performance during these Chapter 11 Cases, the Debtors seek authority to honor all fully earned obligations under the Incentive Plans in the ordinary course of business and on a postpetition basis.

63.     Certain federal and state laws require that the Debtors withhold certain amounts from the Employees' gross pay related to federal, state, and local income taxes for remittance to

the appropriate federal, state, or local taxing authorities.  The Debtors also routinely deduct certain amounts from the Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employees' share of healthcare benefits and insurance premiums, 401(k) contributions, and miscellaneous deductions (including, but not limited to, company paybacks, ortho plan payments, and garnishments).  To the extent that any unremitted amounts exist, the Debtors seek authority to continue to remit amounts withheld on account of the Withholding and Deduction Obligations and to continue these programs in the ordinary course of business and consistent with past practices on a postpetition basis.

64.     In addition to the Withholding and Deduction Obligations described above, the Debtors are required by applicable statutory authority to match from their own funds Social Security, Medicare taxes, and other similar statutory obligations.  The Debtors seek authority to remit the Unpaid Employer Taxes and to continue to honor and process the Employer Payroll Taxes on a postpetition basis in the ordinary course of business and consistent with past practices.

65.     The Debtors use Automatic Data Processing, LLC ("ADP") to handle human resources-related administrative functions, including, but not limited to, payroll, processing, withholding, remittance, and reporting of payroll taxes (including the Employer Payroll Taxes) for the Employees and Independent Contractors.  This relationship with ADP allows the Debtors to realize substantial cost savings with respect to the administration of their employee payroll and benefits, as well as the payroll of all of the PCs, by not having to employ additional human resources professionals and administer payroll and benefit programs.

66.     The Debtors pay ADP for the cost of administering employee Wage Obligations and benefits, as well as fees for these services. As of the Petition Date, the Debtors estimate that

27

they owe approximately $136k to ADP.  The Debtors intend to continue to utilize ADP during these Chapter 11 Cases and seek authority to pay all outstanding prepetition amounts incurred to ADP and to continue to make all payments on a postpetition basis in the ordinary course of business on a postpetition basis.

67.     The Debtors have policies whereby the Employees seek reimbursement for the payment of the Debtors' business related expenses.  The expenses are ordinary course expenses that the Employees incur in performing their job functions.  The Debtors' inability to reimburse Reimbursable Expenses could impose a hardship on the Employees where such individuals incurred Reimbursable Expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed.   The Debtors request that the Court authorize the Debtors to continue the reimbursement program and policy and to pay any prepetition or postpetition claims with respect thereto, in each case, in the ordinary course of business on a postpetition basis.

68.     The Debtors offer health and welfare benefits to eligible Employees for medical, prescription, and dental coverage and certain other welfare benefits, including life, accidental death & dismemberment insurance, and other insurance benefits.  Failure to continue the Health and Welfare Coverage and Benefits could cause the Employees to experience severe hardship and make it difficult to retain the workforce.  The Debtors believe they are authorized to continue the Health and Welfare Coverage and Benefits in the ordinary course; however, out of an abundance of caution the Debtors seek authority to continue the Health and Welfare Coverage and Benefits on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices.

69.     The Debtors offer medical and prescription coverage to the Employees. The medical plan is administered by Anthem/Blue Cross Blue Shield while prescription drug coverage

is available through Express Scripts and RxBenefits.  Approximately 179 Employees are enrolled in the Medical Plan, under which participants and their eligible dependents (usually spouses and children) receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness.  The Debtors provide a dental plan administered by United Concordia (the "Dental Plan"), and a vision plan administered by United Healthcare.  The Debtors provide Employees with the opportunity to contribute to two flexible spending accounts, or to a health savings accounts all of which are administered by Health Equity, and are able to make pre-tax contributions through payroll deductions to pay for certain health and welfare needs. The Debtors provide basic fully-insured life insurance, AD&D insurance, long- and short-term disability insurance, all of which are administered by Cigna, to all active eligible Employees as well as supplemental, spouse, and child life products offered on a voluntary, Employee-paid basis. Other voluntary, Employee-paid benefits are offered such as and certain voluntary products such as critical illness, accident insurance, and hospital indemnity.  These benefits are also administered through Cigna.  The Debtors seek authority to continue these programs on a postpetition basis in the ordinary course of business.

70.    The Debtors maintain workers' compensation insurance for their Employees (the "Workers' Compensation Program") supported with an insurance policy (the "Workers' Compensation Insurance Policy") with Travelers Insurance.  The Workers' Compensation Insurance Policy has a $1 million policy limit and $2,500 deductible.  The Debtors must continue the claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  The Debtors seek authority to continue to pay amounts incurred on account of the

Workers' Compensation Program and to continue this program in the ordinary course of business on a postpetition basis.

71.     As of the Petition Date, the Debtors maintain a retirement savings plan for the benefit of their Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  The 401(k) Plan is administered by Principal Life Insurance Company and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.   The Debtors also match certain Employees' 401(k) contributions in three tiers: in the first tier, the Debtors match 75% of the first 6% of eligible pay contributed; in the second tier, the Debtors match 50% of the first 6% of eligible pay contributed; and in the third tier, the Debtors match 25% of the first 6% of eligible pay contributed.  The Debtors seek authority to continue the 401k Plan on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices.

72.     The Debtors provide paid time off to certain Employees for vacation days, often depending on the length of their services with the company (the "Paid Vacation Benefits").  Most Employees are paid their regular hourly or salaried rate when they elect to use Paid Vacation Benefits.  The Debtors seek authority to pay any amounts due with respect to earned but unused Paid Vacation Benefits for terminated Employees and to continue the Paid Vacation Benefits policies in the ordinary course of business on a postpetition basis.

73.     The Debtors maintain a severance policy, which provides for payment at termination, depending on the Employee's tenure, for certain Employees (the "Severance Policy").  To the best of the Debtors' knowledge, the Debtors do not believe they owe any prepetition amounts on account of the Severance Policy as of the Petition Date.  In addition to the Severance

Policy, the Debtors are party to severance agreements with 5 former employees (the "Severance Agreements").  The Severance Agreements include important non-compete clauses with the former employees party to those agreements.  It is important for the Debtors to maintain their obligations pursuant to the Severance Agreements as the non-compete clauses are valuable to the Debtors and their estates.  As of the Petition Date, the Debtors estimate that they have unpaid amounts of approximately $409k under the Severance Agreements.  The Debtors seek authority to continue the Severance Policy and to honor their obligations pursuant to the Severance Agreements.

74.     In addition to the foregoing, the Debtors offer their Employees the opportunity to participate in a range of ancillary benefits, including an employee assistance program through Cigna, pet insurance through Nationwide Insurance, enhanced telehealth program through 98.6, and a health advocate service through Direct Path (the "Additional Benefit Programs").  These programs are paid by the Debtors with the exception of the optional pet insurance.  The cost incurred by the Debtors on account of the Additional Benefit Programs is *de mimimis*.  The Debtors seek authority to pay any amounts due with respect to these programs and policies and to continue them in the ordinary course of business on a postpetition basis.

75.     **Motion to Pay Taxes**.  In the ordinary course of business, the Debtors collect and incur taxes and fees owed to various taxing authorities nationwide related to (a) sales (including value added tax), property, income, operations, third-party services, and employees,  and (b) regulatory, and other fees (collectively, the "Taxes and Fees").  The Debtors pay or remit, as applicable, Taxes and Fees weekly, monthly, bi-monthly, quarterly, semi-annually, annually, or on other terms to various governments and applicable authorities (collectively, the "Authorities"), depending on the nature and incurrence of a particular Tax or Fee and as required by applicable

laws and regulations.  The Taxes and Fees are typically, but not exclusively, remitted and paid by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.  From time to time, the Debtors also receive tax credits for overpayments or refunds in respect of Taxes or Fees.  The Debtors use these credits in the ordinary course of business to offset against future Taxes or Fees, or have such amounts refunded to the Debtors.

76.     Although the Debtors believe that they are substantially current with respect to their payment of Taxes and Fees, the Debtors seek authority to continue making such payments where: (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees have accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c) payments made prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities, which may give rise to interest and other penalties; and (d) Taxes and Fees incurred for prepetition periods become due and payable after the commencement of these chapter 11 cases.

77.     Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including:  (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the reorganization process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring. The Debtors' failure to pay Taxes and Fees by the due date as required by law may result in fines and penalties, the accrual of interest, or both.  Finally, the Debtors collect and hold certain

outstanding tax liabilities in trust for the benefit of the applicable Authorities and these funds may not constitute property of the Debtors' estates.

I swear under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Dated:  August 2, 2020

By:      <u>/s/ Scott Mell</u>
Name:    Scott Mell

EXECUTION VERSION

## RESTRUCTURING SUPPORT AGREEMENT

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT A THIRD-PARTY OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

### *PREAMBLE*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this **"**Agreement**"**) is made and entered into as of August 2, 2020 (the "Execution Date"), by and among the following parties (each of the following, collectively, the "Parties"):[1]

i.  New LT Smile Holdings, LLC, a Delaware limited liability company, New LT Smile Holdings II, LLC, a Delaware limited liability company, and each of their direct and indirect subsidiaries that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Lenders (collectively, the "Company Parties");

ii.  the undersigned holders of Prepetition First Out Claims and DIP First Out Claims (the "Consenting FO Lenders") that have executed and delivered counterpart signature pages to this Agreement or a Transfer Agreement to counsel to the Company Parties;

iii.  the undersigned holders of Prepetition Last Out Claims, DIP Last Out Claims, and certain Interests (the "Consenting LO Lenders", and together with the Consenting

---

[1]  Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

FO Lenders, the DIP Agent and the Prepetition Agent, the "<u>Consenting Lenders</u>") that have executed and delivered counterpart signature pages to this Agreement or a Transfer Agreement to counsel to the Company Parties;

iv.     the undersigned administrative agent for the DIP Facility (the "<u>DIP Agent</u>"); and

v.     the undersigned administrative agent, collateral agent, or similar Entity under the Prepetition Documents including any successors thereto (the "<u>Prepetition Agent</u>").

## *RECITALS*

**WHEREAS,** the Company Parties and each of the Consenting Lenders have in good faith and at arms' length negotiated certain transactions in pursuit of a Sale Transaction (as defined herein) on the terms set forth in this Agreement and as specified in the following documents and all other Definitive Documents (as defined herein) (such transactions, the "<u>Transactions</u>"):

i.     The Secured Superpriority Debtor-in-Possession Credit Agreement among the Company Parties, the DIP Agent, and the Consenting Lenders party thereto setting forth the terms and conditions of a debtor-in-possession financing facility in an aggregate principal amount not to exceed $30 million, attached as **<u>Exhibit A</u>** to this Agreement (the "<u>DIP Credit Agreement</u>"); and

ii.     The Asset Purchase Agreement, pursuant to which the Stalking Horse Purchaser will credit bid a portion of the Prepetition Secured Claims and DIP Claims in exchange for substantially all of the Company Parties' assets attached hereto as **<u>Exhibit B</u>** to this Agreement (the "<u>Stalking Horse APA</u>").

**WHEREAS,** the Company Parties intend to implement the Transactions, including through the commencement of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "<u>Chapter 11 Cases</u>"); and

**WHEREAS,** the Parties have agreed to take certain actions in support of the Transactions on the terms and conditions set forth in this Agreement and the Post-Emergence Term Sheet and as will be fully documented under the Definitive Documents.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**    ***Definitions and Interpretation.***

1.01    <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02.

"**Agreement Effective Date**" means, with respect to each Party, the date on which the conditions set forth in Section 2 applicable to such Party have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to each Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Transactions.

"**Alternative Transaction**" a sale of some or all of the Company's assets to an Entity other than the Stalking Horse Bidder for cash consideration greater than the Release Price.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas or such other United States Bankruptcy Court where the Company Parties' Chapter 11 Cases are pending.

"**Bidding Procedures**" means the bidding procedures governing the Sale Transaction, which shall be approved by the Bankruptcy Court, and shall be in form and substance acceptable to the Required DIP Lenders.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Plan**" has the meaning set forth in Section 13.07.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement and for the avoidance of doubt shall in no event include any Consenting LO Lender.

"**Confidentiality Agreement**" means an executed confidentiality agreement in connection with any proposed Transactions, including any confidentiality provisions of the DIP Documents or Prepetition Documents.

"**Consenting FO Lenders**" has the meaning set forth in the preamble to this Agreement.

3

"**Consenting FO Advisors**" means Katten Muchin Rosenman LLP and one local counsel.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lender Advisors**" means collectively, the Consenting FO Advisors and the Consenting LO Advisors.

"**Consenting LO Advisors**" means Proskauer Rose LLP, one local counsel, and one financial advisor.

"**Consenting LO Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Contribution Agreement**" means the contribution agreement, to be executed and delivered immediately prior to the Sale Closing, between the Consenting Lenders and the Stalking Horse Purchaser, pursuant to which

(a)     the Consenting FO Lenders will contribute the Prepetition First Out Claims to the Stalking Horse Purchaser in exchange for the FO Term Loans (as defined in the Post-Emergence Term Sheet) to be issued to the Consenting FO Lenders as contemplated by the Post-Emergence Term Sheet;

(b)     the Consenting FO Lenders will contribute the DIP First Out Claims to the Stalking Horse Purchaser in exchange for the cash proceeds of the PIK Facility as defined in and contemplated by the Post-Emergence Term Sheet;

(c)     the Consenting LO Lenders will contribute the Prepetition Last Out Claims less $10,000,000 to the Stalking Horse Purchaser in exchange for (x) all of the direct or indirect equity of the Stalking Horse Purchaser, subject to dilution on account of warrants issue in connection with the PIK Facility as defined in and contemplated by the Post-Emergence Term Sheet and (y) the LO Term Loans as defined in and contemplated by the Post-Emergence Term Sheet; and

(d)     the Consenting LO Lenders will contribute the DIP Last Out Claims to the Stalking Horse Purchaser in exchange for the cash proceeds of the PIK Facility as defined in and contemplated by the Post-Emergence Term Sheet.

"**Debtors**" means, collectively, the Company Parties that are debtors in the Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" has the meaning set forth in the preamble to this Agreement.

"**DIP Claims**" means any Claim on account of the DIP Documents.

"**DIP Credit Agreement**" has the meaning set forth in the recitals to this Agreement.

"**DIP Documents**" means the DIP Facility Credit Agreement and any other documentation necessary to effectuate the incurrence of the DIP Facility.

"**DIP Facility**" means the multi-draw senior secured priming debtor-in-possession term loan facility on the terms set forth in the DIP Credit Agreement.

"**DIP First Out Claims**" means Claims under the DIP Documents held by the Consenting FO Lenders.

"**DIP Last Out Claims**" means Claims under the DIP Documents held by the Consenting LO Lenders.

"**DIP Loans**" means the outstanding principal amount of loans under the DIP Facility.

"**DIP Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing, in the form attached to the DIP Credit Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Fiduciary Out**" has the meaning set forth in Section 8.

"**Interest**" means common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" has the meaning set forth in Section 4.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Consenting Lenders' Claims who meets the requirements of Section 10.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Post-Emergence Term Sheet**" means the term sheet attached to this Agreement as **Exhibit C**, together with any modifications thereto agreed to in writing by the Consenting FO Lenders and the Consenting LO Lenders.

"**Prepetition Agent**" has the meaning set forth in the preamble to this Agreement.

"**Prepetition Agreement Among Lenders**" means that certain Agreement Among Lenders, dated as of March 15, 2018, among the Prepetition Agent and the lenders party to the

Prepetition Credit Agreement, as amended or modified from time to time in accordance with the terms thereof.

"**Prepetition Credit Agreement**" means that certain Credit Agreement, dated as of March 15, 2018, as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof including the First Amendment to Credit Agreement, dated as of March 29, 2020, and the Second Amendment to Credit Agreement and First Amendment to Forbearance Agreement, dated as of June 5, 2020 by and among Benevis Holding Corp. (f/k/a and successor to LT Smile Acquisition Corporation), as borrower, and other parties providing guaranties, the financial institutions from time to time party thereto, as lenders.

"**Prepetition Documents**" means collectively, the Prepetition Agreement Among Lenders, the Prepetition Credit Agreement and all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents (including, without limitation, any notes, guarantees, collateral documents, amendments, and fee letters entered into in connection therewith).

"**Prepetition First Out Claims**" means the Claims under the Prepetition Documents held by the "First Out Lenders" (as such term is defined in the Prepetition Agreement Among Lenders).

"**Prepetition Last Out Claims**" means Claims under the Prepetition Documents held by the "Last Out Lenders" (as such term is defined in the Prepetition Agreement Among Lenders).

"**Prepetition Loans**" means the loans outstanding under the Prepetition Credit Agreement.

"**Prepetition Secured Claims**" means any Claim arising under the Prepetition Documents, including the Prepetition Loans.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims (or enter with customers into long and short positions in Claims), in its capacity as a dealer or market maker in Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Release Price**" means the aggregate of all outstanding DIP Claims and Prepetition Secured Claims, less $10 million.

"**Required DIP Lenders**" means "Required Lenders" as such term is defined in the DIP Credit Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Closing**" means the date of closing of the Sale Transaction.

"**Sale Document**" has the meaning set forth Section 3.01.

**"Sale Transaction"** means a sale of some or all of the Company Parties' assets in accordance with (a) the Stalking Horse APA, or (b) the purchase agreement for an Alternative Transaction.

**"Secured Agents"** means the DIP Agent and the Prepetition Agent, as applicable.

**"Stalking Horse APA"** has the meaning set forth in the recitals to this Agreement.

**"Stalking Horse Purchaser"** means "Purchaser" as such term is defined in the Stalking Horse APA.

**"Successful Bidder"** has the meaning given to such term in the Bidding Procedures.

**"Securities Act"** means the Securities Act of 1933, as amended.

**"Termination Date"** means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, or 13.04.

**"Transactions"** has the meaning set forth in the recitals to this Agreement.

**"Transfer"** means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

**"Transfer Agreement"** means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D.**

1.02    Interpretation.  For purposes of this Agreement:

This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

7

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; <u>provided</u> that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      the phrase "counsel to the Consenting Lenders" refers in this Agreement to each counsel specified in Section 16.12 other than counsel to the Company Parties; and

(k)      unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**Section 2.** *Effectiveness of this Agreement*.

2.01    With respect to the Consenting Lenders, the Agreement Effective Date shall be the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Consenting FO Lenders shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and the Consenting Lender Advisors; and

(b)      each of the Consenting LO Lenders shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and the Consenting Lender Advisors.

2.02    With respect to the Company Parties, the Agreement Effective Date shall be the date on which each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties.

2.03    The Company parties shall have paid (or caused to be paid) to the Consenting Lenders the outstanding fees and expenses of the Consenting Lender Advisors.

2.04    This Agreement shall be effective from the Agreement Effective Date until validly terminated pursuant to the terms set forth in Section 13.  To the extent that a signatory to this Agreement holds, as of the date hereof or thereafter, multiple Claims against or Interests in the Company Parties, such Party shall be deemed to have executed this Agreement in its capacity as a holder of all such Claims and Interests, and this Agreement shall apply severally to such Party with respect to each such Claim and Interest held by such Party.

**Section 3.**    *Definitive Documents*.

3.01    The Definitive Documents governing the Transactions shall include the Agreement and the following documents, each of which shall be materially consistent with the terms of the Agreement (including the Sale Term Sheet, DIP Term Sheet and Milestones): (a) documents implementing and achieving the Transactions, including any substantive "first day" or "second day" motions; (b) the Stalking Horse APA, or, in the event that an Entity other than the Stalking Horse Purchaser is the Successful Bidder, the purchase agreement for the Successful Bidder; (c) the DIP Order; (d) the DIP Documents; (e) any motion seeking approval of the Bidding Procedures and/or a sale of some or all of the Company Parties' assets and all agreements, documents, orders, and/or amendments in connection therewith (collectively, the "Sale Documents"); (g) the Contribution Agreement; (h) documents and agreements contemplated under the Post-Emergence Term Sheet, including any exit financing agreements, and (i) all other material documents necessary or customarily required to consummate the Transactions; provided that in the event the Parties pursue an Alternative Transaction, the Definitive Documents shall not include the Contribution Agreement or Post-Emergence Term Sheet and instead the Definitive Documents shall include whatever documents are necessary to effectuate a payoff of the Consenting Lenders in accordance with the Prepetition Documents and DIP Documents.

3.02    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Transactions, or any amendments thereto, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 15. The Definitive Documents shall be, to the extent permitted by law, consistent with this Agreement in all respects and otherwise reasonably acceptable in form and substance to (i) the Company Parties, and (ii) the Required DIP Lenders.

**Section 4.**    *Milestones*

On and after the Agreement Effective Date, the Company Parties shall use commercially reasonable efforts to implement the Transaction in accordance with the milestones (the "Milestones") set forth in **Exhibit E** hereto unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company Parties and the Required DIP Lenders.

For the avoidance of doubt, nothing in these Milestones shall prevent the Debtors from exercising their respective fiduciary duties under applicable law; <u>provided that</u> any such exercise may constitute a breach of this Agreement (including the DIP Term Sheet and Sale Term Sheet) or the Definitive Documents.

**Section 5.**     *Commitments of the Consenting Lenders*.

    5.01     General Commitments, Forbearances, and Waivers.

    (a)     During the Agreement Effective Period, each Consenting Lender agrees (severally and not jointly) to:

    (i)     use its commercially reasonable efforts to support the Transaction and to act in good faith and take all reasonable actions necessary to implement and consummate the Transaction in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement and the Bidding Procedures, as applicable;

    (ii)     authorize and direct the applicable Secured Agents (or any designated sub-agent) to credit bid up to the full amount of the DIP Claims and Prepetition Secured Claims in accordance with this Agreement, the Contribution Agreement and the Post-Effective Date Term Sheet;

    (iii)     negotiate in good faith the applicable Definitive Documents and use its commercially reasonable efforts to agree to the form and substance of such Definitive Documents consistent with the terms of this Agreement;

    (iv)     support the Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Transactions;

    (v)     direct the applicable Secured Agents to take all actions in furtherance of such Consenting Lender's respective obligations under this Agreement, and if any Secured Agent takes any action inconsistent with a Party's obligations under this Agreement, such Party shall promptly direct such Secured Agent to cease and refrain from taking any such action;

    (vi)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

    (vii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Transactions from the Company Parties' other stakeholders;

    (viii)     use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 5.01(b);

(ix)     give any notice, order, instruction, or direction to the applicable Secured Agents necessary to give effect to the Transactions; and

(x)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it or the Stalking Horse Purchaser is required to be a party.

(b)     During the Agreement Effective Period, each Consenting Lender agrees (severally and not jointly) that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(ii)     direct the applicable Secured Agents to take any action inconsistent with such Consenting Lender's respective obligations under this Agreement;

(iii)     propose, file, support, or vote for any Alternative Proposal;

(iv)     object to, delay, impede, or take any other action to terminate, shorten, or interfere with the Company Parties' exclusivity rights under section 1121 of the Bankruptcy Code;

(v)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement;

(vi)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(vii)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(viii)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

For the avoidance of doubt, nothing in this Agreement shall require any Consenting Lender to consent to, acquiesce in, vote for, support or not object to any Alternative Proposal or any portion thereof, including without limitation any alternative to the terms and provisions of the DIP Term Sheet, or any provision in the DIP Term Sheet.

(c)     If the Successful Bidder is the Stalking Horse Purchaser, in accordance with the terms of the Definitive Documents:

(i)     each Consenting Lender agrees (severally and not jointly), and agree to direct the Secured Agents (as applicable), to (a) consent to the Sale Transaction, and (b)

otherwise support, negotiate in good-faith, and implement such Sale Transaction. Each Consenting Lender agrees to and hereby authorizes and instructs the applicable Secured Agents to promptly execute and deliver any instruments, documentation and agreement necessary or desirable or reasonably requested by the Company Parties with respect to the Sale Transaction;

(ii)     each Consenting Lender agrees (severally and not jointly) (x) concurrently with closing of the Sale Transaction, to enter into the Contribution Agreement and to perform such Consenting Lender's obligations thereunder and (y) notwithstanding the terms and conditions specified in Section 10 herein or any other provision of this Agreement, that any Transfer of any Claim pursuant to and in accordance with the terms of the Contribution Agreement shall be permitted hereunder and each Consenting Lender hereby consents to such Transfer of such Claims pursuant to and in accordance with the terms of the Contribution Agreement;

(iii)    each Secured Agent hereby (x) acknowledges that upon the consummation of the transactions contemplated by the Contribution Agreement, the Stalking Horse Purchaser shall constitute the Required Lenders, as defined in the  DIP Credit Agreement and the Prepetition Credit Agreement, as applicable, for all purposes thereunder and the other DIP Documents and Prepetition Documents, as applicable, and (y) agrees that it will honor any instruction from the Stalking Horse Purchaser in its capacity as the Required Lenders under the DIP Credit Agreement and the Prepetition Credit Agreement to credit bid all or a portion of the DIP Claims and the Prepetition Secured Claims.

5.02    Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting Lenders will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(b)     During the Agreement Effective Period, each Consenting Lender will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with, nor will any Consenting Lender direct the applicable Secured Agents to object to, delay, impede, or take any action to interfere with, any DIP Document filed by any Company Party in the Bankruptcy Court; provided that such DIP Document is acceptable to the Required DIP Lenders.

(c)     During the Agreement Effective Period, the Consenting Lenders agree:

(i)     If the Successful Bidder is the Stalking Horse Purchaser, in accordance with the terms of the Definitive Documents, the Consenting Lenders agree (severally and not jointly) to direct the Secured Agents (as applicable), to (a) consent to the Sale Transaction, and (b) otherwise support, negotiate in good-faith, and implement such Sale Transaction. The Consenting Lenders hereby authorize and instruct the applicable Secured Agents to promptly execute and deliver any instruments, documentation and agreement necessary or desirable or reasonably requested by the Company Parties with respect to the Sale Transaction.

(ii)     If the Successful Bidder is an Entity other than the Stalking Horse Purchaser and such transaction constitutes a Sale Transaction, the Consenting Lenders agree (severally and not jointly), and direct the applicable Secured Agents (as applicable), to: (a) with respect to any and all liens, claims, encumbrances, and interests in the assets of the Company Parties to be transferred to the Successful Bidder, automatically release and discharge on the Sale Closing such liens, claims, encumbrances, and interests without any further action of such Consenting Lender (but for the avoidance of doubt all such liens, claims, encumbrances and interests shall remain on any assets not sold to the Successful Bidder and shall attach to the proceeds of the Sale Transaction) in accordance with the terms of the DIP Documents, and (b) otherwise support, negotiate in good-faith, and implement such Sale Transaction.  The Consenting Lenders hereby authorize and instruct the applicable Secured Agents to promptly execute and deliver any instruments, documentation and agreement necessary or desirable or reasonably requested by the Company Parties to effectuate the agreement set forth in this Section 5.02(c)(ii).

(iii)    Each Consenting Lender will support, and will direct the applicable Secured Agents to support the Transactions and will not object to, delay, impede, or take any other action to interfere with entry of any Sale Document and/or consummation of any Sale Transaction.

**Section 6.**     *Additional Provisions Regarding the Consenting Lenders' Commitments.*

6.01     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), subject to all applicable Confidentiality Agreements; or (b) impair or waive the rights of any Consenting Lender to assert or raise any objection not prohibited under this Agreement in connection with the Transactions, (c) prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, (d) be construed to prohibit any Consenting Lender from appearing as party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding or taking any other action to delay, interfere, impede, directly or indirectly, the Transactions; (e) obligate a Consenting Lender to deliver a vote to support any Chapter 11 Plan or prohibit a Consenting Lender from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Sale Closing); provided that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Sale Closing), such vote shall be deemed void ab initio and such Consenting Lender shall have the opportunity to change its vote; (f) (i) prevent any Consenting Lender from taking any action which is required by applicable Law, or (ii) require any Consenting Lender to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or other professional or business professional privilege; (g) prevent any Consenting Lender by reason of this Agreement or the Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like that are required by applicable Law or (h) prevent any Consenting Lender from defending itself to the fullest extent permitted by law and in the event of any litigation with respect to the Chapter 11 Cases, this Agreement, or the other Transactions. Obligations hereunder may modify the Prepetition Agreement Among Lenders. In the event of any

inconsistency between this Agreement and the Prepetition Agreement Among Lenders, this Agreement shall govern.

**Section 7.**     *Commitments of the Company Parties.*

7.01     <u>Affirmative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and use commercially reasonable efforts (i) to pursue the Transactions on the terms and in accordance with the Milestones set forth in this Agreement, including by negotiating the Definitive Documents in good faith, and (ii) cooperate with the Consenting Lenders to obtain necessary Bankruptcy Court approval of the Definitive Documents to consummate the Transactions;

(b)     not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Transactions, this Agreement, the Sale Transaction;

(c)     negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative agreements to address any legal, financial, or structural impediment to the Transactions that are necessary to effectuate the Transactions in accordance with the terms hereof, provided, that, notwithstanding anything herein to the contrary, the Company Parties shall not be permitted to offer any additional fees, expenses or other economic entitlements to other stakeholders (other than as contemplated by this Agreement) without prior written consent from the Required DIP Lenders;

(d)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement;

(f)     use commercially reasonable efforts to seek additional support for the Transactions from their other material stakeholders to the extent reasonably prudent;

(g)     to the extent reasonably practicable, provide the Consenting Lender Advisors a review period of (i) at least three (3) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company Parties intend to file any Definitive Document with the Bankruptcy Court and (ii) at least one (1) calendar day (or such shorter review period as necessary or appropriate) prior to the date when the Company Parties intend to file any other material pleading with the Bankruptcy Court (but excluding retention applications, fee applications, and any declarations in support thereof or related thereto) with the Bankruptcy Court;

(h)    upon reasonable request of any of the Consenting Lenders, inform the Consenting Lender Advisors as to: (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange; and

(i)    inform the Consenting Lender Advisors as soon as reasonably practicable after becoming aware of: (i) any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Transactions; (ii) a breach or termination event of this Agreement (including a breach by any Company Party); and (iii) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made.

7.02    <u>Negative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Transactions described in, this Agreement;

(c)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement; or

(d)    except as contemplated and permitted by the DIP Documents, engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than the transactions contemplated herein and on the terms contemplated hereby without the consent of the Consenting Lenders.

**Section 8.    *Additional Provisions Regarding Company Parties' Commitments.***

8.01    Notwithstanding anything to the contrary herein, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not, and shall not be deemed to, constitute a breach of this Agreement.  Notwithstanding anything to the contrary herein, each Consenting Lender reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

8.02    Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 8.01, each Company Party and their respective directors, officers, employees,

investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider and respond to Alternative Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Proposals; (d) otherwise cooperate with, assist or participate in any inquiries, proposals, discussions, or negotiation of Alternative Proposals in good faith and consistent with applicable fiduciary obligations; and (e) enter into or continue discussions or negotiations with holders of Claims or Interests (including any Consenting Lender), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Transactions or Alternative Proposals. If any Company Party receives a written or oral proposal or expression of interest regarding any Alternative Proposal that a majority of the Company Parties' applicable Board of Directors, Board of Managers, or similar governing body determines in good faith and following consultation with counsel is a bona fide committed proposal that represents higher or otherwise better economic recovery to the Company Parties' stakeholders than the Transactions taken as a whole, within two (2) Business Days, the Company Party shall notify (with email being sufficient) the Consenting Lender Advisors of any such proposal or expression of interest, with such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof. If the board of directors of the Company Parties decides (i) that proceeding with any of the Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Proposal (a "Fiduciary Out"), the Company Parties shall notify counsel to the Consenting Lenders within two (2) Business Days of such decision. Upon any determination by any Company Party to exercise a Fiduciary Out, the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with Section 13.02 hereof. At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Proposal, the Company Parties shall provide counsel to the Consenting Lenders updates on the status of discussions regarding any Alternative Proposal within three (3) Business Days of the Company Parties' or their advisors' receipt of any such Alternative Proposal. The Company Parties and/or the Company Parties' advisors will make themselves reasonably available for separate weekly status update calls with counsel to the Consenting Lenders with respect to the foregoing.

8.03    Notwithstanding anything to the contrary herein, nothing in this Agreement shall create or impose any additional fiduciary obligations upon any Company Party or any of the Consenting Lenders, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party, that such entities did not have prior to the Agreement Effective Date.

8.04    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**     *Cooperation and Support*

Each Party hereby covenants and agrees to cooperate with the other Parties in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) with respect to: (a) all matters relating to their rights hereunder; (b) all matters concerning the implementation of the Transactions; and (c) the pursuit, approval and support of the Transactions.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, or to effectuate the solicitation of the Transactions, including making and filing any required regulatory filings, executing and delivering any other necessary agreements or instruments, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**Section 10.**     *Transfer of Interests and Securities.*

10.01   Except as otherwise provided in Section 5.01(c), during the Agreement Effective Period, no Consenting Lender shall Transfer any beneficial ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Claims or Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless the Required DIP Lenders consent and either (a) the transferee executes and delivers to (i) Jackson Walker L.L.P., as counsel to the Company Parties, (ii) Katten Muchin Rosenman LLP, as counsel to Consenting FO Lenders and (iii) Proskauer Rose LLP, as counsel to the Consenting LO Lenders, in each case, at or before the time of the proposed Transfer, a Transfer Agreement or (b) the transferee is an existing Consenting Lender and the transferee provides notice of such Transfer (including the amount and type of Claim or interest Transferred) to the respective counsel for each of the other Parties at or before the time of the proposed Transfer.

10.02   Upon compliance with the requirements of Section 10.01, (a) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Claims or Interests and (b) the transferee shall be deemed to be a Consenting Lender under this Agreement with respect to such transferred Claims or Interests.  Any Transfer in violation of Section 10.01 shall be deemed null and void *ab initio* and of no force or effect until such a Transfer Agreement is executed and effective.

10.03   This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Claims or Interests; provided, however, that (a) such additional Claims or Interests shall automatically and immediately upon acquisition by a Consenting Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Lenders) and (b) such Consenting Lender must provide notice of such acquisition (including the amount and type of Claim acquired) pursuant to Section 10.01 within three (3) Business Days of such acquisition.

10.04   This Section 10 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Lender to Transfer any of its Claims or Interests.  Notwithstanding anything to the

contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

10.05   Notwithstanding Section 10.01, a Qualified Marketmaker that acquires any Claims or Interests with the purpose and intent of acting as a Qualified Marketmaker for such Claims or Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Claims or Interests if (a) such Qualified Marketmaker subsequently transfers such Claims (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 10.01; and (c) the Transfer otherwise is permitted under Section 10.01. Any transfer to a Qualified Marketmaker shall be void *ab initio* if such Qualified Marketmaker fails to subsequently transfer such Claim or Interest within five (5) Business Days of its acquisition as permitted pursuant to this Section 10.05

10.06   The Company Parties understand that the Consenting Lenders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Lender that principally manage and/or supervise the Consenting Lender's investment in the Company Parties, and shall not apply to any other trading desk or business group of the Consenting Lender, so long as they are not acting at the direction or for the benefit of such Consenting Lender or in connection with such Consenting Lender's investment in the Company Parties.  The terms of Section 10.05 shall apply to the extent that a Consenting Lender is acting in its capacity as a Qualified Marketmaker.

10.07   Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 11.**   *Representations and Warranties of Consenting Lenders*.  Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers its signature page to this Agreement and as of the Sale Closing:

(a)      it is the beneficial or record owner of the face amount of the Claims and Interests or is the nominee, investment manager, or advisor for beneficial holders of the Claims or Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Claims or Interests or is the nominee, investment manager, or advisor for beneficial holders of the Claims or Interests other than those reflected in, such Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 10);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Claims and Interests;

(c)      such Claims and Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, right of participation, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Claims and Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)      solely with respect to holders of Prepetition Secured Claims or DIP Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Lender in connection with the Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 12.**    *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, as of both the date such Party executed and delivers this Agreement and the Sale Closing:

(a)      it is validly existing and in good standing under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Stalking Horse APA, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it off, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 13.**    *Termination Events.*

13.01   <u>Consenting Lender Termination Events</u>.  This Agreement may be terminated with respect to the Consenting Lenders, at the election of the Required DIP Lenders, by the delivery to the Company Parties of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events:

(a)    if the Company Parties fail to execute signature pages to this Agreement by no later than 30 days after the Agreement Effective Date set forth in Section 2.01 of this Agreement;

(b)    the breach in any material respect of (i) any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement or (ii) any representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is materially adverse to the Consenting Lenders seeking termination pursuant to this provision and (ii) remains uncured for a period of five (5) Business Days after the receipt by the Company Parties of notice of such breach;

(c)    the breach in any material respect by one or more of the Consenting Lenders (other than the Consenting Lenders seeking termination under this provision) holding (i) an amount of Prepetition Loans that would result in non-breaching Consenting Lenders holding less than two-thirds of the aggregate principal amount of Prepetition Loans, (ii) an amount of DIP Loans that would result in the non-breaching Consenting Lenders holding less than two-thirds of the aggregate principal amount of outstanding DIP Loans;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for thirty (30) Business Days after receipt of  a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)    the Milestones set forth in Section 4 have not been achieved, extended, or waived by the Required DIP Lenders (in their sole discretion) within three (3) business days after the date identified for completion of such Milestone (as such date may be extended or waived);

(f)    any termination of the DIP Facility;

(g)    entry of a final order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief were granted, would have a material adverse effect on the consummation of the Transactions;

(h)    any Company Party files any plan of reorganization or liquidation or disclosure statement that is not consistent in any material respect with this Agreement;

(i)    the occurrence of any "Event of Default" under the DIP Facility that has not been cured (if susceptible to cure) or waived by the Required DIP Lenders (in their sole discretion);

(j)      any Company Party files a motion, application, or adversary proceeding (or supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Consenting Lenders' Claims or Interests or asserting any other cause of action against the Consenting Lenders or with respect or relating to such Claims or Interests, the Prepetition Documents or the DIP Documents or the liens securing the Prepetition Secured Claims and DIP Claims or (B) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Consenting Lenders' Claims or Interests or asserting any other cause of action against the Consenting Lenders or with respect or relating to such Claims and Interests or any liens securing such Claims;

(k)      any Company Party no longer has the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(l)      the commencement of an involuntary case against any Company Party or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of any Company Party, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding;

(m)      without the prior consent of the Required DIP Lenders, any Company Party (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except consistent with this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) files an answer admitting the material allegations of a petition filed against it in any proceeding, (D) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, trustee or an examiner pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, (E) makes a general assignment or arrangement for the benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing;

(n)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required DIP Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(o)      the occurrence of a termination event in Section 13.02 of this Agreement;

(p)      the making public, modification, amendment or filing of any of the Definitive Documents by any Company Party that contains terms or conditions that have not received the

consent of the Required DIP Lenders as provided for in this Agreement (i) in a manner that is adverse to the Consenting Lenders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Lender transmits a written notice in accordance with Section 16.12 hereof describing any such breach; or

(q)     notwithstanding Section 8.01, the Company Parties (i) publicly announce their intention not to support the Transactions, (ii) take any action or fail to take any action inconsistent with their obligations under Section 7.01 hereof, or (iii) take any of the actions set forth in Section 7.02.

13.02   <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.12 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting Lenders holding (i) an amount of Prepetition Loans that would result in non-breaching Consenting Lenders holding less than two-thirds of the aggregate principal amount of Prepetition Loans, or (ii) an amount of DIP Loans that would result in non-breaching Consenting Lenders holding less than two-thirds of the aggregate principal amount of DIP Loans, of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Consenting Lenders of notice of such breach;

(b)     the Milestones have not been achieved, extended, or waived within three (3) business days after the date identified for completion of such Milestone (as such date may be extended or waived);

(c)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, to exercise a Fiduciary Out;

(d)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u> that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e)     the Bankruptcy Court enters an order denying approval of the Sale Transaction.

13.03   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required DIP Lenders; and (b) each Company Party.

13.04   <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice (i) immediately after the Sale Closing or (ii) in the event that the Stalking Horse Purchaser is not the Successful Bidder and the Company Parties select a Winning Bid that consists of consideration in an aggregate amount less than the Release Price.

13.05   <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Nothing in this Agreement shall be construed as prohibiting any Company Party or any of the Consenting Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Lender, and (b) any right of any Consenting Lender, or the ability of any Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or any other Consenting Lender.  No purported termination of this Agreement shall be effective under this Section 13.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 13.02(c) or Section 13.02(e). Nothing in this Section 13.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.02(c).

13.06   The Company Parties acknowledge that after the Petition Date, the giving of notice of termination by any Party pursuant to this Agreement shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code; <u>provided,</u> that nothing herein shall prejudice any Party's right to argue that the giving of notice of termination was not proper under the terms of this Agreement.

13.07   The Company Parties and the Required DIP Lenders may agree (in each's sole discretion) to consummate the Sale Transaction via a chapter 11 plan of reorganization (a "<u>Chapter 11 Plan</u>").  In such instance, the references herein to Sale Transaction shall refer to such Chapter 11 Plan and the Parties' rights and obligations under the Agreement (including any rights to terminate the Agreement) shall be modified accordingly.

**Section 14.** *Fees and Expenses*.  The Company Parties shall pay or reimburse all reasonable and documented fees and expenses of the Consenting Lender Advisors within five (5) Business Days of receipt.  The Required DIP Lenders will provide for a carve-out under the DIP for reasonable professional fees of the Company Parties.

**Section 15.** *Amendments and Waivers.*

(a)   This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 15.

(b)   This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by (provided that email shall

be sufficient) (i) each Company Party and (ii) the Required DIP Lenders, solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of such Parties and unless otherwise specified in this Agreement; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material and disproportionate adverse effect on any of the Prepetition Secured Claims and DIP Claims held by a Consenting Lender, then the consent of each such affected Consenting Lender shall also be required with respect to such modification, amendment, waiver or supplement.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio.*

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 16.     *Miscellaneous.***

16.01   <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02   <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits (including the Sale Term Sheet and the DIP Term Sheet), annexes (including the Milestones), signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement as if fully set forth herein, and all references to this Agreement shall include all such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03   <u>Further Assurances</u>.  Each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Transactions, and the Sale Transaction, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or desirable to facilitate the Transactions in accordance with this Agreement and the Definitive Documents.  Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably necessary or reasonably requested by another Party to carry out the purpose and intent

of this Agreement, including facilitating any necessary regulatory filings, and shall refrain from taking any action that would frustrate the purpose and intent of this Agreement.

16.04  <u>Complete Agreement</u>.   Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.   There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10   <u>Survival</u>.  Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in Section 14 shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

16.11   <u>Relationship Among the Parties</u>.  It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in the loans and/or commitments under the Prepetition Documents or DIP Documents or other debt or equity securities of the Company Parties without the consent of the Company Parties, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable non-disclosure agreement, and the terms of this Agreement; <u>provided</u>, further, that neither any Party to this Agreement nor the Company Parties shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement. None of the Consenting Lenders, shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any other Consenting Lender, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Lenders, in each case except as expressly set forth in this Agreement.

16.12   <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Scott Mell
401 S. Old Woodward Avenue, Suite 340
Birmingham, MI  48009
smell@conwaymackenzie.com.

and

Jerry Perchik
1090 Northchase Pkwy SE, Ste 150
Marietta, GA 30067-6407
Email: jperchik@benevis.com

with copies to:

Matthew Cavenaugh
1401 McKinney, Suite 1900
Houston, Texas 77010
Email: mcavenaugh@jw.com

(b)      if to a Consenting First Out Lender, to:

BMO Financial Group.
115 S. LaSalle St., 4W
Chicago, Illinois 60603
Attention: Megan Tripodi
Email: megan.tripodi@bmo.com

with copies to:

Katten Muchin Rosenman LLP
525 W. Monroe Street, Suite 1900
Chicago, IL 60661-3693
Attention: Geoff AuYeung
E-mail: geoff.auyeung@katten.com


(c)      if to a Consenting Last Out Holder

New Mountain Capital, LLC
787 Seventh Avenue, 49th Floor
New York, NY  10019

Attention: Joshua Porter
Email: jporter@newmountaincapital.com

with copies to:

Proskauer Rose LLP
11 Times Square
New York, NY 10036
Attention:      David M. Hillman
                     Lucy F. Kweskin
E-mail:          dhillman@proskauer.com
                     lkweskin@proskauer.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.13   Independent Due Diligence and Decision Making.  Each Consenting Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.14   Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.15   <u>Waiver</u>.   If the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.16   <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

16.17   <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.18   <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.19   <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.20   <u>Capacities of Consenting Lenders</u>.   Each Consenting Lender has entered into this agreement on account of all Claims and Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Claims and Interests.

16.21   <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 15, or otherwise, including a written approval by any Party, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if such consent, acceptance, approval, or waiver is conveyed in writing (including electronic mail) by such Party's counsel.

16.22   <u>Other Interpretive Matters</u>.

(a)   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within

which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vi) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (vii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(b)     The Company Parties and the Consenting Lenders have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature Pages to Follow]*

## COMPANY PARTIES

**NEW LT SMILE HOLDINGS, LLC**

By: New Mountain Finance Corporation
    its Manager

By: _____
    Name: Shiraz Y. Kajee
    Title:  CFO

**NEW LT SMILE HOLDINGS II, LLC**

By: New Mountain Finance Advisers BDC, L.L.C.,
    its Manager

By: _____
    Name: Shiraz Y. Kajee
    Title:  CFO

**LT SMILE CORPORATION**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer

**BENEVIS HOLDING CORP.**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer

**BENEVIS CORP.**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer

*[Signature Page to Restructuring Support Agreement]*

## COMPANY PARTIES

**NEW LT SMILE HOLDINGS, LLC**

By:
Name: _____
Title: _____

**NEW LT SMILE HOLDINGS II, LLC**

By:
Name: _____
Title: _____

**LT SMILE CORPORATION**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer

**BENEVIS HOLDING CORP.**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer

**BENEVIS CORP.**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer

*[Signature Page to Restructuring Support Agreement]*

**BENEVIS INFORMATICS, LLC**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer


**BENEVIS AFFILIATES, LLC**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer


**BENEVIS, LLC**

By: _____
Name: Scott Mell
Title:   Chief Restructuring Officer

**PREPETITION AGENT**


**BMO HARRIS BANK, N.A.**

By:_____
Name: Megan Tripodi
Title:   Director

**DIP AGENT**

**BMO HARRIS BANK, N.A.**

By: _____

Name: Megan Tripodi
Title:  Director

**CONSENTING FO LENDERS**

BANK OF MONTREAL

By: _____
Name: Megan Tripodi
Title:  Director

**<u>CONSENTING FO LENDER</u>**

**SUN LIFE ASSURANCE COMPANY OF CANADA**

By: _____

Name:   Usman Bajwa

Title:   Managing Director

By: _____

Name:   Michael Rudanycz

Title:   Managing Director

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING LO LENDERS**

**NEW MOUNTAIN FINANCE CORPORATION**

By: _____
Name:  Shiraz Y. Kajee
Title:   Chief Financial Officer

**NEW MOUNTAIN FINANCE HOLDINGS, LLC**

By: _____
Name:  Shiraz Y. Kajee
Title:   Chief Financial Officer

**NEW MOUNTAIN GUARDIAN PARTNERS II SPV, LLC**

By: _____
Name:  Shiraz Y. Kajee
Title:   Chief Financial Officer

**NEW MOUNTAIN GUARDIAN II MASTER FUND-B SPV, LLC**

By: _____
Name:  Shiraz Y. Kajee
Title:   Chief Financial Officer

*[Signature Page to Restructuring Support Agreement]*

**NEW MOUNTAIN FINANCE DB, LLC,**

By: _____

Name: Shiraz Y. Kajee
Title:  Chief Financial Officer

*[Signature Page to Restructuring Support Agreement]*

## EXHIBIT A

**DIP CREDIT AGREEMENT**

*Execution Version*

---

### SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of August [_], 2020

among

**BENEVIS HOLDING CORP.**,
as Borrower,

**LT SMILE CORPORATION**,
as a Guarantor,

**THE OTHER PERSONS FROM TIME TO TIME PARTY HERETO AS SUBSIDIARY GUARANTORS**,
each as a Subsidiary Guarantor,

**CERTAIN FINANCIAL INSTITUTIONS,**
as Lenders,

and

**BMO HARRIS BANK, N.A.,**
as Administrative Agent

---

## TABLE OF CONTENTS

Article I DEFINITIONS AND ACCOUNTING TERMS ................................................ 1
    1.01.    Defined Terms ........................................................................ 1
    1.02.    Other Interpretive Provisions ........................................... 34
    1.03.    Accounting Terms ............................................................ 34
    1.04.    Uniform Commercial Code ............................................. 35
    1.05.    Rounding ......................................................................... 35
    1.06.    [Reserved] ....................................................................... 35
    1.07.    Times of Day ................................................................... 36
    1.08.    Rollovers ......................................................................... 36
    1.09.    [Reserved] ....................................................................... 36
    1.10.    Divisions ......................................................................... 36

Article II THE COMMITMENTS AND CREDIT EXTENSIONS ............................ 36
    2.01.    Loan Commitments ......................................................... 36
    2.02.    Borrowings, Conversions and Continuations of Loans ... 38
    2.03.    [Reserved] ....................................................................... 39
    2.04.    [Reserved] ....................................................................... 39
    2.05.    Repayment of Loans ....................................................... 39
    2.06.    Prepayments .................................................................... 39
    2.07.    Termination or Reduction of Commitments ................... 41
    2.08.    Interest ............................................................................ 41
    2.09.    Fees ................................................................................. 41
    2.10.    Computation of Interest and Fees ................................... 42
    2.11.    Evidence of Debt ............................................................ 42
    2.12.    Payments Generally; Administrative Agent's Clawback ... 42
    2.13.    Sharing of Payments by Lenders .................................... 44
    2.14.    [Reserved] ....................................................................... 45
    2.15.    [Reserved] ....................................................................... 45
    2.16.    [Reserved] ....................................................................... 45
    2.17.    Defaulting Lenders ......................................................... 45

Article III TAXES, YIELD PROTECTION AND ILLEGALITY ............................ 46
    3.01.    Taxes ............................................................................... 46
    3.02.    Illegality ......................................................................... 50
    3.03.    Inability to Determine Rates ........................................... 50
    3.04.    Increased Costs; Reserves on LIBO Rate Loans ........... 51
    3.05.    Compensation for Losses ............................................... 52
    3.06.    Mitigation Obligations .................................................... 53
    3.07.    Survival .......................................................................... 53

Article IV CONDITIONS PRECEDENT ................................................................... 53
    4.01.    Conditions Precedent to the Closing Date ..................... 53
    4.02.    Conditions to Final Availability Period. ......................... 56
    4.03.    Conditions to all Credit Extensions ................................ 57

Article V REPRESENTATIONS AND WARRANTIES............................................................ 58
    5.01.    Existence, Qualification and Power........................................................... 59
    5.02.    Authorization; No Contravention; Consents.............................................. 59
    5.03.    Binding Effect........................................................................................... 59
    5.04.    Financial Statements; No Material Adverse Effect .................................. 60
    5.05.    Litigation.................................................................................................. 60
    5.06.    [Reserved]................................................................................................. 60
    5.07.    Ownership of Property; Liens................................................................... 60
    5.08.    Environmental Compliance ...................................................................... 61
    5.09.    Insurance and Casualty ............................................................................ 62
    5.10.    Taxes ........................................................................................................ 62
    5.11.    ERISA Compliance................................................................................... 62
    5.12.    Subsidiaries; Equity Interests; Capitalization ......................................... 63
    5.13.    Margin Regulations; Investment Company Act ...................................... 64
    5.14.    Disclosure ................................................................................................ 64
    5.15.    Compliance with Laws; Anti-Terrorism Laws and Foreign Asset Control
            Regulations .............................................................................................. 64
    5.16.    Labor Matters........................................................................................... 65
    5.17.    Brokers ..................................................................................................... 65
    5.18.    [Reserved]................................................................................................. 65
    5.19.    Healthcare Matters ................................................................................... 65
    5.20.    Dentist Partners ....................................................................................... 67
    5.21.    BHG Support Services Agreements; BHG Security Agreements ...................... 68
    5.22.    OFAC; Patriot Act .................................................................................. 69
    5.23.    Prohibition on Government Assistance. ................................................... 69
    5.24.    Initial Budget ........................................................................................... 69
    5.25.    Other Bankruptcy Matters........................................................................ 70

Article VI AFFIRMATIVE COVENANTS ............................................................................ 70
    6.01.    Financial Statements ................................................................................ 70
    6.02.    Other Information ..................................................................................... 72
    6.03.    Notices ..................................................................................................... 73
    6.04.    Payment of Obligations............................................................................ 74
    6.05.    Preservation of Existence, Etc ................................................................. 74
    6.06.    Maintenance of Properties ....................................................................... 74
    6.07.    Maintenance of Insurance; Condemnation Proceeds............................... 75
    6.08.    Compliance with Laws Generally; Environmental Laws ....................... 75
    6.09.    Books and Records ................................................................................... 76
    6.10.    Inspection Rights; Meetings with Administrative Agent......................... 76
    6.11.    Compliance with ERISA.......................................................................... 77
    6.12.    Further Assurances................................................................................... 77
    6.13.    [Reserved]................................................................................................. 79
    6.14.    Health Care Laws; CPOD Laws .............................................................. 79
    6.15.    Health Care Matters ................................................................................. 79
    6.16.    BHG Support Services Agreements; BHG Security Agreements ...................... 81
    6.17.    BHG Bank Accounts................................................................................. 82
    6.18.    Deposit Accounts; Payment of Professional Fees ................................. 82

6.19.    [Reserved] ........................................................................................................ 82
6.20.    Lender Calls. ................................................................................................... 82
6.21.    Milestones. ...................................................................................................... 82
6.22.    Other Bankruptcy Matters ............................................................................. 82
6.23.    Restructuring Support Matters ...................................................................... 83

Article VII NEGATIVE COVENANTS ............................................................................. 85
7.01.    Indebtedness .................................................................................................. 85
7.02.    Liens ............................................................................................................... 86
7.03.    Investments .................................................................................................... 89
7.04.    Mergers, Dissolutions, Etc ........................................................................... 90
7.05.    Dispositions ................................................................................................... 90
7.06.    Restricted Payments ...................................................................................... 91
7.07.    Change in Nature of Business ....................................................................... 92
7.08.    Transactions with Affiliates .......................................................................... 92
7.09.    Inconsistent Agreements ............................................................................... 92
7.10.    Use of Proceeds ............................................................................................. 94
7.11.    Prepayment of Indebtedness; Amendment to Organization Documents ............. 94
7.12.    [Reserved] ...................................................................................................... 95
7.13.    Anti-Terrorism Laws and Foreign Asset Control Regulations ............................ 95
7.14.    Fiscal Year ..................................................................................................... 95
7.15.    Holdings Covenant ........................................................................................ 95
7.16.    Regulatory Matters ........................................................................................ 96
7.17.    Disbursements; DIP Budget Variance. .......................................................... 96
7.18.    Case Matters .................................................................................................. 96
7.19.    Prohibition on Government Assistance. ......................................................... 98
7.20.    Restructuring Support Matters. ..................................................................... 98

Article VIII EVENTS OF DEFAULT AND REMEDIES .......................................................... 99
8.01.    Events of Default ........................................................................................... 99
8.02.    Remedies Upon Event of Default ................................................................ 104
8.03.    Application of Funds .................................................................................... 106

Article IX ADMINISTRATIVE AGENT ......................................................................... 107
9.01.    Appointment and Authority; Limitations on Lenders .................................. 107
9.02.    Rights as a Lender ....................................................................................... 108
9.03.    Exculpatory Provisions ............................................................................... 108
9.04.    Reliance by Administrative Agent ............................................................... 109
9.05.    Delegation of Duties .................................................................................... 109
9.06.    Resignation of Administrative Agent .......................................................... 109
9.07.    Non-Reliance on Administrative Agent and Other Lenders ........................... 110
9.08.    [Reserved] .................................................................................................... 110
9.09.    Administrative Agent May File Proofs of Claim; Credit Bidding .................... 110
9.10.    Collateral Matters ........................................................................................ 112
9.11.    Other Collateral Matters .............................................................................. 112
9.12.    Right to Perform, Preserve and Protect ....................................................... 112
9.13.    [Reserved] .................................................................................................... 112

9.14. Designation of Additional Agents .................................................................... 112

Article X MISCELLANEOUS ............................................................................................ 113
10.01. Amendments, Etc ................................................................................................ 113
10.02. Notices; Effectiveness; Electronic Communication .................................... 115
10.03. No Waiver; Cumulative Remedies .................................................................. 118
10.04. Expenses; Indemnity; Damage Waiver ........................................................... 118
10.05. Marshalling; Payments Set Aside ................................................................... 120
10.06. Successors and Assigns ...................................................................................... 120
10.07. Treatment of Certain Information; Confidentiality ...................................... 126
10.08. Right of Setoff ..................................................................................................... 127
10.09. Interest Rate Limitation .................................................................................... 128
10.10. Counterparts; Integration; Effectiveness ....................................................... 128
10.11. Survival ................................................................................................................ 128
10.12. Severability .......................................................................................................... 129
10.13. Replacement of Lenders .................................................................................... 129
10.14. Governing Law; Jurisdiction; Etc .................................................................... 130
10.15. Waiver of Jury Trial ........................................................................................... 131
10.16. USA PATRIOT Act Notice ............................................................................... 131
10.17. No Advisory or Fiduciary Responsibility ...................................................... 131
10.18. Attachments ......................................................................................................... 132
10.19. [Reserved] ........................................................................................................... 132
10.20. Acknowledgement and Consent to Bail-In of EEA Financial Institutions ........ 132
10.21. Incorporation of DIP Orders by Reference .................................................... 132

Article XI CONTINUING GUARANTEE .................................................................... 133
11.01. Guarantee ............................................................................................................. 133
11.02. Rights of Lenders ............................................................................................... 133
11.03. Certain Waivers .................................................................................................. 134
11.04. Obligations Independent ................................................................................... 135
11.05. Subrogation ......................................................................................................... 135
11.06. Termination; Reinstatement ............................................................................. 135
11.07. Subordination ..................................................................................................... 136
11.08. Stay of Acceleration ........................................................................................... 136
11.09. Condition of Borrower ...................................................................................... 136
11.10. Limitation of Liability ........................................................................................ 136

**ANNEXES**

| | |
|---|---|
| A | Milestones |
| B | Initial Budget |
| C | Interim DIP Order |

**SCHEDULES**

| | |
|---|---|
| 2.01(a) | Roll-Up Term Loan and Applicable Percentages |
| 2.01(b) | [Reserved] |
| 2.01(c) | Delayed Draw Term Loan Commitments and Applicable Percentages |
| 5.05 | Litigation |
| 5.07(b) | Leased Real Estate |
| 5.09 | Insurance |
| 5.11(d) | Pension Plans |
| 5.12 | Subsidiaries; Capitalization; Other Equity Investments |
| 5.16 | Labor Matters |
| 5.19 | Healthcare Matters |
| 5.20 | Dental Partners |
| 5.21 | BHG Support Services Agreements; BHG Security Agreements |
| 5.23 | Prohibition on Government Assistance |
| 6.13 | Outstanding Items |
| 7.01 | Existing Indebtedness |
| 7.02 | Existing Liens |
| 7.02(y) | Prepetition Priority Liens |
| 7.03 | Existing Investments |
| 7.08 | Affiliate Transactions |
| 10.02 | Administrative Agent's Office (and Account) |

**EXHIBITS**        *Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | [Reserved] |
| C-1 | [Reserved] |
| C-2 | Roll-Up Term Loan Note |
| C-3 | Delayed Draw Term Loan Note |
| C-4 | [Reserved] |
| D | Compliance Certificate |
| E | [Reserved] |
| F | Assignment and Assumption |
| G | [Reserved] |
| H | Form of Assignment of Rights under BHG Support Services Agreements and the BHG Security Agreements |

## SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
## CREDIT AGREEMENT

This **SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "***Agreement***") is entered into as of August [_], 2020, among **BENEVIS HOLDING CORP.**, a Delaware corporation (the "***Borrower***"), **LT SMILE CORPORATION**, a Delaware corporation ("***Holdings***"), as a Guarantor, each Subsidiary Guarantor from time to time party hereto (collectively, the "***Subsidiary Guarantors***" and individually, a "***Subsidiary Guarantor***"), each Lender from time to time party hereto (collectively, the "***Lenders***" and individually, a "***Lender***"), **BMO HARRIS BANK, N.A.**, as Administrative Agent.

## PRELIMINARY STATEMENTS

WHEREAS, on August [_], 2020 (the "Petition Date"), the Borrower and the Guarantors party hereto on the date hereof commenced Chapter 11 case numbers [___] through [___], as jointly administered for procedural purposes at Chapter 11 case number [___] (each a "Case" and collectively, the "Cases") by filing with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") voluntary petitions for relief under the Bankruptcy Code and have continued to operate their business as debtor-in-possession pursuant to Section 1107 and 1108 thereof.

WHEREAS, the Borrower has requested and the Lenders have agreed to provide the Borrower with a priming, secured superpriority debtor-in-possession credit facility in an aggregate principal amount not to exceed $30,000,000 (including Roll-Up Term Loans (as defined herein)) subject to the terms and conditions set forth in this Agreement and the DIP Orders (as defined herein), as applicable.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01.   Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"363 Sale Motion" means the Debtors' motion seeking approval of a 363 Sale Transaction, which motion shall be in form and substance acceptable to the Required Lenders.

"363 Sale Transaction" means the sale of all or substantially all of the Loan Parties' assets consummated under Section 363 of the Bankruptcy Code to: (a) New Mountain or its designee as the "Stalking Horse" on the terms set forth in the Stalking Horse Acquisition Agreement or (b) an Alternative Transaction on the same or substantially the same terms as set forth in the Stalking Horse Acquisition Agreement.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in the acquisition of (a) a majority equity or other ownership interest in another Person (including the purchase of an option, warrant or convertible or similar type security to acquire such a majority interest at the time it becomes exercisable by the holder thereof), or (b) assets of another Person which constitute all or substantially all of the assets of such Person or of a line or lines of business or division conducted by such Person.

"Adequate Protection Obligations" means the Loan Parties' obligations to provide adequate protection to the Prepetition Secured Parties.

"Adequate Protection Superpriority Claims" has the meaning ascribed to such term in the DIP Orders.

"Administrative Agent" means BMO Harris Bank, N.A., in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as Administrative Agent may from time to time notify Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire prepared by a Lender in a form supplied by Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding the foregoing, neither the Administrative Agent nor any Lender shall be deemed to be an "Affiliate" of any Loan Party or any Subsidiary of any Loan Party solely by reason of the provisions of the Loan Documents. For the avoidance of doubt, New Mountain shall not be an "Affiliate" of any Loan Party of or any subsidiary of any Loan Party for purposes of this Agreement and the other Loan Documents other than with respect to Sections 5.09, 5.22, 6.07, 7.08 and 8.01(j) of this Agreement.

"Agent Parties" has the meaning specified in Section 10.02(c).

"Aggregate Delayed Draw Term Loan Commitments" means, as at any date of determination thereof, the sum of all outstanding and undrawn Delayed Draw Term Loan Commitments of all Lenders at such date.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Alternative Transaction" means a sale of all or substantially all of the Debtor's assets to a Qualified Bidder that submits the winning bid at the action (other than New Mountain or its designee as the "Stalking Horse" under the Stalking Horse Acquisition Agreement) for cash consideration greater than the Release Price.

"Applicable Margin" means (a) in the case of a Base Rate Loan, 9.00% per annum, and (b) in the case of a LIBO Rate Loan, 10.00% per annum.

"Applicable Percentage" means (a) in respect of the Delayed Draw Term Loan Facility, with respect to any Delayed Draw Lender at any time, the percentage (carried out to the ninth decimal place) of the Delayed Draw Term Loan Facility, represented by the amount of the sum of the outstanding and undrawn Delayed Draw Term Loan Commitment and outstanding Delayed Draw Term Loans of such Delayed Draw Lender at such time; and (b) in respect of the Roll-Up Term Loan Facility, with respect to any Roll-Up Term Lender at any time, the percentage (carried out to the ninth decimal place) of the Roll-Up Term Loan Facility represented by the Outstanding Amount of such Roll-Up Term Lender's Roll-Up Term Loans at such time. The initial Applicable Percentage of each Lender with respect to each Facility is set forth opposite the name of such Lender on Schedule 2.01(c) with respect to the Delayed Draw Term Loan and Schedule 2.01(a) for the Roll-Up Term Loan Facility or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Budget" shall have the meaning set forth in Section 5.24.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more assignees of Loans or Commitments that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption agreement entered into by a Lender and an assignee of Loans or Commitments (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by Administrative Agent (if consent is required by Section 10.06(b)), in substantially the form of Exhibit F or any other form approved by Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any synthetic lease or other similar financing lease, the capitalized amount of the remaining lease payments under the relevant lease that would be required to appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Audited Financial Statements" means the audited consolidated balance sheets of Holdings and its Subsidiaries for the Fiscal Years ended December 31, 2017 and December 31, 2018, and the related consolidated statements of income or operations, retained earnings and cash flows for such Fiscal Years, including the notes thereto.

"Automatic Stay" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time, and any successor statute.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the rate of interest announced by Administrative Agent from time to time as its prime rate, or its equivalent for U.S. Dollar loans to borrowers located in the United States, for such day (whether or not the lowest rate offered by Administrative Agent and with any change in such rate announced by Administrative Agent taking effect at the opening of business on the day specified in the public announcement of such change); (b) the Federal Funds Rate for such day, plus 0.50%; (c) the LIBO Rate, calculated for such day for an Interest Period of one month plus 1.00%, and (d) 2.00% per annum.

"Base Rate Loan" means a Loan (or segment of a Loan) that bears interest based on the Base Rate.

"BHG Entity" means a professional corporation, professional association or limited liability company or other legal entity that provides dental services to patients and which is or shall become party to an BHG Support Services Agreement.

"BHG Security Agreement" means a security agreement between an BHG Entity and Borrower or any of its Restricted Subsidiaries, pursuant to which such BHG Entity's obligations under the BHG Support Services Agreement entered into by such BHG Entity are secured, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"BHG Support Services Agreement" has the meaning assigned to such term in Section 5.21.

"BHG Support Services Agreement Termination Event" shall mean, with respect to any BHG Support Services Agreement, the occurrence of any event that allows any party to such BHG Support Services Agreement the right to terminate such BHG Support Services Agreement.

"Bidding Procedures Motion" means the Debtors' motion seeking approval of a Bidding Procedures Order, which motion shall be in form and substance acceptable to the Required Lenders.

"Bidding Procedures Order" means an order entered by the Bankruptcy Court, in form and substance acceptable to the Required Lenders approving the bidding and auction procedures with respect to the sale by the Debtors of substantially all of the Debtor's assets

-4-

including designating New Mountain or its designee as the "Stalking Horse" on the terms set forth in the Stalking Horse Acquisition Agreement.

"BMO" means Bank of Montreal.

"Board of Directors" has the meaning specified in Section 6.10(b).

"Borrower" has the meaning specified in the introductory paragraph.

"Borrower Materials" has the meaning specified in Section 10.02(c).

"Borrowing" means any of (a) a Prepetition Rolled Term Loans converted to Roll-Up Term Loans on the Interim Order Entry Date, or (b) a Delayed Draw Term Loan Borrowing.

"Borrowing Date" shall mean (i) the date that the Prepetition Rolled Term Loans are converted into Roll-Up Term Loans hereunder and (ii) any date where Delayed Draw Term Loans are incurred in accordance with the terms and conditions set forth herein and as set forth in the Approved Budget or as otherwise approved in advance in writing by the Required Lenders.

"Business Continuity Agreements" or "BCAs" has the meaning specified in Section 5.20(b).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York or the state where Administrative Agent's Office is located and, if such day relates to any interest rate settings as to a LIBO Rate Loan, any fundings, disbursements, settlements and payments in respect of any such LIBO Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such LIBO Rate Loan, means any such day that is also a London Banking Day.

"Canada Sanctioned Person" means (a) a "terrorist group" as defined for the purposes of Part II.1 of the Criminal Code (Canada), as amended or (b) a Person identified in or pursuant to (i) Part II.1 of the Criminal Code (Canada), as amended or (ii) the Proceeds of Crime (Money Laundering) and Terrorist Finance Act, as amended or (iii) the Justice for Victims of Corrupt Foreign Officials Act (Sergei Magnitsky Law), as amended or (iv) regulations or orders promulgated pursuant to the Special Economic Measures Act (Canada), as amended, the United Nations Act (Canada), as amended, or the Freezing Assets of Corrupt Foreign Officials Act (Canada), as amended, in any case pursuant to this clause (b) as a Person in respect of whose property or benefit a Lender would be prohibited from entering into or facilitating a related financial transaction.

"Canadian Economic Sanctions Laws" means those laws, including enabling legislation, orders-in-council or other regulations administered and enforced by Canada or a political subdivision of Canada pursuant to which economic sanctions have been imposed on any Person, entity, organization, country or regime, including Part II.1 of the Criminal Code (Canada), as amended, the Special Economic Measures Act (Canada), as amended, the Proceeds of Crime (Money Laundering) and Terrorist Finance Act, as amended, the Justice for Victims of Corrupt Foreign Officials Act (Sergei Magnitsky Law), as amended, the United Nations Act (Canada), as

-5-

amended, the Export and Import Permits Act (Canada), as amended, and the Freezing Assets of Corrupt Foreign Officials Act (Canada), as amended, and including all regulations promulgated under any of the foregoing, or any other similar sanctions program or action.

"Capital Leases" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided, that, for purposes of this Agreement, the determination of whether a lease is required to be accounted for as a Capital Lease on the balance sheet of such Person shall be made by reference to GAAP as in effect on the Closing Date.

"Carve-Out" has the meaning ascribed to such term in the DIP Orders.

"Case" or "Cases" has the meaning specified in the recitals to this Agreement.

"Cash Equivalents" means any of the following types of property, to the extent owned by Holdings or any of its Restricted Subsidiaries:

(a)     cash, denominated in Dollars;

(b)     readily marketable direct obligations of the government of the United States or any agency or instrumentality thereof, or obligations the timely payment of principal and interest on which are fully and unconditionally guaranteed by the government of the United States or any state or municipality thereof, in each case so long as such obligation has an investment grade rating by S&P and Moody's;

(c)     commercial paper maturing no more than one year from the date of creation thereof and rated at least P-1 (or then equivalent grade) by Moody's or A-1 (or then equivalent grade) by S&P, or carrying an equivalent rating by a nationally recognized rating agency;

(d)     insured certificates of deposit or bankers' acceptances of, or time deposits with any commercial bank that (i) is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) above, (iii) is organized under the laws of the United States or of any state thereof and (iv) has combined capital and surplus of at least $500,000,000;

(e)     readily marketable general obligations of any corporation organized under the laws of any state of the United States, payable in the United States, expressed to mature not later than 12 months following the date of issuance thereof and rated A or better by S&P or A2 or better by Moody's;

(f)     repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (b) above entered into with any financial institution having combined capital and surplus and undivided profits of not less than $500,000,000;

(g)     repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America or issued by any governmental agency thereof and backed by the full faith and credit of the United States of America, in each case maturing within ninety (90) days or less from the date

of acquisition; provided, that, the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985; and

(h)     readily marketable shares of investment companies or money market funds, in each case, substantially all of the assets of which consist of Investments of the type described in clauses (a) through (g) above.

"Cash Management Order" means an order entered by the Bankruptcy Code, in form and substance acceptable to the Required Lenders governing the Debtors' cash management system.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation, implementation or application thereof or (c) the making or issuance of any request, rule, guideline, interpretation, or directive (whether or not having the force of law) by any Governmental Authority; provided, that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     Ultimate Holdings I and Ultimate Holdings II shall cease to jointly own and control, (directly or indirectly) both (i) 100% of the issued and outstanding Equity Interests of Holdings and (ii) a sufficient percentage of the issued and outstanding Equity Interests of Holdings to control the election of a majority of its board of directors; or

(b)     Holdings shall fail to own and control, (directly or indirectly) 100% of the issued and outstanding Equity Interests of each of its Restricted Subsidiaries (other than directors' qualifying shares or the equivalent), except where such failure is the result of a transaction permitted under the Loan Documents; or

(c)     a sale of substantially all of the assets of Borrower and their Restricted Subsidiaries except where the Required Lenders have provided their prior written consent to such sale.

"Closing Date" means August [_], 2020.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means, collectively, certain personal property of the Loan Parties or any other Person in which Administrative Agent or any Lender Party is granted a Lien under any

Security Instrument and the DIP Orders as security for all or any portion of the Obligations or any other obligation arising under any Loan Document.

"Commitment" means a Delayed Draw Term Loan Commitment.

"Committed Loan Notice" means a notice of (a) a Delayed Draw Term Loan Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of LIBO Rate Loans, which, if in writing, shall be substantially in the form of Exhibit A.

"Committee" means an official creditors' committee of unsecured creditors holding unsecured claims, if any, appointed in the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Connection Income Taxes" means Other Connection Taxes that are imposed or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"consolidated" means the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries, and, for the avoidance of doubt, shall include the financial condition and/or operating results of all entities, including, without limitation, all variable interest entities (as defined by GAAP), that are included or consolidated in the financial statements of such Person and its Subsidiaries in accordance with GAAP, and when used with respect to a Person and its Restricted Subsidiaries, shall include all such entities, including, without limitation, all variable interest entities, that are included or consolidated in the financial statements of such Person and its Restricted Subsidiaries in accordance with GAAP notwithstanding the fact that such variable interest entities are not or may not be Subsidiaries or Restricted Subsidiaries thereof.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, indenture, mortgage, deed of trust, contract or any other instrument or undertaking (other than a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Control Agreement" means, with respect to any Deposit Account, Securities Account, Commodity Account, securities entitlement or Commodity Contract, an agreement, in

form and substance satisfactory to Administrative Agent and the Required Lenders, among Administrative Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC governing such account) over such account to Administrative Agent.

"Controlled Account" means each deposit account and securities account of any Loan Party which, at the request of the Administrative Agent and Required Lenders, may be subject to a Control Agreement.

"Controlled Account Bank" means each bank with whom Deposit Accounts are maintained in which any funds of any of the Loan Parties are maintained and with whom a Control Agreement has been, or is required to be, executed in accordance with the terms of the Loan Documents.

"Core Business" means any material line of business conducted by Borrower and its Subsidiaries as of the Closing Date and any business substantially related, similar, ancillary, complementary, incidental or reasonably related thereto.

"CPOD Laws" shall include any applicable federal, state or local statute, ordinance, code, rule, regulation, policy, or any court or Attorney General decision or opinion relating to (i) the corporate practice of dentistry, medicine, or any similar licensed profession,(ii) fee-splitting or the sharing of fees for dental or other healthcare services, or (iii) the financial arrangement between the Borrower and the BHG Entities, to the extent that such federal, state or local statute, ordinance, code, rule, regulation, policy, court or Attorney General decision or opinion regarding the financial arrangements between the Borrower and the BHG Entities is not a Health Care Law.

"Credit Extension" means a Borrowing.

"Debtors" means Borrower and each of the Guarantors in their capacities as debtors-in-possession in the Cases.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that, with the giving of any notice, the passage of time, or both, would unless cured or waived be an Event of Default.

"Default Rate" means an interest rate equal to the rate of interest otherwise applicable hereunder plus 2% per annum, to the fullest extent permitted by applicable Laws.

"Defaulting Lender" means any Lender that (a) has failed to fund all or any portion of its Loans or otherwise pay to Administrative Agent or any other Lender any other amount required to be paid by it hereunder, in any case within two (2) Business Days of the date such Loans were required to be funded or amounts required to be paid hereunder unless due to such Lender's good faith determination that the conditions set forth in Section 4.02 have not been met,

(b) has notified Borrower or Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, unless due to such Lender's good faith determination that the conditions set forth in Section 4.02 have not been met, (c) has failed, within three Business Days after written request by Administrative Agent or Borrower, to confirm in writing to Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (provided, that, such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets; provided, that, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error.

"Delayed Draw Availability Period" means the period commencing on the Closing Date to and including the Maturity Date.

"Delayed Draw Lenders" means each Lender that has a Delayed Draw Term Loan Commitment or Delayed Draw Term Loans outstanding.

"Delayed Draw Term Loan" has the meaning specified in Section 2.01(c).

"Delayed Draw Term Loan Borrowing" means a borrowing consisting of simultaneous Delayed Draw Term Loans of the same Type and, in the case of LIBO Rate Loans, having the same Interest Period, made by each of the Delayed Draw Lenders pursuant to Section 2.01(c).

"Delayed Draw Term Loan Commitment" has the meaning specified in Section 2.01(c).

"Delayed Draw Term Loan Facility" means the facility described in Section 2.01(c).

"Delayed Draw Term Loan Note" means a promissory note made by Borrower in favor of a Delayed Draw Lender evidencing Delayed Draw Term Loans made by such Delayed Draw Lender, substantially in the form of Exhibit C-3.

"DIP Lien" has the meaning ascribed to such term in the DIP Orders.

"DIP Motion" means the Debtors' motion seeking (i) authorization to enter into this Agreement and (ii) approval of the DIP Orders, which motion shall be in form and substance acceptable to the Required Lenders.

"DIP Orders" means the Interim DIP Order and/or the Final DIP Order, as applicable, as each may be amended, modified or supplemented with the prior written consent of the Required Lenders.

"Disbursements Variance" shall have the meaning set forth in Section 6.01(d)(ii).

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property (including any Equity Interest in another Person owned by the Person in question), or part thereof, by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interest" means any Equity Interest that (a) matures or is redeemable at the option of the holder thereof on or prior to the date that is 180 days after the Maturity Date, (b) is convertible into or exchangeable for debt securities (unless only occurring at the sole option of the issuer thereof), or (c)(i) requires cash dividend payments (other than in respect of taxes) prior to, or (ii) provides the holders thereof with any rights to receive any cash upon the occurrence of a change of control or sale of assets prior to, in each case, the date that is 180 days after the Maturity Date.

"Disqualified Institution" means those persons that are (i) competitors of Borrower, (ii) such other Persons who have been identified to the Administrative Agent in writing prior to the date of the Closing Date and (iii) Affiliates of the Persons identified in clauses (i) and (ii) above that are identifiable as Affiliates thereof on the basis of such Person's name; provided, that, Disqualified Institutions shall not include any Person which is a bona fide debt fund, investment vehicle, regulated bank entity or unregulated lending entity (other than any Person separately identified as a Disqualified Institution pursuant to clause (i) or (ii) above) that is (x) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of business and (y) managed, sponsored or advised by any Person controlling, controlled by or under common control with a competitor of Borrower or Affiliate thereof, as applicable but only to the extent that no personnel involved with the investment in such competitor of  Borrower or Affiliate thereof, as applicable (I) makes (or has the right to make or participate with others in making) investment decisions on behalf of such debt fund, investment vehicle, regulated bank entity or unregulated lending entity or (II) has access to any Information (other than Information that is publicly available).

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States or any political subdivision of the United States (but excluding any territory or possession thereof).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Laws" means any and all applicable Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any Hazardous Materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges of Hazardous Materials to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of a Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract or agreement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in, including partnership, member or trust interests) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party or a Subsidiary thereof within the meaning of section 414(b) or (c) of the Code (and sections 414(m) and (o) of the Code for purposes of provisions relating to Sections 412 and 430 through 436 of the Code and Section 302 through 305 and 4007 of ERISA).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Loan Party, a Subsidiary thereof or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated

-12-

as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party, a Subsidiary thereof or any ERISA Affiliate from a Multiemployer Plan or receipt by any Loan Party, a Subsidiary thereof or any ERISA Affiliate of notification that a Multiemployer Plan is in reorganization or that any Multiemployer Plan is insolvent or being terminated; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination, each under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party, a Subsidiary thereof or any ERISA Affiliate; or (i) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Reserve Percentage" means, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding.  The LIBO Rate for each outstanding LIBO Rate Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"Event of Default" has the meaning specified in Section 8.01.

"Event of Loss" means, with respect to any property, any of the following:  (a) any loss, destruction or damage of such property or (b) any condemnation, seizure, or taking, by exercise of the power of eminent domain or otherwise, of such property by any Governmental Authority, or confiscation of such property or the requisition of the use of such property by any Governmental Authority.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or

Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Borrower under Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01 amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes that would not have been imposed but for such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order" has the meaning specified in Section 5.15.

"Extraordinary Expenses" means all reasonable, documented out-of-pocket costs, expenses, liabilities or advances (including any such expenses, liabilities or advances incurred with respect to or paid to advisors and their affiliates) that Administrative Agent and Lenders incur during a Default or Event of Default, or during the pendency of a proceeding of any Loan Party under any Debtor Relief Laws, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against Administrative Agent, any Lender, any Loan Party, any representative of creditors of a Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of Administrative Agent's Liens with respect to any Collateral), Loan Documents, Letters of Credit or Obligations, including any lender liability or other claims, except in each case resulting from a claim brought by Borrower or any other Loan Party; (c) the exercise, protection or enforcement of any rights or remedies of Administrative Agent in, or the monitoring of, any proceeding applicable to any Loan Party under any Debtor Relief Laws; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any enforcement action; and (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations.  Such reasonable, documented out-of-pocket costs, expenses and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, wages and salaries paid to independent contractors in liquidating any Collateral.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any applicable agreement entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement with respect to the foregoing.

"Facility" means the Roll-Up Term Loan Facility and/or the Delayed Draw Term Loan Facility, as the context may require.

"Facility Termination Date" means the date as of which Payment in Full of all Obligations has occurred.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve

System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; <u>provided</u>, <u>that</u>, (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to BMO on such day on such transactions as reasonably determined by Administrative Agent.

"<u>Final Availability Amount</u>" means $15,000,000.

"<u>Final Availability Period</u>" means the period commencing on the Final Order Entry Date through the Maturity Date.

"<u>Final DIP Order</u>" means an order of the Bankruptcy Court approving the Loans, the Facilities and the Loan Documents on a final basis, which order shall be (i) in form and substance satisfactory to the Required Lenders in their sole discretion, and (ii) in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent at the direction of the Required Lenders.

"<u>Final Order Entry Date</u>" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"<u>Fiscal Month</u>" means each fiscal month of Holdings and its Subsidiaries ending on or about the last day of each calendar month, as established by Borrower from time to time.

"<u>Fiscal Quarter</u>" means each fiscal quarter of Holdings and its Subsidiaries as established by Borrower from time to time.

"<u>Fiscal Year</u>" means each 12 Fiscal Month period of Holdings and its Subsidiaries, ending on December 31 of each year.

"<u>FO Lender</u>" means each Person that is a party hereto in its capacity as an "FO Lender".

"<u>FO Loan</u>" means any Loan held by any FO Lender.

"<u>FO Obligations</u>" means the Obligations owed to the FO Lenders.

"<u>FO Pro Rata Share</u>" means a percentage equal to (x) the sum of (1) the applicable FO Lender's unfunded Delayed Draw Term Loan Commitment (or, in the event such Delayed Draw Term Loan Commitment shall have been terminated, zero) plus (2) the applicable FO Lender's outstanding Delayed Draw Term Loans *<u>divided by</u>* (y) the sum of (1) the total amount of the unfunded Delayed Draw Term Loan Commitments held by all of the FO Lenders (or, in the event such Delayed Draw Term Loan Commitments shall have been terminated, zero) plus (2) the total amount of outstanding Delayed Draw Term Loans held by all of the FO Lenders.

-15-

"Foreign Assets Control Regulations" has the meaning specified in Section 5.15.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Fraudulent Conveyance" has the meaning specified in Section 11.10.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied, subject to Sections 1.03(b) and 1.03(c) below.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Governmental Third Party Payor" means Medicare, Medicaid, TRICARE, CHAMPVA, state government insurers and any other person or entity which presently or in the future maintains Governmental Third Party Payor Programs.

"Governmental Third Party Payor Programs" means all governmental third party payor programs in which any Restricted Party participates or is enrolled (including, without limitation, Medicare, Medicaid, TRICARE, CHAMPVA or any other federal or state health care programs).

"Guarantee" means, as to any Person, any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness against loss in respect thereof (in whole or in part), or (b) Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by

the guaranteeing Person in good faith; provided, that, with respect to clause (b) of the preceding sentence, if the subject Indebtedness or other obligation is non-recourse, then the amount of such Guarantee shall be deemed to be the lower of the amount of such Guarantee determined pursuant to the foregoing terms of this sentence or the fair market value of the property subject to such Lien. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means Holdings, each Subsidiary Guarantor and each other Person that becomes a guarantor of all or part of the Obligations after the Closing Date pursuant to Section 6.12 of the Agreement or otherwise.

"Hazardous Materials" means all substances or wastes listed, defined or regulated pursuant to any Environmental Law as explosive, radioactive, hazardous, toxic or as pollutants and petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Health Care Laws" means (i) any (A) foreign or domestic federal, state or local law, statute, ordinance, code, rule or regulation, (B) order, decision, injunction, judgment, ruling, charge, writ, subpoena, verdict, decree, stipulation, determination or award entered, issued, made or rendered by any Governmental Authority or arbitrator, or (C) license, franchise, consent, approval, permit or similar right, in the case of each of clauses (A), (B) and (C), relating to the regulation of the dental industry or orthodontic industry or to the provision or payment for items or services rendered, provided, dispensed or furnished by dentists or dental professionals; (ii) the civil False Claims Act (31 USC § 3729 et seq.) and similar state laws; (iii) laws relating to the use, storage, sale, marketing and prescribing of drugs; (iv) laws relating to the use of x-rays and other diagnostic imaging techniques; (v) the anti-kickback law (42 USC §1320a-7b(b)) and similar state laws prohibiting remuneration in exchange for referrals; (vi) laws protecting the privacy of medical records and personal health information, including HIPAA; (vii) Medicare (Title XVIII of the Social Security Act) and Medicaid (Title XIX of the Social Security Act) and the regulations promulgated thereunder; and (viii) all applicable laws regulating the provision of free or discounted healthcare services; provided that "Health Care Laws" shall not include any CPOD Laws.

"Holdings" has the meaning specified in the introductory paragraph hereto.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not (except as expressly set forth below) included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      all direct or contingent obligations of such Person arising under (i) letters of credit (including standby and commercial), bankers' acceptances, bank guarantees and similar instruments or (ii) surety, customs, reclamation or performance bonds;

(c)      net obligations of such Person under any Swap Contract;

-17-

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade payables incurred in the Ordinary Course of Business and not more than 90 days past due) that are due and payable but unpaid and if and only to the extent constituting a liability that is required to appear on such Person's balance sheet in accordance with GAAP;

(e)      indebtedness secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      obligations under Capital Leases and synthetic or other similar financing leases of such Person;

(g)      all obligations of such Person with respect to the redemption, repayment or other repurchase or payment in respect of any Disqualified Equity Interest; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, to the extent such Indebtedness is recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any Capital Lease or synthetic or other similar financing lease as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.  The amount of any non-recourse indebtedness described in clause (e) above shall be limited to the fair market value of any property securing such indebtedness if less than the aggregate outstanding amount of such indebtedness.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Budget" shall have the meaning set forth in Section 5.24 and a copy of which is attached hereto as Annex B.

"Intellectual Property" means all rights, title and interest in and to all past, present and future:  trade secrets, know-how and other proprietary information; trademarks, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may

hereafter be issued throughout the world and all tangible property embodying the copyrights, unpatented inventions (whether or not patentable); patent applications and patents; industrial design applications and registered industrial designs; licenses related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, including without limitation, rights in computer software, source codes, object codes, executable code, data, and databases; and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; and all other intellectual property, including all statutory and common law rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means the last day of each calendar month.

"Interest Period" means, as to each LIBO Rate Loan, the period commencing on the date such LIBO Rate Loan is disbursed or converted to or continued as a LIBO Rate Loan and ending, in each case, on the date one, two, three or six months thereafter, or if available to each applicable Lender, 12 months thereafter, or such other date (not to exceed 12 months) thereafter as the applicable Lenders may agree, as selected by Borrower in its Committed Loan Notice; provided, that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     no Interest Period shall extend beyond the Maturity Date for the Roll-Up Term Loan or Delayed Draw Term Loan to which such Interest Period applies; and

(d)     no Interest Period with respect to any portion of the Roll-Up Term Loan, Delayed Draw Term Loan shall extend beyond a date on which Borrower is required to make a scheduled payment of principal on the Roll-Up Term Loan, Delayed Draw Term Loan unless the sum of (a) the aggregate principal amount of the Roll-Up Term Loan, Delayed Draw Term Loan that is Base Rate Loans *plus* (b) the aggregate principal amount of the Roll-Up Term Loan, Delayed Draw Term Loan that is LIBO Rate Loans with Interest Periods expiring on or before such date equals or exceeds the principal amount to be paid on the Roll-Up Term Loan, Delayed Draw Term Loan on such payment date.

"Interim Availability Amount" means $10,000,000.

"Interim Availability Period" shall mean the period commencing on the Interim Order Entry Date through and including the date that is immediately prior to the Bankruptcy Court's entry of the Final Order Entry Date.

-19-

"Interim DIP Order" means an interim order of the Bankruptcy Court approving the Loans, the Facilities and the Loan Documents on an interim basis, which order shall be substantially in the form attached hereto as Annex C (or in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion).

"Interim Facility Maturity Date" means September 1, 2020 to the extent that the Final DIP Order has not been entered at such time.

"Interim Order Entry Date" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the ownership, purchase or other acquisition of Equity Interests or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount, as of any date of determination, of any Investment shall be the amount actually invested, without adjustment for prior or subsequent increases or decreases in the value of such Investment, less all returns of principal or equity thereon (and without adjustment by reason of the financial condition of such other Person) and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such transfer or exchange.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" has the meaning specified in the introductory paragraph hereto and, as the context requires, includes each Delayed Draw Lender and each Roll-Up Term Loan Lender.

"Lender Party" means (a) each Lender, (b) Administrative Agent, (c) each Related Party entitled to indemnification under Section 10.04(b) hereof, and (d) the successors and assigns of each of the foregoing permitted in accordance with this Agreement.

"Lender Party Expenses" has the meaning specified in Section 10.04(a).

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify Borrower and Administrative Agent in writing.

"LIBO Rate" means for any Interest Period with respect to a LIBO Rate Loan, a rate per annum determined by Administrative Agent pursuant to the following formula:

$$\frac{\text{LIBO Base Rate}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

Where,

"LIBO Base Rate" means, for such Interest Period, the higher of (a) the rate per annum equal to the ICE Benchmark Administration Limited LIBOR Rate ("*ICE LIBOR*"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by Administrative Agent from time to time) at approximately 11:00 a.m., London time, two (2) London Banking Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; provided that if such rate is not available at such time for any reason, then the "LIBO Base Rate" for such Interest Period shall be the rate per annum determined by Administrative Agent in accordance with its customary procedures then in effect to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in immediately available funds in the approximate amount of the LIBO Rate Loan being made, continued or converted and with a term equivalent to such Interest Period would be offered by such other authoritative source (as is selected by Administrative Agent in its sole reasonable discretion) to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two (2) London Banking Days prior to the commencement of such Interest Period, and (b) 1.00% per annum.

Notwithstanding the foregoing or anything to the contrary contained herein, if at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in Section 3.02 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 3.02 have not arisen but the supervisor for the administrator of LIBO Rate (or component thereof) or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBO Rate (or component thereof) shall no longer be used for determining interest rates for loans (in the case of either such clause (i) or (ii), an "Alternative Interest Rate Election Event"), the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for leveraged syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary in Section 10.01, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days after the date notice of such alternate rate of interest is provided to the Lenders, a written notice from Required Lenders stating that they object to such amendment (which amendment shall not be effective prior to the end of such five (5) Business Day notice period). To the extent an alternate rate of interest is adopted as contemplated hereby, the approved rate shall be applied in a manner consistent with the prevailing market convention; provided that, to the extent such prevailing market convention is not administratively feasible for the Administrative Agent, such approved

-21-

rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and the Borrower.  From such time as an Alternative Interest Rate Election Event has occurred and continuing until an alternate rate of interest has been determined in accordance with the terms and conditions of this paragraph, (x) any Committed Loan Notice that requests the conversion of any Loan to, or continuation of any Loan as, a LIBO Rate Loan shall be ineffective, and (y) if any Committed Loan Notice requests a LIBO Rate Loan, such Loan shall be made as a Base Rate Loan; provided that, to the extent such Alternative Interest Rate Election Event is as a result of clause (ii) above, then clauses (x) and (y) of this sentence shall apply during such period only if LIBO Rate for such Interest Period is not available or published at such time on a current basis.

"LIBO Rate Loan" means a Loan (or segment of a Loan) that bears interest at a rate based on the LIBO Rate.

"License" means any license or other agreement under which a Loan Party is granted any right to use any Intellectual Property which it does not own in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of assets or property, or any other conduct of its business.

"Licensed Personnel" any Person employed, engaged by or otherwise providing professional services, dental services, and/or dental administrative services for or on behalf of a Loan Party or a BHG Entity, including any dentist, orthodontist, endodontist, oral or maxillofacial surgeon, periodontist, prosthodontist, x-ray or radiology technician, dental assistant or dental hygienist.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"LO Lender" means each Person that is a party hereto in its capacity as an "LO Lender".

"LO Loan" means any Loan held by any LO Lender.

"LO Obligations" means the Obligations owed to the LO Lenders.

"LO Pro Rata Share" means, (a) with respect to the Delayed Draw Term Loans, a percentage equal to (x) the sum of (1) the applicable LO Lender's unfunded Delayed Draw Term Loan Commitment (or, in the event such Delayed Draw Term Loan Commitment shall have been terminated, zero) plus (2) the applicable LO Lender's outstanding Delayed Draw Term Loans *divided by* (y) the sum of (1) the total amount of the unfunded Delayed Draw Term Loan Commitments held by all of the LO Lenders (or, in the event such Delayed Draw Term Loan Commitments shall have been terminated, zero) plus (2) the total amount of outstanding Delayed Draw Term Loans held by all of the LO Lenders and (b) with respect to the Roll-Up Term Loans, a percentage equal to (x) the applicable LO Lender's outstanding Prepetition Roll-Up Term Loans *divided by* (y) the total amount of the outstanding Roll-Up Term Loans held by the LO Lenders.

"Loan" means an extension of credit under Article II in the form of a Roll-Up Term Loan or a Delayed Draw Term Loan.

"Loan Account" has the meaning specified in Section 2.11.

"Loan Documents" means this Agreement, each Note, the Fee Letter, each Security Instrument, and all other instruments and agreements heretofore or hereafter executed or delivered to or in favor of any Lender or Administrative Agent in connection with the Loans made and transactions contemplated by this Agreement.  In no event shall the Prepetition Loan Agreement or any other Prepetition Loan Document be deemed to be a Loan Document for any purpose under this Agreement.

"Loan Parties" means Borrower, Holdings and the Subsidiary Guarantors, collectively.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent), or condition (financial or otherwise) of the Loan Parties taken as a whole or the Loan Parties and their Subsidiaries, taken as a whole; (b) a material impairment of the ability of the Loan Parties taken as a whole to perform their payment obligations under any Loan Document; or (c) a material adverse effect upon the rights and remedies (taken as a whole) of Administrative Agent, including the validity, enforceability or priority of the Liens purported to be created by the Security Documents.

"Material License" has the meaning specified in Section 6.05(d).

"Maturity Date" means the earliest of (a) the Interim Facility Maturity Date, (b) November 5, 2020, (c) the effective date with respect to any Plan of Reorganization, (d) the filing of a motion by the Loan Parties seeking dismissal of any of the Cases, the dismissal of any of the Cases, or the filing of a motion by the Loan Parties seeking to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (e) the date a sale of all or substantially all of the Loan Parties' assets is consummated under Section 363 of the Bankruptcy Code, (f) the acceleration of the Obligations under the Facilities and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders, and (g) the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code.

"Maximum Rate" has the meaning specified in Section 10.09.

"Milestones" means each of the milestones set forth in Annex A.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgaged Property" means the Real Estate of the Loan Parties required from time to time to be subject to a Mortgage pursuant to the terms of the Loan Documents.

"Mortgages" means the mortgages, deeds of trust, or deeds to secure debt executed by an Loan Party from time to time thereafter in favor of Administrative Agent, for the benefit of the Lender Parties, by which such Loan Party has granted to Administrative Agent, as security for the Obligations, a Lien upon the Mortgaged Property described therein.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party, a Subsidiary thereof or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (at least one of which is a Loan Party, a Subsidiary thereof or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means with respect to any transaction or event, an amount equal to the cash proceeds received by any Loan Party (or any Subsidiary thereof) from or in respect of such transaction or event (including deferred payments and cash proceeds of any non-cash proceeds of such transaction), less (a) any out-of-pocket expenses paid to an unaffiliated Person that are reasonably incurred by such Loan Party or Subsidiary in connection therewith (including without limitation legal, investment banking, underwriting, brokerage and accounting and other professional fees, sales commissions, fees and charges of Governmental Authorities), and (b) in the case of a Disposition or Event of Loss, the amount of any Indebtedness secured by a Lien on the related asset and discharged from the proceeds of such Disposition or Event of Loss, any Taxes paid or reasonably estimated by the applicable Loan Party or Subsidiary to be payable by such Person in respect of such Disposition (provided, that, if the actual amount of Taxes paid is less than the estimated amount, the difference shall immediately constitute Net Cash Proceeds), any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to a Disposition (provided, that, such amounts shall be treated as Net Cash Proceeds upon their release to Holdings, Borrower or any of their Subsidiaries from such escrow account and shall then be promptly, but in any event within 10 Business Days, applied to the prepayment of the Loans pursuant to Section 2.06(b)) and any portion of such proceeds which Holdings, a Borrower or a Subsidiary thereof determines in its reasonable business judgment should be reserved for post-closing adjustments and indemnities with respect to such Disposition.

"New Mountain" means New Mountain Finance Corporation, together with its Affiliates (which, for the avoidance of doubt, shall exclude the Loan Parties and any of their Subsidiaries), including, without limitation, New Mountain Finance Holdings, L.L.C.

"Non-Consenting Lender" has the meaning specified in Section 10.01.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" means any of the Roll-Up Term Loan Notes and/or the Delayed Draw Term Loan Notes, as applicable.

"<u>Obligations</u>" means all amounts owing by any Loan Party to Administrative Agent, any Lender or any other Lender Party pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to any Loan, including without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any proceeding under any Debtor Relief Law relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to Administrative Agent and Lenders incurred and payable by the Loan Parties pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, together with all renewals, extensions, modifications or refinancings thereof.

"<u>OFAC</u>" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"<u>OFAC Sanctions</u>" means the country or list based economic and trade sanctions administered and enforced by OFAC.

"<u>Ordinary Course of Business</u>" means the ordinary course of business of Borrower and its Subsidiaries, consistent with past practices and undertaken in good faith.

"<u>Organization Documents</u>" means, as applicable with respect to any Person, its certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); its certificate or articles of formation or organization and operating agreement; or its partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 10.13</u>).

"<u>Outstanding Amount</u>" means, as applicable, the aggregate outstanding principal amount of the Roll-Up Term Loans and/or Delayed Draw Term Loans on any date after giving effect to any Borrowings, prepayments or repayments thereof occurring on such date.

"<u>Overnight Rate</u>" means, for any day, with respect to any amount denominated in Dollars, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined in good faith by Administrative Agent in accordance with banking industry rules on interbank compensation.

"<u>Participant</u>" has the meaning specified in <u>Section 10.06(d)</u>.

"<u>Participant Register</u>" has the meaning specified in Section 10.06(d).

"<u>Payment in Full</u>", "<u>Paid in Full</u>" or "<u>Payment in Full of the Obligations</u>" means (a) the payment in full in cash of all Obligations (other than contingent indemnification claims for which no claim has been asserted), together with all accrued and unpaid interest and fees thereon, (b) the Commitments shall have terminated or expired, and (c) all claims of the Loan Parties against any Lender Party arising on or before the payment date shall have been released on terms reasonably acceptable to Administrative Agent and the Required Lenders.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>Pension Act</u>" means the Pension Protection Act of 2006, as amended from time to time, and any successor statute.

"<u>Pension Funding Rules</u>" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA, and any sections of the Code or ERISA related thereto that are enacted after the date of this Agreement.

"<u>Pension Plan</u>" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by any Loan Party, a Subsidiary thereof or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"<u>Permit</u>" means, with respect to any Person, any permit, approval, authorization, license, waiver, registration, certificate, concession, grant, franchise, variance or permission from, and any other contractual obligations with, any Governmental Authority, and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Permitted Liens</u>" has the meaning specified in <u>Section 7.02</u>.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" has the meaning specified in the recitals hereto.

"Petitions" means the voluntary petitions for relief under Chapter 11 of the Bankruptcy Code filed by the Loan Parties with the Bankruptcy Court.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Loan Party or any such plan to which any Loan Party is required to contribute (including any Pension Plan which any ERISA Affiliate maintains, or is required to contribute to) on behalf of any of its employees.

"Plan of Reorganization" means a Chapter 11 plan for any of the Loan Parties as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Platform" has the meaning specified in Section 10.02(c).

"Patriot Act" has the meaning specified in Section 5.22(b).

"Prepetition Agent" means BMO Harris Bank, N.A., in its capacity as administrative agent and collateral agent for the Prepetition Secured Parties under the Prepetition Loan Agreement.

"Prepetition Collateral" means any and all "Collateral" (as defined under the Prepetition Loan Agreement) that any Loan Party or the Parent (each as defined in the Prepetition Loan Agreement) has pledged, or purported to have pledged, to secure the Prepetition Indebtedness.

"Prepetition Indebtedness" means the "Obligations" (as defined in the Prepetition Loan Agreement).

"Prepetition Lenders" means the "Lenders" under and as defined in the Prepetition Loan Agreement.

"Prepetition Loan Agreement" means that certain Credit Agreement, dated as of March 15, 2018, among the Borrower, the Prepetition Lenders, the Prepetition Agent and the other parties thereto from time to time, as amended by that certain First Amendment to Credit Agreement, dated as of March 29, 2019, as further amended by that certain Second Amendment to Credit Agreement and First Amendment to Forbearance Agreement, dated as of June 5, 2020, as further amended by that certain Second Amendment to Forbearance Agreement, dated as of June 30, 2020, and as the same has been further amended, restated, supplemented or otherwise modified on or before the date hereof, as in effect as of such date.

"Prepetition Loan Documents" means the Prepetition Loan Agreement and the "Loan Documents" under and as defined in the Prepetition Loan Agreement as in effect as of the date hereof, as such Prepetition Loan Documents have been amended, restated, supplemented or otherwise modified on or before the date hereof.

"Prepetition Priority Liens" means the perfected and unavoidable Liens on the assets of any Loan Party validly existing immediately prior to the Petition Date which are not primed by the DIP Liens under the DIP Orders and expressly indicated as "Prepetition Priority Liens" on Schedule 7.02(y) hereto.

"Prepetition Revolving Credit Lenders" means the "Revolving Lenders" as defined in the Prepetition Loan Agreement.

"Prepetition Revolving Facility" means the "Revolving Credit Facility" as defined in the Prepetition Loan Agreement.

"Prepetition Rolled Term Loans" means the portion of the "Second Amendment Delayed Draw Term Loans" as defined in the Prepetition Loan Agreement that are outstanding on the Interim Order Entry Date.

"Prepetition Secured Parties" means the "Secured Parties" as defined in the Prepetition Loan Agreement.

"Private Third Party Payor" means private insurers, health maintenance organizations, managed care plans and any other person or entity which presently or in the future maintains Private Third Party Payor Programs.

"Private Third Party Payor Programs" means all non-governmental third party payor programs in which any Restricted Party participates.

"Proceeding" means any suit, action, cause of action (whether at law or in equity), arbitration, audit, hearing, investigation, litigation, claim, complaint, administrative or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority.

"Professional Fees" means fees and expense reimbursements of Professional Persons.

"Professional Person" means a Person who is an attorney, accountant, appraiser, auctioneer or financial advisor or other professional person who is retained with approval of the Bankruptcy Court by any Debtor or Committee pursuant to Section 327, 328 or 363 of the Bankruptcy Code.

"Properly Contested" means with respect to any obligation of a Loan Party or any Subsidiary of a Loan Party, (a) the obligation is subject to a bona fide dispute regarding amount or such Loan Party's liability to pay; (b) to the extent necessary to preserve the position of the Loan Party or such Subsidiary, the obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment of such obligation could not reasonably be expected to have a Material Adverse Effect, nor result in forfeiture or sale of any material assets of a Loan Party; (e) no Lien (other than an inchoate Lien or a Permitted Lien) is imposed on assets of a Loan Party as a result of the matter being contested, unless bonded and stayed to the satisfaction of Administrative Agent; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"Qualified Bidder" means a bidder who submits an unconditional bid for all or substantially all of the Debtors' assets for the cash purchase price greater than the Release Price.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Estate" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights appurtenant thereto and all leases, tenancies, and occupancies thereof.

"Receipts Variance" shall have the meaning set forth in Section 6.01(d)(ii).

"Recipient" means (a) Administrative Agent, (b) any Lender or (c) or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, as applicable.

"Release Price" means the aggregate of the sum of (x) all outstanding Obligations *plus* (y)  Prepetition Indebtedness *less* $10,000,000.

"Remedies Notice Period" shall have the meaning set forth in Section 8.02(b).

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Replacement Liens" has the meaning ascribed to such term in DIP Order.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Request for Credit Extension" means conversion or continuation of Loans or a Committed Loan Notice.

"Required Lenders" means, as of any date of determination, Lenders holding more than 70% of the sum of (a) Total Outstandings and (b) aggregate unused Commitments. The unused Commitments of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Responsible Officer" means, with respect to each Loan Party, the chief restructuring officer, the chief executive officer, president, chief financial officer, treasurer or controller of such Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Loan Party

and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Party" shall mean each Loan Party, each Restricted Subsidiary of each Loan Party and each BHG Entity.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of Holdings or any Subsidiary, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to a Loan Party's or its Subsidiaries' stockholders, partners or members (or the equivalent Person thereof), (c) any payment of principal or interest or premium on any Indebtedness of a Person to a holder of Equity Interests of such Person or to an Affiliate of a holder of Equity Interests of such Person; provided that, this clause (c) shall not apply to the Indebtedness of the Loan Parties under this Agreement held by New Mountain, or (d) any payment of management, consulting, monitoring, advisory or similar fees to any board member or holder of any capital stock or other Equity Interest of Holdings or any Subsidiary or any Affiliate of any such board member or holder.

"Restricted Subsidiary" means each Subsidiary of Holdings, including, for the avoidance of doubt, the Borrower.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of August 2, 2020 (as may be amended, restated, supplement or otherwise modified in accordance with the terms thereof)), among the Borrower and its direct and indirect domestic subsidiaries party from time to time thereto, the Consenting Lenders (as defined therein), the Company Parties (as defined therein) and any Permitted Transferees (as defined therein).

"Roll-Up Term Loans" shall have the meaning set forth in Section 2.01(a).

"Roll-Up Term Loan Lender" means each Lender that has Roll-Up Term Loans outstanding.

"Roll-Up Term Loan Note" means a promissory note made by Borrower in favor of a Roll-Up Term Lender evidencing Roll-Up Term Loans made by such Roll-Up Term Lender, substantially in the form of Exhibit C-2.

"RSA Definitive Documentation" means the "Definitive Documentation" as defined in the Restructuring Support Agreement.

"RSA Transactions" means the "Transactions" as defined in the Restructuring Support Agreement.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc. and any successor thereto.

"<u>Sanctioned Entity</u>" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

"<u>Sanctioned Person</u>" means (a) a person named on the OFAC-maintained list of "Specially Designated Nationals" (as defined by OFAC) or (b) a Canada Sanctioned Person.

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Lenders, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to <u>Section 9.05</u>, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms hereof or under the DIP Orders.

"<u>Securitization</u>" has the meaning specified in <u>Section 10.07</u>.

"<u>Security Agreement</u>" means the Pledge and Security Agreement dated as of the date hereof by the Loan Parties and Administrative Agent for the benefit of the Lender Parties.

"<u>Security Instruments</u>" means, collectively or individually as the context may indicate, the Security Agreement, the Control Agreements, any Mortgages, all security agreements pertaining to Intellectual Property, any landlord lien waiver, warehouseman's or bailee's letter or similar agreement, the DIP Orders, and all other agreements, instruments and other documents, whether now existing or hereafter in effect, pursuant to which any Loan Party or other Person shall grant or convey to Administrative Agent or the Lenders a Lien in property as security for all or any portion of the Obligations.

"<u>Seller</u>" has the meaning given to such term in the Stalking Horse Acquisition Agreement.

"<u>Stalking Horse Acquisition Agreement</u>" means that certain Asset Purchase Agreement, dated as of August 2, 2020, by and among Holdings, Borrower, Benevis Corp., Benevis Affiliates, LLC, Benevis, LLC, Benevis Informatics, LLC and New Mountain Finance Corporation, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time with the consent of the Required Lenders in the case of any amendment, supplement or modification adverse to the interests of the Lenders.

"<u>Subsidiary</u>" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (but not a representative office of such Person) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person and,  in any event, including any other Person the accounts of which would be consolidated with such Person in accordance with GAAP as of the date of determination.  For the avoidance of doubt, no BHG Entity shall be considered a direct or indirect Subsidiary of Holdings or Borrower, except for purposes of the financial statements of Holdings or Borrower

and the calculation of ratios, tests or the amount or availability of any exception or basket applicable to Holdings or Borrower, to the extent consolidated with Holdings or Borrower in accordance with GAAP.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Subsidiary Guarantor" and "Subsidiary Guarantors" has the meaning specified in the introductory paragraph hereto, and shall include each other Subsidiary that becomes a Guarantor of all or a part of the Obligations after the Closing Date pursuant to Section 6.12 of the Agreement or otherwise.

"Superpriority Claims" shall mean all of the allowed superpriority administrative expense claims of the Administrative Agent and the other Secured Parties on account of the Obligations, which claims shall be entitled to the benefits of section 364(c)(1) and 364(e) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Loan Parties. Superpriority Claims shall, at all times be (x) junior only to the Carve-Out and (y) senior to any and all other administrative expense claims or other claims against the Loan Parties or their estates, in the Cases and any successor cases.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code, and (c) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "***Master Agreement***"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or

other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Declaration" shall have the meaning given to such term in Section 8.02(a).

"Third Party Payor Programs" shall mean, collectively, the Governmental Third Party Payor Programs and the Private Third Party Payor Programs.

"Total Outstandings" means the Outstanding Amount of all Loans.

"Trading With the Enemy Act" has the meaning specified in Section 5.15.

"Transaction" means the extension of Facilities under and in accordance with the Loan Documents and DIP Orders.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a LIBO Rate Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, that, if, with respect to any financing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of any security interests granted to Administrative Agent pursuant to any applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, the term "UCC" shall also include the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement, each Loan Document and any financing statement relating to such perfection or effect of perfection or non-perfection.

"Ultimate Holdings I" means New LT Smile Holdings, LLC, a Delaware limited liability company.

"Ultimate Holdings II" means New LT Smile Holdings II, LLC, a Delaware limited liability company.

"United States" and "U.S." mean the United States of America.

"United States Trustee" means the United States Trustee appointed under Title 28 Section 586(a)(3) of the Bankruptcy Code to supervise the administration of the Cases.

"Updated Budget" shall have the meaning set forth in Section 6.01(d)(i).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Variance Report Date" shall have the meaning set forth in Section 6.01(d)(ii).

"Variance Reports" shall have the meaning set forth in Section 6.01(d)(ii).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.02. **Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein or in any other Loan Document), (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.03. **Accounting Terms**.

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared

in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)  Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either Borrower, Administrative Agent or the Required Lenders shall so request, Administrative Agent, the Lenders and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided, that,, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall provide to Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(c)  [Reserved].

(d)  In computing financial ratios and other financial calculations of Holdings and its Subsidiaries required to be submitted pursuant to this Agreement, all Indebtedness shall be calculated at par value irrespective of whether Borrower has elected the fair value option pursuant to FASB Interpretation No. 159 – The Fair Value Option for Financial Assets and Financial Liabilities—Including an amendment of FASB Statement No. 115 (February 2007).

(e)  Notwithstanding anything to the contrary contained herein, any reference herein to the financial statements of any Person and its Restricted Subsidiaries shall include all entities, including, without limitation, all variable interest entities (as defined by GAAP), that are included or consolidated in the financial statements of such Person and its Restricted Subsidiaries in accordance with GAAP, and the financial condition and operating results of all such included or consolidated entities shall be included in the financial condition and operating results of such Person and  its Restricted Subsidiaries for all calculations of ratios, tests or the amount or availability of any exception or basket applicable to such Person and its Restricted Subsidiaries, in each case regardless of whether or not such entities are or may not be Subsidiaries or Restricted Subsidiaries thereof.

**1.04.   Uniform Commercial Code**.  As used herein, the following terms are defined in accordance with the UCC in effect in the State of New York from time to time:  "Chattel Paper," "Commodity Account", "Commodity Contract", "Deposit Account," "Documents," "General Intangible," "Instrument," "Inventory," and "Securities Account."

**1.05.   Rounding**.  Any financial ratios required to be maintained by Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.06.   [Reserved].**

**1.07.    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Central time (daylight or standard, as applicable). When the payment of any obligations is stated to be due on a day which is not a Business Day, the date of such payment shall extend to the immediately succeeding Business Day.

**1.08.    Rollovers**.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Loans with loans incurred under a new credit facility, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment be made "in Dollars", "in immediately available funds", "in cash" or any other similar requirement.

**1.09.    [Reserved]**.

**1.10.    Divisions**.  Any restriction, condition or prohibition applicable to a merger, consolidation, amalgamation, assignment, restricted payment, investment, disposition, sale, transfer, or similar term set forth in the Loan Documents shall be deemed to apply to a division of or by a limited liability company or a limited partnership, or an allocation of assets to a series of a limited liability company or a limited partnership (or the unwinding of such a division or allocation), as if it were a merger, consolidation, amalgamation, assignment, restricted payment, investment, disposition, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company or a limited partnership shall constitute a separate Person under the Loan Documents (and shall be subject to Section 6.12 (and each similar covenant or exception in this Agreement and in each other Loan Document) (including any deadlines set forth therein) to the same extent as such limited liability company or a limited partnership, immediately prior to giving effect to such division).

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**2.01.    Loan Commitments**.

(a)    Roll-Up Amounts.  Upon the Interim Order Entry Date, the Prepetition Rolled Term Loans held by the LO Lenders as of the Petition Date were, on cashless basis, automatically substituted and exchanged for (and repaid by) loans issued hereunder (the "Roll-Up Term Loans"), and such Roll-Up Term Loans were allocated among the LO Lenders based on their LO Pro Rata Share (and such Roll-Up Term Loans have been deemed funded on and as of the Interim Order Entry Date, and constitute and are deemed to be Loans hereunder) (the foregoing substitution and exchange of such Prepetition Rolled Term Loans into the Roll-Up Term Loans shall be defined herein, generally, as the "Roll-Up"). The aggregate principal amount of the Roll-Up Term Loans deemed funded hereunder equals $5,000,000.

(b)    [Reserved].

(c)    Delayed Draw Term Loan Commitments.

(i)        Subject to the terms and conditions herein (including, without limitation, Section 2.01(d)) and in any DIP Order, each Lender with a Delayed Draw Term Loan Commitment severally and not jointly agrees to lend to the Borrower during the Delayed Draw Availability Period, or until the earlier reduction of its Delayed Draw Term Loan Commitment to zero in accordance with the terms hereof, Delayed Draw Term Loans in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name in Schedule 2.01(c) under the heading "Delayed Draw Term Loan Commitment" (such amounts being referred to herein as such Lender's "Delayed Draw Term Loan Commitment" and amounts borrowed under this subsection 2.01(c) are referred to collectively as the "Delayed Draw Term Loans"); *provided* that (a) the amount of Delayed Draw Term Loans to be borrowed for any Delayed Draw Term Loan Borrowing shall be in a principal amount not to exceed the amount required pursuant to the Approved Budget, (b) the aggregate principal amount of all such Delayed Draw Term Loans for all such Lenders shall not exceed the Aggregate Delayed Draw Term Loan Commitment as of the Closing Date (as such commitment may be reduced from time to time in accordance with this Agreement) and (c) the Delayed Draw Term Loans shall be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid, no Delayed Draw Term Loan may be reborrowed.

(ii)        Notwithstanding anything to the contrary herein or in any other Loan Document, the Delayed Draw Term Loans shall be Loans for all purposes under this Agreement and the other Loan Documents, shall have terms that are identical to those of the Loans outstanding under this Agreement, and shall be entitled to all the benefits afforded by this Agreement and the other Loan Documents in respect of Loans, including, without limitation, that the Delayed Draw Term Loans (i) shall have the same Maturity Date, (ii) have the same interest rate (including, without limitation, any default rate) as the Loans and interest shall be payable on a pari passu basis with interest payable on the Loans, when such interest payments are due and payable in respect of the Loans on the applicable Interest Payment Date, (iii) shall benefit, on a pari passu basis with all the Loans, from any voluntary or mandatory payments in respect of the Loans, and (iv) shall benefit equally and ratably from the guarantees and Liens in favor of the Administrative Agent, for the benefit of the Administrative Agent and the Lenders, created by the Security Agreement or any other Loan Documents on a pari passu basis with the Loans under the Loan Documents.

(iii)        Notwithstanding anything herein or in any other Loan Document, (x) prior to the Interim Availability Period, no Delayed Draw Term Loans may be advanced by the applicable Lenders, (y) during the Interim Availability Period up to the Interim Availability Amount may be advanced by the applicable Delayed Draw Lenders, and (z) during the Final Availability Period, up to the Final Availability Amount *plus* the undrawn Interim Availability Amount may be advanced by the applicable Delayed Draw Lenders; provided that in no event shall the aggregate amount of Delayed Draw Term Loans advanced exceed $25,000,000.

(d)     <u>Order of Advances</u>.   Notwithstanding any other provision herein, the Lenders agree that:

(i)     the first $10,000,000 of Delayed Draw Term Loans borrowed hereunder shall be made by the FO Lenders and each FO Lender agrees to advance an amount equal to its FO Pro Rata Share of the applicable Borrowing; and

(ii)     the remaining $15,000,000 of Delayed Draw Term Loans borrowed hereunder shall be made by the LO Lenders and each LO Lender agrees to advance an amount equal to its LO Pro Rata Share of the applicable Borrowing.

**2.02.   Borrowings, Conversions and Continuations of Loans**.

(a)     Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of LIBO Rate Loans shall be made upon Borrower's irrevocable notice to Administrative Agent, which may be given by telephone.  Each such notice must be received by Administrative Agent not later than 1:00 p.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of LIBO Rate Loans or of any conversion of LIBO Rate Loans to Base Rate Loans, and (ii) on the requested date of any Borrowing of Base Rate Loans; *provided* that notices with respect to Delayed Draw Term Loan Borrowings must be received by the Administrative Agent not later than 1:00 p.m. (x) in the case of Delayed Draw Term Loan Borrowings in a principal amount of $5,000,000 or less, five (5) Business Days prior to the requested date of such Delayed Draw Term Loan Borrowing and (y) in the case of Delayed Draw Term Loan Borrowings in a principal amount greater than $5,000,000, five (5) Business Days prior to the requested date of such Delayed Draw Term Loan Borrowing.  Each telephonic notice pursuant to this <u>Section 2.02(a)</u> must be confirmed promptly by delivery to Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of Borrower.  Each Borrowing of, conversion to or continuation of LIBO Rate Loans shall be in a principal amount of $250,000 or a whole multiple of $50,000 in excess thereof (subject, in the case of Delayed Draw Term Loans, to <u>Section 2.01(c)</u>).  Except as provided in <u>Section 2.04(c)</u>, each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof (subject, in the case of Delayed Draw Term Loans, to <u>Section 2.01(c)</u>).  If Borrower fails to specify a Type of Loan in a Committed Loan Notice or if Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans.  If Borrower requests a Borrowing of, conversion to, or continuation of LIBO Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of three (3) months.

(b)     Following receipt of a Committed Loan Notice for a Facility, Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage under such Facility of the applicable Loans, and if no timely notice of a conversion or continuation is provided by Borrower, Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in the preceding subsection.  In the case of a Borrowing, each Lender shall make the amount of its Loan available to Administrative Agent in immediately available funds at Administrative Agent's Office not later than 1:00 p.m. on the

Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction (or waiver) of the applicable conditions set forth in <u>Section 4.02</u> (and (x) if such Borrowing is the initial Credit Extension, <u>Section 4.01</u> and (y) if such Borrowing is a Delayed Draw Term Loan Borrowing, <u>Section 4.03</u>), Administrative Agent shall make all funds so received available to Borrower in like funds as received by Administrative Agent either by (i) crediting the account of Borrower on the books of Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with written instructions provided to (and reasonably acceptable to) Administrative Agent by Borrower.

(c)     Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan unless the Borrower pays the amount due, if any, under <u>Section 3.05</u> in connection therewith.  During the existence of an Event of Default, at the election of Required Lenders, no Loans may be requested, as converted to or continued as LIBO Rate Loans.

(d)     After giving effect to all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than eight Interest Periods in effect in respect of the Facilities, unless otherwise agreed between the Borrower and the Administrative Agent.

(e)     Borrower and each Lender hereby irrevocably authorize Administrative Agent, in Administrative Agent's sole discretion, to advance to Borrower, and/or to pay and charge to Borrower's Loan Account hereunder, all sums necessary to pay (i) any interest accrued on the Obligations when due and to pay all fees, costs and expenses and other Obligations at any time owed by any Loan Party to Administrative Agent or any Lender hereunder and (ii) any service charge or Lender Party Expenses when due; <u>provided</u>, <u>that</u>, any such advance or charge shall only be made following Administrative Agent giving Borrower five Business Days' notice of such advance or charge and Borrower raising no objection thereto.

**2.03.   [Reserved]**.

**2.04.   [Reserved]**.

**2.05.   Repayment of Loans.**   Borrower unconditionally promises to pay to Administrative Agent for the account of each Lender the aggregate principal amount of the Loans (with accrued and unpaid interest on the principal amount of all Loans outstanding on such date) outstanding on the earlier to occur of (x) Maturity Date and (y) the date of the acceleration of the Loans in accordance with the terms hereof; <u>provided</u> that, payments made pursuant this <u>Section 2.05</u> shall be applied (1) <u>*first*</u>, pro rata to the remaining principal installments of the Delayed Draw Term Loans held by the FO Lenders until Paid in Full and (2) <u>*second*</u>, pro rata to the remaining principal installments of the Roll-Up Term Loans and Delayed Draw Term Loans held by the LO Lenders.

**2.06.   Prepayments**.

(a)     <u>Optional</u>.   Borrower may, upon notice to Administrative Agent from Borrower, at any time or from time to time voluntarily prepay Roll-Up Term Loans or Delayed Draw Term Loans in whole or in part without premium or penalty; <u>provided</u>, <u>that</u>, (A) such notice

must be received by Administrative Agent not later than 1:00 p.m. (1) three Business Days prior to any date of prepayment of LIBO Rate Loans and (2) on the date of prepayment of Base Rate Loans; (B) any prepayment of LIBO Rate Loans shall be in a principal amount of at least $500,000; (C) any prepayment of Base Rate Loans shall be in a principal amount of at least $100,000 or, in each case, if less, the entire principal amount thereof then outstanding and (D) no LO Loans may be voluntarily prepaid until the Delayed Draw Term Loans held by FO Lenders have been Paid in Full. Each such notice shall specify the date and amount of such prepayment, and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans are to be prepaid, the Interest Period(s) of such Loans. Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the relevant Facility). If such notice is given by Borrower, Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided, that, such notice may state that the prepayment is conditioned upon the effectiveness of other credit facilities, acquisitions or dispositions, in which case such notice may be revoked by Borrower (by notice to Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any prepayment of a LIBO Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each prepayment of the outstanding Loans pursuant to this Section 2.06(a) shall be applied (x) *first*, pro rata to the outstanding FO Loans until Paid in Full and (y) *second*, pro rata to the outstanding LO Loans. Subject to Section 2.17, such prepayments shall be paid to the Lenders in accordance with their respective Applicable Percentage in respect of each of the relevant Facilities.

        (b)    Mandatory.

        (i)    [Reserved].

        (ii)    Asset Dispositions. If any Loan Party or any of its Restricted Subsidiaries Disposes of, or suffers an Event of Loss of, any property (other than any Disposition of any property permitted by Sections 7.05(a), 7.05(c), 7.05(e), 7.05(f), 7.05(g) or 7.05(h)), Borrower shall prepay an aggregate principal amount of Loans equal to such excess Net Cash Proceeds promptly after receipt thereof by such Person.

        (iii)    Debt Incurrence. Upon the incurrence or issuance by any Loan Party or any of its Restricted Subsidiaries of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.01), Borrower shall prepay an aggregate principal amount of Loans equal to all Net Cash Proceeds received therefrom promptly after receipt thereof by such Loan Party or such Subsidiary.

        (iv)    [Reserved.]

        (v)    Application of Mandatory Prepayments. Each prepayment of Loans pursuant to the foregoing provisions of this Section 2.06(b) shall be applied (x) *first*, pro rata to the outstanding FO Loans until Paid in Full and (y) *second*, pro rata to the outstanding LO Loans. Subject to Section 2.17, such prepayments shall be paid

to the Lenders in accordance with their respective Applicable Percentage in respect of the relevant Facilities.

**2.07.   Termination or Reduction of Commitments**.

(a)      [Reserved].

(b)      [Reserved].

(c)      Delayed Draw Term Loan Commitment. The Delayed Draw Term Loan Commitments will be automatically and permanently reduced upon and by the amount of any Delayed Draw Term Loan Borrowing; provided that any Delayed Draw Term Loan Commitments outstanding on the Maturity Date will be automatically and permanently reduced to zero on such date. All fees accrued until the effective date of any termination of the Delayed Draw Term Loan Commitments shall be paid on the effective date of such termination.

**2.08.   Interest**.

(a)      Subject to the provisions of Section 2.10 and subsection (b) below, (i) each LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBO Rate for such Interest Period plus the Applicable Margin; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)      (i)      If any amount payable by Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)      If an Event of Default shall have occurred, all outstanding Obligations shall thereafter automatically bear interest from and after the date on which the Event of Default occurred at a fluctuating interest rate per annum at all times equal to the Default Rate during the continuance of such Event of Default.

(iii)      Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand in immediately available funds.

(c)      Interest on each Loan shall be due and payable in immediately available funds in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Each payment of interest on the Loans shall be applied (i) *first*, pro rata to accrued and unpaid interest on the FO Loans and (ii) *second*, pro rata to accrued and unpaid interest on the LO Loans.

**2.09.   Fees**.

(a)     The Borrower agrees to pay to the Administrative Agent for the account of each Lender, a closing fee in an amount equal to 3.00% of the aggregate principal amount of each such Lender's Delayed Draw Term Loan Commitment (the "DIP Lender Fee"), which DIP Lender Fee shall be deducted from the amount of the applicable Delayed Draw Term Loan. The DIP Lender Fee shall be fully earned on the Interim Order Entry Date, payable in cash on the date that the first Delayed Draw Term Loan is advanced (and shall be paid with the proceeds thereof), and allocated among the Lenders based on their pro rata share of the Delayed Draw Term Loan Commitment.  For the avoidance of doubt, the Borrower shall not be required to pay the DIP Lender Fee on the Roll-Up Term Loans.

(b)     Generally.  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to Administrative Agent for distribution to the Lenders entitled thereto.

**2.10.    Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of the actual days elapsed over a 360-day year.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided, that, any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11.    Evidence of Debt**.  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by Administrative Agent (the "*Loan Account*") in the ordinary course of business; provided, that, any failure to so record or any error in doing so shall not limit or otherwise affect the obligation of Borrower hereunder to pay any amount owing with respect to the Obligations.  The accounts or records maintained by Administrative Agent (and any Lender) shall be prima facie evidence absent manifest error; provided, that, in the event of any conflict between the accounts and records maintained by any Lender and Administrative Agent, the accounts and records of Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through Administrative Agent, Borrower shall execute and deliver to such Lender (through Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.

**2.12.    Payments Generally; Administrative Agent's Clawback**.

(a)     General.  All payments to be made by Borrower shall be made without deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by Borrower hereunder shall be made to Administrative Agent, for the account of the respective Lenders to which such payment is owed, at Administrative Agent's Office in Dollars and in immediately available funds not later than 3:00 p.m. on the date specified herein.  Subject to Section 2.14, Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by Administrative Agent after 4:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue on the

day on which such payment is received.  If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected when computing interest or fees, as the case may be.

(b)   Presumptions by Administrative Agent.

(i)   Funding by Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of LIBO Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to Administrative Agent such Lender's share of such Borrowing, Administrative Agent may assume that such Lender has made such share available in accordance with Section 2.02 and may, in reliance upon such assumption, make available to Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to Administrative Agent, then the applicable Lender and Borrower, jointly and severally, severally agree to pay to Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by Borrower, the interest rate applicable to Base Rate Loans.  If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period.  If such Lender pays its share of the applicable Borrowing to Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(ii)   Payments by Borrower.  Unless Administrative Agent shall have received notice from Borrower prior to the time at which any payment is due to Administrative Agent for the account of the Lenders that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, the amount due.  In such event, if Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation.

-43-

A notice of Administrative Agent to any Lender or Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to Borrower by Administrative Agent because the conditions to the applicable Credit Extension set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     <u>Obligations of Lenders Several</u>.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to <u>Section 10.04(c)</u> are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under <u>Section 10.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under <u>Section 10.04(c)</u>.

(e)     <u>Insufficient Funds</u>.  If at any time insufficient funds are received by and available to Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied as provided in <u>Section 8.03</u>.

**2.13.   Sharing of Payments by Lenders**.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of any of the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then, in each case under clauses (a) and (b) above, the Lender receiving such greater proportion shall (A) notify Administrative Agent of such fact, and (B) make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, <u>provided</u>, <u>that</u>:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations

-44-

or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii) the provisions of this Section shall not be construed to apply to any payment made by or on behalf of any Loan Party pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender)

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14.** **[Reserved]**.

**2.15.** **[Reserved]**.

**2.16.** **[Reserved]**.

**2.17.** **Defaulting Lenders**.

(a) <u>Adjustments</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i) <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders," or any comparable definition and <u>Section 10.01</u>.

(ii) <u>Reallocation of Payments</u>. Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by Administrative Agent from a Defaulting Lender pursuant to <u>Section 10.08</u> shall be applied at such time or times as may be determined by Administrative Agent, <u>provided</u>, <u>that</u>, if (x) such payment is a payment of the principal amount of any Loans in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders under the applicable Facility on a pro rata basis (and ratably among all applicable Facilities computed in accordance with the Defaulting Lenders' respective funding deficiencies) prior to being applied to the payment of any Loans of such Defaulting Lender under the applicable Facility until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments. It is agreed and understood that Administrative Agent shall be entitled to set off any funding shortfall of such Defaulting Lender against such

-45-

Defaulting Lender's respective share of any payments received from Borrower. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01.  Taxes**.

(a)      Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)      Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.  If, however, applicable Law requires the withholding or deduction of any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined by Borrower or Administrative Agent, as the case may be.

(ii)      If applicable Law requires the withholding or deduction of any Taxes from any payment under any Loan Document, then (A) the applicable Loan Party shall withhold or make such deductions as are required based upon applicable Law, (B) such Loan Party shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the applicable Law, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Loan Party shall be increased as necessary so that after such withholding or the making of such deduction (including deductions applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)      Payment of Other Taxes by Loan Parties.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)      Tax Indemnification.

(i)      Without limiting the provisions of subsection (a) or (b) above, each Loan Party shall, and does hereby, on a joint and several basis indemnify each Recipient and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) withheld or deducted (and for which such Recipient has not already been indemnified under Sections 3.01(a) or (c)) on payments to, or paid by, such Recipient, as the case may be, and any reasonable expenses arising therefor or with respect thereto, whether or not such Indemnified Taxes were correctly or legally

imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Without limiting the provisions of subsection (a) or (b) above, each Lender shall, and does hereby, indemnify Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, against (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(d) relating to the maintenance of a Participant Register and (iii) any Taxes (other than Indemnified Taxes) attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender, under this Agreement or any other Loan Document against any amount due to Administrative Agent under this clause (ii).  The agreements in this clause (ii) shall survive the resignation and/or replacement of Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the occurrence of the Facility Termination Date.

(d)     Evidence of Payments.  Upon request by Borrower or Administrative Agent, as the case may be, after any payment of Taxes by the Loan Parties or by Administrative Agent to a Governmental Authority as provided in this Section 3.01, Borrower shall deliver to Administrative Agent or Administrative Agent shall deliver to Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to Borrower or Administrative Agent, as the case may be.

(e)     Status of Lenders; Tax Documentation.

(i)     Each Lender shall deliver to Borrower and to Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by Borrower or Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit Borrower or Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by the Loan Parties

-47-

pursuant to this Agreement or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction; provided each Lender shall only be required to deliver such documentation as it may legally provide. Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii) and (iv) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing:

(A) any Lender that is a U.S. Person shall deliver to Borrower and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) executed originals of Internal Revenue Service Form W-9 (or successor form) certifying that such Lender is exempt from U.S. Federal backup withholding tax; and

(B) each Foreign Lender, to the extent legally entitled to do so, shall deliver to Borrower and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of Borrower or Administrative Agent), whichever of the following is applicable:

(I) executed originals of Internal Revenue Service Form W-8BEN or W-8BEN-E (or successor form), as applicable, establishing eligibility for benefits of an income tax treaty to which the United States is a party, if any,

(II) executed originals of Internal Revenue Service Form W-8ECI (or successor form),

(III) executed originals of Internal Revenue Service Form W-8IMY (or successor form) and all required supporting documentation, or

(IV) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code

-48-

and (y) executed originals of Internal Revenue Service Form W-8BEN or W-8BEN-E (or successor form), as applicable.

(iii)     Each Lender shall promptly notify Borrower and Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction pursuant to this Section 3.01(e), and each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Administrative Agent in writing of its legal inability to do so.

(iv)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Administrative Agent as may be necessary for Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment under FATCA, if any. Solely for purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)     Treatment of Certain Refunds.    If Administrative Agent, any Lender determines, in its sole discretion acting in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section, it shall pay to such Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by any Loan Party under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by Administrative Agent, such Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided, that, each Loan Party, upon the request of Administrative Agent, such Lender agrees to repay the amount paid over to any Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent, such Lender in the event Administrative Agent, such Lender is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.   This subsection shall not be construed to require Administrative Agent, any Lender to make available its tax returns

-49-

(or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

 **3.02.**  **Illegality**.  If any Change in Law has made it unlawful for any Lender, or that any Governmental Authority after the date of this Agreement first asserts that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the LIBO Rate, or to determine or charge interest rates based upon the LIBO Rate, or after the date of this Agreement any Governmental Authority imposes material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to Borrower through Administrative Agent, (i) any obligation of such Lender to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the LIBO Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by Administrative Agent without reference to the LIBO Rate component of the Base Rate, in each case until such Lender notifies Administrative Agent and Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Loan Parties shall, upon demand from such Lender (with a copy to Administrative Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by Administrative Agent without reference to the LIBO Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the LIBO Rate, Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the LIBO Rate component thereof until Administrative Agent is advised in writing by such Lender that it is no longer illegal  for such Lender to determine or charge interest rates based upon the LIBO Rate.  Upon any such prepayment or conversion, the Loan Parties shall also pay accrued interest on the amount so prepaid or converted.  When the circumstances that caused a Lender to send a notice pursuant to this Section 3.02 no longer exist, the suspension of such Lender's obligations to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall terminate. Any Lender that has sent a notice pursuant to this Section 3.02 shall promptly notify the Administrative Agent and Borrower when the circumstances that caused such notice to be sent no longer exist.

 **3.03.**  **Inability to Determine Rates**.  If the Administrative Agent determines that for any reason in connection with any request for a LIBO Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan or in connection with an existing or proposed Base Rate Loan, or (c) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, Administrative Agent will promptly so notify Borrower

and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the LIBO Rate component of the Base Rate, the utilization of the LIBO Rate component in determining the Base Rate shall be suspended, in each case until Administrative Agent revokes such notice.  Upon receipt of such notice, Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein. When the circumstances that caused the Administrative Agent to send a notice pursuant to this <u>Section 3.03</u> no longer exist, the suspension of the Lenders' obligations to make or maintain LIBO Rate Loans shall terminate. The Administrative Agent shall promptly notify each Lender and Borrower when the circumstances that caused such notice to be sent no longer exist.

      **3.04.   Increased Costs; Reserves on LIBO Rate Loans**.

      (a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

      (i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>);

      (ii)    subject any Recipient to any Taxes on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto (except for (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and (C) Connection Income Taxes); or

      (iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBO Rate Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Loan Parties will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

      (b)    <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Loans made by, or participations in Letters of Credit held by, such Lender to a level that is materially below that which such Lender or such Lender's or holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital

-51-

adequacy), then from time to time pursuant to subsection (c) below the Loan Parties will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a), (b) or (e) of this Section, and a calculation of the amount thereof in reasonable detail, stating that it is then the general policy of such Lender to demand such compensation in similar circumstances from comparable borrowers under comparable provisions of other credit agreements, and delivered to Borrower shall be conclusive absent manifest error. The Loan Parties shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)  Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided, that, the Loan Parties shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than four months prior to the date that such Lender notifies the Loan Parties of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the four-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)  Reserves on LIBO Rate Loans.  Without duplication of the effect of the Eurodollar Reserve Percentage, Borrower shall pay to each Lender, as long as such Lender shall be required as a result of a Change in Law to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided Borrower shall have received at least 10 days' prior notice (with a copy to Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

**3.05.  Compensation for Losses**.  Upon demand of any Lender (with a copy to Administrative Agent) from time to time, Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)  any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)  any failure by Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by Borrower; or

(c)     any assignment of a LIBO Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by Borrower pursuant to Section 10.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBO Rate Loan made by it at the LIBO Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan was in fact so funded.

**3.06.   Mitigation Obligations**.    If any Lender requests compensation under Section 3.04, or a Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.07.   Survival**.    All of the obligations under this Article III shall survive the resignation of Administrative Agent, the replacement of any Lender and the occurrence of the Facility Termination Date.

**ARTICLE IV**
**CONDITIONS PRECEDENT**

**4.01.   Conditions Precedent to the Closing Date and the Interim Availability Period**.  The obligation of each Lender to make any Credit Extension during the Interim Availability Period hereunder is subject to the satisfaction or waiver by the Required Lenders of the following conditions precedent:

(a)     Administrative Agent's and the Lenders' receipt of the following items, each to the extent applicable, properly executed by a Responsible Officer of the applicable Loan Party, each dated as of the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Administrative Agent, the Lenders and their legal counsel:

(i)     executed counterparts of this Agreement and the Security Agreement;

(ii)     any and all original certificates representing Pledged Shares (together with duly executed undated powers);

(iii)     UCC financing statements, in proper form for filing in all places required by applicable Law to perfect the Liens of Administrative Agent under the Security Instruments as a first priority Lien (subject to Permitted Liens) as to items of Collateral in which a security interest may be perfected by the filing of financing statements, and such other documents and/or evidence of other actions as may be reasonably necessary under applicable law to perfect the Liens of Administrative Agent granted pursuant to the DIP Order, any other Security Instruments and/or hereunder as a first priority Lien (subject to Permitted Liens) in and to such other Collateral as Administrative Agent may require; provided that, the Administrative Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to any Security Instrument;

(iv)     UCC, tax, judgment and other related search results showing only Liens that are Permitted Liens or those Liens as are acceptable to the Administrative Agent and Lenders;

(v)     at least three (3) Business Days prior to the Closing Date (or such shorter period to which the Required Lenders may agree), documentation and other information with respect to the Loan Parties that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act and OFAC, in each case as has been reasonably requested in writing by Administrative Agent at least ten (10) days prior to the Closing Date;

(vi)     at least three (3) Business Days prior to the Closing Date (or such shorter period to which the Required Lenders may agree), Administrative Agent shall have received an executed notice of borrowing for the initial funding of the Loans;

(vii)     (A) resolutions of the board of directors or other governing body of each Loan Party authorizing the entry of such Loan Party into the Loan Documents and (B) certificates of each Loan Party evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party, in each case reasonably acceptable to the Required Lenders;

(viii)     evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in its jurisdiction of organization reasonably acceptable to the Required Lenders;

(ix)    certificates of insurance indicating the Loan Parties' compliance with the Loan Documents, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or lenders loss payee, the form and substance of which shall be satisfactory to the Required Lenders;

(x)    a certificate of the Borrower signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.01(c), (d) and (e) have been met, and (B) since the Petition Date, no change, occurrence or development shall have occurred or become known to the Loan Parties that has had or could reasonably be expected to have a Material Adverse Effect other than the filing of the Cases and the events that typically result from the filing of a case under Chapter 11 of the Bankruptcy Code;

(xi)    duly executed and delivered collateral assignment of rights under the BHG Support Services Agreements and the BHG Security Agreements, substantially in the form of Exhibit H hereto.

(b)    All fees and out-of-pocket expenses of the Lenders relating to the Facilities (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full.

(c)    The representations and warranties of the Loan Parties contained in Article V or any other Loan Document, or which are contained in any document furnished in connection with this Section 4.01, shall be true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) as of such earlier date, and except that for purposes of this Section 4.01(c), the representations and warranties contained in subsections (a) and (b) of Section 5.04 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(d)    No Default or Event of Default shall have occurred and be continuing, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(e)    As of the Closing Date, there shall have been (a) no litigation commenced which could reasonably be expected to have a material adverse impact on any Loan Party, or its business, or its ability to perform any material obligation or repay the Loans, or which challenges any Facility and (b) no material increase in the liabilities, liquidated or contingent, of any Loan Party, or material decrease in the assets of the Loan Parties.

(f)    The Administrative Agent shall have a valid first priority perfected Lien on the Collateral, subject only to the Carve-Out and the Prepetition Priority Liens.

(g)    The Administrative Agent and the Lenders shall have received, and the Administrative Agent and the Required Lenders shall have approved, the Initial Budget.

(h)     All filed "first day" pleadings and "first day" orders filed on the Petition Date which relate to the Facility shall be reasonably acceptable in form and substance to the Required Lenders, and all other filed "first day" pleadings and "first day" orders filed on the Petition Date shall not be adverse to the Administrative Agent's or the Lenders' interests or be inconsistent, in any material respect, with the terms hereof.

(i)     The Interim DIP Order (i) shall have been entered on the docket of the Bankruptcy Court no more than three (3) Business Days prior to the Closing Date, (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, overturned, modified or amended in any respect without the written consent of the Administrative Agent and the Required Lenders (such consents not to be unreasonable withheld, conditioned or delayed) and (iii) the Debtors shall be in compliance in all respects with the Interim DIP Order.

(j)     Each other Milestone that is required to be complied with prior to or concurrently with entry of the Interim DIP Order shall have been complied with.

(k)     No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties.

(l)     the Cash Management Order acceptable to the Administrative Agent and the Required Lenders shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(m)     Upon entry of the Interim DIP Order, the entry into this Agreement shall not violate any applicable law and shall not be enjoined, temporarily, preliminarily or permanently.

(n)     The Restructuring Support Agreement shall be in full force and effect as to all parties thereto other than the Debtors and shall not have been amended, modified or supplemented in a manner materially adverse to the interests of the Administrative Agent or the Lenders, and no Consenting Lender shall have withdrawn its support for or refused to abide by the terms of the Restructuring Support Agreement.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02.   Conditions to Final Availability Period.**   The obligation of each Lender to make any Credit Extension during the Final Availability Period hereunder is subject to the satisfaction or waiver by the Required Lenders of the following conditions precedent:

(a)     The Final Order Entry Date shall have occurred and the conditions set forth in Section 4.01 have been satisfied.

(b)     The Final DIP Order and the Cash Management Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in any manner, or relating to any matter, that is adverse to the interests of the Required Lenders.

(c)     The Debtors shall be in compliance with the Final DIP Order.

(d)     The Loan Parties shall have satisfied all Milestones which are required to be satisfied on or prior to such Borrowing Date.

(e)     The Initial Budget or Approved Budget, as applicable, shall be in full force and effect on and as of the proposed Borrowing Date, and the making of any Loan on any such Borrowing Date shall be in accordance with the Initial Budget or Approved Budget, as applicable, and in compliance with Section 7.17.

(f)     The representations and warranties of the Loan Parties contained in Article V or any other Loan Document, or which are contained in any document furnished in connection with this Section 4.02, shall be true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) as of such earlier date, and except that for purposes of this Section 4.02(f), the representations and warranties contained in subsections (a) and (b) of Section 5.04 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(g)     No Default or Event of Default shall have occurred and be continuing, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(h)     The Borrower shall have paid to the Administrative Agent (and its relevant affiliates) and the Lenders all costs, fees and expenses (including, without limitation, reasonable and documented legal fees and expenses) then payable subject to the limitations set forth in the Approved Budget (subject to a 10% variance with respect to such amounts as set forth in the detailed professional fees backup to the Approved Budget).

(i)     On such Borrowing Date, the Administrative Agent shall have received a certificate, dated the Borrowing Date and signed on behalf of the Borrower by a Responsible Officer of the Borrower, certifying on behalf of the Borrower that the conditions specified in this Section 4.02 have been satisfied.

**4.03.   Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of LIBO Rate Loans) after the Closing Date is subject to the following conditions precedent:

(a)     The representations and warranties of the Loan Parties contained in Article V or any other Loan Document, or which are contained in any document furnished at any

time under or in connection herewith or therewith, shall be true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) as of such earlier date, and except that for purposes of this Section 4.02(a), the representations and warranties contained in subsections (a) and (b) of Section 5.04 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(b)     No Default or Event of Default shall have occurred and be continuing, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)     Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     With respect to any Credit Extension requested after the Final Order Entry Date, the Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on the date that is on or before the Interim Facility Maturity Date, and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, overturned or modified in any respect without the written consent of the Administrative Agent and the Required Lenders in their sole discretion.

(e)     The Administrative Agent's shall have received an executed notice of borrowing for the Delayed Draw Term Loans pursuant to Section 2.02(a).

(f)     All reasonable fees and expenses of the Administrative Agent and the Lenders for which invoices have been presented on or before the date of such Delayed Draw Term Loan Borrowing shall have been paid, or arranged to be paid or deducted from the applicable Delayed Draw Term Loan Borrowing to the extent invoiced at least one (1) Business Day prior to such Delayed Draw Term Loan Borrowing.

(g)     With respect to any Delayed Draw Term Loan (x) made during the Interim Availability Period, the conditions specified in Section 4.01 shall have been satisfied and (y) made during the Final Availability Period, the conditions specified in Sections 4.01 and 4.02 shall have been satisfied.

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of LIBO Rate Loans) submitted by Borrower shall be deemed to be a representation and warranty that the conditions specified in Section 4.03 have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Lender Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to Administrative

Agent and the Lenders, and in the case of representations and warranties made as of the Closing Date both immediately before and after the consummation of the Transactions, that:

**5.01.   Existence, Qualification and Power**.  Each Loan Party and each Restricted Subsidiary (a) is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization (solely in the case of any such Person other than the Borrower, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect), (b) has all requisite power and authority to (i) own or lease its assets and carry on its business (except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (ii) to the extent such Person is a Loan Party and subject to the entry of the DIP Orders, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and in good standing under the Laws of each jurisdiction where its operation or properties requires such qualification, except, in the case of this clause (c), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**5.02.   Authorization; No Contravention; Consents**.  Subject to the entry of the DIP Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which it is a party have been duly authorized by all necessary organizational action, and do not and will not (a) contravene the terms of its Organization Documents, (b) conflict with or result in any breach or contravention of, in any material respect, or the creation of any Lien under (other than as permitted by <u>Section 7.02</u>) (i) any material Contractual Obligation to which such Person is a party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, (c) violate any Law to any Loan Party or Subsidiary (except to the extent such violation could not reasonably be expected to have a Material Adverse Effect), or (d) require any approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person, (other than actions required to perfect Liens under the Loan Documents (or to release existing Liens that will be released in connection with the Transactions) and the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and other than the DIP Orders) if the failure to obtain the same, take such action or give such notice could reasonably be expected to result in a Material Adverse Effect.

**5.03.   Binding Effect**.

(a)   This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as the enforcement hereof may be limited by the entry of the DIP Orders and bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or affecting the rights and remedies of creditors, including the Cases, or by general equitable principles.

(b)   Subject to the entry of the DIP Orders, each of the Security Instruments is effective to create in favor of Administrative Agent, for the benefit of Lender Parties, a legal, valid,

binding and enforceable security interest in the Collateral described therein and required to be perfected as of the Closing Date pursuant to <u>Section 4.01(a)</u>, except as enforceability may be limited by the entry of the DIP Orders applicable bankruptcy, insolvency, reorganization, moratorium or Debtor Relief Laws affecting the enforcement of creditors' rights generally, including the Cases, and by general equitable principles (whether enforcement is sought by proceedings in equity or at Law). The Administrative Agent's Lien under each Security Instrument shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Collateral, as security for the Obligations, in each case prior to the Liens of any other Person (except Permitted Liens) upon the entry of the DIP Orders.

**5.04.   Financial Statements; No Material Adverse Effect**.

(a)     The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)     The unaudited consolidated balance sheet of Holdings and its Subsidiaries dated as of March 31, 2020, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the quarter then ended (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)     Since the Petition Date there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**5.05.   Litigation**.  As of the Closing Date, other than the Cases, or as stayed upon the commencement of the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Loan Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any Restricted Subsidiary or against any of their properties that (a) purport to affect or pertain to this Agreement or any other Loan Document or any of the Transactions or (b) except as specifically disclosed in <u>Schedule 5.05</u>, either individually or in the aggregate, assert liabilities in excess of, or could reasonably be expected to have a Material Adverse Effect.

**5.06.   [Reserved]**.

**5.07.   Ownership of Property; Liens**.

(a)     Each Loan Party and each of its Restricted Subsidiaries has good, and in the case of Real Estate, marketable title to, all property (tangible and intangible) necessary to, or used in the ordinary conduct of, its business, subject to Permitted Liens and except (i) for any such

properties which are immaterial to the operations of such Loan Party's or such Subsidiary's respective business, (ii) as may have been disposed of in compliance with the terms of this Agreement, (iii) for defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, and (iv) where the failure to have such title or other interest could not reasonably be expected to have a Material Adverse Effect.

(b)     Schedule 5.07(b) sets forth the address (including street address, county and state) of all leases of the Loan Parties, with respect to each such lease as of the Closing Date.

(c)     Schedule 7.02 sets forth, as of the Closing Date, a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Restricted Subsidiaries (other than Liens created under the Loan Documents), showing the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Restricted Subsidiary subject thereto.  The property and assets of each Loan Party and each of its Restricted Subsidiaries is subject to no Liens, other than Liens set forth on Schedule 7.02, and other Permitted Liens.

(d)     Pursuant to the terms of the DIP Orders, the joint and several Obligations of the Loan Parties under this Agreement constitute Superpriority Claims and shall be allowed administrative expense claims in the Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof), subject only to the terms of the DIP Orders and the Carve-Out.

**5.08.  Environmental Compliance**.

(a)     No Loan Party or any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law with respect to such Loan Party's or Restricted Subsidiary's operations, (ii) has become subject to a pending claim with respect to any Environmental Liability or (iii) has received written notice of any claim with respect to any Environmental Liability except, in each case of clauses (i), (ii) or (iii) above, as has not resulted, and could not, individually or in the aggregate, reasonably be expected to result, in Environmental Liabilities on the part of the Loan Parties and their Subsidiaries in excess of $2,000,000.

(b)     As of the Closing Date, (i) none of the properties owned or operated by any Loan Party or any Restricted Subsidiary is listed or, to the knowledge of the Loan Parties, proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (ii) except as set forth on Schedule 5.08, to the knowledge of the Loan Parties, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Restricted Subsidiary; (iii) except as set forth on Schedule 5.08, to the knowledge of the Loan Parties, there is no asbestos or asbestos-containing material on any property currently

owned or operated by any Loan Party or Restricted Subsidiary; and (iv) Hazardous Materials have not been released, discharged or disposed of by any Loan Party or Restricted Subsidiary in violation of Environmental Laws or, to the knowledge of the Loan Parties, by any other Person in violation of Environmental Laws on any property currently owned or operated by any Loan Party or any Restricted Subsidiary, except in the case of clauses (i) or (iv) as has not resulted and could not, individually or in the aggregate, reasonably be expected to result in, Environmental Liabilities on the part of the Loan Parties and Subsidiaries in excess of $2,000,000.

(c)     Except as could not individually or in the aggregate reasonably be expected to result in Environmental Liabilities on the part of the Loan Parties and their Restricted Subsidiaries in excess of $2,000,000, as of the Closing Date: no Loan Party or any Restricted Subsidiary is undertaking, and no Loan Party or any Restricted Subsidiary has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored by any Loan Party or any Restricted Subsidiary at, or transported to or from by or on behalf of any Loan Party or any Restricted Subsidiary, any property owned or operated by any Loan Party or any Subsidiary have, to the knowledge of the Loan Parties, been disposed of in a manner not reasonably expected to result in Environmental Liability to any Loan Party or any Restricted Subsidiary in excess of $2,000,000.

**5.09.    Insurance and Casualty**.  The Loan Parties and their Restricted Subsidiaries maintain insurance with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Restricted Subsidiary operate.  Schedule 5.09 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date.  Each insurance policy listed on Schedule 5.09 is in full force and effect as of the Closing Date, in accordance with the terms of each such policy.

**5.10.    Taxes**.  Each Loan Party and each Restricted Subsidiary has filed all Federal and state income Tax returns and other material Tax returns and reports required to be filed (taking into account extensions of time to file), and has paid all Federal and state income Taxes and other material Taxes or similar government charges levied or imposed upon it or its properties, income or assets otherwise due and payable, except, in each case, those which are being Properly Contested.  Neither Holdings nor any Restricted Subsidiary thereof is party to any tax sharing agreement.

**5.11.    ERISA Compliance**.

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter or opinion letter from the Internal Revenue Service to the effect that the form of such Plan is qualified

under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code and such letter may be relied upon, or an application for such a letter is currently being processed by the Internal Revenue Service.  To the best knowledge of each Loan Party, nothing has occurred that would prevent or cause the loss of any such Plan's tax-qualified status.

(b)     As of the Closing Date, there are no pending or, to the best knowledge of any Loan Party, threatened claims, actions or lawsuits, or action by any Person, with respect to any Plan that could reasonably be expected to result in liabilities to a Loan Party or any of its Restricted Subsidiaries individually or in the aggregate in excess of $500,000.  As of the Closing Date, there has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in liabilities to a Loan Party or any of its Restricted Subsidiaries individually or in the aggregate in excess of $2,000,000.

(c)     (i) No ERISA Event has occurred, and no Loan Party is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event, in each case that could reasonably be expected to result in liabilities to a Loan Party or any of its Restricted Subsidiaries individually or in the aggregate in excess of $2,000,000; (ii) each Loan Party, each Restricted Subsidiary thereof and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained, in each case except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Parties or any of their Subsidiaries in excess of $2,000,000; (iii) as of the valuation date for any Pension Plan immediately prior to the date this representation is made, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and no Loan Party knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; and (iv) no Loan Party, no Subsidiary thereof nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA, except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Parties or any of their Subsidiaries in excess of $2,000,000.

(d)     As of the Closing Date, no Loan Party or Restricted Subsidiary maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan other than those listed on Schedule 5.11(d) hereto.

**5.12.     Subsidiaries; Equity Interests; Capitalization**.  No Loan Party and no Restricted Subsidiary of any Loan Party (a) has any Subsidiaries other than those disclosed on Schedule 5.12 (which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary) or those that have been created or acquired in compliance with Section 6.12, or (b) has any equity Investments in any other Person other than those specifically disclosed on Schedule 5.12 or made after the Closing Date in compliance with this Agreement and the other Loan Documents.  All of the outstanding Equity Interests of each Loan Party and each Restricted Subsidiary have been validly issued, are fully paid and non-assessable and, as of the Closing Date, are owned by the Persons and in

the amounts specified on Schedule 5.12 free and clear of all Liens except for non-consensual Permitted Liens.

**5.13. Margin Regulations; Investment Company Act**.  No Loan Party and no Restricted Subsidiary of any Loan Party is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the Loan Parties or any Restricted Subsidiary is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

**5.14. Disclosure**.  As of the Closing Date, no report, financial statement, certificate or other information furnished by or on behalf of any Loan Party or any Subsidiary to Administrative Agent or any Lender (other than projections and other forward looking information and information of a general economic or general industry nature) in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) when furnished, and when taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made not materially misleading in light of the circumstances under which such statements were made; provided, that, all financial performance projections delivered to the Administrative Agent, including the financial performance projections delivered on or prior to the Closing Date, represent Borrower's best good faith estimate of future financial performance (for the periods covered thereby) based upon assumptions believed to be reasonable at the time made (it being understood and agreed that projections are not to be viewed as facts or a guarantee of financial performance and are subject to uncertainties and contingencies, known and unknown, many of which are beyond the control of the Loan Parties and their Subsidiaries, and that no assurance can be given that such projections will be realized and actual results may differ from the projections and such differences may be material).

**5.15. Compliance with Laws; Anti-Terrorism Laws and Foreign Asset Control Regulations**.

(a)      Each Loan Party and each Subsidiary is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)      Each Loan Party and each Subsidiary is in compliance in all material respects with, and the advances of the Loans and use of the proceeds thereof will not violate, (a) the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "***Trading With the Enemy Act***") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "***Foreign Assets Control Regulations***") and any other enabling legislation or executive order relating thereto, thereto (which for the avoidance of doubt shall include, but shall not be limited to Executive Order 13224 of

-64-

September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "***Executive Order***")) and/or (b) the Uniting And Strengthening America by Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001). None of the Loan Parties or any of their Subsidiaries is a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations.

      **5.16.**   **Labor Matters**.  Except as set forth on <u>Schedule 5.16</u>, as of the Closing Date no Loan Party or any Restricted Subsidiary is a party to or bound by any collective bargaining agreement.  There are no strikes, lockouts, slowdowns or other labor disputes against any Loan Party or any Restricted Subsidiary pending or, to the knowledge of any Loan Party, threatened which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  As of the Closing Date, there are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Restricted Subsidiary has made a pending demand for recognition.  As of the Closing Date, there are no complaints, unfair labor practice charges, arbitrations or any other claims or complaints against any Loan Party or any Restricted Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Restricted Subsidiaries which individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.  The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Restricted Subsidiaries is bound.

      **5.17.**   **Brokers**.  No broker or finder retained by or representing the Loan Parties (except for those whose fees and expenses have been paid in full on the Closing Date) brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents.

      **5.18.**   **[Reserved]**.

      **5.19.**   **Healthcare Matters**.

      Without limiting any other provision of this Agreement:

      (a)   Except for those matters set forth on <u>Schedule 5.19</u>, and except where failure to do so would not reasonably be expected to have a Material Adverse Effect: (i) for the last three (3) years, each Loan Party, each of its Restricted Subsidiaries and to the knowledge of any Loan Party, each BHG Entity has been in compliance in all material respects with all Health Care Laws and requirements of Third Party Payor Programs applicable to it and its business or operation; and (ii) each Loan Party, each of its Restricted Subsidiaries and to the knowledge of any Loan Party, each BHG Entity has in effect all Permits, including, without limitation, all Permits necessary for it to own, lease or operate its properties and other assets and to carry on its business and operations as presently conducted and all such Permits are in full force and effect and there exists no default under, or material violation of, any such Permit. Neither any Loan Party,

any of its Restricted Subsidiaries, nor, to the knowledge of the Loan Parties, any BHG Entity has received written notice that any Governmental Authority is considering limiting, suspending, terminating, adversely amending or revoking any such Permit. Except for those matters set forth on Schedule 5.19, and except where such action, demand, requirement, investigation, suit, or proceeding would not reasonably be expected to have a Material Adverse Effect, no action, demand, requirement or investigation by any Governmental Authority and no suit, action or proceeding by any other person, in each case with respect to any Loan Party, any of its Restricted Subsidiaries or any BHG Entity, is pending or, to the knowledge of any Loan Party, threatened.

(b)     All reports, documents, claims, notices or approvals required to be filed, obtained, maintained or furnished pursuant to any CPOD Law or Health Care Law to any Governmental Authority by any Loan Party, any of its Restricted Subsidiaries, or, to the knowledge of the Loan Parties, any BHG Entity (i) have been so filed, obtained, maintained or furnished in compliance with such CPOD Law or Health Care Law; and (ii) were complete and correct on the date filed (or were corrected in or supplemented by a timely subsequent filing), except where failure to comply with either clause (i) or (ii) would not reasonably be expected to have a Material Adverse Effect.

(c)     Since December 31, 2016, no Loan Party, no Restricted Subsidiary of any Loan Party and, to the knowledge of the Loan Parties, no BHG Entity has knowingly made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact required to be disclosed to any Governmental Authority, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to be in violation of any Health Care Law or CPOD Law.

(d)     Each Restricted Subsidiary of each Loan Party and to the knowledge of the Loan Parties, each BHG Entity (including any contracting dentist on behalf of any of the foregoing) has the requisite provider or supplier number, enrollment or other Permit to bill under Medicare, the respective Medicaid program (in the state or states in which such entity operates and provides services to Medicaid beneficiaries) or Private Third Party Payor Programs, in each case, to the extent such Loan Party, Restricted Subsidiary of a Loan Party, BHG Entity or contracting dentist on behalf of the foregoing, is enrolled in or bills such programs and/or payors.  Except as set forth in Schedule 5.19(d) and except for investigations, audits, claims, reviews, or other actions in the ordinary course of business, there is no investigation, audit, claim, review, or other action (A) pending against any Loan Party or Restricted Subsidiary of any Loan Party, or to the knowledge of any Loan Party, against any BHG Entity or, (B) to the knowledge of any Loan Party, threatened against any Loan Party, Restricted Subsidiary of a Loan Party or BHG Entity, which, in the case of either (A) or (B), would reasonably be expected to result in (1) a revocation, suspension, termination, probation, restriction, limitation or non-renewal of any Governmental Third Party Payor or Private Third Party Payor provider or supplier number, enrollment or Permit; (2) any Loan Party's, any Restricted Subsidiary of any Loan Party's or any BHG Entity's exclusion from any Governmental Third Party Payor Program; or (3) any Loan Party's, any Restricted Subsidiary of any Loan party's or any BHG Entity's termination from a Private Third Party Payor Program, to the extent that any such action in (1), (2) or (3) would reasonably be expected to have a Material Adverse Effect.

(e)     Except as set forth in Schedule 5.19(e), no Loan Party, Restricted Subsidiary of any Loan Party, BHG Entity, or owner, officer, manager or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) equal to or greater than five percent (5%) in any Loan Party or to the knowledge of a Loan Party with a "direct or indirect ownership interest" equal to or greater than five percent (5%) in any BHG Entity, or, to the knowledge of any Loan Party, any Licensed Personnel of any Loan Party, any Restricted Subsidiary of any Loan Party or any BHG Entity has been: (i) excluded from participation in a Governmental Third Party Payor Program pursuant to 42 U.S.C. § 1320a-7 and related regulations or (ii) a party to any corporate integrity agreement, monitoring agreement, consent decree, settlement order, or similar agreement with any Governmental Authority.

(f)     Each Loan Party, Restricted Subsidiary of any Loan Party, and to the knowledge of the Loan Parties, each BHG Entity (A) is in compliance with applicable requirements of HIPAA; and (B) is not subject to, and could not reasonably be expected to become subject to, any civil or criminal penalty or any investigation, claim or process with regard to any data breach or other material violation of HIPAA.

(g)     To the knowledge of any Loan Party and except as set forth on Schedule 5.19, (i) each of the Licensed Personnel holds all licenses and other Permits that are required to provide the services provided by such Person, (ii) each such license and other Permit is in full force and effect and, to the knowledge of any Loan Party, no revocation, suspension or cancellation of any such license or other Permit is pending or threatened, and (iii) each of the Licensed Personnel is insured under a valid professional liability insurance policy in amounts not less than commercially reasonable levels.

(h)     Except as set forth in Schedule 5.19(h) and except where failure to do so would not reasonably be expected to have a Material Adverse Effect, the Licensed Personnel of each Loan Party, each Restricted Subsidiary of each Loan Party and each BHG Entity currently are, and during the last three (3) years (or if shorter, the time employed by an BHG Entity) have been (i) duly licensed and registered, and in good standing in the applicable state to engage in the practice of dentistry or applicable allied dental profession and said license and registration have not been suspended, revoked or restricted in any manner; and (ii) is insured under a valid professional liability insurance policy in amounts not less than commercially reasonable levels.

**5.20.   Dentist Partners**.

(a)     Schedule 5.20 contains a complete and accurate list of each BHG Entity as of the date hereof.

(b)     Except as set forth on Schedule 5.20 or as otherwise disclosed after the Closing Date in writing to the Administrative Agent, for the last three (3) years, to the knowledge of the Loan Parties valid and enforceable business continuity agreements ("Business Continuity Agreements" or "BCAs") are in place between (i) each BHG Entity (ii) certain Licensed Personnel who own equity interests in a BHG Entity (collectively, the "Dentist Partners") and (iii) certain other Licensed Personnel, as option holders, pursuant to the terms set forth in such BCAs.  For the last three (3) years, to the knowledge of the Loan Parties, none of the Dentist Partners have given written notice of, and to the knowledge of the Loan Parties, none of the Dentist Partners have

orally expressed plans to act in contravention of the BCAs or any other ancillary agreements related to the operations of a BHG Entity, in any manner which would reasonably be expected to have a Material Adverse Effect.

(c)     To the knowledge of the Loan Parties and except as set forth on Schedule 5.20, during the three (3) years preceding the date of this Agreement or, if shorter, the time employed by an BHG Entity as a Dentist Partner, each of the Dentist Partners: (i) has been duly licensed and registered, and is in good standing by their state to engage in the dental practice, and said license and registration have not been suspended, revoked or restricted in any manner, and (ii) has had valid professional liability insurance in place in amounts not less than commercially reasonable levels and has not indicated any intent to terminate or reduce his or her professional liability coverage.

### 5.21.   **BHG Support Services Agreements; BHG Security Agreements**.

(a)     Schedule 5.21 contains a true, correct and complete list of each (A) support or services agreement relating to the affiliation with a professional corporation or other dental group that the Borrower or any of its Restricted Subsidiaries is a party to as of the Closing Date (each such service agreement, together with each additional service agreement entered into by the Borrower or any of its Restricted Subsidiaries after the Closing Date, and as any of the foregoing may be amended from time to time, are referred to herein as a "BHG Support Services Agreement" and collectively, the "BHG Support Services Agreements") and (B) BHG Security Agreement that the Borrower or any of its Restricted Subsidiaries is a party to as of the Closing Date.  The Borrower has provided Administrative Agent with a true, correct and complete copy of each BHG Support Services Agreement and each BHG Security Agreement as in effect as of the Closing Date.

(b)     Except as set forth on Schedule 5.21(b), a BHG Security Agreement has been executed in connection with each BHG Support Services Agreement.

(c)     With the exception of any termination right arising from or relating to insolvency, no BHG Support Services Agreement Termination Event exists under any BHG Support Services Agreement.

(d)     Subject to any restrictions under applicable law, except as set forth on Schedule 5.21, all of the BHG Support Services Agreements and the BHG Security Agreements are freely assignable to third parties and collaterally assignable to the Administrative Agent without the consent of any party to such BHG Support Services Agreement.

(e)     Each BHG Security Agreement creates, as security for certain obligations of the applicable BHG Entity under such BHG Support Services Agreement, a valid and enforceable, and upon entry of the DIP Orders, perfected security interest in and Lien upon such BHG Entity's accounts and accounts receivable in favor of the Borrower, superior to and prior to the rights of all third persons and subject to no other Liens other than Liens permitted under the BHG Security Agreement, except to the extent that the creation of such security interests, in the reasonable business judgment of the Borrower, would reasonably be expected to cause Borrower to violate CPOD Laws.  No filings or recordings are required in order to perfect the security

interests created under any BHG Security Agreement except for filings or recordings required in connection with any such BHG Security Agreement that shall have been made, or for which satisfactory arrangements have been made, upon or prior to the execution and delivery thereof, except to the extent that the perfection of such security interests, in the reasonable business judgment of the Borrower, would reasonably be expected to cause Borrower to violate CPOD Laws.

**5.22.   OFAC; Patriot Act**.

(a)   Neither any Loan Party nor any Subsidiary or any Affiliate thereof is in violation of any of the OFAC Sanctions or Canadian Economic Sanctions Laws.  Neither any Loan Party nor any Subsidiary thereof, nor to the knowledge of such Loan Party or any of its Subsidiaries, any director, officer, employee, agent, Affiliate or representative thereof (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in a Sanctioned Entity, (c) derives revenues from investments in, or transactions with a Sanctioned Person or a Sanctioned Entity or (d) is owned or controlled by a Sanctioned Entity or a Sanctioned Person.

(b)   Each Loan Party and its Subsidiaries are in compliance with the (i) Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act") and (iii) Canadian Economic Sanctions Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.23.   Prohibition on Government Assistance.**  Except as set forth on the Schedule 5.23, the Loan Parties and their Subsidiaries have not applied for, incurred or otherwise received any assistance from the Department of Health and Human Services, any other Governmental Authority or any other Person in the form of Indebtedness, grants or any other form under the Public Health and Social Services Emergency Fund of the Coronavirus Aid Relief and Economic Security (CARES) Act, the Paycheck Protection Program and the Health Care Enhancement Act.

**5.24.   Initial Budget.**  The Loan Parties have prepared and delivered a thirteen week cash flow forecast in form and substance acceptable to the Required Lenders in their sole discretion (the "Initial Budget"), setting forth cash revenues, receipts, expenses, professional fees and other disbursements (including, without limitation, any payments with respect to real property leases), net cash flows, inventory receipts and other items on a line item basis (including all necessary and required expenses which the Loan Parties expect to incur and anticipated uses of proceeds of draws under the Facility and any other post-petition financing arrangements) on a weekly basis for the period beginning as of the week of the Petition Date through and including the thirteenth (13th) week after such week, as the same may be amended, supplemented or modified from time to time only with the prior written consent of the Required Lenders. The Initial Budget shall be deemed the "Approved Budget" for all purposes of this Agreement and the other Loan Documents until

superseded by any Updated Budget that subsequently is approved in writing by the Required Lenders, at which point it shall become the Approved Budget.

### 5.25.   Other Bankruptcy Matters.

(a)      The Cases were commenced on the Petition Date, in accordance with applicable law and proper notice thereof under the circumstances, and proper notice under the circumstances of (x) the motion seeking approval of the Loan Documents and (y) entry of the DIP Orders, as applicable and the hearings for the approval of the Interim DIP Order have been held by the Bankruptcy Court.

(b)      Upon the entry of the DIP Orders, each such DIP Order and the Loan Documents are sufficient to provide that the Obligations will constitute superpriority administrative expense claims and the Liens and security interests securing the Obligations shall be senior secured, valid, enforceable and automatically and properly perfected priming liens, having the priorities set forth herein but subject to the Carve-Out.

(c)      Each DIP Order, once entered, is in full force and effect and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Required Lenders.

(d)      The Loan Parties are in compliance in all material respects with all agreements entered into, and all orders entered by the Bankruptcy Court, from the Petition Date.

### ARTICLE VI
### AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Obligation (other than contingent indemnification claims for which no claim has been asserted) hereunder shall remain unpaid or unsatisfied, each Loan Party shall, and shall cause each Restricted Subsidiary to:

### 6.01.   Financial Statements.  Deliver to Administrative Agent and each Lender:

(a)      on or before September 30, 2020, for the fiscal year ended December 31, 2019, a consolidated balance sheet of Holdings, its Restricted Subsidiaries and all BHG Entities that are treated as "Variable Interest Entities" pursuant to GAAP whose results are consolidated with Holdings as of the end of such Fiscal Year, and the related consolidated statements of income or operations, owners' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP; such consolidated statements to be audited and accompanied by a report and opinion of Frazier & Deeter or another accounting firm reasonably satisfactory to the Required Lenders (including, but not limited to, any of the "big 4" national firms) (the "*Auditor*"), which report and opinion shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than any qualification or exception relating to (x) the commencement of the Cases or the events leading thereto, (y) the occurrence of the Maturity Date within one year from the date such opinion is delivered or (z) any potential inability to satisfy any financial maintenance covenants, if any, on a future date or in a

future period) that has not been approved by the Required Lenders and shall state that such financial statements fairly present the financial condition of Holdings, its Restricted Subsidiaries and all BHG Entities that are treated as "Variable Interest Entities" pursuant to GAAP whose results are consolidated with Holdings as of the dates indicated and the results of their operations and cash flow for the periods indicated in conformity with GAAP (other than as a result of (x) the Obligations being classified as short-term indebtedness during the one-year period prior to the maturity of such Obligations or (y) the forecast of any Fiscal Year demonstrating a failure to comply with any covenant set forth in this Agreement);

(b)     monthly and quarterly, as soon as available, but in any event within 30 days after the end of each Fiscal Month (or, with respect to the last Fiscal Month of any Fiscal Quarter, 45 days thereafter), with respect to monthlies and within 45 days after the end of each Fiscal Quarter, with respect to quarterlies, in each case unaudited consolidated balance sheets of Holdings, its Restricted Subsidiaries and all BHG Entities that are treated as "Variable Interest Entities" pursuant to GAAP whose results are consolidated with Holdings as of the end of such Fiscal Month and Fiscal Quarter, respectively, and the related consolidated statements of income or operations and cash flows for such Fiscal Month and Fiscal Quarter, respectively, and for the portion of the Fiscal Year then elapsed, setting forth in each case in comparative form figures for the preceding Fiscal Year and the financial projections for the current Fiscal Year and certified by a Responsible Officer of Borrower to the effect that such statements fairly present in all material respects in accordance with GAAP the financial condition of Holdings, its Restricted Subsidiaries and all BHG Entities that are treated as "Variable Interest Entities" pursuant to GAAP whose results are consolidated with Holdings as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end adjustments and the absence of footnotes, other than any footnotes relating to the commencement of the Cases or the events leading thereto;

(c)     [Reserved];

(d)     <u>DIP Budget and Variance Reporting</u>.

(i)     On or before 12:00 p.m. New York City time on the Friday of each third (3rd) calendar week following the Petition Date, the Loan Parties shall deliver to the Administrative Agent and the Lenders a supplement to the Initial Budget (or the previously supplemented Approved Budget, as the case may be), covering the subsequent 13-week period that commences with the week immediately following the date of delivery of the supplemental budget, consistent with the form and level of detail set forth in the Initial Budget and otherwise in form and substance acceptable to the Required Lenders (each such supplemental budget, an "<u>Updated Budget</u>"). Upon (and subject to) the approval in writing of any such Updated Budget by the Required Lenders, such Updated Budget shall constitute the then-approved Approved Budget; <u>provided</u> that unless and until the Required Lenders approve such supplemental budget, the then-current Approved Budget shall remain in effect. The Debtors shall comply with the Approved Budget (subject to Permitted Variances) at all times.

(ii)     Commencing with the first full calendar week following the Petition Date and for each calendar week thereafter, by no later than 12:00 p.m. New York

City time on the Friday of such calendar week, (each such Friday, a "Variance Report Date"), the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, a variance report (each, a "Variance Report") for the applicable Testing Period setting forth, in reasonable detail, any differences between (i) the cumulative actual cash receipts on an aggregate basis for such Testing Period compared to the projected cash receipts on an aggregate basis set forth in the Approved Budget for such Testing Period (any such difference, a "Receipts Variance") and (ii) the cumulative actual cash disbursements on an aggregate basis for such Testing Period compared to the projected cash disbursements on an aggregate basis set forth in the Approved Budget for such Testing Period (any such difference, a "Disbursements Variance"), together with a statement from the Borrower's chief financial officer certifying the information contained in such Variance Report and compliance with Section 7.17 hereof. The Variance Report shall also provide a reasonably detailed explanation for any variance on a cumulative basis. The term "Testing Period" means, with respect to each Variance Report required to be delivered on a Variance Report Date, the prior four-week period (except that no such variance reporting shall not be required for periods prior to the Petition Date); provided that, the first Variance Report shall be based on the first three (3) weeks following the Petition Date (the "Initial Testing Period").

(iii)    Notwithstanding the foregoing, for informational purposes only, and not for purposes of approval or variance testing required by Section 7.17 hereof, on or before 12:00 p.m. New York City time on the Friday of each calendar week following the Petition Date, the Loan Parties shall deliver to the Administrative Agent and the Lenders a 13-week cash flow forecast, or a weekly update thereto, showing updated actuals and variances.

(iv)    Notwithstanding the foregoing, for informational purposes only, and not for purposes of approval or variance testing required by Section 7.17 hereof, each Variance Report for the applicable Testing Period shall also set forth, in reasonable detail, any differences between (i) the actual cash receipts on a line-item basis for all categories shown in the Approved Budget for such Testing Period compared to the projected cash receipts on a line-item basis set forth in the Approved Budget for such Testing Period and (ii) the actual cash disbursements on a line-item basis for all categories shown in the Approved Budget for such Testing Period compared to the projected cash disbursements on a line-item basis set forth in the Approved Budget for such Testing Period.

**6.02.    Other Information**.  Deliver to Administrative Agent and each Lender, in form and detail reasonably satisfactory to Required Lenders:

(a)    concurrently with delivery of financial statements under Section 6.01(a) and with the financial statements under Section 6.01(b) for each Fiscal Month that is the end of a Fiscal Quarter, a Compliance Certificate executed by a Responsible Officer of Borrower;

(b)     within two (2) Business Days after any delivery thereof, copies of all material written reports and presentations delivered by or on behalf of any Loan Party to the Committee or any other party in interest in the Cases that have not been filed publicly on the Bankruptcy Court's docket within such period;

(c)     promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements, which (in any of the foregoing cases) Borrower or Holdings may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, and not otherwise required to be delivered to Administrative Agent pursuant hereto; and

(d)     promptly, such additional information regarding the business, financial or organizational affairs of any Loan Party, any Restricted Subsidiary or any BHG Entities that are treated as "Variable Interest Entities" pursuant to GAAP whose results are consolidated with Holdings, or compliance with the terms of the Loan Documents, as Administrative Agent or any Lender may from time to time reasonably requests.

**6.03.   Notices**.  Promptly notify Administrative Agent and each Lender of:

(a)     the occurrence of any Default or Event of Default;

(b)     any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including to the extent permissible by applicable requirements of Law, (i) breach or non-performance of or default under, or receipt of a notice alleging breach or non-performance of or default under, a Material License or a Contractual Obligation (other than resulting from the filing of the Cases); (ii) the threat or commencement of (or any material development in) any dispute, litigation, arbitration, or governmental investigation; (iii) the violation or asserted violation of any applicable Law; or (iv) any notice of any party seeking relief from the Automatic Stay other than as expressly authorized under the DIP Orders;

(c)     the occurrence of any ERISA Event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(d)     the creation or acquisition of any Subsidiary;

(e)     any material change in accounting policies or financial reporting practices by any Loan Party or any Restricted Subsidiary, the receipt by any Loan Party or any Restricted Subsidiary of any comment letter or management report submitted by its Auditor (together with a copy thereof) or any discharge, resignation or withdrawal by or of any Loan Party's present Auditor;

(f)     any casualty, damage or destruction to any material portion of the Collateral (deemed to include Collateral having an aggregate value in excess of $3,000,000) or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral (deemed to include Collateral having an aggregate value in excess of $3,000,000) under power of eminent domain or by condemnation or similar proceeding; and

(g)     Promptly notify the Administrative Agent in writing, (a) as soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in the Cases, if any, or to the United States Trustee, as the case may be, (i) the Final DIP Order and (ii) all other material proposed orders and pleadings that are (A) adverse to the interests of the Administrative Agent or the Lenders or (B) inconsistent with the Approved Budget or terms of the Loan Documents, in each case, relating to any of (x) the Cases, (y) the Prepetition Loan Agreement and this Agreement and the credit facilities contemplated thereby and hereby, or (z) any sale contemplated in accordance with the Milestones, any Plan of Reorganization or any disclosure statement related thereto, and (b) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Case, if any, or to the United States Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Case, if any, or to the United States Trustee.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of Borrower setting forth details of the occurrence referred to therein and stating what action, if any, Borrower has taken and propose to take with respect thereto.

**6.04.   Payment of Obligations**.  Subject to Section 7.17 and the DIP Orders, pay and discharge (a) as the same shall become due and payable, all Federal, state and other material tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being Properly Contested or are not more than 30 days overdue; and (b) all lawful claims which, if unpaid, would by law become a Lien upon its property, except to the extent that any such Lien would otherwise be permitted by Section 7.02 or the failure to so pay or discharge would not reasonably be expected to result in a Material Adverse Effect.

**6.05.   Preservation of Existence, Etc**.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except (i) other than with respect to any Person (other than the Borrower), to the extent the board of directors (or equivalent governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and the other Restricted Subsidiaries and to the extent that the loss thereof shall not be disadvantageous to the Borrower, any of the other Restricted Subsidiaries or the Lenders in any material respect or (ii) in a transaction permitted by Section 7.04 or 7.05; (b) [reserved]; (c) preserve or renew all of its registered Intellectual Property and rights to use Intellectual Property necessary in the normal conduct of its business the loss of which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; and (d) keep in full force and effect each License the expiration or termination of which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect (each a "***Material License***").

**6.06.   Maintenance of Properties**.  Maintain, preserve and protect all of its properties (other than insignificant properties) and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and casualty or condemnation excepted, except where failure to do so could not reasonably be expected to have a Material Adverse Effect individually or in the aggregate.

**6.07.    Maintenance of Insurance; Condemnation Proceeds**.

(a)    Maintain with (i) companies having an A.M. Best Rating of at least "A" or (ii) financially sound and reputable insurance companies reasonably acceptable to Administrative Agent and not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the other Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons.

(b)    Deliver to Administrative Agent certificates setting forth in reasonable detail the nature and extent of all insurance maintained by the Loan Parties, and cause each issuer of an insurance policy to a Loan Party to provide Administrative Agent with a customary endorsement showing, among other things, Administrative Agent as a loss payee with respect to each policy of property or casualty insurance and naming Administrative Agent as an additional insured with respect to each policy of liability insurance.  Borrower shall execute and deliver, and cause each other applicable Loan Party to execute and deliver, to Administrative Agent a collateral assignment, in form and substance reasonably satisfactory to Administrative Agent, of each business interruption insurance policy maintained by the Loan Parties.

(c)    Unless Borrower provides Administrative Agent with evidence of the continuing insurance coverage required by this Agreement, Administrative Agent may purchase insurance at Borrower's expense to protect Administrative Agent's and Lenders' interests in the Collateral.  This insurance may, but need not, protect Borrower's and each other Loan Party's interests.  The coverage that Administrative Agent purchases may, but need not, pay any claim that is made against Borrower or any other Loan Party in connection with the Collateral.  Borrower may later cancel any insurance purchased by Administrative Agent, but only after providing Administrative Agent with evidence that Loan Parties have obtained the insurance coverage required by this Agreement.  If Agent purchases insurance for the Collateral, as set forth above, Borrower will be responsible for the costs of that insurance, including interest and any other charges that may be imposed with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance and the costs of the insurance may be added to the principal amount of the Loans owing hereunder.

**6.08.    Compliance with Laws Generally; Environmental Laws**.  Except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply with the requirements of all Laws (including without limitation all applicable Environmental Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which  such requirement of Law or order, writ, injunction or decree is being Properly Contested; (b) maintain its Real Estate in compliance with all Environmental Laws; (c) obtain and renew all environmental permits necessary for its operations and properties; and (d) implement any and all investigation, remediation, removal and response actions that are required to comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under or about any of its Real Estate.

-75-

**6.09.    Books and Records**.  (a) Maintain proper books of record and account, in which full, true and correct entries, in all material respects, for the Loan Parties taken as a whole and for the Loan Parties and their Restricted Subsidiaries taken as a whole, in conformity with GAAP consistently applied shall be made; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over any Loan Party or such Restricted Subsidiary, as the case may be.

**6.10.    Inspection Rights; Meetings with Administrative Agent.**

(a)    Subject to the terms of any applicable leases with third parties, permit Administrative Agent or its respective designees or representatives from time to time, subject to reasonable notice and during normal business hours (except, no such notice shall be required and the inspection may be conducted at any time, when a Default or Event of Default exists), to conduct inspections of the operations and properties of the Loan Parties and Subsidiaries and/or appraisals and audits, to examine its organizational, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers and Auditors; provided, that, (except, in each case, when a Default or Event of Default exists) (i) representatives of Borrower shall be given the opportunity to participate in any discussions with the Auditors, and (ii) such visits and inspections shall be coordinated through the Administrative Agent.  Each of Administrative Agent and each Lender shall not have any duty to any Loan Party to share any results of any such inspection or examination with any Loan Party.  The Loan Parties acknowledge that all reports are prepared by or for Administrative Agent and Lenders for their purposes, and Loan Parties shall not be entitled to rely upon them.  Notwithstanding anything herein to the contrary, unless an Event of Default exists, (i) no such inspection, appraisal, audit or examination may unduly interfere with the businesses of the Loan Parties and their Subsidiaries, (ii) no more than one such inspections, appraisals, audits and examinations may be conducted in any period of twelve consecutive months, (iii) the costs of such inspections, appraisals, audits and examinations shall not exceed $50,000 in any Fiscal Year and (iv) the Borrower shall bear the cost of only one such inspection, appraisal, audit or examination within any Fiscal Year unless an Event of Default has occurred and is continuing.  None of the Borrower nor any of the other Restricted Subsidiaries shall be required to disclose to the Administrative Agent or any Lender (or any authorized representative or independent contractor of any of them) any information that (u) is prohibited by Law to be disclosed, (v) is subject to a third party's confidentiality arrangement which prohibits dissemination of such information, (w) is subject to a conflict of interest  with the Administrative Agent or Lenders, (x) is subject to attorney-client privilege or constitutes attorney work product, (y) relates to compensation issues not otherwise material to the operations, business, assets, properties, liabilities (actual or contingent), or financial condition of the Loan Parties or (z) constitutes non-financial trade secrets or non-financial proprietary information of the Borrower or its Subsidiaries and/or any of their respective customers and/or suppliers.

(b)    The Loan Parties shall deliver to the Administrative Agent for distribution to the Lenders a copy of written materials (including copies of all board presentations) delivered to the governing body (the "***Board of Directors***") at each such board meeting (in each case, other than any portions of such reports or materials that contains information that (v) is subject to a third party's confidentiality arrangement which prohibits dissemination of such information, (w) is subject to a conflict of interest with the Administrative Agent or Lenders, (x) is subject to the attorney-client privilege or constitutes attorney work product, (y) relates to compensation issues

-76-

not otherwise material to the operations, business, assets, properties, liabilities (actual or contingent), or financial condition of the Loan Parties or (z) constitutes non-financial trade secrets or non-financial propriety information of the Borrower or its Subsidiaries and/or any of the responsible customers and/or suppliers).

**6.11.  Compliance with ERISA**.  Do, and cause each of its ERISA Affiliates to do, each of the following: (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable Laws; (b) cause each Plan which is qualified under section 401(a) of the Code to maintain such qualification; and (c) make all required contributions to any Plan, except when the failure to make such contributions would not reasonably be expected to result in a Material Adverse Effect.

**6.12.  Further Assurances**.

(a)     At Borrower's cost and expense, upon the reasonable request of Administrative Agent (at the direction of Required Lenders), duly execute and deliver or cause to be duly executed and delivered, to Administrative Agent such further instruments, documents, certificates and financing and continuation statements, and do and cause to be done such further acts that may be reasonably necessary or advisable in the reasonable opinion of Required Lenders to carry out more effectively the provisions and purposes of this Agreement, the Security Instruments and the other Loan Documents.

(b)     Upon the acquisition or creation of any Subsidiary, cause to be delivered to Administrative Agent each of the following, as applicable, in each case reasonably acceptable to Administrative Agent (at the direction of the Required Lenders) and, as applicable, duly executed by the parties thereto: (i) a joinder agreement with respect to this Agreement, together with other Loan Documents reasonably requested by Administrative Agent (at the direction of Required Lenders), including all Security Instruments and other documents reasonably requested to establish and preserve the Lien of Administrative Agent in all Collateral of such Subsidiary, subject to any limitations on Collateral set forth in the Loan Documents; (ii) Uniform Commercial Code financing statements, Documents and original collateral (including pledged Equity Interests, other securities and Instruments) and such other documents and agreements as may be reasonably required by Administrative Agent (at the direction of Required Lenders), all as necessary or desirable to establish and maintain a valid, perfected Lien in all Collateral in which such Subsidiary has an interest consistent with the terms of the Loan Documents executed on the Closing Date (and subject to any limitations on Collateral or perfection set forth therein); (iii) an opinion of counsel to such Subsidiary addressed to Administrative Agent and the Lenders, in form and substance reasonably acceptable to Administrative Agent (at the direction of Required Lenders) and substantially similar to those opinions of counsel delivered on the Closing Date; and (iv) current copies of the Organization Documents of such Subsidiary, resolutions of the board of directors, partners, or appropriate committees thereof (and, if required by such Organization Documents or applicable law, of the shareholders, members or partners) of such Person authorizing the actions and the execution and delivery of documents described in this Section 6.12, all certified by an appropriate officer as Administrative Agent may elect.

(c)     Upon the acquisition by any Loan Party of any fee owned Real Estate with an individual fair market value in excess of $3,000,000, deliver or cause to be delivered to

Administrative Agent, with respect thereto, in each case reasonably acceptable to Administrative Agent (at the direction of Required Lenders), a mortgage or deed of trust, as applicable, and an opinion of Borrower's counsel with respect thereto, an ALTA lender's title insurance policy insuring Administrative Agent's first priority Lien (subject to non-consensual Permitted Liens), a current ALTA survey, certified to Administrative Agent by a licensed surveyor, a certificate from a national certification agency indicating whether such Real Estate is located in a special flood hazard area, an environmental audit, and in addition, in the case of Real Estate that consists of a leasehold estate, such estoppel letters, consents and waivers from the landlord and non-disturbance agreements from any holders of mortgages or deeds of trust on such Real Estate and as may be obtained after the exercise of commercially reasonable efforts by the applicable Loan Party. Administrative Agent will have the right to waive all requirements set forth in this subsection (c) with respect to leasehold interests.

(d)     Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)     the Loan Documents shall not require the creation or perfection of pledges of or security interests in, or the delivery of particular documents with respect to, particular assets if and for so long as the Required Lenders and the Borrower determine in their reasonable discretion that the burden or cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance in respect of such assets shall outweigh the benefit of the security afforded thereby;

(ii)     notwithstanding anything to the contrary contained herein, the Loan Parties shall not be required to (a) grant a security interest in any asset or perfect a security interest in any asset to the extent (and for the duration) that the granting of a security interest in such asset would be prohibited by enforceable anti-assignment provisions of contracts or applicable law or with respect to any assets to the extent such a pledge would violate the terms of any contract with respect to such assets (in each case, after giving effect to relevant provisions of the UCC or other applicable law) or would trigger termination (or a right of termination) pursuant to any "change of control" or similar provision or the ability of any third party to amend any rights, benefits or obligations of any Loan Party in respect of the relevant assets or which require any Loan Party or any of its Subsidiaries to take any action that is materially adverse to their respective interests (so long as such third-party right was not entered into in contemplation of the Transactions), and (b) perfect a security interest in vehicles and any other assets subject to a certificate of title and letter of credit rights to the extent not perfected by the filing of a UCC-1 financing statement; and

(iii)     the Administrative Agent (at the direction of Required Lenders) may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the time as set forth therein for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in its discretion, that perfection cannot be accomplished without undue effort or expense

-78-

by the time or times at which it would otherwise be required by this Agreement or the Security Instruments.

**6.13.   [Reserved]**.

**6.14.   Health Care Laws; CPOD Laws.**

(a)      Without limiting or qualifying any other provision of this Agreement, each Loan Party will comply, and cause each of its Restricted Subsidiaries to comply, and will require each of the BHG Entities to comply, with all applicable Health Care Laws, except where such Loan Party's failure to so comply would not reasonably expected to result in a Material Adverse Effect. Each Loan Party shall maintain and cause each of its Restricted Subsidiaries to maintain, and will require each BHG Entity to maintain, in full force and effect: (i) all Permits required under Health Care Laws (other than such Permits, the failure of which to so maintain could not reasonably be expected to result in a Material Adverse Effect); and (ii) any qualifications, enrollments, provider or supplier numbers or agreements, or other Permits required to be enrolled in and receive payment under Medicare, Medicaid and other applicable Third Party Payor Programs (other than such qualifications, enrollments, provider or supplier numbers or agreements, or other Permits, the failure of which to maintain would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect). Each Loan Party shall comply, and cause each of its Restricted Subsidiaries to comply, and require each BHG Entity to comply with all applicable material requirements of Medicare, Medicaid, and other Third Party Payor Programs in which such Loan Party, Restricted Subsidiary or BHG Entity participates, except where such Loan Party's failure to so comply would not reasonably expected to result in a Material Adverse Effect. Each Loan Party shall modify (and will cause its Restricted Subsidiaries to modify) their respective corporate compliance programs as may be necessary to ensure continuing material compliance with all applicable Laws and Health Care Laws.

(b)      Each Loan Party will comply, and cause each of its Restricted Subsidiaries to comply, and will require each of the BHG Entities to comply, in all respects with applicable CPOD Laws, except where such Loan Party's failure to so comply would not reasonably expected to result in a Material Adverse Effect.

**6.15.   Health Care Matters.** Each Loan Party shall notify the Administrative Agent within five (5) Business Days (or, with respect to the BHG Entities, within ten (10) days) following the occurrence (or, to the extent the Loan Party(s)' duty to notify Administrative Agent of such occurrence is contingent upon Loan Party(s)' knowledge of such occurrence, within ten (10) days following knowledge of such occurrence) of any of the following facts, events, notices, or circumstances, and as permitted by applicable Laws together with such supporting data and information as shall be reasonably necessary to fully explain to the Administrative Agent the scope and nature of the fact, event, notice or circumstance, and shall provide to the Administrative Agent within two (2) Business Days (or, with respect to the BHG Entities, within five (5) Business Days) of Administrative Agent's request, such additional information as Administrative Agent shall reasonably request regarding such disclosure:

(a)      notice of any material civil or criminal investigation or audit, or proceeding pending or to the knowledge of any Loan Party, threatened in writing, by any federal, state, local

Governmental Authority, Governmental Third Party Payor or Private Third Party Payor relating to any actual or alleged material violation by any Loan Party, any Restricted Subsidiary of any Loan Party, or to the knowledge of any Loan Party, any BHG Entity, of any Health Care Laws or that alleges systematic, deliberate, widespread or material false or fraudulent claims submission by any Loan Party, Restricted Subsidiary of a Loan Party or any BHG Entity;

(b)       any Loan Party, an owner, officer, manager or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) equal to or greater than five percent (5%) in any Loan Party or any Subsidiary thereof, or, in each of the following to the knowledge of any Loan Party, any BHG Entity, or an owner, officer, manager or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) equal to or greater than five percent (5%) in, or any Licensed Personnel of, any BHG Entity: (A) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) has been excluded from participation in a Governmental Third Party Payor Program or is the subject of a proceeding seeking to assess such penalty; (C) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (D) has been named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. §§ 3729 et seq.;

(c)       copies of any written recommendation from any Governmental Authority that any Loan Party or any of its Restricted Subsidiaries or, to the knowledge of any Loan Party, any BHG Entity should have any of its Permits, provider or supplier number suspended, revoked, or limited in any way, or any penalties or sanctions imposed, provided that implementation of any such recommendation would reasonably be expected to result in a Material Adverse Effect;

(d)       notice of any claim to recover any alleged overpayments to a Loan Party, a Restricted Subsidiary of a Loan Party or an BHG Entity in excess of $1,500,000;

(e)       voluntary disclosure by a Loan Party or a Restricted Subsidiary of a Loan Party or to the knowledge of any Loan Party by an BHG Entity to the Office of the Inspector General of the United States Department of Health and Human Services (or any other Governmental Authority or Administrative Agent of a Governmental Authority designated to receive such disclosures) or any state's Medicaid program of a potential overpayment matter involving the submission of claims to such payor in any amount greater than $3,000,000;

(f)       any revocation, suspension, termination, material limitation, denial or non-renewal of the enrollment or participation status or eligibility to accept assignments or rights to reimbursement of any Loan Party or any of its Restricted Subsidiaries or to the knowledge of any Loan Party of any BHG Entity with respect to any Governmental Third Party Payor Program and Private Third Party Payor Program, provided that any such revocation, suspension, termination, material limitation, denial or non-renewal from a Private Third Party Payor Program would reasonably be expected to result in a Material Adverse Effect;

(g)       notice of any Third Party Payor Program reimbursement payment contract or process that results or is reasonably expected to result in any claim against a Loan Party, a

-80-

Restricted Subsidiary of a Loan Party or an BHG Entity (including on account of overpayments, settlement payments, appeals, repayment requests) in excess of $1,500,000; and

(h)     notice of any Dentist Partners that have threatened in writing to act in contravention of the BHG Support Services Agreement or the related BCA or any other ancillary agreements related to the operations of such BHG Entity.

**6.16.    BHG Support Services Agreements; BHG Security Agreements.**

(a)     The Borrower and each of its Restricted Subsidiaries shall comply in all respects with all of their material obligations under each BHG Support Services Agreement and shall promptly enforce and diligently pursue all of their material rights under each BHG Support Services Agreement and each BHG Security Agreement.

(b)     At each time of delivery of the financial statements provided for in Section 6.01(b), the Borrower shall provide to the Administrative Agent, who shall promptly deliver a copy of the same to the Lenders, (A) a copy of any BHG Support Services Agreement and any related BHG Security Agreement entered into by the Borrower or any of its Restricted Subsidiaries during such period covered by the financial statements to the extent not previously delivered to the Administrative Agent, and (B) a copy of any material amendment or other modification to the terms or provisions of any BHG Support Services Agreement or BHG Security Agreement, entered into during such period covered by the financial statements to the extent not previously delivered to the Administrative Agent.

(c)     The Loan Parties shall, and shall cause each of their respective Restricted Subsidiaries to, take all action as may be necessary and appropriate to ensure that each BHG Security Agreement continues to create, as security for certain obligations of the applicable BHG Entity under such BHG Support Services Agreement, a valid and enforceable, perfected security interest in and Lien on such BHG Entity's accounts and accounts receivable in favor of the Borrower, superior to and prior to the rights of all third persons and subject to no other Liens other than Liens permitted under the BHG Security Agreement, except to the extent that the creation of such security interests, in the reasonable business judgment of the Borrower, would reasonably be expected to cause Borrower to violate CPOD Laws. The Loan Parties will, and will cause each of their respective Subsidiaries to, at the expense of the Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Administrative Agent from time to time such conveyances, financing statements, transfer endorsements, powers of attorney, certificates, and other assurance instruments and take such further steps relating to the collateral provided to the Borrower by the BHG Entities as the Administrative Agent may reasonably require except to the extent that such actions, in the reasonable business judgment of the Borrower, would reasonably be expected to cause Borrower to violate CPOD Laws.

(d)     Pursuant to and in accordance with Section 6(k) of the Security Agreement, each Loan Party shall execute a collateral assignment of rights under the BHG Support Services Agreements and the BHG Security Agreements, substantially in the form of Exhibit H hereto, with respect to each BHG Support Services Agreement and BHG Security Agreement (or supplements to any such existing collateral assignment of rights agreement covering each BHG Support Services Agreement and BHG Security Agreement).

**6.17. BHG Bank Accounts.** Cause the balance in excess of $250,000 in each bank account (whether in existence on or after the Closing Date) of each BHG Entity to be swept, directly or indirectly, by zero balance authorization on a weekly (or more frequently upon request by Administrative Agent (at the direction of Required Lenders) upon the occurrence and during the continuance of an Event of Default) basis to an account of the Borrower which is subject to a Control Agreement.

**6.18. Deposit Accounts; Payment of Professional Fees.** All Deposit Accounts of the Loan Parties shall be Controlled Accounts. The Loan Parties shall deposit all receivables, securities, cash and Cash Equivalents into a Controlled Account. Upon the occurrence and during the continuance of an Event of Default, all deposits in such Controlled Accounts shall be transferred to an account designated by the Administrative Agent on each Business Day and applied to repay the outstanding Obligations in accordance with Section 8.03. The cash management system of the Loan Parties shall be otherwise maintained in a manner reasonably satisfactory to the Administrative Agent and the Required Lenders, it being agreed that the Borrower's existing arrangements with Bank of America, N.A. are acceptable to the Administrative Agent and the Required Lenders. The Cash Management Order shall not be modified in any material respect without the prior written consent of the Administrative Agent and the Required Lenders. All Professional Fees at any time paid by the Loan Parties, or any of them, shall be paid by the Loan Parties pursuant to an order of the Bankruptcy Court, including, without limitation the DIP Orders and pursuant to the Approved Budget.

**6.19. [Reserved].**

**6.20. Lender Calls.** Upon the request of the Administrative Agent or the Required Lenders, the Borrower will hold a telephonic conference call with the Lenders (and their advisors), to discuss the Variance Report, the Cases, the financial and operational performance of the Loan Parties, and such other related matters as may be reasonably requested with reasonable advance notice.

**6.21. Milestones**. The Loan Parties shall comply with the Milestones.

**6.22. Other Bankruptcy Matters.**

(a) The Loan Parties shall comply in all material respects with all of the requirements and obligations set forth in the DIP Orders and in all material respects with any other orders entered in the Cases to the extent relevant to the interests of the Lenders, in each case after the entry thereof.

(b) The Loan Parties shall deliver to the Administrative Agent and Lenders (and their respective advisors, including without limitation, Proskauer Rose LLP) as soon as reasonably practicable, but in no event less than three (3) days prior to any filing, copies of all material proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases that affect or may affect the Administrative Agent or the Lenders, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, including, without limitation, the DIP Orders, any plan of reorganization or

-82-

liquidation and any disclosure statements related to such plan, in the Cases (each of which must be in form and substance acceptable to the Required Lenders).

(c)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and the Lenders and to counsel to the Administrative Agent and the Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases.

(d)     Except as otherwise is permitted by the DIP Orders, the Borrower shall provide prior written notice as soon as reasonably practicable to the Administrative Agent and the Lenders (and their respective counsel) prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), if the Administrative Agent (at the direction of the Required Lenders) informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

(e)     The Loan Parties shall maintain the engagement of Conway MacKenzie as their financial advisor or retain such other financial advisor reasonably satisfactory to the Required Lenders.

**6.23.    Restructuring Support Matters**.  The Loan Parties agree to:

(a)     support and use commercially reasonable efforts (i) to pursue the RSA Transactions on the terms and in accordance with the Milestones, including by negotiating the RSA Definitive Documents in good faith, and (ii) cooperate with the Consenting Lenders (as defined in the Restructuring Support Agreement) to obtain necessary Bankruptcy Court approval of the RSA Definitive Documents to consummate the RSA Transactions;

(b)     not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement or the Restructuring Support Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the RSA Transactions, the Restructuring Support Agreement, and the 363 Sale Transaction;

(c)     negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative agreements to address any legal, financial, or structural impediment to the RSA Transactions that are necessary to effectuate the RSA Transactions in accordance with the terms hereof, provided, that, notwithstanding anything herein to the contrary, the Loan Parties shall not be permitted to offer any additional fees, expenses or other economic entitlements to other stakeholders (other than as contemplated by the Restructuring Support Agreement) without prior written consent from the Required Lenders;

-83-

(d)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the RSA Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the RSA Definitive Documents and any other required agreements to effectuate and consummate the RSA Transactions as contemplated by the Restructuring Support Agreement;

(f)     use commercially reasonable efforts to seek additional support for the RSA Transactions from their other material stakeholders to the extent reasonably prudent;

(g)     to the extent reasonably practicable, provide the Consenting Lender Advisors (as defined in the Restructuring Support Agreement) a review period of (i) at least three (3) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Loan Parties intend to file any RSA Definitive Document with the Bankruptcy Court and (ii) at least one (1) calendar day (or such shorter review period as necessary or appropriate) prior to the date when the Loan Parties intend to file any other material pleading with the Bankruptcy Court (but excluding retention applications, fee applications, and any declarations in support thereof or related thereto) with the Bankruptcy Court;

(h)     upon reasonable request of any of the Consenting Lenders (as defined in the Restructuring Support Agreement), inform the Consenting Lender Advisors (as defined in the Restructuring Support Agreement) as to: (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the RSA Transactions, including progress in relation to the negotiations of the RSA Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)     inform the Consenting Lender Advisors (as defined in the Restructuring Support Agreement) as soon as reasonably practicable after becoming aware of: (i) any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the RSA Transactions; (ii) a breach or termination event of Restructuring Support Agreement (including a breach by any Loan Party); and (iii) any representation or statement made or deemed to be made by them under the Restructuring Support Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; and

(j)     cooperate with the parties to the Restructuring Support Agreement in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) with respect to: (a) all matters relating to their rights hereunder; (b) all matters concerning the implementation of the RSA Transactions; and (c) the pursuit, approval and support of the RSA Transactions. Furthermore, subject to the terms of the Restructuring Support Agreement, each of the Loan Parties shall take such action as may be reasonably necessary or reasonably requested by the other parties thereto to carry out the purposes and intent of the Restructuring Support Agreement, or to effectuate the solicitation of the RSA Transactions, including making and filing any required regulatory filings, executing and delivering any other necessary agreements or

instruments, and shall refrain from taking any action that would frustrate the purposes and intent of the Restructuring Support Agreement.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan, or Obligation (other than contingent indemnification claims for which no claim has been asserted) hereunder shall remain unpaid or unsatisfied, no Loan Party shall, nor shall it permit any Restricted Subsidiary to, directly or indirectly:

**7.01.   Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, except:

(a)    the Obligations;

(b)    Indebtedness outstanding on the date hereof and listed on Schedule 7.01 (but not, for greater certainty, any extensions or renewals thereof);

(c)    Guarantees by any Loan Party in respect of Indebtedness otherwise permitted hereunder of any other Loan Party (other than Holdings); provided, that, any Guarantee of Indebtedness that is required to be subordinated to the Obligations under the terms of this Agreement shall be subordinated to the Obligations on substantially the same terms as such subordinated Indebtedness;

(d)    obligations (contingent or otherwise) of the Loan Parties existing or arising under any Swap Contract, provided, that, such obligations are (or were) required hereunder or entered into by such Person in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, cash flows or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view";

(e)    Indebtedness in respect of Capital Leases and purchase money obligations for real property and fixed or capital assets within the limitations set forth in Section 7.02(i); provided, however, that the aggregate principal amount of all such Indebtedness at any one time outstanding shall not exceed $3,500,000;

(f)    the endorsement of negotiable instruments for deposit or collection or similar transactions in the Ordinary Course of Business;

(g)    unsecured Indebtedness of any Loan Party (other than Holdings) owing to any other Loan Party;

(h)    Indebtedness arising out of surety bonds, bids, tenders, performance bonds, litigation bonds, appeal bonds and similar obligations incurred in the Ordinary Course of Business;

(i)    Indebtedness owing to insurance carriers and incurred to finance insurance premiums of any Loan Party or any Subsidiary in the Ordinary Course of Business in a principal

-85-

amount not to exceed at any time the amount of insurance premiums to be paid by such Loan Party or any Subsidiary;

(j)     Prepetition Indebtedness, as outstanding as of the date hereof;

(k)     Indebtedness in respect of cash management obligations, automatic clearing house arrangements, netting services, overdraft protections and other like services, in each case incurred in the Ordinary Course of Business;

(l)     Indebtedness (i) arising from customary agreements for indemnification related to sales of goods or adjustment of purchase price or similar obligations in any case incurred in connection with the acquisition or disposition of any business, assets or Subsidiary of Borrower otherwise permitted hereunder, (ii) representing deferred compensation to employees of any Loan Party incurred in the Ordinary Course of Business and (iii) representing customer deposits and advance payments received in the Ordinary Course of Business from customers for goods purchased in the Ordinary Course of Business;

(m)     [reserved];

(n)     [reserved];

(o)     [reserved];

(p)     [reserved];

(q)     Indebtedness incurred by any Loan Party or any Restricted Subsidiary of any Loan Party in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the Ordinary Course Of Business, including in respect of workers compensation claims, health, disability or other employee benefits, salary, wages or other compensation or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; and

(r)     without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Borrower and/or any other Restricted Subsidiary hereunder.

Notwithstanding any of the foregoing, and except for the Carve Out as provided in the Orders, no Indebtedness permitted under this Section 7.01 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with (x) the Superpriority Claims and (y) the superpriority administrative expense claims of the Prepetition Agent and the Prepetition Secured Parties, in each case, as set forth herein and in the DIP Orders.

**7.02.   Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following ("***Permitted Liens***"):

(a) Liens in favor of Administrative Agent (or any Lenders) pursuant to any Loan Document;

(b) Liens existing on the date hereof and listed on Schedule 7.02 (but not, for greater certainty, any replacements, renewals or extensions thereof);

(c) Liens for taxes, duties, levies, imposts, deductions, assessments or other governmental charges (i) not yet due and payable except those which are being Properly Contested and (ii) the nonpayment of which is permitted or required by the Bankruptcy Code;

(d) Liens of carriers, warehousemen, processors, mechanics, materialmen, repairmen, landlords or other like Liens imposed by Law or arising in the Ordinary Course of Business which are not overdue for a period of more than 30 days or which are being Properly Contested;

(e) Liens, pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f) Liens on deposits to secure the performance of bids, tenders, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds, performance bonds, litigation bonds, appeal bonds and other obligations of a like nature incurred in the Ordinary Course of Business;

(g) Liens consisting of minor imperfections of title and easements, rights-of-way, covenants, consents, reservations, encroachments, variations and zoning and other similar restrictions, charges, encumbrances or title defects affecting real property which, in the aggregate do not materially detract from the value of the property subject thereto or materially interfere with the use by the Loan Parties in the Ordinary Course of Business of the property subject to such encumbrance;

(h) Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01 or securing appeal or other surety bonds related to such judgments;

(i) Liens securing Indebtedness permitted under Section 7.01(e) or the replacement, renewal or extension of any such Indebtedness; provided, that, (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (ii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition plus the amount of any related interest, premiums, fees and/or expenses and/or other customary amounts;

(j) licenses, sublicenses, operating leases or subleases (and precautionary UCC filings or filings under similar Laws with respect thereto) granted by or to the Loan Parties to or from any other Person in the Ordinary Course of Business;

(k)     Liens in favor of collecting banks arising under Section 4-208 or 4-210 of the UCC;

(l)     Liens (including the right of setoff) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(m)     Liens in favor of customs and revenue authorities imposed by Law to secure payment of customs duties in connection with the importation of goods and arising in the Ordinary Course of Business which are not overdue for a period of more than 30 days or which are being Properly Contested;

(n)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto to the extent permitted under Section 7.01(i) and cash collateral securing such Indebtedness in an aggregate amount not to exceed $1,000,000.

(o)     [reserved];

(p)     [reserved];

(q)     Liens granted by a Restricted Subsidiary in favor of any Loan Party;

(r)     [reserved];

(s)     Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the Ordinary Course Of Business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction);

(t)     Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(u)     [reserved];

(v)     (i) Liens on Equity Interests of joint ventures securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-wholly- owned Subsidiaries;

(w)     Liens securing obligations under Swap Contracts permitted hereunder; and

(x)     Liens securing the Prepetition Indebtedness;

(y)     Prepetition Priority Liens; and

(z)     Replacement Liens;

*provided* that all Permitted Liens (other than the Carve-Out and Prepetition Priority Liens), while any portion of the Obligations remain outstanding, shall at all times be junior and subordinate to

-88-

the Liens granted under the Loan Documents and the DIP Orders, which prohibition specifically restricts, without limitation, any Loan Party, the Committee, or any other party-in-interest in the Cases or any successor case, from priming or creating Liens *pari passu* with any Liens of the Administrative Agent, the Lenders (other than the Carve-Out and Prepetition Priority Liens) irrespective of whether such Liens may be "adequately protected".

     **7.03.**   **Investments**.  Make any Investments, except:

     (a)     Investments held by the Loan Parties and their Subsidiaries in the form of Cash Equivalents;

     (b)     loans and advances to officers, directors and employees of the Loan Parties and Subsidiaries, or any parent company thereof, made in the Ordinary Course of Business or in other emergency or special circumstances in an aggregate amount at any one time outstanding not to exceed $500,000;

     (c)     (i) Investments by the Loan Parties and their wholly-owned Restricted Subsidiaries in their respective wholly-owned Restricted Subsidiaries solely to the extent outstanding on the date hereof, (ii) additional Investments by Holdings and its wholly-owned Restricted Subsidiaries in Loan Parties (other than Holdings), and (iii) Investments taking the form of loans or advances to BHG Entities or contributions of equipment to BHG Entities, in each case in the Ordinary Course of Business;

     (d)     Investments of any Person existing at the time such Person becomes a Restricted Subsidiary or consolidates or merges with and into any Loan Party or Restricted Subsidiary so long as such Investments were not made in contemplation of such Person becoming a Restricted Subsidiary or of such consolidation or merger;

     (e)     Investments consisting of lease, utility or other similar deposits, or of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit, in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

     (f)     Investments existing as of the date hereof (other than those set forth on Schedule 5.12) to the extent set forth in Schedule 7.03 (but not, for greater certainty, any extensions or renewals thereof);

     (g)     [reserved];

     (h)     bank deposits and securities accounts maintained in accordance with the terms of this Agreement and the other Loan Documents;

     (i)     Investments in securities of account debtors received pursuant to a plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such account debtors and Investments acquired in connection with the settlement of delinquent accounts receivable in the Ordinary Course of Business;

(j)      [Reserved]; and

(k)      Investments constituting Indebtedness (including Swap Contracts) and Guarantees permitted under <u>Section 7.01</u> and Investments permitted by <u>Sections 7.05</u> and <u>Section 7.06</u>.

**7.04.   Mergers, Dissolutions, Etc.**.  Merge, dissolve, liquidate, consolidate with or into another Person.

**7.05.   Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)      Dispositions of Cash Equivalents and Inventory in the Ordinary Course of Business, including the destruction or donation of obsolete or near-obsolete Inventory in the Ordinary Course of Business;

(b)      Dispositions in the Ordinary Course of Business of equipment or fixed assets that are obsolete, worn out, surplus or no longer useful in the Ordinary Course of Business, or that is economically impracticable to maintain or such Dispositions as set forth on <u>Schedule 7.05(b)</u>;

(c)      any Disposition that constitutes or funds (i) an Investment permitted under <u>Section 7.03</u>, (ii) a Lien permitted under <u>Section 7.02</u>, or (iii) a Restricted Payment permitted under <u>Section 7.06</u>;

(d)      such Disposition that results from a casualty or condemnation in respect of such property or assets and is not otherwise an Event of Default so long as all proceeds thereof are remitted to Administrative Agent for application to the Obligations in accordance with <u>Section 2.06(b)(ii)</u>;

(e)      the sale or discount, in each case without recourse, of accounts receivable arising in the Ordinary Course of Business, but only in connection with the compromise or collection thereof;

(f)      licenses, sublicenses, leases or subleases granted to third parties in the Ordinary Course of Business (but limited, in the case of licenses of Intellectual Property, to non-exclusive licenses) not interfering with the business of the Loan Parties;

(g)      the lapse, abandonment or other dispositions of Intellectual Property that is, in the reasonable good faith judgment of a Loan Party, either no longer economically practicable or commercially desirable to maintain or no longer useful in the conduct of the business of the Loan Parties or any of their Restricted Subsidiaries;

(h)      Dispositions among the Loan Parties (other than to Holdings) or by any Restricted Subsidiary to a Loan Party (other than Holdings);

(i)      A cancellation of any intercompany Indebtedness among the Loan Parties to the extent that no negative tax consequences would result therefrom;

(j)      A Disposition which constitutes an insured event or an Event of Loss so long as all proceeds thereof are remitted to Administrative Agent for application to the Obligations in accordance with Section 2.06(b)(ii) if required thereby;

(k)      Cashless exchanges of existing equipment for new equipment that is substantially similar to the equipment being exchanged and that has a value reasonably equivalent to (or greater than) the equipment being exchanged;

(l)      Dispositions in connection with the unwinding of any Swap Contract pursuant to its terms;

(m)      any surrender, waiver, settlement, compromise, modification or release of contractual rights in the Ordinary Course Of Business, or the settlement, release or surrender of tort or other claims of any kind;

(n)      Dispositions made pursuant to deferred compensation arrangements in the Ordinary Course Of Business;

(o)      Dispositions of Equity Interests made in connection with the exercise or settlement of equity-based awards outstanding as of the date hereof or hereafter granted under the terms of any equity or equity-based compensation plans, programs, agreements or arrangements of any Holdings or any of its Restricted Subsidiaries;

(p)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements;

(q)      [reserved];

(r)      [reserved]; and

(s)      any sale of motor vehicles and information technology equipment purchased at the end of an operating lease and resold thereafter.

To the extent that any Collateral is disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take (and shall take) any actions it deems appropriate in order to effect the foregoing.

7.06.   **Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(a)      each Subsidiary may make Restricted Payments to a Loan Party or a Restricted Subsidiary of a Loan Party (other than Holdings except Restricted Payments made to Holdings the proceeds of which are used for Restricted Payments permitted hereunder) and, in connection therewith, on a pro rata basis to any other equity holder of such Subsidiary;

(b)      [reserved];

(c)     [reserved];

(d)     Restricted Payments may be made to the extent necessary to permit Holdings to pay administrative costs and expenses (including reasonable out-of-pocket fees and expenses of tax advisors) related to the business of Holdings, Holdings and its Subsidiaries, so long as Holdings applies the amount of such Restricted Payment for such purposes in any Fiscal Year;

(e)     [reserved];

(f)     [reserved]; and

(g)     Restricted Payments may be made in an amount sufficient to permit Holdings to pay consolidated or similar tax liabilities of Holdings and its Subsidiaries relating to the business of Borrower and Borrower's Subsidiaries, so long as Holdings applies the amount of such Restricted Payment for such purpose.

**7.07.   Change in Nature of Business**.  Engage in any material line of business other than the Core Business or as otherwise consented to by the Required Lenders.

**7.08.   Transactions with Affiliates**.  Enter into, or suffer to exist, any transaction, arrangement or agreement of any kind with any Affiliate of any Loan Party, other than (a) those described on Schedule 7.08, as in existence on the date hereof and any amendment, modification or extension thereof (as long as such amendment, modification or extension is not adverse to the interests of any Lender Party), (b) those expressly permitted by this Agreement and the other Loan Documents, (c) transactions between or among Loan Parties, (d) employment agreements, expense reimbursement and compensation to employees (including stock ownership plans, awards or grants of Equity Interests, employee benefit plans including vacation plans, health and life insurance plans, deferred compensation plans, retirement or savings plans and similar plans), (e) indemnification of officers,  directors and employees in the Ordinary Course of Business, (f) the entry into this Agreement and the other Loan Documents and all transactions contemplated hereby and thereby, including, without limitation, the Cases, (g) issuances of Equity Interests and Indebtedness not prohibited under this Agreement, (h) [reserved], (i) [reserved] and (j) others on fair and reasonable terms, taken as a whole, substantially as favorable (or more favorable) to such Loan Party or such Restricted Subsidiary as would be obtainable by such Loan Party or such Restricted Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate.

**7.09.   Inconsistent Agreements**.  Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that (i) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure the Obligations of such Person (other than a Permitted Lien); or (ii) limits the ability (A) of any Subsidiary to make Restricted Payments to any Loan Party or to otherwise transfer property to any Loan Party, (B) of any Subsidiary to Guarantee the Indebtedness of any Loan Party or become a direct Borrower hereunder, or (C) of Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person; provided, however, that this Section 7.09 shall not prohibit limitations:

-92-

(a)     in respect of any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under <u>Section 7.01(e)</u> solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness;

(b)     in respect of customary restrictions and conditions contained in any agreement relating to any Disposition not prohibited hereunder (in which case such restrictions or conditions shall relate only to the applicable property) or otherwise relating to a Disposition that is conditioned upon the amendment, restatement or replacement of this Agreement or the repayment in full of amounts owing hereunder;

(c)     consisting of restrictions regarding licenses or sublicenses by a Loan Party or a Restricted Subsidiary of a Loan Party of Intellectual Property in the Ordinary Course of Business (in which case such restrictions shall relate only to such Intellectual Property);

(d)     customary anti-assignment provisions and restrictions on cash, other deposits or net worth found in Contractual Obligations entered into in the Ordinary Course of Business and permitted hereunder;

(e)     customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted hereunder and applicable solely to the assets of and Equity Interests of and in such joint venture entered into in the Ordinary Course Of Business;

(f)     restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries or the property or assets intended to secure such Indebtedness;

(g)     customary non-assignment provisions with respect to leases or licensing agreements or other agreements entered into by the Borrower or any of the other Restricted Subsidiaries, in each case entered into in the Ordinary Course Of Business;

(h)     restrictions set forth in any Swap Contract;

(i)     restrictions arising under agreements or instruments relating to Indebtedness permitted to be incurred after the Closing Date if the relevant restrictions, taken as a whole, are not materially less favorable to the Lenders than the restrictions contained in this Agreement, taken as a whole, as reasonably determined by the Borrower;

(j)     restrictions arising under or as a result of applicable law, rule, regulation or order or the terms of any license, authorization, concession or permit; and

(k)     other restrictions or encumbrances imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the contracts, instruments or obligations referred to in the foregoing clauses of this Section 7.9; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrower, more restrictive with respect to such encumbrances and other restrictions, taken as a whole, than those

in effect prior to the relevant amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

**7.10.  Use of Proceeds**.  No proceeds from the Loans, directly or indirectly, for any purposes other than to pay or fund the following (in each case solely in accordance with the Approved Budget and the DIP Orders):

     (a)    certain costs, fees and expenses related to the Cases;

     (b)    Adequate Protection Obligations;

     (c)    to fund the Carve-Out as described more fully in the DIP Orders; and

     (d)    the working capital needs of the Borrower and the other Loan Parties during the Case.

Notwithstanding anything to the contrary contained in any Loan Document, none of the proceeds of the Loans and none of the Obligations, the cash collateral, the Collateral or the Carve-Out may be used for the following purposes: to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Loan Documents, the Prepetition Revolving Facility or the Prepetition Loan Documents, or the liens, security interests or claims granted under the DIP Orders, this Agreement, the other Loan Documents or the Prepetition Loan Documents, (ii) investigate, initiate or prosecute any claims and defenses or causes of action against any of the Administrative Agent, the Lenders, the Prepetition Lenders, the Prepetition Secured Parties, or their respective agents, affiliates, representatives, attorneys or advisors under or relating to the Prepetition Revolving Facility, the Prepetition Indebtedness, the Prepetition Loan Documents, the Prepetition Collateral or the Loan Documents, (iii) prevent, hinder or otherwise delay the Administrative Agent's or any Lender's assertion, enforcement or realization on the cash collateral or the Collateral in accordance with the Loan Documents, (iv) seek to modify any of the rights granted to the Administrative Agent, the Lenders, the Prepetition Lenders or the Prepetition Secured Parties hereunder or under the Loan Documents or the Prepetition Loan Documents, in each of the foregoing cases without such parties' prior written consent or (v) pay any amount on account of any claims arising prior to the Petition Date, to fund acquisitions, capital expenditures, capital leases, or any other expenditure, unless such payments or expenditures are (A) approved by an order of the Bankruptcy Court and (B) in accordance with this Agreement and any relevant Approved Budget; provided that, the Committee may use up to $25,000 to investigate the claims or causes specified in clauses (i) and (ii) above, but may not seek formal discovery or commence any challenge, objection or prosecute any such claim or cause of action; provided further that, and notwithstanding the forgoing proviso, none of the proceeds of the Loans and none of the Obligations, the cash collateral, the Collateral or the Carve-Out may be used to investigate any claims or causes or seek formal discovery or commence any challenge, objection or prosecute any such claim or cause of action with respect to the DIP Orders, this Agreement or the other Loan Documents or against any of the Administrative Agent or the Lenders.

**7.11.  Prepayment of Indebtedness; Amendment to Organization Documents**.

(a)      Voluntarily prepay, redeem, purchase, repurchase, defease or otherwise satisfy prior to the scheduled maturity thereof (a "<u>Junior Repayment</u>") any Indebtedness that is subordinated to any of the Obligations.

(b)      Amend, modify or change in any manner any term or condition of any Indebtedness that is subordinated to any of the Obligations in a manner that violates the subordination terms thereof.

(c)      Amend or otherwise modify any Organization Documents of such Person except for such amendments or other modifications required by Law or which are not materially adverse to the interests of Administrative Agent or any Lender (in the reasonable judgment of the Borrower) and which, in each instance, are fully disclosed to Administrative Agent and the Lenders.

(d)      [Reserved].

(e)      Assume, reject, amend, restate, supplement or otherwise modify, or breach, cancel or otherwise terminate (or, as relevant, repay or prepay in its entirety) (whether pursuant to Section 365 of the Bankruptcy Code or any other applicable Law or otherwise) (a) any Contract, or the (b) the Prepetition Loan Agreement, in each case, except to the extent such assumption, rejection, amendment, restatement, supplement, modification, breach, cancellation, termination, repayment or prepayment would not be materially adverse to the interests of the Administrative Agent and the Lenders.

**7.12.   [Reserved]**.

**7.13.   Anti-Terrorism Laws and Foreign Asset Control Regulations.**  (a) Become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations, (b) knowingly engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violate any such order, or (c) use any part of the proceeds of the Loans for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**7.14.   Fiscal Year**.   Change its Fiscal Year end; <u>provided</u>, that, Holdings or the Borrower may, upon written notice to the Administrative Agent, change their Fiscal Year to another date, in which case the Borrower and the Administrative Agent will, and are hereby authorized to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

**7.15.   Holdings Covenant**.   Permit Holdings to engage in any business activities, hold any assets or incur any Indebtedness other than (i) acting as a holding company and transactions incidental thereto (including participating in tax, accounting and other administrative activities as parent of the Borrower and its Subsidiaries), (ii) entering into the Loan Documents and activities required to be undertaken by Holdings pursuant to this Agreement or the other Loan Documents or expressly permitted to be undertaken specifically by Holdings pursuant to this

Agreement or the other Loan Documents, (iii) entering into the agreements related to and consummating the Transactions, (iv) receiving and distributing the dividends, distributions and payments permitted to be made to Holdings pursuant to <u>Section 7.06</u>, (v) entering into engagement letters and similar type contracts and agreements with attorneys, accountants and other professionals, (vi) owning the Equity Interests of Borrower, (vii) issuing Equity Interests as permitted hereunder, (viii) engaging in activities necessary or incidental to any director, officer and/or employee option incentive plan at Holdings, (ix) providing guarantees for the benefit of Loan Parties' obligations to the extent such Person is otherwise permitted to enter into the transaction under this Agreement (including guaranties of lease obligations), (x) holding nominal deposits in Deposit Accounts in connection with consummating any of the foregoing transactions, and (xi) engaging in activities that are incidental to the activities described in the foregoing clauses (i) through (x).

**7.16.   Regulatory Matters.**  Knowingly allow any Licensed Personnel to provide any professional services to or on behalf of Borrower that: (i) has been reprimanded, sanctioned, excluded, or disciplined by any licensing board or any other Governmental Authority, professional society, or hospital, unless and during the period of time such reprimand, sanction or disciplinary action permits such Licensed Personnel to continue to treat patients; (ii) abused illegal drugs or alcohol, unless such Licensed Personnel has satisfactorily completed a program for impaired professionals approved by the applicable Board of Dentistry; (iii) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a; (iv) has been excluded from participation in a Governmental Third Party Payor Program; or (v) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518.

**7.17.      Disbursements; DIP Budget Variance**.

(a)      Make any disbursements other than those set forth in the Approved Budget (or as otherwise permitted in accordance with the terms of the DIP Orders); or

(b)      Commencing with the third (3rd) full calendar week following the Petition Date, the Loan Parties shall not permit (i) a Receipts Variance for any Testing Period to have a negative variance in excess of 15% (with negative variance meaning, for the avoidance of doubt, that actual receipts are less than projected receipts) or (ii) a Disbursements Variance for any Testing Period to have a negative variance in excess of 15% (with negative variance meaning, for the avoidance of doubt, that actual disbursements are greater than the projected disbursements); <u>provided</u> that, during any Testing Period, (x) any positive Receipts Variance may be used to offset any negative Disbursements Variance for such Testing Period and (y) any positive Disbursements Variance may be used to offset any negative Receipts Variance for such Testing Period (such permitted variances, the "<u>Permitted Variances</u>").

**7.18.      Case Matters.**

(a)      assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers

or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

        (i)     avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, of the Obligations, the DIP Liens, the Prepetition Indebtedness, the Prepetition Loan Documents or the Prepetition Liens; reversing, modifying, amending, staying or vacating the DIP Orders, without the prior written consent of the Required Lenders;

        (ii)    granting priority for any administrative expense, secured claim or unsecured claim against the Borrower or any of the Guarantors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, except as provided under the Carve-Out or to the extent expressly permitted under the DIP Orders;

        (iii)   granting or imposing under Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the DIP Liens except to the extent expressly permitted under the DIP Orders;

        (iv)   permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders or this Agreement;

        (v)    modifying, altering, or impairing in any manner any of the DIP Liens or the Prepetition Liens, or any of the Administrative Agent's, the Lenders' or the Prepetition Secured Parties' rights or remedies under the DIP Orders, this Agreement, any of the Loan Documents, any of the Prepetition Loan Documents or any documents related thereto (including the right to demand payment of all Obligations and Adequate Protection Obligations, as applicable, and to enforce its Liens and security interests in the Collateral and the Prepetition Collateral, as applicable), whether by plan of reorganization or liquidation, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Loan Party or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

        (b)    without the prior written consent of the Required Lenders, seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding;

(c)     make any payments or transfer any property on account of claims asserted by any vendors of any Loan Party for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Administrative Agent or unless otherwise consented to by the Required Lenders.

(d)     return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Administrative Agent or unless otherwise consented to by the Administrative Agent (at the direction of the Required Lenders);

(e)     [reserved];

(f)     [reserved]; or

(g)     propose to the Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, without the prior written consent of the Required Lenders.

**7.19.    Prohibition on Government Assistance.**  Apply for, incur or otherwise receive any assistance from the Department of Health and Human Services, any other Governmental Authority or any other Person in the form of Indebtedness, grants or any other form under the Public Health and Social Services Emergency Fund of the Coronavirus Aid Relief and Economic Security (CARES) Act, the Paycheck Protection Program and the Health Care Enhancement Act.

**7.20.    Restructuring Support Matters**.

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the RSA Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the RSA Transactions described in the Restructuring Support Agreement;

(c)     file any motion, pleading, or RSA Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with the Restructuring Support Agreement; or

(d)     except as contemplated and permitted by the Restructuring Support Agreement, engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than the transactions contemplated in the Restructuring Support Agreement and on the terms contemplated thereby without the consent of the Consenting Lenders (as defined in the Restructuring Support Agreement).

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01.**   **Events of Default**.  Any of the following shall constitute an Event of Default:

(a)   Non-Payment.  Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within 3 Business Days after the same becomes due, any interest on any Loan, or any fee or other amount payable hereunder or under any other Loan Document; or

(b)   Specific Covenants.  Any Loan Party or Subsidiary fails to perform or observe any term, covenant or agreement contained (i) in any of Sections 6.01(d), 6.03(a) (solely with respect to notices of Events of Default), 6.03(g), 6.05(a) (solely with respect to the Loan Parties), 6.07, 6.18, 6.20, 6.21, 6.22 or Article VII, or (ii) in any of Sections 6.01(a), 6.01(b), 6.02(a), 6.02(b), 6.10, or 6.14(b) and such failure continues for ten (10) or more Business Days; or

(c)   Other Defaults.  Any Loan Party or Subsidiary fails to perform or observe any other term, covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier of (i) receipt of notice of such failure by a Responsible Officer of Borrower from Administrative Agent, or (ii) any Responsible Officer of any Loan Party becomes aware of such failure; or

(d)   Representations and Warranties.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party or any Subsidiary herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality); or

(e)   Cross-Default.  Any Loan Party or Restricted Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, and after passage of any grace period) in respect of any post-petition Indebtedness (other than Indebtedness hereunder) or Guarantee (other than in respect of the Indebtedness hereunder) having an aggregate principal amount of more than $2,500,000, or (B) fails to observe or perform any other agreement or condition relating to any such post-petition Indebtedness or Guarantee (other than, for the avoidance of doubt, with respect to Indebtedness consisting of obligations under Swap Contracts, termination events or equivalent events pursuant to the terms of the relevant Swap Contract which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, therein specified, the effect of which is to cause, or to permit the holder or holders of such post-petition Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such post-petition Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; provided that

-99-

clause (B) of this paragraph (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; or

(f)     [Reserved]; or

(g)     [Reserved]; or

(h)     Judgments.  There is entered against any Loan Party or any Restricted Subsidiary (i) one or more final judgments or orders that are not subject to the Automatic Stay for the payment of money in an aggregate amount exceeding $1,500,000 (except (a) to the extent covered by insurance as to which the insurer does not dispute coverage or third party indemnification acceptable to Required Lenders, (b) settlements relating to the litigation matters set forth on Schedule 5.05 (*Litigation*) and (c) pursuant to an order of the Bankruptcy Court), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, such judgments or orders remain unvacated and unpaid and either (A) enforcement proceedings are commenced by any creditor upon any such judgment or order, or (B) there is a period of 60 consecutive days during which a stay of enforcement of any such judgment or order, by reason of a pending appeal or the Automatic Stay or otherwise, is not in effect; or

(i)     ERISA.  (i) An ERISA Event occurs which, together with any outstanding liability incurred in connection with any other ERISA Event, has resulted or could reasonably be expected to result in liability of any Loan Party or any Restricted Subsidiary in an aggregate amount in excess of $1,000,000, (ii) the existence of any Lien under Section 430(k) of the Code or Section 303(k) or Section 4068 of ERISA on any assets of a Loan Party or any Restricted Subsidiary thereof, or (iii) a Loan Party, a Restricted Subsidiary thereof or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan that could reasonably be expected to result in liability for any Loan Party in an aggregate amount in excess of $1,000,000; or

(j)     Invalidity of Loan Documents.  Any material Loan Document, or any Lien granted thereunder, at any time after its execution and delivery and for any reason, other than as expressly permitted under such Loan Document or upon Payment in Full of all Obligations (other than, with regard to Liens granted thereunder, by reason of (i)  a release of Collateral in accordance with the terms of any Loan Document or (ii) the termination of any Security Instrument in accordance with the terms thereof): ceases to be in full force and effect other than in accordance with its terms; or any Loan Party or any Subsidiary or Affiliate thereof repudiates, challenges or contests in any manner the validity or enforceability of any Loan Document, Obligation or any Lien granted to Administrative Agent pursuant to the Security Instruments (including the perfection or priority thereof) other than as a result of the occurrence of the Maturity Date or as a result of the release of any Loan Party therefrom in accordance with its terms or the terms hereof; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)    <u>Liens</u>.  Any Lien granted to the Administrative Agent for the benefit of the Secured Parties with respect to any material portion of the Collateral intended to be secured thereby (i) ceases to be, or is not at any time, valid, perfected and prior to all other Liens (other than Liens granted in respect of the Carve-Out and the Prepetition Priority Liens or otherwise authorized pursuant to the DIP Orders) or (ii) is terminated, revoked, or declared void (unless released or terminated pursuant to the terms of this Agreement); or

(l)    <u>Cessation of Business</u>.  Any Loan Party or any Restricted Subsidiary shall cease conducting any business operations by virtue of any casualty, any labor unrest or any injunction or other prohibition imposed by any Governmental Authority, or otherwise (other than in connection with any regularly scheduled shutdown for employee vacations and/or maintenance in the Ordinary Course of Business), for any period of 15 consecutive days and the same has had, or could reasonably be expected to have, a Material Adverse Effect (after taking into account any business interruption insurance proceeds received by the Loan Parties and their Restricted Subsidiaries in connection therewith); or

(m)    <u>Change of Control</u>.  Any Change of Control occurs; or

(n)    <u>Chapter 11 Cases</u>. Any of the following shall have occurred in the Cases:

(i)    The failure of the Debtors to comply with any of the Milestones; <u>provided</u> that the Required Lenders may agree to an extension of any of the Milestone dates in their sole and absolute discretion;

(ii)    the bringing of a motion or application by any Debtor in the Cases, or the entry of any order by the Bankruptcy Court in the Cases: (A) to obtain additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash immediately upon the consummation of such financing without the prior written consent of the Required Lenders; (B) to grant any Lien other than Liens expressly permitted under this Agreement or the DIP Orders upon or affecting any Collateral; (C) except as provided in this Agreement or the DIP Orders, to use cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and the Required Lenders; or (D) that (in the case of any Debtor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent or the Lenders hereunder or their interest in the Collateral;

(iii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Debtor other than a chapter 11 plan that is not acceptable to the Required Lenders as determined in their sole discretion (and, with respect to any terms that would reasonably be expected to have a materially adverse economic impact on the Lenders that are not Required Lenders, such Lenders) unless such plan or disclosure statement contains provision for Payment in Full of

-101-

the Obligations under this Agreement and the Prepetition Indebtedness under the Prepetition Loan Agreement (an "Approved Plan");

(iv)    the termination or modification of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization;

(v)    the entry of an order in any of the Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a plan or plans of reorganization other than an Approved Plan;

(vi)    the entry of an order in the Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document in a manner adverse to the economic interests of the Lenders without the prior written consent of the Required Lenders;

(vii)    [reserved];

(viii)    the payment of, or application by any Debtor for authority to pay, any prepetition claim without the Required Lenders' prior written consent other than amounts set forth in the Approved Budget;

(ix)    the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor, for an order seeking the appointment of, in either case without the consent of the Required Lenders, an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery);

(x)    the sale without the Required Lenders' prior written consent, of any of Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a Plan of Reorganization confirmed by the Bankruptcy Court in the Cases, or otherwise, except to the extent that such sale indefeasibly results in the Payment in Full of the Obligations;

(xi)    the dismissal of any of the Cases, or if any Debtor files a motion or other pleading seeking the dismissal of the Cases, in each case, without the prior written consent of the Required Lenders;

(xii)    the conversion of any of the Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code, or if any Debtor files a motion or other pleading seeking the conversion of any of the Cases under section 1112 of the Bankruptcy Code or otherwise;

(xiii)    any Debtor files, without the Required Lenders' prior written consent, a motion or application seeking, or the entry of an order by the Bankruptcy

-102-

Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Administrative Agent and the Prepetition Agent;

(xiv)   any Debtor files a motion or application seeking, or the entry of an order in the Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement, the other Loan Documents or the Prepetition Loan Agreement;

(xv)   the failure of any Debtor to perform any of its obligations under the DIP Orders or any violation of any of the terms of the DIP Orders, subject to any applicable grace or cure periods set forth therein;

(xvi)   the challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Loan Documents, or the Prepetition Loan Agreement;

(xvii)   the remittance, use or application of proceeds of the Loans, cash collateral or other cash or funds of the Debtor other than in accordance with the DIP Orders;

(xviii)  any Debtor files a motion or application seeking, or the entry of an order in any of the Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and the Lenders, without the consent in writing of the Required Lenders (other than any such super priority administrative claim or lien that is expressly permitted to have such priority hereunder);

(xix)   the filing of a motion or application by any Debtor requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the Administrative Agent's or the Lenders' claims under the Loan Documents or with the claims of the Prepetition Secured Parties under the Prepetition Loan Agreement, as applicable, not in accordance with the terms hereof;

(xx)   any Debtor files a motion or application seeking, or the entry of an order precluding the Administrative Agent or the Prepetition Agent (or its respective designee) from having the right to or being permitted to "credit bid" with respect to the assets of the Debtors;

(xxi)   any attempt by any Debtor to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt, including, without limitation, the Prepetition Indebtedness;

(xxii)   the modification, reversal, vacation or stay of the effectiveness of the DIP Orders or any provision thereof without the prior written consent of the Required Lenders;

(xxiii) the payment of or granting adequate protection (except for the Adequate Protection Superpriority Claims) with respect to any Prepetition Indebtedness (other than with respect to payment permitted under the DIP Orders) without the prior written consent of the Required Lenders;

(xxiv) damages claim or an administrative expense claim of at least $500,000, other than with the prior written consent of the Required Lenders; or

(xxv)   any Debtor commences, or supports any person, in any litigation challenging or seeking to challenge the DIP Liens against the Administrative Agent, or the Lenders, except as may be permitted under the DIP Orders; or

(xxvi)  if the Confirmation Order is entered in form and substance which is not (i) reasonably acceptable to the Required Lenders in respect of the treatment of the claims of the Administrative Agent and the Lenders or (ii) otherwise reasonably acceptable to the Required Lenders; or

(xxvii) unless consented to by the Required Lenders, any Debtor shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date (other than, in each case, as permitted under this Agreement, the DIP Orders or an Approved Plan or relief sought in any "first day" motions filed on the Petition Date); or

(xxviii) an application for any of the orders described in this Section 8.01(n) including, without limitation, clauses (i), (iv), (v), (vi), (viii), (xii), (xiii), (xvii), (viii) or (xix) shall be made by a Person other than the Administrative Agent or the Lenders and such application is not, to the extent requested by the Administrative Agent or the Required Lenders, contested by the Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal; or

(xxix)  the cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Security Instruments and the Collateral; or

(xxx)   the Restructuring Support Agreement is terminated for any reason by the Debtors or the Required Consenting Lenders (as defined in the Restructuring Support Agreement), or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders.

**8.02.   Remedies Upon Event of Default**.

(a)     If any Event of Default occurs and is continuing, Administrative Agent may, at the direction of the Required Lenders, shall deliver a written notice to the Borrower (a "Termination Declaration"), that, pursuant to the Orders, the automatic stay provision of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the Administrative Agent and the Lenders to: (a) declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated; (b) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower; (c) [reserved]; (d) declare that the application of the Carve Out has occurred; (e) terminate this Agreement and the other Loan Documents as to any future liability or obligation of the Loan Parties, but without affecting any of the Administrative Agent's Liens in the Collateral and without affecting the Obligations; and/or (f) immediately terminate, reduce or restrict the Loan Parties' use of any cash collateral;

(b)     Following the delivery of a Termination Declaration and upon further order of the Bankruptcy Court on no less than 48 hours' notice (and the Loan Parties and the Committee (if any) and any other party-in-interest shall not object to such shortened notice), the Administrative Agent may, at the direction of the Required Lenders (i) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law; (ii) freeze monies or balances in the Loan Parties' Deposit Accounts and Securities Accounts and sweep all funds contained in the Controlled Account for application in accordance with Section 8.03; (iii) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Administrative Agent or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the Administrative Agent or the applicable Lenders, including, without limitation, disposition of the Collateral solely for application towards the Obligations; (iv) obtain an order from the Bankruptcy Court approving bid procedures for a sale of substantially all of the Loan Parties' assets pursuant to section 363 of the Bankruptcy Code; (v) in connection with an Event of Default that is continuing in respect of a breach of Section 7.17, at the written direction of the Required Lenders, immediately commence the sale of all or substantially all of the Collateral pursuant to section 363 of the Bankruptcy Code and the Loan Parties and their advisors will cooperate therewith, including by delivering an Updated Budget that contemplates the liquidation of all of the Loan Parties' assets in form and substance satisfactory to the Required Lenders; and (l) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the Loan Documents or applicable law or equity.

The Loan Parties and the Committee (if any) may seek an emergency hearing during the three (3) business days following the date a Termination Declaration is delivered (such three (3) business day period, the "Remedies Notice Period") for the sole purpose of determining whether an Event of Default has in fact occurred or is continuing, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties or, if applicable, the Prepetition Secured Parties.

(c)     Notwithstanding anything in this Agreement or the Loan Documents to the contrary, to the extent that the Bidding Procedures Order or any other order is entered by the

Bankruptcy Court approving the bidding and auction procedures with respect to the sale by the Debtors of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code do not require the winning bid to be for cash consideration greater than the Release Price, then the LO Lenders shall have the right to direct the Administrative Agent to (x) terminate this Agreement and the other Loan Documents as to any future liability or obligation of the Lenders, but without affecting any of the Administrative Agent's Liens in the Collateral and without affecting the Obligations, (y) notwithstanding Section 8.01, declare that an Event of Default has occurred and is continuing (and the parties hereto agree that upon such declaration that an Event of Default has occurred and is contusing), and (z) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower. For the avoidance of doubt, the LO Lenders may exercise the rights provided in this paragraph even if the LO Lenders do not constitute the Required Lenders.

      **8.03.   Application of Funds**.

      (a)   After the exercise of any remedy provided for in Section 8.02, any amounts received on account of the Obligations shall, subject to the provisions of Sections 2.16 and 2.17, be applied by Administrative Agent in the following order:

      First, to all fees, indemnities, expenses and other amounts (including all Extraordinary Expenses and all reasonable fees, charges and disbursements of counsel to Administrative Agent and amounts payable under Article III) due to Administrative Agent in its capacity as such, until Paid in Full;

      Second, to that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest, fees and other Obligations expressly described in clauses Third through Sixth below) payable to the Lenders (including reasonable fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them until Paid in Full;

      Third, to that portion of the Obligations constituting accrued and unpaid interest on the FO Loans and other FO Obligations, ratably among the FO Lenders in proportion to the respective amounts described in this clause Third payable to them until Paid in Full;

      Fourth, to that portion of the Obligations constituting unpaid principal on the FO Loans and other FO Obligations, ratably among the FO Lenders in proportion to the respective amounts described in this clause Fourth payable to them until Paid in Full;

      Fifth, to that portion of the Obligations constituting accrued and unpaid interest on the LO Loans and other LO Obligations, ratably among the LO Lenders in proportion to the respective amounts described in this clause Fifth payable to them until Paid in Full;

      Sixth, to that portion of the Obligations constituting unpaid principal on the LO Loans and other LO Obligations, ratably among the LO Lenders in proportion to the respective amounts described in this clause Sixth payable to them until Paid in Full;

Seventh, to all other Obligations of Borrower owing under or in respect of the Loan Documents that are due and payable to Administrative Agent and the other Lender Parties, or any of them, on such date (provided, that, funds from, and proceeds of Collateral owned by, any Person directly or indirectly liable for a Swap Obligation and that was not an "eligible contract participant" as defined in the Commodity Exchange Act at the time such Swap Obligation was incurred may not be used to satisfy such Swap Obligation), ratably based on the respective aggregate amounts of all such Obligations owing to Administrative Agent and the other Lender Parties on such date until Paid in Full; and

Last, the balance, if any, after Payment in Full of the Obligations, to Borrower or as otherwise required by Law.

(b)      The allocations set forth in this Section are solely to determine the rights and priorities of Administrative Agent and Lender Parties as among themselves, and may be changed by agreement among them without the consent of Borrower.  This Section is not for the benefit of or enforceable by any Loan Party.

(c)      For purposes of Section 8.03(a), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any insolvency proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any proceeding under Debtor Relief Laws.

## ARTICLE IX
## ADMINISTRATIVE AGENT

**9.01.    Appointment and Authority; Limitations on Lenders**.  Each of the Lenders hereby irrevocably appoints BMO Harris Bank, N.A. to act on its behalf as Administrative Agent hereunder and under the other Loan Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of Administrative Agent, the Lenders, except for Borrower's consent right as expressly permitted in Section 9.06 and Section 9.14 and no Loan Party shall have rights as a third party beneficiary of any of such provisions (although each Loan Party shall be bound by such provisions).  Administrative Agent shall be authorized to determine whether any conditions to funding any Loan have been satisfied.  Actions taken by Administrative Agent hereunder, under the other Loan Documents or upon the instructions of Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as Administrative Agent shall believe in good faith shall be necessary), shall be binding upon each Lender.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them or the Collateral shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Administrative Agent in accordance with Section 8.02 for the

benefit of all the Lenders or any sub-agent appointed by the Administrative Agent in accordance with Section 9.05; provided, however, that the foregoing shall not prohibit (a) Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to Borrower under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**9.02.   Rights as a Lender**.  The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**9.03.   Exculpatory Provisions**.  Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, Administrative Agent:

(a)   shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)   shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall not be required to take any action that, in its opinion may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)   shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by Administrative Agent or any of its Affiliates in any capacity.

Administrative Agent shall not be liable for any action taken (including any apportionment or distribution of payments) or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own, gross negligence or willful misconduct.  Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default is given to

-108-

Administrative Agent by Borrower or a Lender.  Administrative Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or expose Administrative Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of this Agreement.

Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent.

9.04.    **Reliance by Administrative Agent**.  Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.   In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, Administrative Agent may presume that such condition is satisfactory to such Lender unless Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  Administrative Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05.    **Delegation of Duties**.  Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent.  Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

9.06.    **Resignation of Administrative Agent**.  Administrative Agent may at any time give notice of its resignation to the Lenders and Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with Borrower and, so long as no Event of Default exists, to the approval of Borrower (which approval shall not be unreasonably withheld), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and approved by

Borrower (if required) and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided, that, if Administrative Agent shall notify Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective at the expiration of such 30 day period in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such Collateral (although shall have no duties with respect thereto) until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders (with the approval of Borrower, if required) appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**9.07.  Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**9.08.  [Reserved]**.

**9.09.  Administrative Agent May File Proofs of Claim; Credit Bidding**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the

Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and Administrative Agent) allowed in such judicial proceeding; and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 2.09.

Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Loan Parties and the Lender Parties hereby irrevocably authorize Administrative Agent, based upon the instruction of the Required Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363 of the Bankruptcy Code or any similar Laws in any other jurisdictions to which a Loan Party is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Lender Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Administrative Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Administrative Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lender Parties whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase).

Except as provided above and otherwise expressly provided for herein or in the other Security Instruments, Administrative Agent will not execute and deliver a release of any Lien on any Collateral.  Upon request by Administrative Agent or Borrower at any time, the Lender Parties will confirm in writing Administrative Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 9.09.

**9.10.    Collateral Matters**.  The Lender Parties irrevocably authorize Administrative Agent, at its option and in its discretion, (a) to release any Lien on any Collateral (i) upon the occurrence of the Facility Termination Date, (ii) that is Disposed or to be Disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document or (iii) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders; (b) to subordinate any Lien on any property granted to or held by Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted hereunder; and (c) to release any Subsidiary from its obligations under the Loan Documents (and all Liens granted by such Subsidiary) if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.  Upon request by Administrative Agent at any time, the Required Lenders will confirm in writing Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under the Loan Documents pursuant to this Section 9.10.

**9.11.    Other Collateral Matters**.

(a)    Care of Collateral.  Administrative Agent shall have no obligation to assure that any Collateral exists or is owned by a Loan Party, or is cared for, protected or insured, nor to assure that Administrative Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

(b)    Lenders as Agent For Perfection by Possession or Control.  Administrative Agent and Lender Parties appoint each Lender as agent (for the benefit of Lender Parties) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control.  If any Lender obtains possession or control of any Collateral, it shall notify Administrative Agent thereof and, promptly upon Administrative Agent's request, deliver such Collateral to Administrative Agent or otherwise deal with it in accordance with Administrative Agent's instructions.

**9.12.    Right to Perform, Preserve and Protect**.  If any Loan Party fails to perform any obligation hereunder or under any other Loan Document, Administrative Agent itself may, but shall not be obligated to, cause such obligation to be performed at the Loan Parties' expense. Administrative Agent is further authorized by the Loan Parties and the Lender Parties to, upon the occurrence and during the continuance of an Event of Default, make expenditures from time to time which Administrative Agent, in its reasonable business judgment, deems necessary or desirable to (i) preserve or protect the business conducted by Loan Parties, the Collateral, or any portion thereof and/or (ii) enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations.  Each Loan Party hereby agrees to reimburse Administrative Agent on demand for any and all costs, liabilities and obligations incurred by Administrative Agent pursuant to this Section 9.12.  Each Lender hereby agrees to indemnify Administrative Agent upon demand for any and all costs, liabilities and obligations incurred by Administrative Agent pursuant to this Section 9.12, in accordance with the provisions of Section 10.04.

**9.13.    [Reserved]**.

**9.14.    Designation of Additional Agents**.  The Administrative Agent, subject to the consent of Borrower (not to be unreasonably withheld), shall have the continuing right, for

purposes hereof, at any time and from time to time to designate one or more of the Lenders (and/or its or their Affiliates) as "syndication agents," "documentation agents," "book runners," "lead arrangers," "arrangers" or other designations for purposes hereto, but such designation shall have no substantive effect, and such Lenders and their Affiliates shall have no additional powers, duties or responsibilities as a result thereof**.**

**ARTICLE X**
**MISCELLANEOUS**

        **10.01. Amendments, Etc**.   No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrower or any other Loan Party therefrom, shall be effective unless the same shall be in writing signed by the Required Lenders and  Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

        (a)     extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.02</u>) without the written consent of such Lender;

        (b)     postpone any date fixed by this Agreement or any other Loan Document for any payment (but excluding the delay or waiver of any mandatory prepayment) of principal, interest, fees or other amounts due to the Lenders (or any of them), including the Maturity Date, or any scheduled reduction of the Commitments hereunder or under any other Loan Document, in each case without the written consent of each Lender directly affected thereby;

        (c)     reduce the principal of, or the rate of interest specified herein on, any Loan or (subject to clause (iv) of the second proviso to this <u>Section 10.01</u>) any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly affected thereby; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" (so long as such amendment does not result in the Default Rate being lower than the interest rate then applicable to Base Rate Loans or LIBO Rate Loans, as applicable) or to waive any obligation of Borrower to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein);

        (d)     change the provisions requiring pro rata payments to the Lenders set forth herein without the written consent of each Lender directly affected thereby;

        (e)     change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

        (f)     release Borrower or all or substantially all of the Guarantors from this Agreement or release any material Security Instrument to which any such Person is a party without the written consent of each Lender, except to the extent such Person is the subject of a Disposition permitted by <u>Section 7.05</u> or in accordance with the express provisions of this Agreement or such

-113-

Security Instrument (in which cases such release may be made by Administrative Agent acting alone); or

(g)     release all or substantially all of the Collateral without the written consent of each Lender except with respect to Dispositions and releases of Collateral permitted or required hereunder (including pursuant to Section 7.05) or as provided in the other Loan Documents (in which case such release may be made by Administrative Agent acting alone);

and, provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by Administrative Agent in addition to the Lenders required above, affect the rights or duties of Administrative Agent under this Agreement or any other Loan Document; and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the respective parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

If any Lender does not consent (a "*Non-Consenting Lender*") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender or any class of Lenders and that has been approved by the Required Lenders, Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided, that, such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by Borrower to be made pursuant to this paragraph).

No Loan Party will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or otherwise, to any Lender or its Affiliates (in their capacities as such) as consideration for the agreement by such Lender to any amendment, waiver, consent or release with respect to any Loan Document, unless such remuneration or value is concurrently paid, on the same terms, on a ratable basis to all Lenders providing their agreement.

In addition, notwithstanding anything to the contrary contained in Section 10.01, if the Administrative Agent and Borrower shall have jointly identified an obvious error or any error, defect or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof.

Notwithstanding any provision or this Agreement or any other Loan Document, any Milestone may be amended, waived, extended or otherwise modified from time to time by the Required Lenders by electronic mail.

**10.02.  Notices; Effectiveness; Electronic Communication**.

(a)     <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone or in the case of notices otherwise expressly provided herein (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or email (including as a .pdf file) as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

if to a Loan Party or the Administrative Agent to the address, telecopier number, electronic mail address or telephone number specified for such Person below, as changed pursuant to subsection (d) below:

| | | |
|---|---|---|
| (i) | If to Administrative Agent: | BMO Harris Bank, N.A.<br>111 West Monroe Street<br>Chicago, Illinois 60603<br>Attention: Zachary Evett<br>Facsimile No.: (312) 293-4355<br>Telephone No.: (312) 461-7437<br>Email: Zachary.Evett@bmo.com |
| | With a copy to: | Katten Muchin Rosenman LLP<br>525 West Monroe Street, Suite 1900<br>Chicago, IL 60661<br>Attention: Geoff AuYeung, Esq.<br>Facsimile No.: (312) 902-1061<br>Telephone No.: (312) 902-5340<br>Email: geoff.auyeung@kattenlaw.com |
| (ii) | If to a Loan Party: | Benevis Holding Corp.<br>1090 Northchase Parkway, Suite 150<br>Marietta, Georgia<br>Attention:  Mr. Scott Hornbuckle<br>Facsimile No.: (678) 247-7824<br>Telephone No. (770) 916-5345 |
| | With a copy to (which shall not constitute notice): | Jackson Walker LLP<br>1401 McKinney St., Suite 1900<br>Houston, Texas 77010<br>Attention:  Elizabeth C. Freeman<br>Email: efreeman@jw.com |

|       |                  |                                             |
|-------|------------------|---------------------------------------------|
| (iii) | If to New Mountain: | c/o New Mountain Finance Corporation      |
|       |                  | 787 Seventh Avenue, 49th Floor              |
|       |                  | New York, NY  10019                         |
|       |                  | Attention:  Joshua Porter                   |
|       |                  | Facsimile No.: 646.514.6066                 |
|       |                  | Telephone: No.: 212.655.0063                |
|       |                  | Email: jporter@newmountaincapital.com       |

|       |                  |                                             |
|-------|------------------|---------------------------------------------|
|       | With a copy to (which shall not constitute notice): | Proskauer Rose LLP        |
|       |                  | One International Place                      |
|       |                  | Boston, MA 02110                            |
|       |                  | Attention: Stephen A. Boyko                 |
|       |                  | Facsimile No.: 617.526.9899                 |
|       |                  | Telephone No. 617.526.9770                  |
|       |                  | Email: sboyko@proskauer.com                 |

|      |               |                                              |
|------|---------------|----------------------------------------------|
| (iv) | If to Sun Life: | Sun Life Capital Management                |
|      |               | One York Street, Suite 3200                  |
|      |               | Toronto, ON M5J 086                          |
|      |               | Attention:  Usman Bajwa, Managing Director   |
|      |               | Facsimile No.: 415.979.6178                  |
|      |               | Telephone: No.: 212.655.0063                 |
|      |               | Email: usman.bajwa@SLCManagement.com         |

if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire, as changed pursuant to subsection (d) below (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to Loan Parties).

Notices sent by hand or overnight courier service or by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not sent during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent, provided, that, the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  Administrative Agent or Borrower may, in its discretion, but shall not be required to, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided, that, approval of such procedures may be limited to particular notices or communications.

-116-

Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed to have been given when sent; provided, that, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed given to the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  Each Loan Party hereby acknowledges that Administrative Agent and/or the Lead Arrangers will make available to the Lenders materials and/or information provided by or on behalf of Borrower hereunder (collectively, "**_Borrower Materials_**") by posting Borrower Materials on SyndTrak, IntraLinks or another similar electronic system (the "**_Platform_**").  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH BORROWER MATERIALS OR THE PLATFORM.  In no event shall Administrative Agent or any of its Related Parties (collectively, the "**_Agent Parties_**") have any liability to Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Borrower's or Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party or in the case of a claim by any third party against any indemnitee, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 10.04.

(d)     Change of Address, Etc.  Each of Borrower and the Administrative Agent may change its address, telecopier number, electronic mail address or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier number, electronic mail address or telephone number for notices and other communications hereunder by notice to Borrower and the Administrative Agent.  In addition, each Lender agrees to notify Administrative Agent from time to time to ensure that Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Administrative Agent and Lenders.  Administrative Agent, and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied

from any confirmation thereof.  All telephonic notices to Administrative Agent may be recorded by Administrative Agent, and each of the parties hereto hereby consents to such recording.

**10.03.  No Waiver; Cumulative Remedies**.   No failure by any Lender or Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**10.04.  Expenses; Indemnity; Damage Waiver**.

(a)   Costs and Expenses.  Borrower shall pay (i) all reasonable documented out-of-pocket expenses (including any Extraordinary Expenses) incurred by the Administrative Agent (including without limitation, the reasonable and documented out-of-pocket fees, charges and disbursements of Katten Muchin Rosenman LLP), New Mountain (including, without limitation, the reasonable and documented out-of-pocket fees, charges and disbursements of Proskauer Rose LLP) and the other Lenders (whether incurred prior to or during any workout, restructuring or negotiations in respect of the Obligations), (A) in connection with this Agreement and the other Loan Documents (including, without limitation, reasonable and documented out-of-pocket fees, charges and disbursements of outside consultants for the Administrative Agent, to the extent reasonably deemed by the Administrative Agent to be necessary), (B) in connection with (1) the administration of the credit facilities provided for herein, or (2) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all documented out-of-pocket expenses (including any Extraordinary Expenses) incurred by Administrative Agent, New Mountain, BMO and their respective Affiliates (whether incurred prior to or during any workout, restructuring or negotiations in respect of the Obligations) in connection with the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral.  Borrower shall pay all reasonable documented out-of-pocket expenses incurred by the Lender Parties who are not the Administrative Agent, New Mountain, BMO or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default; provided, that, such Lender Parties shall be entitled to reimbursement for no more than one counsel representing all such Lender Parties (absent a conflict of interest in which case the Lender Parties may engage and be reimbursed for additional counsel) and local or specialty counsel, as needed (the foregoing, collectively being referred to as "***Lender Party Expenses***").

(b)   Indemnification by Loan Parties. Each Loan Party shall indemnify Administrative Agent (and any sub-agent thereof), each other Lender Party and each Related Party of any of the foregoing Persons (each such Person being called an "***Indemnitee***") against, and hold harmless each Indemnitee from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (but limited to the actual reasonable and documented out-of-pocket fees and expenses of one counsel to New Mountain and its Related Parties, one counsel to BMO and its Related

Parties and one counsel to all other Indemnitees, taken as a whole, and to the extent reasonably necessary, the reasonable and documented out-of-pocket fees and expenses of one local counsel to New Mountain and its Related Parties in any relevant material jurisdiction, one local counsel to BMO and its Related Parties in any relevant material jurisdiction and one local counsel to such other Persons taken as a whole in any relevant material jurisdiction (and, in the event of any actual or perceived conflict of interest, the reasonable and documented out-of-pocket fees and expenses of one additional counsel to the affected Indemnitees taken as a whole)), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby or, in the case of Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration and enforcement of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Restricted Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Restricted Subsidiaries, (iv) any claims of, or amounts paid by any Lender Party to, a Controlled Account Bank or other Person which has entered into a control agreement with any Lender Party hereunder or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party, or by Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided, that, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are (x) determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by Borrower or any other Loan Party against an Indemnitee for breach of such Indemnitee's obligations arising from gross negligence or willful misconduct hereunder or under any other Loan Document, if Borrower or such other Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. This Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, liabilities and related expenses arising from any non-Tax claim.

(c)    Reimbursement by Lenders.  To the extent that (i) the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, or (ii) any liabilities, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever are imposed on, incurred by, or asserted against, Administrative Agent or a Related Party in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by Administrative Agent or a Related Party in connection therewith, then, in each case, each Lender severally agrees to pay to Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage of such unpaid amount, provided, that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for Administrative Agent (or any such sub-agent) in connection with such capacity; and provided, further, that the

-119-

obligation of the Lenders to so indemnify shall not be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Administrative Agent or Related Party.  The obligations of the Lenders under this subsection (c) are subject to the provisions of <u>Section 2.12(d)</u>.

(d)     <u>Waiver of Consequential Damages, Etc</u>.  No Indemnitee nor any Loan Party nor any of their respective officers, directors, employees, agents, advisors or representatives shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document (other than in respect of any such damages incurred or paid by an Indemnitee to a third party unaffiliated with such Indemnitee).

(e)     <u>Payments</u>.  All amounts due under this Section shall be payable not later than 30 days after demand therefor.

(f)     <u>Survival</u>.  The agreements in this Section shall survive the resignation of Administrative Agent, the replacement of any Lender and the occurrence of the Facility Termination Date.

**10.05.  Marshalling; Payments Set Aside**.  None of Administrative Agent or Lenders shall be under any obligation to marshal any assets in favor of any Loan Party or against any Obligations.  To the extent that any payment by or on behalf of any Loan Party is made to a Lender Party, or a Lender Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Lender Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  The obligations of the under <u>clause (b)</u> of the preceding sentence shall survive the occurrence of the Facility Termination Date.

**10.06.  Successors and Assigns**.

(a)     <u>Successors and Assigns Generally</u>.

(i)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except as described in clauses (ii) and (iii) below and in the other provisions of this Section 10.06.

(ii)     No Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Administrative Agent and each Lender. For the avoidance of doubt, no Loan Party may undergo a

"Division" or any other similar conversion or process, except pursuant to the terms of Section 1.9 and this Section 10.06(a)(ii). If any Loan Party becomes a "Dividing Company", each resulting "Division Company" of such Loan Party shall be a successor in interest to such Loan Party and automatically become a party to the Loan Documents, in the same capacity as such Loan Party and subject to the same rights and obligations of such Loan Party; *provided* that, if the Borrower becomes a "Dividing Company", each resulting "Division Company" of the Borrower, in addition to being subject to the provisions of the immediately preceding clause, shall also automatically become a party to the Loan Documents as a Guarantor. For the purposes of this Section 10.06(a)(ii), the terms "Division", "Division Company", and "Dividing Company" shall have the meanings assigned to such terms in Section 18-217 of Title 6 of the Delaware Code or any other similar terms in the applicable statute(s) of any other jurisdiction, as applicable.

(iii)     No Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to any Person (other than any of the Persons described in subsection (b)(iv) of this Section) in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).

(iv)     Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Lender Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided, that, any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Facility and the Loans at the time owing to it under such Facility or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning

Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, in the case of any assignment in respect of the Roll-Up Term Loan Facility, Delayed Draw Term Loan Facility or any increase, unless each of Administrative Agent and, so long as no Event of Default has occurred and is continuing, Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single assignee (or to an assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    Required Consents.    No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of Borrower (such consent not to be unreasonably withheld, delayed or conditioned) shall be required unless (1) an Event of Default under Section 8.01(a) or Section 8.01(f) has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided, that, Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Administrative Agent within 5 Business Days after having received notice thereof;

(B)    the consent of Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned) shall be required absent the continuance of an Event of Default under Section 8.01(a) or Section 8.01(f) (though notice to the Administrative Agent of any such assignment shall nonetheless be required), for assignments in respect of (i) any Delayed Draw Term Loan Commitment if such assignment is to a Person that is not a Lender with a Commitment or Loan in respect of the applicable Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (ii) any Roll-Up Term Loan or Delayed Draw Term Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund; and

(C)    the consent of the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned).

(iii)    Assignment and Assumption.    The parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and provided, further,

-122-

that such fee shall not be payable in connection with an assignment to an Affiliate of a Lender or an Approved Fund.  The assignee, if it is not a Lender, shall deliver to Administrative Agent an Administrative Questionnaire.

(iv)   <u>No Assignment to Certain Persons</u>.  No such assignment shall be made to (A) Holdings, Borrower or any of their Subsidiaries, (B) any Defaulting Lender, (C) any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B) or (C) a natural person, (D) unless an Event of Default under <u>Section 8.01(a)</u> has occurred and has been continuing for a period of 15 Business Days at the time of such assignment, any Disqualified Institution or (E) without the written consent of the Borrower in its sole discretion, any Prepetition Lender that is not party to the Restructuring Support Agreement at the time of such assignment.

(v)   <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of Borrower and Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent or any Lender hereunder (and interest accrued thereon).  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(vi)   <u>Restructuring Support Agreement</u>.  Notwithstanding any other provision in this Agreement or any other Loan Document, no assignment pursuant to this Section 10.06(b) shall be permitted unless such assignment complies with the terms of the Restructuring Support Agreement, the proposed assignee executes and delivers a joinder to the Restructuring Support Agreement and the proposed assignee otherwise consents to the 363 Sale Transaction.

Subject to acceptance and recording thereof by Administrative Agent in the Register pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to

be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d); provided, that, an assignment or transfer not in compliance with Section 10.06(b)(iv) shall be void and of no force or effect.

(c)     Register.  Administrative Agent, acting solely for this purpose as a non-fiduciary agent of Borrower (in such capacity, subject to Section 10.17), shall maintain at Administrative Agent's Office in the U.S. a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts and stated interest of the Loans and Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error, and Borrower, Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  In addition, Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender.  The Register shall be available for inspection by Borrower at any reasonable time and from time to time upon reasonable prior notice.  In addition, at any time that a request for a consent for a material or substantive change to the Loan Documents is pending, any Lender may request and receive from Administrative Agent a copy of the Register.

(d)     Participations.  Any Lender may at any time after the Closing Date, without the consent of, or notice to, Borrower or Administrative Agent, sell participations to any Person (other than a natural person, a Defaulting Lender, Borrower or any of Borrower's Affiliates or Subsidiaries or unless (x) an Event of Default under Section 8.01(f) has occurred and is continuing at the time of such assignment or (y) an Event of Default under Section 8.01(a) has occurred and has been continuing for a period of 15 Business Days at the time of such assignment, a Disqualified Institution or, without the written consent of the Borrower in its sole discretion any Prepetition Lender that is not a party to the Restructuring Support Agreement) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement; provided, that, (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrower, Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement or otherwise exercise its voting rights in connection therewith; provided, that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section provided that such Participant agrees to be subject to the provisions

of Sections 3.01, 3.04 and 3.06 as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender granting a participation shall as a non-fiduciary agent of Borrower maintain in the U.S. a register ("**Participation Register**") with respect to the ownership and transfer of each participation containing the information set forth in the Register described in Section 10.06(c).  No transfer of a participation shall be effective unless recorded in such Participation Register.  Each Participation Register shall be available for inspection by Borrower during normal business hours upon prior reasonable notice to the applicable Lender maintaining the Participant Register to the extent required to cause the Obligations to be in "registered form" within the meaning of Treasury Regulation Sections 5f.103-1 and 1.871-14(c). The entries in the Participation Register shall be prima facie evidence absent manifest error.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participation Register.

(e)      Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(f)      Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that, no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)      Upon the request of any Lender, the Administrative Agent shall provide the list of Disqualified Institutions to such requesting Lender.  If any assignment or participation under this Section 10.06 is made to any Disqualified Institution without the Borrower's prior written consent, then the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate any Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution, (B) in the case of any outstanding Roll-Up Term Loans or Delayed Draw Term Loans held by such Disqualified Institution, purchase such Loans by paying the lesser of (x) par and (y) the amount that such Disqualified Institution paid to acquire such Loans, in the cases of clauses (x) and (y), plus accrued interest thereon, accrued fees and all other amounts payable to it hereunder and/or (C) require such Disqualified Institution to assign, without recourse, all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that (I) in the case of clause (A), the applicable Disqualified Institution has received payment of an amount equal to the lesser of (1) par and (2) the amount that such Disqualified Institution paid for the applicable Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the Borrower, (II) in the case of clauses (A) and (B), the Borrower shall be liable to the relevant Disqualified Institution under Section 3.05 if any LIBO Rate Loan owing to such Disqualified Institution is repaid or purchased other than on the last day of the Interest Period

relating thereto and (III) in the case of <u>clause (C)</u>, the relevant assignment shall otherwise comply with this <u>Section 10.06</u> (except that no registration and processing fee required under this <u>Section 10.06</u> shall be required with any assignment pursuant to this paragraph).  Nothing in this <u>Section 10.06(g)</u> shall be deemed to prejudice any right or remedy that the Borrower may otherwise have at law or equity.  Each Lender acknowledges and agrees that Holdings and its Subsidiaries will suffer irreparable harm if such Lender breaches any obligation under this <u>Section 10.06</u> insofar as such obligation relates to any assignment, participation or pledge to any Disqualified Institution without the Borrower's prior written consent.  Additionally, each Lender agrees that the Borrower may seek to obtain specific performance or other equitable or injunctive relief to enforce this <u>Section 10.06(g)</u> against such Lender with respect to such breach without posting a bond or presenting evidence of irreparable harm.

(h)     <u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.07. Treatment of Certain Information; Confidentiality**.  Each of the Lender Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, trustees, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners) (<u>provided</u> that such Lender that discloses any Information or any Loan Document pursuant to this <u>clause (b)</u> shall provide the Borrower with prompt advance written notice of such disclosure (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority, self-regulatory authority, state insurance commissioners or the National Association of Insurance Commissioners exercising its examination or regulatory authority) to the extent permitted by applicable Law and use commercially reasonable efforts to ensure the relevant Information or Loan Document is accorded confidential treatment, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (<u>provided</u>, that such Lender that discloses any Information or any Loan Document pursuant to this <u>clause (c)</u> shall provide the Borrower with prompt written advance notice of such disclosure to the extent permitted by applicable law and use commercially reasonable efforts to ensure the relevant Information or Loan Document is accorded confidential treatment), (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or

prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower and its obligations, (g) with the prior written consent of Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Lender Parties or any of their respective Affiliates on a nonconfidential basis from a source other than the Loan Parties (i) to a Person that is an investor or prospective investor in a Securitization that agrees that its access to Information is solely for purposes of evaluating an investment in such Securitization and who agrees to treat such information as confidential, or (j) to a Person that is a trustee, collateral manager, servicer, noteholder or secured party in a Securitization in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization. For purposes of this Section, "Securitization" means a public or private offering by a Lender or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Loans or the Commitments.

For purposes of this Section, "***Information***" means all information received from any Loan Party or any Subsidiary relating to a Loan Party or any Subsidiary or any of their respective businesses, other than any such information that is available to any Lender Party on a nonconfidential basis prior to disclosure by a Loan Party or any Subsidiary, provided, that, in the case of information received from either a Loan Party or any Subsidiary after the date hereof, any information not marked "PUBLIC" at the time of delivery will be deemed to be confidential; provided, that, any information marked "PUBLIC" may also be marked "Confidential". Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Lender Parties acknowledges that (a) the Information may include material non-public information concerning either a Loan Party or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

Administrative Agent and each Lender reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**10.08. Right of Setoff**. If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law and the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the Obligations of Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that, in the event that any Defaulting Lender shall exercise any

-127-

such right of setoff, (x) all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify Borrower and Administrative Agent promptly after any such setoff and application, provided, that, the failure to give such notice shall not affect the validity of such setoff and application.

**10.09.  Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "***Maximum Rate***").  If Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to Borrower.  In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10.  Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Subject to Section 4.01, this Agreement shall become effective when it shall have been executed by Administrative Agent and when Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement and each other Loan Document by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.11.  Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Lender Parties, regardless of any investigation made by any Lender Party or on their behalf and notwithstanding that any Lender Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which no claim has been asserted) shall remain outstanding.

Further, the provisions of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u> and <u>Article X</u> shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

**10.12. Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this <u>Section 10.12</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13. Replacement of Lenders**.  If any Lender requests compensation under <u>Section 3.04</u>, if Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, if any Lender is a Defaulting Lender, or if any Lender fails to approve any amendment, waiver or consent requested by Borrower pursuant to <u>Section 10.01</u> that has received the written approval of not less than the Required Lenders but also requires the approval of such Lender, then in each such case Borrower may, at their sole expense and effort, upon notice to such Lender and Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights (other than its existing rights to payments pursuant to <u>Section 3.04</u> or <u>Section 3.01</u>) and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u>, <u>that</u>:

(a)     Administrative Agent shall have received the assignment fee specified in <u>Section 10.06(b)</u>;

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee or Borrower (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d)     in the case of any such assignment resulting from the refusal of a Lender to approve a requested amendment, waiver or consent, the Person to whom such assignment is being made has agreed to approve such requested amendment, waiver or consent; and

(e)        such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

   **10.14.   Governing Law; Jurisdiction; Etc**.

(a)        GOVERNING LAW.  EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS REQUIRING APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)        SUBMISSION TO JURISDICTION.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT ABSTAINS FROM HEARING OR REFUSES TO EXERCISE JURISDICTION, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH BANKRUPTCY COURT, STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ADMINISTRATIVE AGENT, ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)        WAIVER OF VENUE.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)  SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

10.15.  **Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.16.  **USA PATRIOT Act Notice**.  Each Lender that is subject to the Patriot Act and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender or Administrative Agent, as applicable, to identify Borrower in accordance with the Patriot Act.

10.17.  **No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A) the arranging and other services regarding this Agreement provided by the Lender Parties are arm's-length commercial transactions between each Loan Party, on the one hand, and the Lender Parties, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Lender Party is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates or any other Person and (B) no Lender Party has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents, (iii) the Lender Parties may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their Affiliates, and no Lender Party has any obligation to disclose any of such interests to any Loan Party or its Affiliates and (iv) the Lender Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the

transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against any Lender Party with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.18.  Attachments**.  Any exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein; except, that, in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.19.  [Reserved]**.

**10.20.  Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**10.21.     Incorporation of DIP Orders by Reference**.  Each of the Loan Parties, the Administrative Agent and the Lenders agrees that any reference contained herein to (i) the Interim DIP Order shall include all terms, conditions, and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes, and (ii) the Final DIP Order shall include all terms, conditions, and provisions of such Final DIP Order and that the Final DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement and the terms of the DIP Orders, the terms of the DIP Orders shall govern**.**

## ARTICLE XI
## CONTINUING GUARANTEE

**11.01.  Guarantee**.

(a)    Holdings, Borrower and each Subsidiary Guarantor hereby absolutely and unconditionally guarantees, as a guarantee of payment and performance and not merely as a guarantee of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all of the Obligations, whether for principal, interest, premiums, fees, indemnities, damages, costs, expenses or otherwise, of Borrower to the Lender Parties, arising hereunder or under any other Loan Document (including all renewals, extensions, amendments, refinancings and other modifications thereof and all costs, attorneys' fees and expenses incurred by the Administrative Agent and/or the Lender Parties in connection with the collection or enforcement thereof, subject to the limitations set forth in Section 10.04(a) hereof).  Administrative Agent's books and records showing the amount of the Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon Holdings, Borrower and each Subsidiary Guarantor, and prima facie evidence for the purpose of establishing the amount of the Obligations, subject to manifest error. This Guarantee shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any instrument or agreement evidencing any Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Obligations which might otherwise constitute a defense to the obligations of Holdings, Borrower or any Subsidiary Guarantor under this Guarantee (other than defense of payment), and Holdings, Borrower and each Subsidiary Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing (other than defense of payment).

(b)    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations. The obligations of each Qualified ECP Guarantor under this Section 11.01(b) shall remain in full force and effect until Payment in Full of the Obligations. Each Qualified ECP Guarantor intends that this Section 11.01(b) constitute, and this Section 11.01(b) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**11.02. Rights of Lenders**.   Holdings, Borrower and each Subsidiary Guarantor consents and agrees that the Administrative Agent and/or the Lender Parties may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof and subject only to the terms of this Agreement:  (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guarantee or any Obligations; (c) apply such security and direct the order or manner of sale thereof as Administrative Agent and the Lenders in their sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the

Obligations. Without limiting the generality of the foregoing, Holdings, Borrower and each Subsidiary Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of Holdings, Borrower or any Subsidiary Guarantor under this Guarantee or which, but for this provision, might operate as a discharge of Holdings, Borrower or any Subsidiary Guarantor.

**11.03.  Certain Waivers**.

(a)    Holdings, Borrower and each Subsidiary Guarantor waives, to the fullest extent permitted by law, (i) any defense arising by reason of any disability or other defense of Borrower or any other Guarantor, or the cessation from any cause whatsoever (including any act or omission of any Lender Party) of the liability of Borrower; (ii) any defense based on any claim that Holdings', Borrower's or any Subsidiary Guarantor's obligations exceed or are more burdensome than those of Borrower; (iii) the benefit of any statute of limitations affecting Holdings', Borrower's or any Subsidiary Guarantor's liability hereunder; (iv) any right to require any Lender Party to proceed against Borrower, proceed against or exhaust any security for the Obligations, or pursue any other remedy in the power of any Lender Party whatsoever; (v) any benefit of and any right to participate in any security now or hereafter held by any Lender Party; and (vi) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties. Holdings, Borrower and each Subsidiary Guarantor expressly waives, to the fullest extent permitted by law, all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this Guarantee or of the existence, creation or incurrence of new or additional Obligations, except as otherwise expressly set forth in this Agreement.

(b)    Holdings, Borrower and each Subsidiary Guarantor agrees that its obligations hereunder are absolute and unconditional, irrespective of (i) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which Borrower or other Loan Party is or may become a party or be bound; (ii) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Administrative Agent or any Lender with respect thereto; (iii) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guarantee for the Obligations or any action, or the absence of any action, by Administrative Agent or any Lender in respect thereof (including the release of any security or guarantee); (iv) the insolvency of Borrower or any other Loan Party; (v) any election by Administrative Agent or any Lender in proceeding under Debtor Relief Laws for the application of Section 1111(b)(2) of the Bankruptcy Code; (vi) any borrowing or grant of a Lien by Borrower or other Loan Party, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (vii) the disallowance of any claims of Administrative Agent or any Lender against Borrower for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (viii) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except defense of payment.

(c)     Holdings, Borrower and each Subsidiary Guarantor expressly waives, to the fullest extent permitted by law, all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Administrative Agent or Lenders to marshal assets or to proceed against Borrower, or any other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against Holdings, Borrower or such Subsidiary Guarantor.  Holdings, Borrower and each Subsidiary Guarantor waives, to the fullest extent permitted by law, all defenses available to a surety, guarantor or accommodation co-obligor other than defense of payment.  It is agreed among Holdings, Borrower and each Subsidiary Guarantor, Administrative Agent and Lenders that the provisions of this <u>Article XI</u> are essential to the transaction contemplated by the Loan Documents and that, but for such provisions, Administrative Agent and Lenders would decline to make Loans and issue Letters of Credit.  Holdings, Borrower and each Subsidiary Guarantor acknowledges that its guarantee pursuant to this Section is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

(d)     Administrative Agent and Lenders may, in their discretion, pursue such rights and remedies as they deem appropriate, including realization upon Collateral by judicial foreclosure or non-judicial sale or enforcement, without affecting any rights and remedies under this <u>Article XI</u>.  If, in taking any action in connection with the exercise of any rights or remedies, Administrative Agent or any Lender shall forfeit any other rights or remedies, including the right to enter a deficiency judgment against any Loan Party or other Person, whether because of any applicable Laws pertaining to "election of remedies" or otherwise, Holdings, Borrower and each Subsidiary Guarantor consents to such action and waives any claim based upon it, even if the action may result in loss of any rights of subrogation that Holdings, Borrower or any Subsidiary Guarantor might otherwise have had.  Any election of remedies that results in denial or impairment of the right of Administrative Agent or any Lender to seek a deficiency judgment against Borrower shall not impair Holdings', Borrower's and each Subsidiary Guarantor's obligation to pay the full amount of the Obligations.

**11.04.  Obligations Independent**.  The obligations of Holdings, Borrower and each Subsidiary Guarantor hereunder are those of primary obligor, and not merely as surety, and are independent of the Obligations and the obligations of any other guarantor, and a separate action may be brought against Holdings, Borrower and each Subsidiary Guarantor to enforce this Guarantee whether or not a Borrower or any other person or entity is joined as a party.

**11.05.  Subrogation**.  Neither Holdings, nor Borrower nor any Subsidiary Guarantor shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guarantee until the Facility Termination Date.  If any amounts are paid to Borrower or any Guarantor in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Lender Parties and shall forthwith be paid to Administrative Agent to reduce the amount of the Obligations, whether matured or unmatured.

**11.06.  Termination; Reinstatement**.  This Guarantee is a continuing and irrevocable guarantee of all Obligations now or hereafter existing and shall remain in full force and effect until the Facility Termination Date.  Notwithstanding the foregoing, this Guarantee shall continue in full force and effect or be revived, as the case may be, if any payment by or on

behalf of Borrower or Holdings or any Subsidiary Guarantor is made, or any of the Lender Parties exercises its right of setoff, in respect of the Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any of the Lender Parties in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Lender Parties are in possession of or have released this Guarantee and regardless of any prior revocation, rescission, termination or reduction.  The obligations of Holdings, Borrower and each Subsidiary Guarantor under this paragraph shall survive termination of this Guarantee.

**11.07.  Subordination**.  Holdings, Borrower and each Subsidiary Guarantor hereby subordinates the payment of all obligations and indebtedness of Borrower owing to Holdings and each Subsidiary Guarantor, whether now existing or hereafter arising, including but not limited to any obligation of Borrower to Holdings or any Subsidiary Guarantor as subrogee of the Lender Parties or resulting from Holdings' or any Subsidiary Guarantor's performance under this Guarantee, to the indefeasible Payment in Full of all Obligations.  If the Required Lenders so request after the occurrence and during the continuance of any Event of Default, any such obligation or indebtedness of Borrower to any Guarantor shall be enforced and performance received by such Guarantor as trustee for the Lender Parties and the proceeds thereof shall be paid over to the Administrative Agent to be applied to the Obligations, but without reducing or affecting in any manner the liability of any Guarantor under this Guarantee.

**11.08.  Stay of Acceleration**.  If acceleration of the time for payment of any of the Obligations is stayed, in connection with any case commenced by or against Borrower or any Guarantor under any Debtor Relief Laws, or otherwise, all such amounts shall nonetheless be payable by Borrower and each Guarantor immediately upon demand by the Lender Parties.

**11.09.  Condition of Borrower**.  Borrower and each Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from any other Guarantor such information concerning the financial condition, business and operations of any such other Guarantor as Borrower or such Guarantor requires, and that none of the Lender Parties has any duty, and no Guarantor is relying on the Lender Parties at any time, to disclose to any Guarantor any information relating to the business, operations or financial condition of any other Guarantor (Borrower and each Guarantor waiving any duty on the part of the Lender Parties to disclose such information and any defense relating to the failure to provide the same).

**11.10.  Limitation of Liability**.  Notwithstanding any provision of this Article XI to the contrary, it is intended that the provisions of this Article XI not constitute a "Fraudulent Conveyance" (as defined below).  Consequently, each Lender Party and Loan Party agrees that if the provisions of this Article XI, or any Liens securing the obligations and liabilities arising pursuant to this Article XI, would, but for the application of this sentence, constitute a Fraudulent Conveyance, this Agreement and each such Lien shall be valid and enforceable only to the maximum extent that would not cause such provisions or such Lien to constitute a Fraudulent Conveyance, and such provisions shall automatically be deemed to have been amended accordingly at all relevant times.  For purposes hereof, "***Fraudulent Conveyance***" means a fraudulent conveyance or fraudulent transfer under Section 548 of the Bankruptcy Code

or a fraudulent conveyance or fraudulent transfer under the provisions of any applicable fraudulent conveyance or fraudulent transfer law or similar law of any Governmental Authority as in effect from time to time.

*- Remainder of page is intentionally left blank; signature pages follow -*

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

**<u>BORROWER</u>**:

BENEVIS HOLDING CORP.

By:  _____
Name: Scott Mell
Title:  Chief Restructuring Officer

**<u>HOLDINGS</u>**:

LT SMILE CORPORATION

By:  _____
Name:  Scott Mell
Title:  Chief Restructuring Officer

**<u>GUARANTORS</u>**:

BENEVIS CORP.

By: _____
Name:   Scott Mell
Title:   Chief Restructuring Officer

BENEVIS INFORMATICS, LLC

By: _____
Name:   Scott Mell
Title:   Chief Restructuring Officer

BENEVIS AFFILIATES, LLC

By: _____
Name:   Scott Mell
Title:   Chief Restructuring Officer

BENEVIS, LLC

By: _____
Name:   Scott Mell
Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

**ADMINISTRATIVE AGENT**:

BMO Harris Bank, N.A., as Administrative Agent

By: _____
Name: Megan Tripodi
Title:   Director

**<u>LENDERS</u>**:

Bank of Montreal, as a Lender and as a FO Lender

By: _____

Name: Megan Tripodi
Title:   Director

**NEW MOUNTAIN FINANCE CORPORATION**, as a Lender and as a FO Lender

By: _____
Name:  Shiraz Y. Kajee
Title:  Chief Financial Officer

**NEW MOUNTAIN GUARDIAN PARTNERS II SPV, LLC**, as a Lender and as a FO Lender

By: _____
Name:  Shiraz Y. Kajee
Title:  Chief Financial Officer

**NEW MOUNTAIN GUARDIAN II MASTER FUND-B SPV, LLC**, as a Lender and as a FO Lender

By: _____
Name:  Shiraz Y. Kajee
Title:  Chief Financial Officer

Signature Page to DIP Credit Agreement

**SUN LIFE ASSURANCE COMPANY OF CANADA**, as a Lender and as a FO Lender

By: _____
Name:   Usman Bajwa
Title:   Managing Director

By: _____
Name:   Michael Rudanycz
Title:   Managing Director

# **EXHIBIT B**

## **STALKING HORSE APA**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**NEW BENEVIS HOLDCO, INC.**

**AND**

**LT SMILE CORPORATION,**

**BENEVIS HOLDING CORP.,**

**BENEVIS CORP.,**

**BENEVIS AFFILIATES, LLC,**

**BENEVIS, LLC,**

**AND**

**BENEVIS INFORMATICS, LLC**

**August 2, 2020**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I DEFINITIONS AND INTERPRETATION ..................................................2
    1.1       Definitions ...................................................................................................2
    1.2       Interpretation ............................................................................................13

ARTICLE II PURCHASE AND SALE OF ASSETS ..................................................13
    2.1       Purchased Assets ......................................................................................13
    2.2       Retained Assets ........................................................................................16

ARTICLE III ASSUMPTION OF LIABILITIES .........................................................17
    3.1       Assumed Liabilities ..................................................................................17
    3.2       Retained Liabilities ..................................................................................18

ARTICLE IV CONSIDERATION ...............................................................................19
    4.1       Purchase Price ..........................................................................................19
    4.2       Allocation of Purchase Price ...................................................................19
    4.3       Cure Costs ................................................................................................19

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS...............19
    5.1       Organization and Good Standing. ...........................................................19
    5.2       Power; Authority; Enforceability ............................................................20
    5.3       Title to Assets ..........................................................................................20
    5.4       Noncontravention; Governmental Filings ...............................................21
    5.5       Litigation .................................................................................................21
    5.6       Permits .....................................................................................................21
    5.7       Intellectual Property Rights .....................................................................21
    5.8       Compliance with Laws ............................................................................22
    5.9       Healthcare Regulatory Matters ...............................................................22
    5.10      Employees ................................................................................................25
    5.11      Employee Benefit Plans ..........................................................................26
    5.12      Real Property ...........................................................................................27
    5.13      Contracts ..................................................................................................27
    5.14      Environmental Matters ............................................................................28
    5.15      Insurance .................................................................................................28
    5.16      Brokers or Finders ...................................................................................28
    5.17      No Implied or Other Representations or Warranties................................28

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER.......29
    6.1       Organization and Good Standing .............................................................29
    6.2       Power; Authority; Enforceability ............................................................29
    6.3       Consents ...................................................................................................30
    6.4       No Conflicts .............................................................................................30
    6.5       Litigation .................................................................................................30
    6.6       Brokers or Finders ...................................................................................31

6.7    Financing ...................................................................................31
6.8    Purchaser's Investigation .........................................................31

ARTICLE VII CONDITIONS TO CLOSING ..............................................31
7.1    Conditions to Obligations of All Parties ..................................31
7.2    Conditions to Purchaser's Obligations .....................................32
7.3    Conditions to Sellers' Obligations ...........................................33

ARTICLE VIII COVENANTS .....................................................................34
8.1    Conduct of the Business ...........................................................34
8.2    Access .......................................................................................36
8.3    Bankruptcy Court Matters ........................................................37
8.4    Employee Matters .....................................................................38
8.5    Publicity ....................................................................................41
8.6    Expenses ...................................................................................41
8.7    Further Assurances ...................................................................41
8.8    Governmental Approvals ..........................................................41
8.9    Notice of Certain Matters .........................................................42
8.10   Bulk Transfer Laws ..................................................................42
8.11   Insurance ..................................................................................42

ARTICLE IX CLOSING AND TERMINATION ..........................................43
9.1    Closing ......................................................................................43
9.2    Termination ...............................................................................43
9.3    Effect of Termination ...............................................................45

ARTICLE X TAX MATTERS .....................................................................45
10.1   Filing of Returns ......................................................................45
10.2   Transaction Taxes .....................................................................45
10.3   Tax Claims ................................................................................45
10.4   Tax Prorations ...........................................................................45
10.5   Provision of Tax Forms ............................................................46

ARTICLE XI GENERAL PROVISIONS .....................................................46
11.1   Bankruptcy Court Approval .....................................................46
11.2   Notices ......................................................................................46
11.3   Survival of Representations, Warranties, Covenants and Agreements ...........47
11.4   Binding Effect ..........................................................................47
11.5   Headings ...................................................................................47
11.6   Exhibits and Schedules .............................................................47
11.7   Counterparts ..............................................................................47
11.8   Governing Law/Jurisdiction .....................................................48
11.9   WAIVER OF JURY TRIAL .....................................................48
11.10  Waivers .....................................................................................48
11.11  Pronouns ...................................................................................48
11.12  Modification ..............................................................................48
11.13  Successors/Assignment .............................................................48

11.14    Entire Agreement .................................................................................49
11.15    Severability..........................................................................................49
11.16    No Third Party Beneficiaries................................................................49
11.17    Non-Recourse ......................................................................................49
11.18    Negotiated Agreement..........................................................................49
11.19    Specific Performance ..........................................................................49

**EXHIBITS**

Exhibit A – Bill of Sale and Assignment and Assumption Agreement
Exhibit B – IP Assignment Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***") is dated as of August 2, 2020, by and among LT Smile Corporation, a Delaware corporation, Benevis Holding Corp., a Delaware corporation, Benevis Corp., a Delaware corporation, Benevis Affiliates, LLC, a Delaware limited liability company, Benevis, LLC, a Delaware limited liability company, and Benevis Informatics, LLC, a Delaware limited liability company (collectively, "***Sellers***" and each a "***Seller***"), and New Benevis Holdco, Inc., a Delaware corporation, or its designees or assignees ("***Purchaser***"). Purchaser and Sellers are also referred to herein individually as a "***Party***," and, collectively, as the "***Parties***."

## RECITALS

WHEREAS, Sellers intend to become debtors-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "***Bankruptcy Code***"), by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "***Bankruptcy Case***") (such filing date, the "***Petition Date***"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***");

WHEREAS, in connection with the Bankruptcy Case, the Purchaser shall credit bid on a dollar-for-dollar basis a portion of the outstanding Purchaser Secured Claims pursuant to Section 363 of the Bankruptcy Code;

WHEREAS, Sellers and Purchaser are entering into this Agreement subject to the final approval by the Bankruptcy Court;

WHEREAS, Sellers are engaged in the business of providing dental practice support services to the Supported Entities (as defined herein) (the "***Business***");

WHEREAS, subject to the approval of the Bankruptcy Court, Sellers desire to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser desires to purchase, acquire, and assume from Sellers pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, as contemplated by this Agreement and the Ancillary Agreements (together with the other transactions contemplated hereby and thereby, the "***Transactions***"); and

WHEREAS, Sellers, as debtors and debtors-in-possession, will continue in the possession of its assets and in the management of the Business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1     <u>Definitions</u>. When used in this Agreement, the following terms in all of their tenses shall have the meanings assigned to them below or elsewhere in this Agreement as indicated below:

"***Accounts Receivable***" means all accounts, rights to payment and notes and other amounts receivable (whether current or non-current) otherwise arising from the conduct of the Business, including receivables from credit card processors and the sale of gift cards.

"***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"***Agreement***" is defined in the Preamble.

"***Alternative Transaction***" means a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the Purchased Assets to another purchaser or purchasers other than the Purchaser.

"***Assumed Contracts***" is defined in <u>Section 2.1(e)</u>.

"***Assumed Liabilities***" is defined in <u>Section 3.1</u>.

"***Assumed Seller Plans***" is defined in <u>Section 2.1(t)</u>.

"***Avoidance Actions***" means any claim, right, or cause of action arising under chapter 5 of the Bankruptcy Code and any analogous state law claims related to the Purchased Assets or the Business.

"***Bankruptcy Case***" is defined in the Recitals.

"***Bankruptcy Code***" is defined in the Recitals.

"***Bankruptcy Court***" is defined in the Recitals and includes such other courts exercising competent jurisdiction over the Bankruptcy Case involving Sellers.

"***Bidding Procedures***" means the bidding procedures for the solicitation and submission of bids for a sale, reorganization, or other disposition of Sellers or all or substantially all of their assets approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, which shall be in form and substance acceptable to Purchaser.

"***Bidding Procedures Motion***" means the motion seeking entry of the Bidding Procedures Order.

"***Bidding Procedures Order***" means an order of the Bankruptcy Court approving the Bidding Procedures, which shall be in form and substance acceptable to Purchaser in its reasonable discretion.

"***Bill of Sale and Assignment and Assumption Agreement***" means a Bill of Sale and Assignment and Assumption Agreement executed by Purchaser and Sellers, in substantially the form of <u>Exhibit A</u>.

"***Business***" is defined in the Recitals.

"***Business Continuity Agreement***" or "***BCA***" is defined in <u>Section 5.9(i)</u>.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"***Business Employee***" means each Person who is, or could be considered to be, employed by Sellers.

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" and "***Closing Date***" are defined in <u>Section 9.1</u>.

"***COBRA***" means the continuation coverage provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as codified in Code Section 4980B and ERISA Sections 601 et seq., as amended from time to time, and the regulations and other guidance promulgated thereunder and any other similar provisions of state or local law.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Contract***" means any written commitment, understanding, instrument, lease, sub-lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, commitment, note, bond, franchise, guarantee, indemnity, instrument, promise or other arrangement evidencing or creating any legally binding obligation, whether written or oral (including all amendments, side-letters, supplements and modifications of any of the foregoing and all rights and interests arising thereunder or in connection therewith).

"***Contracting Parties***" is defined in <u>Section 11.17</u>.

"***Controlled Group Liability***" means any and all Liabilities (i) under Title IV of ERISA; (ii) under Section 302, 303, or 4068(a) of ERISA; (iii) under Section 412, 430 or 4971 of the Code; (iv) under Section 436 of the Code or Section 206(g) of ERISA; (v) as a result of the failure to comply with the continuation coverage requirements of ERISA Sections 601 *et seq.,* and Section 4980B of the Code or the group health requirements of Sections 701 *et seq.,* of ERISA and Sections 9801 *et seq.,* of the Code; (vi) for violation of HIPAA or the Patient Protection and Affordable Care Act of 2010, as amended; (vii) as a result of a failure to comply with the requirements of Section 414(t) of the Code; or (viii) under corresponding or similar provisions of any non-U.S. Law.

- 3 -

"*Credit Bid Amount*" is defined in <u>Section 4.1</u>.

"*Cure Costs*" means, with respect to the Assumed Contracts, all amounts, including pre-petition amounts, required to be paid or otherwise satisfied pursuant to the Bankruptcy Code in order to cure Sellers' monetary defaults under such Assumed Contracts at the time of the assumption thereof by and assignment to Purchaser as provided hereunder.

"*Dentist Partner*" is defined in <u>Section 5.9(i)</u>.

"*DIP Facility*" means the debtor-in-possession financing facility provided to Sellers under that certain Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of August 2, 2020, by and among Benevis Holding Corp., LT Smile Corporation, the other loan parties party thereto, the banks and financial institutions or entities from time to time party thereto and BMO Harris Bank, N.A., as administrative agent and the DIP Orders, each as authorized by the Bankruptcy Court.

"**DIP Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing.

"*Encumbrances*" means any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting right (in the case of any security or equity interest), transfer right, right to receipt of income or exercise of any other attribute of ownership.

"*Environmental Laws*" means all applicable federal, state, local, municipal and foreign Laws concerning public or human health and safety (as it relates to exposure to Hazardous Substances), endangered or threatened species, pollution, or protection of the environment (including ambient air, soil, surface water or groundwater or subsurface strata), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, release, threatened release, control, or cleanup of, or exposures to, any Hazardous Substances (including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any regulations promulgated thereunder, and analogous state Laws).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means any Person (whether or not incorporated) which, together with the Seller, is (or at any relevant time was) required to be treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"*Excluded Employee Liabilities*" means the following liabilities of Sellers or any of their respective Affiliates relating to any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof: (i) any liability arising at any time under or in connection with any Seller Plan (other than any Assumed Seller Plan); (ii) any liability that constitutes a Pre-Closing COBRA Liability or a Pre-Closing WARN Act Liability; (iii) any Controlled Group Liability; (iv) any liability arising in connection with the actual or prospective employment or engagement, the retention and/or discharge by Sellers or any of their respective Affiliates of any current or former Business

Employee or other service provider of Sellers or any of their respective Affiliates; (v) any employment, labor, compensation, pension, employee welfare and employee-benefits-related liabilities relating to any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, including but not limited to all liabilities related to or arising out of claims made by any such Person (a) for any statutory or common law severance or other separation benefits, (b) for any contractual or other severance or separation benefits and any other legally-mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a judgment of a court, tribunal or other authority having jurisdiction over the Parties), (c) with respect to any unfair labor practice, (d) under any state unemployment compensation or workers' compensation Law, (e) under any federal or state employment Law or other Law relating to employment, discrimination, classification, immigration, or (f) relating to any obligation to inform or consult with employees or other service providers, employee representatives, unions, works councils or other employee representative bodies in connection with the Transactions, in each case (I) associated with any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, arising at any time, and (II) associated with any Transferred Employee, arising on or prior to the Closing Date.

"*Government Program*" means any health care reimbursement program funded, in whole or in part, by a Governmental Authority of the United States or any state of the United States, under which any Seller or Supported Entity has received or is receiving reimbursement for the provision of medical services, including, without limitation, any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), state Medicaid programs, state CHIP programs, TRICARE, Medicaid managed care and similar or successor programs with or for the benefit of any Governmental Authority, and such other similar federal, state or local reimbursement or governmental programs for which a Seller or Supported Entity is eligible and in which such Seller or Supported Entity participates.

"*Governmental Approvals*" means any approval, consent, Permit, license, waiver, or other authorization issued, granted, given or otherwise made available by or under any Governmental Authority or pursuant to any Law.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Hazardous Substances*" means any pollutant, contaminant, chemical, hazardous material, substance or waste defined, listed or classified as a "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under, or otherwise regulated under any Environmental Law, including petroleum and petroleum-derived substances, products, by products and wastes, asbestos, urea, formaldehyde and lead based paint or lead-containing materials.

"*Health Care Laws*" means all applicable Laws of any Governmental Authority or Government Program relating to dentistry or health care, including without limitation, Titles XI, XVIII and XIX of the Social Security Act (42 U.S.C. § 1301 et seq., 42 U.S.C. § 1395 et seq. and 42 U.S.C. § 1396 et seq., respectively); TRICARE (10 U.S.C. Section 1071 et seq.); provisions of HIPAA unrelated to privacy, security or breach of unsecured PHI; the Occupational Safety and Health Act, and all federal, state and local laws and regulatory schemes governing workplace safety and/or the operation of dental practices; the federal false claims Laws; false representations Laws; insurance fraud Laws; debarment and exclusion Laws; other similar and applicable Laws relating to false and deceptive trade practices, including the Exclusion Law (42 U.S.C. § 1320a-7), the Civil Monetary Penalties Law (42 U.S.C. §§ 1320a-7a and 1320a-7b), the civil False Claims Act (31 U.S.C. §3729 et seq.), the Program Fraud Civil Remedies Act (31 U.S.C. § 3801 et seq.) and the Federal Health Care Fraud Law (18 U.S.C. § 1347); the federal anti-kickback statute (42 U.S.C. §1320a 7 et seq.) and all other provisions of the Medicare/Medicaid fraud and abuse Laws; the Stark Law (42 U.S.C. §1395nn); the Controlled Substances Act (CSA) Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 801 et seq. and all regulations promulgated thereunder) and state controlled substance Laws); the Patient Protection and Affordable Care Act of 2010 as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152) and the regulations promulgated thereunder; the Consolidated Omnibus Budget Reconciliation Act of 1985; any Laws promulgated by any applicable state regarding dentists, dental assistants, nurses, hygienists, dental technicians or assistants, the practice of dentistry as defined in any applicable state where the Sellers and Supported Entities operate, prescribing, dispensing or administration of drugs, operation of dental spas; state anti-kickback Law; state dentist self-referral Law and facility licensing Laws, and certification requirements and related Laws; professional licensing Laws; fee-splitting Laws; corporate practice of dentistry Laws; Laws governing the use, handling, control, storage, transportation, and maintenance of controlled substances, pharmaceuticals or drugs; state insurance Laws and Laws governing the offering of discount dental plans; OSHA and state workplace laws related to the operation of dental practices; quality and safety Laws, rules or regulations relating to the regulation, provision or administration of, or payment for, health care products or services; the Clinical Laboratory Improvement Amendments of 1988 (Public Law 100- 578) and any state Laws concerning the operation of a clinical or dental laboratory; any Laws related to clinical personnel supervision and delegated authority; any Laws related to advertising and marketing; any Laws related to office-based medical and dental procedures, including anesthesia requirements; any Laws concerning the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; or any other Law or regulation of any Governmental Authority which regulates kickbacks, fraud and abuse, Government Programs, claims processing, dental record documentation requirements, the hiring of employees or acquisition of services or products from those who have been excluded from Government Programs or any other aspect of providing dental care, each of the foregoing as may heretofore have been amended from time to time.

"*Health Care Permit*" means any and all licenses, permits, authorizations, approvals, franchises, registrations, accreditations, certificates of need, consents, supplier or provider numbers, qualifications, operating authority, and/or any other permit or permission which are legally required for the operation of the business of the Sellers and Supported Entities as currently conducted, in each case that are issued or enforced by a Governmental Authority with jurisdiction over any Health Care Law.

"**_Healthcare Regulatory Consents_**" means in respect of Purchaser or any Seller, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses, Permits or Health Care Permits of any Governmental Authority as shall be required or desirable to be obtained with respect to the operation of the Business and such notifications to any Governmental Authority as shall be required to be given by such party in order for it to consummate the Transactions in compliance with all applicable Health Care Laws.  Such consents shall include the approval of Purchaser to operate the Business.

"**_Improvements_**" means all leasehold improvements located, placed, constructed or installed on or under any parcel of Leased Real Property (but only to the extent the related Real Property Leases constitute Assumed Contracts), including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration and cooling systems, facilities, lines, installations and conduits.

"**_Insurance Policies_**" is defined in <u>Section 5.15</u>.

"**_Intellectual Property_**" means any (a) trademarks and service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, including all applications, registrations and renewals of any of the foregoing, together with the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications, registrations and renewals of any of the foregoing, and works of authorship, whether or not copyrightable; (c) trade secrets, confidential know-how, discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information; (d) patents and patent applications; (e) Software; (f) websites, internet domain name registrations and social media account or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto; and (g) all other intellectual and industrial property rights and assets, and all rights, interests and protections that are associated with any of the foregoing.

"**_Intellectual Property Rights_**" means all rights in, to, arising out of, or associated with any Intellectual Property in any jurisdiction throughout the world.

"**_IP Assignment Agreement_**" means the IP Assignment Agreement, executed by Purchaser and Sellers, in substantially the form of Exhibit B.

"**_Knowledge of Sellers_**" or any other similar knowledge qualification in this Agreement means, as to a particular matter, the actual knowledge of the following individuals, after reasonable investigation and inquiry: Dale Mayfield, Scott Hornbuckle, Scott Mell, and Jerry Perchik.

"**_Law_**" means any federal, state, provincial, territorial, local, municipal, foreign, international, or multinational statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law enacted, adopted, promulgated, issued, applied by or administered or enforced by or on behalf of, any Governmental Authority or other similar authority.

"***Leased Real Property***" means all material real property leased by any Seller or Supported Entity and used in connection with the Business.

"***Legal Proceeding***" means any judicial, administrative or arbitral action, investigation, litigation, suit, proceeding (public or private), cause of action, examination, dispute, charge, hearing, audit, assessment, inquiry or claim by or before any Governmental Authority, and any appeal from any of the foregoing.

"***liability***" means any liability, damage, fine, fee, penalty, settlement, cost, expense, Tax, debt or obligation of any kind, character, or description, whether known or unknown, asserted or unasserted, matured or unmatured, liquidated or unliquidated, disputed or undisputed, accrued or unaccrued, due or to become due, fixed, absolute, contingent or otherwise, whenever or however arising and regardless of when asserted and by whom.

"***Lien***" means any lien (statutory or otherwise), mortgage, hypothecation, deed of trust, right of use or possession, right of setoff, successor liability, servitude, encroachment, restriction or restrictive covenant, charge, covenant, condition, easement, adverse claim, demand, encumbrance, limitation, security interest, preference, priority, right of first refusal, option, pledge, title defect, or restriction, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"***Material Adverse Effect***" means any event, occurrence, fact, condition, development or change that (a) has, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets and/or the Assumed Liabilities or (b) has, or would reasonably be expected to prevent, materially delay, or materially impair the ability of the Sellers to consummate the Transactions, except, in each case, to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions or the public announcement thereof; (ii) changes or conditions affecting the dental services or dental management service industries generally in the geographic regions in which the Business operates; (iii) changes in national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index or any changes in currency exchange rates); (v) changes in Law (or other binding directives or determination issued or made by or agreements with or consents of any Governmental Authority) or in GAAP or interpretations thereof; or (vi) changes arising in connection with any earthquake, flood, hurricane, tornado or other act of God (but excluding any pandemic, other than the current public health crisis caused by the novel coronavirus known as COVID-19 or any escalation or worsening thereof), except, in the case of the foregoing clauses (ii), (iii), (iv), (v) and (vi), to the extent such event, occurrence, fact, condition, development or change has a disproportionate effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased

Assets and/or the Assumed Liabilities, in each case, relative to other participants in the dental services or dental management service industries.

"***Multiemployer Plan***" means a "multiemployer plan" (as defined in Section 3(37) of ERISA).

"***Non-Party Affiliates***" is defined in Section 11.17.

"***Omitted Contract***" is defined in the last paragraph of Section 2.1.

"***Order***" shall mean any order, judgment, injunction, award, decree or writ of any Governmental Authority.

"***Ordinary Course of Business***" means substantially the same manner in which the Business is conducted by Sellers immediately prior to the Petition Date, consistent with past practice.

"***Organizational Documents***" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"***Party***" and "***Parties***" are defined in the Preamble.

"***Periodic Taxes***" is defined in Section 10.4.

"***Permits***" means all approvals, authorizations, permits, provider numbers, certificates of need, certificates of exemption, licenses, franchises, approvals, authorizations, accreditations, registrations, certificates and consents required to be obtained from Governmental Authorities.

"***Permitted Liens***" has the meaning set forth in the DIP Facility.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Personal Information***" means personally identifiable information of Sellers' employees, other personnel, agents, officers, directors, contractors, patients, potential and prospective patients, suppliers, and/or other Persons, which information may include name, address, other contact information, persistent identifier, financial account information, heath or medical information, insurance information, social security number, tax ID number, driver's license, mother's maiden name, date of birth, password, PIN number, employee ID number, payroll records, salary information or other human resources records and information, personal identification number or code, other account information and/or account activity information, other information or data that can be used for identity theft (including that which is not personally identifiable) or to identify a

particular natural person, computer, device or software, and any other sensitive information regarding such Persons.

"***Petition Date***" is defined in the Recitals.

"***Practitioner***" is defined in <u>Section 5.9(c)</u>.

"***Pre-Closing COBRA Liability***" means any liability arising under COBRA related to a qualifying event occurring on or prior to the Closing Date in respect of any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, in any case who does not become a Transferred Employee.

"***Pre-Closing WARN Act Liability***" means any liability arising under the WARN Act, in any case arising on or prior to the Closing Date.

"***Pre-Petition Facility***" means the pre-Petition Date financing facility provided to the debtors under that certain Credit Agreement, dated as of March 15, 2018, by and among Benevis Holding Corp., LT Smile Corporation, the other loan parties party thereto, the banks and financial institutions or entities from time to time party thereto and BMO Harris Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

"***Program***" is defined in <u>Section 5.9(c)</u>.

"***Proration Periods***" is defined in <u>Section 10.4</u>.

"***Purchase Price***" is defined in <u>Section 4.1</u>

"***Purchased Assets***" is defined in <u>Section 2.1</u>.

"***Purchaser***" is defined in the Preamble.

"***Purchaser Documents***" is defined in <u>Section 6.2</u>.

"***Purchaser Fundamental Representations***" means the representations in <u>Section 6.2</u> (Power; Authority; Enforceability) and <u>Section 6.6</u> (Brokers or Finders).

"***Purchaser Secured Claims***" means the aggregate amount of (a) all obligations owing by Sellers as of the Closing under the DIP Facility, including any unpaid principal, interest, fees, and costs and (b) all obligations, less $10 million, owing by Sellers as of the Closing under the Pre-Petition Facility, including any unpaid principal, interest, fees and costs.

"***Real Property Leases***" has the meaning set forth in <u>Section 5.12(b)</u>.

"***Registered Transferred Intellectual Property Rights***" is defined in <u>Section 5.7(a)</u>.

"***Retained Assets***" is defined in <u>Section 2.2</u>.

- 10 -

"***Retained Contracts***" means all Contracts to which any Seller is a party and which are not Assumed Contracts.

"***Retained Liabilities***" is defined in <u>Section 3.2</u>.

"***Sale Hearing***" means the hearing conducted by the Bankruptcy Court to approve the Transactions or an Alternative Transaction.

"***Sale Motion***" means the motion, in form and substance reasonably acceptable to Sellers and Purchaser, filed by Sellers pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to obtain entry of the Sale Order.

"***Sale Order***" means the final order of the Bankruptcy Court (a "***Final Order***"), to be issued by the Bankruptcy Court pursuant to sections 363, 365 and, to the extent possible, section 1146(c), of the Bankruptcy Code in a form and substance acceptable to Purchaser, (i) approving this Agreement and the Transactions, (ii) approving the sale of the Purchased Assets to Purchaser free and clear of all Liens, Claims, interests and Encumbrances pursuant to section 363(f) of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, (iii) approving the assumption and assignment to Purchaser of the Assumed Contracts, in each case, on the terms and subject to the conditions set forth in this Agreement, (iv) mutual releases between and among Purchaser and the Sellers and (v) finding that (A) Purchaser purchased the Purchased Assets for reasonably equivalent value, (B) the sale of the Purchased Assets was negotiated at arm's length, and (C) Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

"***Seller Documents***" is defined in <u>Section 5.2</u>.

"***Seller Fundamental Representations***" means the representations in <u>Section 5.1</u> (Organization and Good Standing), <u>Section 5.2</u> (Power; Authority; Enforceability), <u>Section 5.3</u> (Title to Assets), clause <u>(a)</u> of <u>Section 5.4</u> (Noncontravention; Governmental Filings) and <u>Section 5.16</u> (Brokers or Finders).

"***Seller Plan***" means each "employee benefit plan" (as defined in ERISA § 3(3), whether or not subject to ERISA) or other benefit or compensation plan, program, policy, practice, contract, agreement, or arrangement providing for retirement, medical, dental, vision, prescription drug, employee assistance, wellness, severance, vacation, termination pay, workers' compensation, disability, death, hospitalization, relocation, cafeteria, dependent care, commuter or transportation, adoption assistance, tuition reimbursement, relocation, retention, change of control, deferred compensation, short-term incentive, long-term incentive, performance awards, stock or stock-related awards, fringe benefits or other employee benefits of any kind maintained, sponsored, or contributed or required to be contributed to by Sellers or any of their respective ERISA Affiliates or with respect to which Sellers or any of their respective ERISA Affiliate have, or could reasonably be expected to have, any liability, other than governmental plans, programs, agreements or arrangements, or any plans, programs, agreements or arrangements mandated by a Governmental Authority or by applicable Law.

"***Sellers***" is defined in the Preamble.

"**_Software_**" means any and all computer programs, including operating system and applications software, firmware, computerized implementations of algorithms, program interfaces and other code, whether in source code or object code form (including all of the foregoing that is installed on computer hardware), including data files, databases, and related protocols, specifications, and all available documentation, including user manuals, relating to the foregoing.

"**_Supported Entities_**" is defined in <u>Section 5.1(c)</u>.

"**_Tax_**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**_Tax Costs_**" means (i) all out of pocket costs of Sellers in recovering any refunds or credits with respect to any Taxes of any Seller, any Affiliate of any Seller, or the Business, and (ii) any amounts demanded by the Internal Revenue Service as payroll Tax liabilities, together with any related fees, costs, penalties and interest, but only to the extent attributable to time periods prior to the Closing.

"**_Tax Returns_**" means any return, report or declaration filed with or submitted to any Governmental Authority in connection with the assessment, collection or payment of any Tax.

"**_Termination Date_**" is defined in <u>Section 9.2(d)(i)</u>.

"**_Transactions_**" is defined in Recitals

"**_Transaction Documents_**" means the Bidding Procedures Order, the Sale Order, the Bills of Sale and Assignment and Assumption Agreements, the IP Assignment Agreement, and the other agreements, certificates, and instruments executed and delivered in connection with this Agreement or any of the foregoing (or the Transactions).

"**_Transaction Taxes_**" is defined in <u>Section 10.2</u>.

"**_Transferred Employee_**" is defined in <u>Section 8.4(a)</u>.

"**_Transferred Intellectual Property Rights_**" means all Intellectual Property Rights owned by any Seller and used in the operation of the Business.

"**_WARN Act_**" means the Worker Adjustment and Retraining Notification Act, as amended and any similar state or local "mass layoff" or "plant closing" Laws.

"**_Welfare Claims_**" is defined in <u>Section 8.4(c)</u>.

"**_Wind Down Amount_**" means an amount of cash estimated in good faith by Sellers and acceptable to Purchaser, as necessary to fund (i) all accrued, unpaid and allowed administrative

expense claims in the Bankruptcy Case, and (ii) an orderly liquidation, dismissal or conversion of the Bankruptcy Cases and the dissolution of the Sellers to be used in accordance with a budget determined with the consent of Purchaser (to be finalized prior to the Sale Hearing and attached as an exhibit to the Sale Order); provided, that to the extent there is any residual amount remaining after the payment of the items set forth in (i) – (ii), such amounts shall be promptly delivered to Purchaser. In the event the Sellers have insufficient cash on hand to fund the Wind Down Amount, Purchaser shall have no obligation to fund any shortfall.

1.2     Interpretation. When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated.  Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation."  Unless otherwise indicated, all references to dollars refer to United States dollars. The Parties acknowledge that both Purchaser on the one hand, and Sellers on the other hand, have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1     Purchased Assets. Subject to the terms and conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, free and clear of all Liens except the Permitted Liens, and Purchaser shall purchase, all right, title and interest of Sellers in and to all assets, properties, claims and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) wherever located and whether now existing or hereafter acquired (other than the Retained Assets) (collectively, the "***Purchased Assets***"), including the following:

(a)     All cash, bank deposits, certificates of deposit, and cash equivalents (including all undeposited checks, marketable securities and short term investments) of Sellers, except to the extent such amounts are necessary to fund the Wind Down Amount;

(b)     All bank accounts of Sellers other than accounts established for the retention of the Wind Down Amount, safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts);

(c)     All tangible personal property owned or leased by Sellers, wherever located, including, but not limited to, all machinery, equipment, tools, fixtures, parts, supplies, furniture, furnishings, motor vehicles, inventory, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure and telephone systems (including any of the foregoing property that is subject to a finance lease, but only to the extent that Purchaser assumes such finance lease as an Assumed Contract);

(d)     The Transferred Intellectual Property Rights and all other manuals, instructions, documents and protocols relating thereto, including those listed on Schedule 2.1(d), including (A) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Sellers with respect to the Transferred Intellectual Property Rights; and (B) claims and causes of action with respect to the Transferred Intellectual Property Rights accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation or other violation thereof, and rights to protection of interests therein under the Laws of all jurisdictions;

(e)     All of the Contracts and Real Property Leases that are listed on Schedule 2.1(e) (along with the Cure Costs associated with each), and all Leased Real Property associated with such Real Property Leases, and all rights of any kind relating to any of the foregoing, including rights to payments thereunder (collectively, the "***Assumed Contracts***") (and in each case, all Avoidance Actions related thereto), subject to the amendment of Schedule 2.1(e) as contemplated pursuant to the last paragraph of this Section 2.1.

(f)     All Permits listed on Schedule 2.1(f), but only to the extent such Permits may be transferred under applicable Law;

(g)     All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Business or any Purchased Assets;

(h)     All rights with respect to prepaid expenses, credits, advance payments, security, deposits, charges, sums, and any cash collateral used to secure surety bonds, performance bonds or other transactional assurances to the extent related to the Business or any Purchased Assets, including without limitation, any deposits made by the Sellers to any third parties;

(i)     Originals, or where not available or to the extent retained by Sellers for Tax purposes, copies, of all books and records, files and papers including books of account, ledgers and general, financial and accounting records, supplier lists, production data, quality control records and procedures, patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), strategic plans, internal financial statements and marketing and promotional surveys, material and research, documentation relating to the Transferred Intellectual Property Rights, and other similar documents and records, that relate to the Business or the Purchased Assets;

(j)     Copies of all Tax records;

(k)     All rights to any Legal Proceedings, credits, allowances, rebates, or rights of setoff (other than against Sellers or any of their Affiliates) or claim of any nature available to or being pursued by Sellers arising out of or relating to the Business or any of the Purchased Assets or Assumed Liabilities, whether arising by way of counterclaim or otherwise, including but not limited to (i) claims for breach of contract, or breach of fiduciary duty or tort claims and (ii) all of Sellers' claims or causes of action, including those vested in any Seller under Sections 541, 542, 544, 545, 547, 548 and 549 (and, to the extent applicable for remedies, Sections 550 and 551) of the Bankruptcy Code;

(l)      All Accounts Receivable (whether billed or unbilled), and any security, claim, remedy or other rights related to such Accounts Receivable or to the collectability thereof;

(m)      All Improvements;

(n)      All rights to the telephone and facsimile numbers and email addresses used by Sellers;

(o)      All Insurance Policies that may be transferred or assigned to Purchaser, except to the extent included as a Retained Asset on Schedule 2.2(c), including but not limited to the rights to make, administer and settle claims under any such Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), and (ii) the amount of, and all rights to any insurance proceeds received by Sellers under any such Insurance Policies after the date hereof in respect of any loss, liability, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities.

(p)      All rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties (including, any non-disclosure or confidentiality, non-compete or non-solicitation agreements entered into in connection with an Auction (as defined in the Bidding Procedures Order)), in each case, which relate to the Business or any of the Purchased Assets or Assumed Liabilities;

(q)      All unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to the Business or any Purchased Asset or Assumed Liability, including any item of real property, personal property or equipment;

(r)      All employee and personnel records, including all current employment eligibility verification form and related records, documents and papers, of the Transferred Employees;

(s)      Any assets, attributes and claims against any Person for refunds or credits with respect to any Taxes, net of any offsets by Governmental Authorities;

(t)      All rights in or under the Seller Plans that are maintained, sponsored, or contributed or required to be contributed to by Sellers for the benefit of any Transferred Employee, as set forth on Schedule 2.1(t) (each, an "*Assumed Seller Plan*"), including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith; provided that, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(t) after the date hereof but no later than (i) with respect to health and welfare Seller Plans, the later of (i) thirty (30) days following the date hereof and (ii) five (5) Business Days following the grant or denial of the consents contemplated by Section 7.2(h) and (ii) with respect to other Seller Plans, thirty (30) days following the date hereof in order to (x) add any Seller Plan to such Schedule 2.1(t) and it shall be automatically included as an Assumed Seller Plan for purposes of this Agreement or (ii) remove any Assumed Seller Plan from such Schedule 2.1(t) and it shall be automatically deemed a Retained Asset for purposes of this Agreement;

(u)      All equity interests of Benevis LLC Protected Cell Series 2019-10 (a series of Maple Shade Assurance, LLC) (the "***Benevis Protected Cell Series***"), provided that, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, at any time prior to the date that is the later of (i) thirty (30) days following the date hereof and (ii) five (5) days following the grant or denial of the consents contemplated by Section 7.2(g), amend or revise this Section 2.1(u) to remove such equity interests of the Benevis Protected Cell Series from the Purchased Assets and it shall be automatically deemed a Retained Asset for purposes of this Agreement; and

(v)      All goodwill, patient and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the assets described in the foregoing clauses, the Assumed Liabilities and/or the Business.

Notwithstanding anything in this Agreement to the contrary, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(e) (i) at any time prior to the Closing Date, in order to add any Contract to such Schedule 2.1(e) and it shall be automatically included as an Assumed Contract for purposes of this Agreement, or remove any Contract to such Schedule 2.1(e) and it shall be automatically be deemed a Retained Contract for purposes of this Agreement, and (ii) at any time after the Closing Date to remove any Contract from such Schedule 2.1(e) in the event that after Closing, (A) the Bankruptcy Court determines (or the parties otherwise agree) that the actual Cure Costs exceed the estimated Cure Costs listed on Schedule 5.13(a), or (B) a timely filed objection to a Cure Cost or to Purchaser's assumption and assignment of a Contract is not resolved, and such removed Contract shall be automatically deemed a Retained Contract for purposes of this Agreement; provided that Purchaser has notified Sellers in writing of the removal of any such Contract no later than thirty (30) days following the determination of the actual Cure Cost of such Contract. Furthermore, if it is discovered that a Contract should have been listed on Schedule 5.13(a) but was omitted therefrom (an "***Omitted Contract***"), Sellers shall, promptly following discovery thereof (but in no event later than three (3) Business Days after such discovery), (x) notify Purchaser in writing of such Omitted Contract and the corresponding related Cure Costs thereof (if any) and (y) if requested by Purchaser in writing, file a motion with the Bankruptcy Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract in accordance with this Section 2.1 (provided that no Omitted Contract shall be assumed by and assigned to Purchaser unless such Omitted Contract shall be accepted at such time in writing by Purchaser as an Assumed Contract).  With respect to each Assumed Contract, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract to the applicable counterparty to such Assumed Contract.

2.2      Retained Assets. Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include any of the following assets, properties or rights (collectively, the "***Retained Assets***"):

(a)      The Wind Down Amount;

(b)      All rights of Sellers under this Agreement, the Transaction Documents or the Retained Contracts;

(c)       (i) All Insurance Policies of each Seller set forth on <u>Schedule 2.2(c)</u>, and all credits, premium refunds, proceeds, causes of action or rights arising thereunder in respect of any loss, liability, destruction or condemnation of any Retained Assets occurring prior to, on or after the Closing or relating to any Retained Liabilities, (ii) any and all insurance refunds or claims made under any Insurance Policies relating to the Purchased Assets or the Assumed Liabilities on or before the Closing Date, and (iii) the amount of, and all rights to any insurance proceeds under any Insurance Policies received by either the Sellers or Purchaser after the date hereof in respect of the loss, destruction or condemnation of any Retained Assets occurring prior to, on or after the Closing or relating to any Retained Liabilities;

(d)       The Organizational Documents, minute books, qualifications to conduct business as a foreign corporation or limited liability company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, personnel records, stock records and Tax Returns of Sellers and other similar books and records, financial records, books of account, bank and brokerage records and statements and any other books and records which Sellers are prohibited from disclosing or transferring to Purchaser under applicable Law or are required by applicable Law to retain;

(e)       All shares of capital stock or other equity interests issued in or issued by a Seller;

(f)       All nontransferable Permits;

(g)       All Contracts of Sellers other than the Assumed Contracts;

(h)       All Seller Plans and any assets of any Seller Plan or any right, title or interest in any of the assets thereof or relating thereto (other than Assumed Seller Plans);

(i)       All Avoidance Actions that are not otherwise Purchased Assets as described in <u>Section 2.1</u>; and

(j)       The assets, properties and rights specifically set forth on <u>Schedule 2.2(j)</u>.

**ARTICLE III**
**ASSUMPTION OF LIABILITIES**

3.1       <u>Assumed Liabilities</u>. Purchaser shall assume no obligation or other liability of any Seller, or of any predecessor or any Affiliate of any Seller, other than the obligations and other liabilities explicitly set forth in this <u>Section 3.1</u>. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective as of the Closing Date, to assume, pay, perform and discharge when due (subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities are owed), only the following liabilities, responsibilities and obligations of Sellers existing as of the Closing Date (collectively, the "***Assumed Liabilities***"):

(a)       All of Sellers' liabilities, responsibilities and obligations under the Assumed Contracts;

(b)      All claims, liabilities, responsibilities, obligations, costs and expenses arising in any way out of the operation of the Business or the ownership or operation of the Purchased Assets but solely to the extent first arising on or after the Closing Date, including, without limitation, any and all Taxes arising out of or attributable to the operation or ownership of the Purchased Assets and the Business so long as such Taxes have both arisen and become due and payable following the Closing Date; and

(c)      All Cure Costs, subject to the last paragraph of Section 2.1.

3.2      Retained Liabilities. Notwithstanding anything to the contrary in this Agreement or the Transaction Documents, Purchaser shall not assume or be obligated for any liabilities, Claim, Encumbrance or obligations of any and every kind whatsoever, direct or indirect, known or unknown, absolute or contingent, or whatever nature, whether presently in existence or arising hereafter, not expressly assumed by Purchaser under Section 3.1 and shall under no circumstances be liable or responsible for any liabilities (other than the Assumed Liabilities) of any Seller, or any predecessor or Affiliate thereof, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place prior to the Closing. Purchaser shall not be a successor in interest to any of the Sellers for any purpose and is not answerable for any successor liability Claims. Sellers shall retain all liabilities, responsibilities and obligations of Sellers not specifically included in the Assumed Liabilities (all such liabilities, responsibilities and obligations not being assumed being herein referred to, collectively, as the "***Retained Liabilities***"). For the avoidance of doubt, the Retained Liabilities shall include, without limitation each of the following items:

(a)      Any liability which is not expressly listed as an Assumed Liability in Section 3.1, including any Claims under Section 503 and 507 of the Bankruptcy Code;

(b)      Any liabilities of any of the Sellers not related to the operation of the Business or the Purchased Assets;

(c)      Any and all liabilities for Taxes, except as otherwise provided in Section 3.1(b) or ARTICLE X;

(d)      Any liabilities relating to or arising out of the Retained Assets;

(e)      Any liabilities in respect of any Retained Contracts, including any liabilities arising out of the rejection of any such Contracts pursuant to section 365 of the Bankruptcy Code;

(f)      Any liabilities to any current or former equityholder or Affiliate of any Seller;

(g)      Any liabilities relating to investigations, Claims or other Legal Proceedings (including any workers' compensation matters and all liabilities arising in connection therewith) which arise out of, relate to or otherwise are in respect of (i) the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing Date, and/or (ii) any violation of any applicable Law or Order by any of the Sellers (or their respective Affiliates);

(h)     Any liabilities arising from the ownership or operation of the Business and/or the Purchased Assets prior to the Closing, including, (i) in respect of indebtedness (including arising under any intercompany loan arrangements or promissory notes), and (ii) all accounts payable (including vendor trade payables) that are not Assumed Liabilities pursuant to Section 3.1(a);

(i)     Any Excluded Employee Liability, except with respect to such liabilities arising under an Assumed Contract;

(j)     Any costs, fees, commissions, expenses and other liabilities owing to any broker, investment banker, financial or restructuring advisor, outside counsel, auditing firm or consultant retained by or on behalf of any Seller (or any of its Affiliates), whether relating to or arising out of the Transactions or otherwise, except as otherwise permitted in the DIP Order;

(k)     Any liability of any Seller with respect to any Lien (except Permitted Liens) (including with respect to the Business and/or the Purchased Assets, to the extent arising out of or relating to the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing); and

(l)     Any liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of any Seller (or any of its Affiliates) (including with respect to any breach of fiduciary obligations by same).

## ARTICLE IV
## CONSIDERATION

4.1     Purchase Price. The total consideration to be paid by Purchaser to Sellers for the Purchased Assets (the "***Purchase Price***") is: (a) a credit bid on a dollar-for-dollar basis of the Purchaser Secured Claims (the "***Credit Bid Amount***"); (b) the payment by Purchaser of the Cure Costs, and (c) the assumption by Purchaser of the Assumed Liabilities.

4.2     Allocation of Purchase Price. The Purchase Price will be allocated for Tax purposes among the Purchased Assets in accordance with Section 1060 of the Code, as determined by Purchaser after consultation with Sellers, and Purchaser shall deliver to Sellers the allocation within one hundred (100) days after Closing. Purchaser and Sellers shall not take any positions that are inconsistent with this allocation unless required to do so by applicable Law.

4.3     Cure Costs. Purchaser shall as promptly as reasonably practicable or thereafter upon assumption of the applicable Assumed Contract, pay all Cure Costs associated therewith (if any).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing, as follows:

5.1     Organization and Good Standing.

(a)     Each of LT Smile Holdings, LLC, Benevis Affiliates, LLC, Benevis, LLC, and Benevis Informatics, LLC are limited liability companies duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)     Each of LT Smile Corporation, Benevis Holding Corp., and Benevis Corp. are corporations duly organized, validly existing and in good standing under the laws of the State of Delaware.

(c)     Schedule 5.1(c) sets forth a list of each of the professional corporations or organizations to which the Sellers provide any management services (the "***Supported Entities***"), the state where each Supported Entity is incorporated or organized, and each state in which each Supported Entity is authorized to do business. Each shareholder of the Supported Entities is duly licensed to practice dentistry in the states set forth next to such shareholder's name on Schedule 5.1(c).

(d)     Each Seller and Supported Entity is, and to Seller's Knowledge the Benevis Protected Cell Series is, duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the ownership of Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (a) would not adversely affect the ability of a Seller to carry out its obligations under this Agreement or the Transaction Documents and to consummate the Transactions, and (b) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, the Purchased Assets or the Assumed Liabilities.

5.2     Power; Authority; Enforceability. Each Seller has full corporate or limited liability company power, as applicable, to:  (a) own, lease and operate the Purchased Assets and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) execute, deliver and perform this Agreement, the Transaction Documents and all other agreements and documents to be executed and delivered by such Seller in connection herewith (the "***Seller Documents***"), subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.  All requisite actions to approve, execute, deliver and perform this Agreement and the Seller Documents have been taken by Sellers. This Agreement and each of the Seller Documents have been duly executed and delivered by such Seller and constitute binding obligations of such Seller, enforceable against each such Seller, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting creditors' rights generally and by principles of equity.

5.3     Title to Assets. Sellers have or will have as of immediately prior to the Closing good and valid title to, or, in the case of leased or subleased Purchased Assets (including the Leased Real Property), valid and subsisting leasehold interests in, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens). Upon consummation of the Transactions at the Closing and subject to the entry of the Sale Order, Seller will convey such title to or rights to use, all of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens) to Purchaser.  Except for the Retained Assets, the Purchased Assets constitute all

of the assets, rights, interests, claims and properties used in (to the extent Sellers hold rights, title and interest in such tangible personal property) or held for use in the conduct of the Business, or otherwise necessary for Purchaser to conduct and operate the Business immediately after the Closing in all material respects as presently conducted by Sellers.  All tangible Purchased Assets are located on the Leased Real Property.

5.4     <u>Noncontravention; Governmental Filings</u>. Subject to the entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement and the Transaction Documents and the consummation of the Transactions do not and will not (a) violate any Seller's Organizational Documents or (b) assuming compliance with the matters referred to in the last sentence of this <u>Section 5.4</u>, to the Knowledge of Sellers, violate any applicable Law (including, for the avoidance of doubt, with respect to the assignment and assumption of the equity interests of the Benevis Protected Cell Series, subject to <u>Section 2.1(u)</u>). Subject to the entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement, the Transaction Documents and the consummation of the Transactions by Sellers require any action by or in respect of, notification to or filing with, any Governmental Authority other than (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (ii) Healthcare Regulatory Consents (if any).

5.5     <u>Litigation</u>. Except as disclosed on <u>Schedule 5.5</u>, as of the date hereof, there are no Legal Proceedings pending against or, to the Knowledge of Sellers, threatened in writing against any Seller, or manager, director, officer or key employee of any Seller or Supported Entity involving, relating to or affecting, the Purchased Assets, Assumed Liabilities or the Business before any Governmental Authority which (a) if determined adversely to any such Seller or Supported Entity, would be, individually or in the aggregate, material with respect to the Purchased Assets, Assumed Liabilities or the Business, or (b) questions the validity of this Agreement, any Transaction Document or the Transactions, or in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

5.6     <u>Permits</u>. <u>Schedule 5.6</u> sets forth a complete and correct list of all Permits required to own the Purchased Assets and conduct and operate the Business in a manner consistent with the current practices of Sellers in the Ordinary Course of Business.  Except as set forth on <u>Schedule 5.6</u>, (a) each Seller and to the Knowledge of Seller, each Supported Entity (if applicable) has obtained and is in material compliance with the terms and requirements of each Permit and (b) each such Permit is valid and is presently in full force and effect; and no written notice of revocation, modification, refusal to renew or violation of any Permit has been received from any Governmental Authority and no Legal Proceeding is pending (or threatened) seeking to revoke, suspend, modify, cancel or limit any such Permit. The provisions of this <u>Section 5.6</u> shall not be deemed to apply to Health Care Laws and Health Care Permits or to any matters covered by <u>Section 5.9</u>.

5.7     <u>Intellectual Property Rights</u>.

(a)     <u>Schedule 5.7(a)</u> sets forth all Transferred Intellectual Property Rights that are registered with any Governmental Authority or authorized registrar or for which an application for registration with any Governmental Authority or authorized registrar has been filed as of the date hereof, in each instance enumerating the applicable application number, registration number,

title, date of filing, date of issuance, and owner (collectively, the "**Registered Transferred Intellectual Property Rights**"). To the Knowledge of Sellers, all Registered Transferred Intellectual Property Rights is subsisting and in full force and effect.

(b)     A Seller is the sole and exclusive legal, beneficial, and with respect to Registered Transferred Intellectual Property Rights, record owner of all right, title and interest in and to the Transferred Intellectual Property Rights, free and clear of all Liens (except Permitted Liens). To the Knowledge of Sellers, all of the Transferred Intellectual Property Rights are valid and enforceable, and constitute all of the Intellectual Property Rights owned, used or held for use by any Seller in connection with the Business or otherwise necessary to operate the Business as presently conducted by the Sellers (and as conducted in the Ordinary Course of Business).

(c)     Except as disclosed on Schedule 5.7(c), to the Knowledge of Sellers, (i) the conduct of the Business by Sellers as currently conducted (including the products and services sold or provided by Sellers) does not infringe, misappropriate or otherwise violate any Person's Intellectual Property Rights, and no such claims are pending or threatened in writing against any Seller, and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property Rights included in the Purchased Assets, and no such claims are pending or threatened in writing against any Person by any Seller.

(d)     To the Knowledge of the Sellers, (i) no Seller has experienced any material failures, disruptions, unauthorized intrusions or breaches of its information technology or telecommunications networks, nor any material loss, theft or unauthorized access to or use of any personal information held by or on behalf of such Seller, and (ii) each Seller has implemented industry standard security measures to protect the security of its information technology and telecommunications networks and systems and the privacy and security of any material data or personal information stored thereon.

5.8     Compliance with Laws. Each Seller and to the Knowledge of Sellers, each Supported Entity is, and for the past six (6) years has been, in compliance and has not been in violation of any Law (other than Healthcare Laws) applicable to the Purchased Assets, the Assumed Liabilities or the conduct of the Business, except for violations or instances of non-compliance, which do not or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, the Purchased Assets or the Assumed Liabilities.

5.9     Healthcare Regulatory Matters.

(a)     Except as set forth on Schedule 5.9(a), each Seller and, to the Knowledge of Sellers, each Supported Entity is and has at all times been in compliance in all material respects with all Health Care Laws.  Except as set forth on Schedule 5.9(a), to the Knowledge of Sellers, there has been no threatened material legal proceedings or actions relating to non-compliance by, or liability of, the Sellers or any Supported Entity under any Health Care Law.  Except as set forth on Schedule 5.9(a), no Seller and to the Knowledge of Sellers, no Supported Entity has (a) been the subject of any inspection, investigation, survey, audit, monitoring or other form of review by any Governmental Authority in the last four (4) years, except in the Ordinary Course of Business; or (b) been served with or received any search warrant, subpoena, civil investigation demand, or

contact letter by or from any Governmental Authority with regard to any alleged or actual violation of applicable Health Care Laws by any Seller or Supported Entity.

(b)　　Schedule 5.9(b) sets forth a complete list of the material Health Care Permits of the Sellers and to the Knowledge of Sellers, each of the Supported Entities.  Each Seller and to the Knowledge of Sellers, each Supported Entity owns, holds, and possesses, and has at all times owned, held and possessed, all material Health Care Permits required for the conduct of its business as presently conducted.  No Seller and to the Knowledge of Sellers, no Supported Entity has received written notice that any Governmental Authority is considering limiting, suspending, terminating, adversely amending or revoking any such Health Care Permit.  All such Health Care Permits are, and have at all times been, valid and in full force and effect and Sellers and to the Knowledge of Sellers, the Supported Entities are in material compliance with the terms and conditions of all such Health Care Permits.

(c)　　Except as set forth on Schedule 5.9(c), to the Knowledge of Sellers, the Supported Entities and each licensed professional or other individual employed by or contracted with the Supported Entities who otherwise provides health care services through the Supported Entities (the "***Practitioners***") are, and have been, during the past four (4) years, in material compliance with the requirements of participation and coverage of, and where applicable are parties to valid supplier or other participation agreements for payment by, Medicaid, any other state or Government Programs, any private insurance company, health maintenance organization, preferred provider organization, managed care organization or government contracting agency (collectively, the "***Programs***") to the extent they bill or receive reimbursement from a particular Program in connection with services provided as an employee or agent of the Sellers and Supported Entities.  Within the past four (4) years, no Seller and to the Knowledge of Sellers, no Supported Entity has received any written notice from any Program that such Program is to be cancelled or modified in a manner materially adverse to the Sellers and Supported Entities.

(d)　　No Seller and to the Knowledge of Sellers, no Supported Entity nor any Practitioner: (a) is, or was a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, (b) has any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (c) except as set forth on Schedule 5.9(d), has ever received any subpoena, or been indicted or charged or investigated in connection with any material violation of any Health Care Law, or (d) is or was excluded or debarred from any Program.

(e)　　No Seller nor any of its directors, managers, officers or employees and to the Knowledge of Sellers, no Supported Entity nor any of its directors, managers, officers, employees or Practitioners, has engaged in any of the following during the last four (4) years:  (a) knowingly and willfully soliciting, paying, or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (i) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Government Program, or (ii) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Program; (b) presenting or causing to be presented a claim for reimbursement for services that is for an item or service that was known or should have

been known to be (i) not provided as claimed, or (ii) false or fraudulent; or (c) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation of a material fact or omitting a material fact required to be stated therein, or necessary to make the statements contained therein not misleading, with respect to information required to be provided under 42 U.S.C. §1320a-3.

(f)     To the Knowledge of Sellers, each Practitioner is, and has been in the last four (4) years, duly licensed to practice in the state in which he or she provides services and, each such Practitioner who is or was permitted by law to dispense or prescribe drugs has been during the last four (4) years and is validly registered with the United States Drug Enforcement Administration under the Controlled Substances Act.  To the Knowledge of Sellers, no event has occurred during such period and no fact, circumstance or condition exists that has or reasonably may be expected to result in the denial, loss, revocation, or rescission of or to such professional licenses.

(g)     Each Seller and to the Knowledge of Sellers, each Supported Entity has instituted a compliance program designed to promote compliance with all applicable Health Care Laws applicable to the operations of Sellers and the Supported Entities, and to detect, prevent and address violations of such Laws that includes policies, procedures and training (including on HIPAA and other relevant matters). Sellers operate in material compliance with such compliance program.

(h)     To the Knowledge of Sellers, all billing practices and billings by the Supported Entities for services, including billings to all Government Programs and other Programs, have been true and correct in all material respects and in material compliance with all applicable Health Care Laws. To the Knowledge of Sellers, Schedule 5.9(h) sets forth all notices, subpoenas and material correspondence related to billing, utilization, reimbursement or other government or third party audits or investigations targeted at the Supported Entities, currently in process, other than such correspondence received in the Ordinary Course of Business.  To the Knowledge of Sellers, except as permitted by Law, none of the Supported Entities have waived or discounted patient responsibility for any services provided by any of the Supported Entities or have engaged in any "balance billing" unless permitted contractually and by Law.  Except as set forth in Schedule 5.9(h), to the Knowledge of Sellers, no Program or Government Program has requested, asserted or threatened any material recoupment, refund, or set-off from any Supported Entity.  To the Knowledge of Sellers, no Supported Entity has received an overpayment by any Governmental Authority, including any intermediary or carrier, which has not been timely repaid to such Government Program, and all material undisputed refunds, discounts and adjustments that such Supported Entity has identified, and been obligated to pay under applicable Law pertaining to Governmental Programs or any applicable Health Care Laws, have been repaid. Except as set forth on Schedule 5.9(h), to the Knowledge of Sellers, no Supported Entity has retained any overpayment from any Program.

(i)     Schedule 5.9(i) sets forth a complete and correct list of all business continuity agreements ("**Business Continuity Agreements**" or "**BCAs**") among (i) each Supported Entity, (ii) certain Practitioners who own equity interests in a Supported Entity and (iii) certain other Practitioners who own equity interests in such Supported Entity (collectively, the "**Dentist Partners**").  Except as set forth on Schedule 5.9(i), for the last four (4) years, to the Knowledge of

the Sellers, each BCA is valid and enforceable and none of the Dentist Partners have given written notice of, and to the Knowledge of Sellers, none of the Dentist Partners have orally expressed plans to act in contravention of the BCAs or any other ancillary agreements related to the operations of a Supported Entity, in any manner which would reasonably be expected to have a Material Adverse Effect.

5.10   Employees.

(a)   Schedule 5.10 sets forth a complete and correct list of all Business Employees as of the date hereof, including each Business Employee's (a) annual compensation or rate of pay, as applicable (as of the date hereof), (b) employment agreement (if any), (c) employment location (city and state), (d) title or employment position, (e) date of hire or, if applicable, date of rehire, (f) applicable paymaster/payroll entity, and (g) the amount of accrued but unused vacation or paid time off as of the date hereof, with each such individual identified as (i) salaried or hourly, (ii) exempt or nonexempt, (iii) union or nonunion, (iv) full-time or part-time, (v) temporary, regular or leased/staffing agency and (vi) active or inactive (with the reason for such inactive status specified, e.g., leave of absence, FMLA, disability, layoff, etc.).

(b)   (i) Neither Sellers nor any of their respective Affiliates is, or has ever been, a party to or bound by any union collective bargaining agreements or other labor contracts covering any Business Employee, there are no unions or similar labor organizations representing or purporting to represent or, to the Knowledge of Sellers, attempting to represent, any Business Employee and no Business Employee is attempting, or has attempted, to form a union or similar labor organization; (ii) neither Sellers nor any of their respective Affiliates are experiencing or have experienced in the three (3) years prior to the date of this Agreement, any material labor disputes or work stoppages due to labor disputes in connection with their business and operations and there is not currently, and has not been in the three (3) years prior to the date of this Agreement, any labor strike, dispute, slow down or stoppage actually pending or, threatened against Sellers or any of their respective Affiliates; (iii) neither Sellers nor any of their respective Affiliates have in the three (3) years prior to the date of this Agreement engaged in any unfair labor practices within the meaning of the National Labor Relations Act with respect to its employees or other individuals who provide services that support the business and operations; (iv) neither Sellers nor any of their respective Affiliates have (A) in the ninety (90) days preceding the date of this Agreement implemented any mass layoffs, plant closings or shutdowns as defined under the WARN Act or (B) incurred any liability or obligation under the WARN Act that remains unpaid or unsatisfied; (v) there are no pending employment discrimination, employee health and safety, unfair labor practice, wage and hour, unemployment compensation, worker's compensation, immigration, union grievance or other employment-related claims, citations, proceedings or, to the Knowledge of Sellers, investigations or allegations against Sellers, any of the Supported Entities or any of their respective Affiliates; and (vi) Sellers and their respective Affiliates have complied in all material respects with all applicable legal requirements relating to employment and employment practices, including all legal requirements respecting terms and conditions of employment, wages, hours, classification of employees, including for minimum wage, overtime, and independent contractor purposes, discrimination in employment, immigration, occupational health and safety, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations and collective bargaining and are not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing. To the Knowledge of

Sellers, in the last four (4) years, no allegations of sexual or other unlawful harassment or discrimination have been made against (i) any officer of Sellers or any of the Supported Entities or (ii) any Business Employee receiving annualized total compensation of $150,000 or more. Sellers, the Supported Entities and their respective Affiliates have correctly classified each of its respective service providers as "partners", "employees" or "independent contractors" and as "exempt" or "non-exempt" for all purposes and has properly reported all compensation paid to such service providers for all purposes.

      5.11   <u>Employee Benefit Plans</u>.

      (a)   <u>Schedule 5.11(a)</u> contains a complete and accurate list of all Seller Plans. Seller has provided to, or made available to, Purchaser true, correct and complete copies of each Seller Plan (including all plan documents and amendments thereto) including (i) each plan document, and in the case of an unwritten plan, a written description thereof, (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the most recently filed annual report (Form 5500 and all schedules thereto), (v) the most recent Internal Revenue Service determination or opinion letter, (vi) the most recent summary annual report, actuarial report, financial statement and trustee report and (vii) any material correspondence with a Governmental Authority. There are no pending or, to the Knowledge of Sellers, threatened claims, litigation or other proceedings with respect to any Seller Plan, other than ordinary and usual claims for benefits by participants and beneficiaries.

      (b)   Each Seller Plan (and any related trust or other funding vehicle) has been established, maintained, funded, operated and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws and there has been no written notice issued by any Governmental Authority questioning or challenging such compliance, and there are no audits, examinations, investigations or other legal proceedings (other than non-material routine claims for benefits) pending, or, to the knowledge of Sellers, threatened, involving any such Seller Plan or the assets of any such Seller Plan. Except as could not be reasonably expected to result in any material liability, no Seller Plan is subject to any audit, investigation, or examination by any Governmental Authority and no such actions are pending or, to the knowledge of Sellers, threatened with respect to any Seller Plan.

      (c)   Each Seller Plan which is intended to be qualified within the meaning of Code Section 401(a) is so qualified and has received, or timely requested, a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and its trust is exempt from federal taxation under Code Section 501(a), and to the knowledge of Sellers nothing has occurred that is reasonably likely to adversely affect the qualified status of such Seller Plan.

      (d)   Except as set forth on <u>Schedule 5.11(d)</u>, none of Sellers or any of their respective ERISA Affiliates maintains, sponsors, contributes to or is required to contribute to, or has ever maintained, sponsored, contributed to or been required to contribute to: (i) any Multiemployer Plan, (ii) any pension plan subject to Title IV of ERISA, Part 3 of Title I of ERISA or Section 412 of the Code, (iii) any "multiple employer plan" as defined in Section 413(c) of the

Code, (iv) any multiple employer welfare arrangement as defined in Section 3(40) of ERISA, (v) a voluntary employee benefit association under Section 501(c)(9) of the Code, or (vi) any plan which provides, or under which Sellers or any of their respective ERISA Affiliate thereof has any liability to provide, retiree or post-employment life insurance, medical, severance or other employee welfare benefits to any participant, except as required by Section 4980B of the Code or any similar applicable Law and at the sole expense of the applicable participant.

(e)     Neither Sellers nor any of their respective ERISA Affiliates sponsor, maintain, or contribute to, or otherwise have any liability with respect to, any Seller Plan that may not be terminated by Sellers or any of their respective ERISA Affiliates in their sole discretion at any time without material liability.

(f)     Neither the execution nor the delivery of this Agreement or any other document related to the Transaction or other agreement by Sellers or their respective Affiliates, nor the consummation of the Transactions, either alone or in combination with another event, will (i) entitle any Business Employee to any payment; (ii) increase the amount of compensation or benefits due to any Business Employee; (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefits; (iv) result in any obligation or other liability to or obligation or commitment by Purchaser or any of its Affiliates to any Business Employee; or (v) result in any "parachute payment" within the meaning of Code Section 280G or any similar foreign, state or local Laws. No current or former Business Employee or other service provider of the Sellers has a right to receive a gross-up payment with respect to any excise Taxes that may be imposed upon such individual pursuant to Code Section 409A or Code Section 4999 or otherwise.

5.12    Real Property.

(a)     The Leased Real Property constitutes all of the real property (whether leased, subleased or licensed) used by Sellers and the Supported Entities in connection with the Business.  Sellers and the Supported Entities do not own any real property which is used in connection with the Business.

(b)     Schedule 5.12(b) lists each lease or sublease, including all amendments, modifications or supplements thereof, pursuant to which a Seller or Supported Entity occupies any Leased Real Property (collectively, the "***Real Property Leases***").  Sellers have delivered (or otherwise made available) to the Purchaser a true, correct and complete copy of each Real Property Lease, in each case, as amended or otherwise modified and in effect, together with extension notices, lease summaries, notices or memoranda of lease, estoppel certificates and subordination, non-disturbance and attornment agreements related thereto.

5.13    Contracts.

(a)     Schedule 5.13(a) sets forth a list of all executory Contracts and other Contracts material to the Business (including the Real Property Leases) to which any Seller is a party or by which any Seller, the Business or the Purchased Assets are bound or to which the Assumed Liabilities relate, including any Contract under which any Seller continues to have any obligation or liability as of the date of this Agreement, and Sellers' good faith estimate of the Cure

Costs associated with each. Sellers have made available to Purchaser or its Representatives true, complete and correct copies of all material Contracts (including any amendments thereto).

(b)     Other than the obligation to pay Cure Costs (if any) set forth on Schedule 5.13(a), or as a result of (i) rejection by Sellers in the Bankruptcy Cases, (ii) the automatic stay under the Bankruptcy Code, (iii) any consequence of any of the foregoing, and except as set forth on Schedule 5.13(b), with respect to each such Contract no Seller nor, to the Knowledge of Sellers, any Supported Entity that is party thereto, as applicable, or any third party is in default or breach with respect to any obligation to be performed under any such material Contract, except for any breach or default, individually or in the aggregate, that would not reasonably be expected to be material to the Business, the Purchased Assets, or the Assumed Liabilities. Each such Contract is valid, binding and in full force and effect, enforceable against all applicable Sellers (or any Supported Entity that is party thereto, as applicable) and, to the Knowledge of Sellers, enforceable against the other party or parties thereto, in each case, in accordance with the terms thereof (except (A) as enforcement may be limited by applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, equitable subordination or similar Laws of general application and other Laws affecting creditors' rights generally and (B) insofar as the availability of equitable remedies may be limited by applicable Law).

5.14    Environmental Matters.  Except as set forth on Schedule 5.14, to the Knowledge of Sellers, Sellers are in compliance in all material respects with all applicable Environmental Laws with respect to the Leased Real Property. No Seller is the subject of any outstanding liability in respect of violations of Environmental Laws or any Release of a Hazardous Substances by any Seller. The Sellers have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business, subject to renewal of such Permits in the ordinary course of business.

5.15    Insurance. Schedule 5.15 sets forth a true and complete list of the insurance policies (collectively, the "***Insurance Policies***") maintained by each Seller that cover (or relate to) the Business, the Purchased Assets and/or the Assumed Liabilities. Each of the Insurance Policies are in full force and effect and all premiums due thereon as of the date hereof have been paid. Except as set forth on Schedule 5.15, there are no claims, by or with respect to any Seller pending under any of the Insurance Policies or disputes with insurers with respect thereto. Sellers have made available to Purchaser true, complete and accurate copies of all Insurance Policies. Sellers have not received any written notice of cancellation or non-renewal of, or material reduction of coverage with respect to, any such Insurance Policy.

5.16    Brokers or Finders.  Except as set forth on Schedule 5.16, Sellers have not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

5.17    No Implied or Other Representations or Warranties. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLERS AND ANY OF THEIR RESPECTIVE AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR

IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE PURCHASED ASSETS, AND IT IS UNDERSTOOD THAT EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, PURCHASER TAKES ALL OF SUCH PROPERTIES AND ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.  NEITHER SELLERS NOR ANY STOCKHOLDERS, MEMBERS, EMPLOYEES, MANAGERS, DIRECTORS, OFFICERS OR REPRESENTATIVES OF SELLERS HAVE MADE, AND SHALL NOT BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES IN ANY PRESENTATION OF THE BUSINESS OF SELLERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREIN, AND NO STATEMENT MADE IN ANY SUCH PRESENTATION SHALL BE DEEMED A REPRESENTATION OR WARRANTY HEREUNDER OR OTHERWISE.  IT IS EXPRESSLY UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS, PREDICTIONS OR FORWARD-LOOKING STATEMENTS CONTAINED IN ANY DATA, FINANCIAL INFORMATION, MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS ARE NOT AND SHALL NOT BE DEEMED TO BE OR INCLUDE PRESENTATIONS OR WARRANTIES OF SELLERS OR OF ANY STOCKHOLDER, MEMBER, EMPLOYEE, MANAGER, DIRECTOR, OFFICER, OR REPRESENTATIVE OF SELLERS.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers, as of the date hereof and as of the Closing, as follows:

6.1     Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

6.2     Power; Authority; Enforceability. Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "***Purchaser Documents***"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser, including approval of its board of directors and stockholders (as applicable), necessary for it to validly execute and deliver, this Agreement and each Purchaser Document.  This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by the Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a legal proceeding at law or in equity).  None of the execution

and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

6.3     Consents.

(a)     Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents (if any), (ii) approvals under applicable Laws, if any, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect on the Business or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Transactions.

(b)     The execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will not conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Transactions.

6.4     No Conflicts. No action taken by or on behalf of Purchaser in connection herewith, including, but not limited to, the execution, delivery and performance of this Agreement, and each other agreement and document delivered by it in connection herewith, and consummation of the Transactions, (a) gives rise to a right of termination or acceleration under any Contract to which Purchaser is a party or by which Purchaser is bound; (b) conflicts with or violates (i) any Law; (ii) Purchaser's Organizational Documents; or (iii) any Order to which Purchaser is subject; or (c) constitutes an event which, after notice or lapse of time or both, could result in any of the foregoing, except as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay Purchaser's ability to consummate the Transactions.

6.5     Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened in writing against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions. Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions.

6.6     <u>Brokers or Finders</u>. Purchaser has not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

6.7     <u>Financing</u>. Purchaser has or will have as of the Closing Date adequate cash on hand to enable it to fulfill its obligations under this Agreement.  Purchaser acknowledges and agrees that Purchaser's obligations under this agreement are not contingent on obtaining adequate financing.

6.8     <u>Purchaser's Investigation</u>. Purchaser represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets.  Notwithstanding anything in this Agreement to the contrary, Purchaser acknowledges that it is accepting the Purchased Assets in their present condition and with their present operating capabilities. Purchaser acknowledges that Sellers make no warranty, express or implied or written or oral, as to the condition of the Purchased Assets or as to the accuracy or completeness of any information regarding any Seller, the Business, any Purchased Asset, any Retained Asset, any Assumed Liability, any Retained Liability or the Transactions, including any data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business, the Purchased Assets, the Assumed Liabilities and the Transactions, except as expressly set forth in this Agreement.  Purchaser has not relied upon, and Sellers shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Business or the Purchased Assets, except as may be contained in this Agreement.  Purchaser has inspected, or waived its right to inspect, the Purchased Assets for all purposes and satisfied itself as to their condition.  Purchaser is relying solely upon its own inspection of the Purchased Assets, and Purchaser shall accept all of the same in their "as-is" and "where-is" condition.  Purchaser acknowledges that the representations and warranties of Sellers contained in this Agreement constitute the sole and exclusive representations and warranties of Sellers to Purchaser in connection with this Agreement and the Transactions, and Purchaser acknowledges that all other representations and warranties, including all warranties of merchantability or fitness for a particular purpose, are specifically disclaimed and may not be relied upon or serve as a basis for a claim against any Seller.

## ARTICLE VII
## <u>CONDITIONS TO CLOSING</u>

7.1     <u>Conditions to Obligations of All Parties</u>. The obligation of each Party to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by each Party:

(a)     The Bankruptcy Court shall have issued an Order approving the Bid Procedures Order.

(b)     The Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order.

(c)     There shall be no Order of any nature which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions.

(d)     All Healthcare Regulatory Consents shall have been obtained.

7.2     <u>Conditions to Purchaser's Obligations</u>. The obligation of Purchaser to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waiveable) by Purchaser:

(a)     Each of the Seller Fundamental Representations shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such Seller Fundamental Representations speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except such inaccuracies that, individually or in the aggregate, are de minimis and (ii) all other representations and warranties of Sellers contained in this Agreement or any Transaction Document (but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein) shall be true and correct in all respects at and as of the date hereof and as of the Closing Date as though made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except where the failure of such representations and warranties which are the subject of this clause (ii) to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Sellers shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

(c)     Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(d)     All Permits set forth on <u>Schedule 2.1(f)</u> shall have been transferred to Purchaser as legal and beneficial holder thereof, or, if any Permit is not transferable, a replacement permit or license (as applicable), on substantially similar terms shall have been issued to Purchaser.

(e)     Each Seller shall have delivered to, or caused to be delivered to, Purchaser the following documents, duly executed by such Seller (where appropriate):

(i)     A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)     A duly executed counterpart of the IP Assignment Agreement;

(iii)     A certificate, dated the Closing Date and signed by an authorized officer of such Seller, certifying (A) that the conditions contained in <u>Sections 7.2(a)</u> and <u>(b)</u> have been satisfied, (B) that attached thereto are true and complete copies of all resolutions adopted by the board of directors or managers, as applicable, of such Seller

authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby and (C) the names and signatures of the officers of such Seller authorized to sign this Agreement and the other documents to be delivered hereunder;

(iv)     A copy of the Sale Order;

(v)     Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement;

(f)     Cash, in an amount equal to the Wind Down Amount, shall be retained in an account designated by Sellers, which is a Retained Asset.

(g)     Sellers shall not have applied for, incurred or otherwise received any assistance from the Department of Health and Human Services or any other Governmental Authority in the form of indebtedness, grants or any other form under the Public Health and Social Services Emergency Fund of the Coronavirus Aid Relief and Economic Security (CARES) Act, the Paycheck Protection Program and the Health Care Enhancement Act, or other similar legislation in connection with COVID-19, except as set forth on Schedule 7.2(g).

(h)     If Purchaser has not exercised its right to remove the equity interests of the Benevis Protected Cell Series from the Purchased Assets pursuant to Section 2.1(u), then Sellers shall have (i) obtained all required consents from the applicable parties (including Maple Shade Assurance LLC and Berkley Life and Health Insurance Company), and (ii) made all necessary filings with the applicable Governmental Authority and shall have obtained all Governmental Approvals, in each case for the continued use, operation and management by Purchaser of Benevis Protected Cell Series.

7.3     Conditions to Sellers' Obligations. The obligation of each Seller to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waiveable) by Sellers:

(a)     (i) Each of the Purchaser Fundamental Representations shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such Purchaser Fundamental Representations speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), and (ii) all other representations and warranties of Purchaser contained in this Agreement or the Transaction Documents (but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein) shall be true and correct in all respects at and as of the date hereof and as of the Closing Date as though made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except for such failure to be so true and correct that, individually or in the aggregate, have not had, and would not reasonable be expected to have, a Material Adverse Effect on the ability of Purchaser to consummate the Transactions.

(b)     Purchaser shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c)     Purchaser shall deliver a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Purchased Assets.

(d)     Purchaser shall have delivered to, or caused to be delivered, to Sellers the following documents, duly executed by Purchaser (where appropriate):

(i)     A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)    A duly executed counterpart of the IP Assignment Agreement;

(iii)   A certificate, dated the Closing Date and signed by an authorized officer of Purchaser, certifying (A) that the conditions contained in Sections 7.3(a) and (b) have been satisfied, (B) that attached thereto are true and complete copies of all resolutions adopted by the board of directors or managers of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby and (C) the names and signatures of the officers of Purchaser authorized to sign this Agreement and the other documents to be delivered hereunder; and

(iv)    Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

### ARTICLE VIII
### COVENANTS

8.1     Conduct of the Business.

(a)     From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.2 and the Closing Date, except as expressly set forth on Schedule 8.1(a), Sellers agree to, and agree to use commercially reasonable efforts to cause the Supported Entities to, with respect to the Business: (i) conduct the Business (including the operation thereof) in the Ordinary Course of Business; (ii) use commercially reasonable efforts to preserve the goodwill and present business relationships (contractual or otherwise) with all Supported Entities, customers, patients, suppliers, resellers, employees, licensors, distributors and others having business relationships with the Business; (iii) use their commercially reasonable efforts to keep available the services of the Business' (including the Supported Entities') current officers, directors, employees and consultants; (iv) use their commercially reasonable efforts to preserve and maintain (consistent with past practice) in all material respects the Business' present properties and its tangible and intangible assets (including all of the Purchased Assets); (v)  comply in all

material respects with all applicable Laws and material Contracts; (vi) pay all applicable Taxes as such Taxes become due and payable; and (vii) maintain all existing Permits.

(b)     From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.2 and the Closing Date, except (i) in the Ordinary Course of Business, (ii) as required by applicable Law, (iii) as required by the Bankruptcy Court or this Agreement, (iv) as disclosed on Schedule 8.1(b), or (v) with the prior written consent of Purchaser, Sellers will not, and will use commercially reasonable efforts to cause the Supported Entities not to, with respect to the Business:

(i)     acquire a material amount of assets from (or the equity interests of) any other Person, or sell, lease, license, transfer, encumber or otherwise dispose of any Purchased Assets;

(ii)     modify, amend, supplement or terminate any Assumed Contract;

(iii)     fail to maintain and keep in full force and effect all existing insurance policies for the benefit of the Business or the Purchased Assets (including the Insurance Policies), other than such insurance policies that expire by their terms (in which event Sellers shall use reasonable best efforts to renew or replace such insurance policies) or changes to such insurance policies made in the Ordinary Course of Business;

(iv)     except to the extent required by the terms of the applicable Seller Plan as in effect on the date hereof (excluding any discretionary actions permitted under any Seller Plan), (i) increase the salary, bonus or severance arrangements of any employee or other service provider receiving annualized total compensation of $150,000 or more; (ii) adopt, enter into, amend or terminate any Seller Plan (including any employee benefit plan or arrangement which would be a Seller Plan if entered into as of the date hereof); (iii) exercise any discretion to accelerate the vesting or payment of any compensation or benefit under any Seller Plan; (iv) grant any loan to, increase the compensation or benefits of or pay any material bonus to any employee or other service provider; (v) grant any severance, change of control, retention, termination or similar compensation or benefits to any employee or other service provider; (vi) pay to any employee or other service provider any benefit or amount not required under any Seller Plan as in effect on the date of this Agreement; (vii) hire or terminate the employment of any employee receiving annualized total compensation of $150,000 or more; (viii) transfer the employment of any employee from a status in which such employee would have been a Business Employee to a status in which such employee will not be a Business Employee; or (ix) transfer the employment of any employee from a status in which such employee would not have been a Business Employee to a status in which such employee will be a Business Employee;

(v)     make, revoke or change any Tax election, file any amended Tax Return, revoke or change any Tax accounting method, enter into any closing agreement within the meaning of Section 7121 of the Code, request any Tax ruling with or from a Governmental Authority, surrender any right to claim a Tax refund, offset or other reduction in Tax liability, consent to any extension or waiver of limitations period applicable to any Tax claim or assessment, or settle any Tax proceeding;

(vi)　change any financial accounting policies or procedures or any methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(vii)　(A) materially accelerate collection of notes or Accounts Receivable in advance of their regular due dates or the dates when the same would have been collected in the Ordinary Course of Business; (B) materially delay or accelerate payment of any account payable in advance of its due date or the date such liability would have been paid in the Ordinary Course of Business; (C) make any material changes to cash management policies; or (D) materially delay or postpone the repair or maintenance of the Purchased Assets (including any of the Leased Real Property).

(viii)　adopt any amendments to the Organizational Documents of any Seller;

(ix)　form any new subsidiary of any Seller;

(x)　waive, release, assign, settle or compromise any material pending or threatened Legal Proceeding;

(xi)　demolish or remove any Improvement on the Leased Real Property or erect Improvements on the Leased Real Property or any portion thereof;

(xii)　make or enter into any new commitment for capital expenditures (except as permitted pursuant to the DIP Facility);

(xiii)　subject any of the Purchased Assets to any Lien, except for permitted post-petition liens and any Lien secured and granted pursuant to the DIP Order or a cash collateral order;

(xiv)　take any action with respect to the Purchased Assets, the Assumed Liabilities or the Business relating to, as a result of, or on the basis of, the COVID-19 pandemic, except to the extent required by applicable Law;

(xv)　take any action that would reasonably be expected to cause the failure of any condition contained in Section 7.2 (other than actions taken by Sellers in connection with the discharge of their fiduciary duties during the Bankruptcy Cases); or

(xvi)　agree or commit to do any of the foregoing.

8.2　Access. From the date hereof until the Closing Date, Sellers shall provide Purchaser and its representatives reasonable access, during normal business hours upon reasonable advance notice, to Sellers' personnel, facilities and all books and records and such other information and Persons relating to the Business as Purchaser may reasonably request in such a manner as not to interfere with the conduct of the Business.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to disclose any information to Purchaser if such disclosure would (x) jeopardize any attorney-client or other privilege; or (y) contravene any applicable Law or fiduciary duty.

8.3   Bankruptcy Court Matters.

    (a)    Bankruptcy Court Filings.

        (i)    Sale Order and Bidding Procedures Order. Seller shall seek entry of the Sale Order, the Bidding Procedures Order, and any other necessary orders by the Bankruptcy Court to consummate the Closing as soon as reasonably practicable following the execution of this Agreement. Purchaser and Sellers understand and agree that the Transaction is subject to approval by the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and Bidding Procedures Order, including a finding of adequate assurance of future performance by Purchaser, and furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

        (ii)    Sellers shall file such motions or pleadings as may be appropriate or necessary to: (A) assume and assign the Assumed Contracts, and (B) subject to the consent of the Purchaser, determine the amount of the Cure Costs; provided that nothing herein shall preclude Sellers, subject to Purchaser's prior written consent, from filing such motions to reject any Contracts or Leases that are not listed on Schedule 2.1(e) or that have been designated for rejection by Purchaser.

        (iii)    Sellers shall (A) consistent with their respective obligations as fiduciaries under the Bankruptcy Code, cooperate with Purchaser concerning the Bidding Procedures Order, the Sale Order, and any other orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement, and (B) use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to this Agreement or the transactions contemplated hereby, in advance of the proposed filing date so as to permit the Purchaser sufficient time to review and comment on such drafts and, with respect to all provisions that impact the Purchaser or relate to the transactions contemplated by this Agreement, such pleadings and proposed orders shall be in form and substance acceptable to the Purchaser and materially consistent with this Agreement. Sellers shall give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

    (b)    On the Petition Date, Sellers shall file with the Bankruptcy Court the Bidding Procedures Motion, together with a substantially final form of this Agreement. Sellers shall promptly serve true and correct copies of all applicable pleadings and notices in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable order of the Bankruptcy Court.

8.4     Employee Matters.

(a)     Employees. Purchaser shall offer employment commencing as of the Closing Date to the active Business Employees who are employed as of immediately prior to Closing, on an at-will basis. Each Business Employee who is offered and accepts such offers of employment with Purchaser based on the initial terms and conditions set by Purchaser and further then actually commences employment with Purchaser will become a "**_Transferred Employee_**", with such employment to be effective as of 12:01 a.m. on the Closing Date. Sellers shall terminate, or shall cause to be terminated, effective as of immediately prior to 12:01 a.m. on the Closing Date, the employment of all Transferred Employees. Sellers will reasonably cooperate with any reasonable requests by Purchaser in order to facilitate the offers of employment and delivery of such offers.  Purchaser shall have no obligations, liabilities or responsibilities with respect to any Business Employees who do not become Transferred Employees, and Purchaser shall not be required to maintain any minimum benefit or compensation levels or prevent any change in the employee benefits provided to any Transferred Employees, except as required by Law.  Except as set forth in Section 8.4(b) and Section 8.4(c), Purchaser shall have no liability whatsoever for, and Sellers shall retain and hold Purchaser harmless and indemnify Purchaser with respect to, any and all liabilities (including statutory or contractual severance benefits) with respect to, (i) any compensation or other obligations owing or purported to be owing to any current or former Business Employee or other service provider by any Seller or any Supported Entity, including any severance (including statutory or contractual severance benefits), separation pay, change of control payments or benefits, retention payments or any other payments or benefits arising in connection with the termination of such employee's employment by or such service provider's services to any Seller or any of their respective Affiliates (whether occurring or arising prior to, upon or after the Closing Date) or (ii) any cause of action under the WARN Act by any past or present Business Employee or other service provider (whether or not a Transferred Employee) in connection with such employee's employment with or such service provider's services to any Seller or any of their respective Affiliates (or any other "employment loss" or similar action identified in the WARN Act).  As soon as reasonably practicable following Purchaser's request, and in any event no later than five (5) Business Days prior to the Closing Date, Sellers shall provide Purchaser with a written schedule of each "employment loss" (as defined in the WARN Act) experienced by any Business Employee during the ninety (90) day period prior to the Closing Date (including the location of employment of such employee, and the reason for the employment loss) and such other information as Purchaser may reasonably request to determine whether any actions taken by Sellers prior to, upon or after the Closing Date, or any actions taken by Purchaser upon or after the Closing Date, is reasonably likely to require the delivery of notice or payment in lieu of notice (under the WARN Act or otherwise) to any individuals. Sellers and Purchaser intend that the Transactions shall not constitute a severance or termination of employment of any Business Employee prior to or upon the Closing for purposes of any severance or termination benefit plan, program, policy, agreement or arrangement of Sellers, and that Transferred Employees shall have continuous and uninterrupted employment immediately before and immediately after the Closing.

(b)     Sellers and Purchaser hereby agree to follow the standard procedure for employment Tax withholding as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35. Accordingly, Sellers shall have employment tax reporting responsibilities for the wages and other compensation paid by or on behalf of Sellers to Business Employees and Purchaser shall have

employment tax reporting responsibilities for the wages and other compensation paid by or on behalf of Purchaser to Transferred Employees.

(c)     Sellers shall be liable for all workers' compensation short- and long-term disability, medical, prescription drug, dental, vision, life insurance, accidental death and dismemberment and other welfare benefit claims ("***Welfare Claims***") incurred (i) at any time by the Business Employees and their eligible dependents who are not Transferred Employees, or (ii) on or prior to the Closing Date by the Transferred Employees and their eligible dependents.  With respect to Welfare Claims incurred after the Closing Date by the Transferred Employees and their eligible dependents, Purchaser shall be solely responsible.  For these purposes, a Welfare Claim shall be deemed to be incurred: (A) in the case of workers' compensation and short-term disability benefits, at the time of the injury, sickness or other event giving rise to the claim for such benefits; (B) in the case of medical, prescription, drug, dental or vision benefits, at the time the professional services, equipment or prescription drugs covered by the applicable plan are obtained; (C) in the case of life insurance benefits, upon death; and (D) in the case of accidental death and dismemberment benefits, at the time of the accident.  In the case of workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained on or prior to the Closing Date, including injuries sustained after the Closing Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Closing Date or arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Sellers' facilities and which are alleged to have been sustained or contracted on or prior to the Closing Date, such workers' compensation claims shall be deemed to be incurred prior to the Closing Date.

(d)     Sellers shall be solely responsible for compliance with the requirements of Section 4980B of the Code and Part 6 of Subtitle I of ERISA, including provision of continuation coverage (within the meaning of COBRA), with respect to all Business Employees, and their respective eligible spouses and dependents, for whom a qualifying event (within the meaning of COBRA) occurs at any time on or prior to the Closing Date (including qualifying events that occur in connection with the Transactions).  Purchaser shall be responsible for compliance with such health care continuation requirements with respect to all Transferred Employees and their respective eligible spouses and dependents for whom a qualifying event (within the meaning of COBRA) occurs after the Closing Date.

(e)     For purposes of determining the number of vacation days to which each Transferred Employee shall be entitled during the calendar year in which the Closing Date occurs, Purchaser shall assume and honor all vacation days accrued or earned but not yet taken by such Transferred Employee as of the Closing Date that are not cashed out in connection with such Transferred Employee's termination of employment with Sellers.  To the extent that a Transferred Employee is entitled under applicable Law to be paid for any vacation days accrued or earned but not yet taken by such Transferred Employee as of the Closing Date, the applicable Sellers shall pay to each Transferred Employee all amounts in respect of vacation days and other paid time off accrued but not taken by such Transferred Employee on or prior to the Closing Date and Purchaser shall have no obligation to honor such accrued vacation days or paid time off after the Closing Date.

(f)     The Parties shall reasonably cooperate in good faith to assign to the Purchaser all Assumed Seller Plans, including all related pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith, in each case effective as of the Closing. If the Purchaser's assumption of one or more Assumed Seller Plans is not practicable, the Parties shall reasonably cooperate in good faith to permit the transfer of the applicable assets of the applicable Seller Plan(s) related to the Transferred Employees to the corresponding Purchaser employee benefit plan(s) in accordance with the intent of this Agreement. The Parties shall cooperate in good faith to enter into such amendments to this Agreement as are necessary to effectuate the actions contemplated pursuant to this Section 8.4(f).

(g)     If requested by Purchaser in a writing delivered to the Sellers following the date hereof and no later than thirty (30) days following the date hereof, Sellers shall adopt resolutions to terminate, effective as of no later than the day before the Closing Date, any Seller Plan that is a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (a "Seller 401(k) Plan"). Sellers shall provide Purchaser with a copy of the resolutions and any plan amendments, notices and other documents prepared to effectuate the termination of the Seller 401(k) Plans in advance and give Purchaser a reasonable opportunity to comment on such documents in advance (which comments shall be considered in good faith), and prior to the Closing Date, Sellers shall provide Purchaser with the final documentation evidencing that the Seller 401(k) Plans have been terminated effective as of no later than the day before the Closing Date.

(h)     Following the date of this Agreement, Sellers and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this Section 8.4, including (i) exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverages and any information that is reasonably necessary to affect their respective Tax withholding, accounting and reporting obligations under applicable Law, (ii) in obtaining any governmental approvals required hereunder, (iii) in responding to reasonable questions posed by employees, labor unions, employee representatives or any other persons or entities, (iv) providing offers of employment to the Business Employees and (v) transferring to Purchaser, no later than the Closing Date, all employee records, including all current employment eligibility verification form and related records, documents and papers, of the Transferred Employees.

(i)     The Parties shall reasonably cooperate in good faith with respect to any communications to Business Employees regarding the Transactions.  Sellers will provide Purchaser with a reasonable opportunity to review and comment on any communications intended for the Business Employees that it desires or has to send to Business Employees prior to the Closing Date.  Purchaser will provide Sellers with a reasonable opportunity to review and comment on any communications intended for the Business Employees (including regarding its offers of employment) that it desires or has to send to Business Employees prior to the Closing Date.

(j)     The Parties acknowledge and agree that all provisions contained in this Section 8.4 are included for the sole benefit of the parties to this Agreement, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employee or former employee of Sellers (including the Business Employees), any participant in any employee benefit plan maintained by any of the

Parties, or any dependent or beneficiary thereof, or (ii) to continued employment with any of the Parties or any of their respective Affiliates.  Nothing in this Agreement shall affect the right of the Parties or any of their respective Affiliates to terminate the employment of its employees.  Nothing contained in this Section 8.4 is intended to be or shall be considered to be an amendment or adoption of any Seller Plan or any other plan, program, Contract, arrangement or policy of the Parties or any of their respective Affiliates.  In addition, nothing contained in this Section 8.4 shall interfere with the Parties' or any of their respective Affiliates' right to amend, modify or terminate any Seller Plan in accordance with its provisions or to terminate the employment of any employee of Sellers (including the Business Employees).

8.5     Publicity. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

8.6     Expenses. Except to the extent otherwise specifically provided in this Agreement, each Party shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.

8.7     Further Assurances.

(a)     Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, each Seller agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions. Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to further transfer and assign to Purchaser all of the Purchased Assets, and to vest in Purchaser good and marketable title to each of the Purchased Assets.

(b)     Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, Purchaser agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions. Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to cause Purchaser to assume the Assumed Liabilities in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

8.8     Governmental Approvals.  Sellers and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or any Transferred Intellectual Property Rights

included in the Purchased Assets, in connection with the Transaction including without limitation, the Healthcare Regulatory Consents, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers. Each Party shall, as promptly as possible, (i) make, or cause or to be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, Orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be required to take or agree to take any action, including entering into any consent decree, hold, Order or other arrangements, that would (i) require or result in the sale, divestiture or other direct or other disposition of any assets or businesses of Purchaser or any of its Affiliates or (ii) limit Purchaser's or any of its Affiliates' freedom of action with respect to, or its or their ability to retain, consolidate or control, the Purchased Assets or any assets or businesses of Purchaser or any of its Affiliates.

8.9     Notice of Certain Matters. Sellers and Purchaser will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which any Seller has Knowledge or Purchaser has knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in ARTICLE VII not to be satisfied as of any date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 8.9 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

8.10     Bulk Transfer Laws. The Parties hereby waive (a) compliance with the provisions of any so-called bulk sales or bulk transfer law of any jurisdiction in connection with the sale of any or all of the Purchased Assets to Purchaser hereunder and (b) all claims related to the non-compliance therewith.

8.11     Insurance.

(a)     To the extent that any of Purchaser's rights to insurance under the Insurance Policies (including those listed as a Retained Asset on Schedule 2.2(a)), or to proceeds therefrom, relating to the damage, destruction, taking or other impairment of any of the Purchased Assets or to liabilities arising from Assumed Liabilities, including insurance for pre-Closing occurrences, direct property loss and business interruption or other time element losses, are not transferable or assignable, then as promptly as practicable following receipt of a written request from Purchaser, Sellers shall use their commercially reasonable efforts to pursue recovery on all such claims; in its own name or as attorney-in-fact for Purchaser, including but not limited to the rights to make, administer and settle claims under any Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), subject to direction and control by Purchaser; provided, however, that Purchaser shall, within five (5) calendar days after receipt of written request therefor, reimburse Sellers and any of their Affiliates for any documented out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this Section

8.11.  Purchaser and Sellers shall cooperate in the making and recovery of any such claims for insurance proceeds.  Upon the receipt by Sellers of any such insurance proceeds or condemnation proceeds relating thereto, Sellers shall as promptly as practicable pay Purchaser such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any damage, destruction, other impairment or other time element losses or liability arising from, any Assumed Liabilities actually suffered or incurred by Purchaser, or the costs of repair borne by Purchaser, in each case in excess of any losses, damages, costs and expenses or other amounts borne by Sellers or any of its Affiliates in connection with such claims).  Additionally, Purchaser shall pay the amount of any deductibles, self-insured retentions, co-insurance or similar expenses (other than increases in premiums) that would otherwise be borne by Sellers or any of its Affiliates as a result of any such claims.

(b)    To the extent any Insurance Policy (including but not limited to those policies listed on Schedule 2.2(a)), provides "occurrence based" liability insurance, Sellers shall request that, prior to the Closing, Purchaser be added as an additional insured, on a primary and noncontributory basis for claims or loss arising from or relating to the Purchased Assets and Assumed Liabilities, under such Insurance Policy for the current policy year and the preceding six (6) policy years.  Additionally, to the extent any Insurance Policy (including but not limited to those policies listed on Schedule 2.2(a)), provides "claims made" liability insurance coverage, Sellers shall request that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Purchased Assets and Assumed Liabilities from the current policy year and the preceding six (6) policy years for as many years following the Closing as Sellers' insurance carriers are willing to agree.  Purchaser shall, within five (5) calendar days after receipt of written request therefor, reimburse Sellers and any of their Affiliates for any documented out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this Section 8.11.

## ARTICLE IX
## CLOSING AND TERMINATION

9.1    Closing. The closing (the "**_Closing_**") of the Transactions shall be held on or within three Business Days after the conditions set forth in ARTICLE VII are or, if legally permissible, waived (other than those conditions that by their nature are to be satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver) (or such other date as the Parties may agree in writing), remotely via the electronic exchange of documents and signature pages or at such other time or place as Purchaser and Sellers may agree.  The date on which the Closing occurs is referred to as the "**_Closing Date_**."

9.2    Termination. This Agreement and the Transactions may not be terminated prior to the Closing except as follows:

(a)    Upon the mutual written consent of Sellers and Purchaser;

(b)    By Sellers if Sellers are not then in material breach of any provision of this Agreement that would give rise to the failure of a condition set forth in Section 7.1 or Section 7.3, and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Purchaser pursuant to this Agreement that would, either

individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.3</u> and such breach, inaccuracy or failure to perform is not curable or has not been cured within fifteen (15) days' written notice thereof to Purchaser;

   (c) By Purchaser if:

     (i) Purchaser is not then in material breach of any provision of this Agreement that would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.2</u> and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would, either individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.2</u> and such breach is not curable or has not been cured within fifteen (15) days' written notice thereof to Sellers;

     (ii) as a result of an Order of the Bankruptcy Court, (i) the Bankruptcy Cases are converted to chapter 7 and a chapter 7 trustee is appointed with respect to Sellers or (ii) the Bidding Procedures are modified or amended in a manner not acceptable to Purchaser;

     (iii) Sellers (i) withdraw, or seek to withdraw, the Sale Motion, or (ii) announce or file a plan or other transaction, or seek to file a plan or other transaction, contemplating reorganization or sale of all or any part of any Seller under the Bankruptcy Code that does not comply with the terms and conditions of this Agreement; or

     (iv) Sellers fail to comply with the DIP Order or DIP Facility (subject to any cure or grace periods contained therein).

   (d) By either Sellers or Purchaser if:

     (i) the Closing shall not have been consummated on or before September 18, 2020 (or such later date as mutually agreed by Sellers and Purchaser) (the "***Termination Date***"); provided that by written notice to Sellers, Purchaser may, in its sole discretion, extend the Termination Date by thirty (30) calendar days; provided, further, that neither party shall have the right to terminate this Agreement pursuant to this <u>Section 9.2(d)(i)</u> if the Closing shall not have occurred on or prior to the Termination Date due to such party's failure to perform any covenants or breach of any representation or warranty of such party set forth in this Agreement; or

     (ii) there shall be a final non-appealable Order of any nature which is in effect and has the effect of making the Transactions illegal, otherwise restraining or prohibiting consummation of the Transactions or causing any of the Transactions to be rescinded following completion thereof;

   (e) Automatically, if Sellers close or consummate an Alternative Transaction or the Bankruptcy Court enters an Order approving such Alternative Transaction;

The Party desiring to terminate this Agreement pursuant to this <u>Section 9.2</u> (other than pursuant to <u>Section 9.2(a)</u> or <u>Section 9.2(e)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 11.2</u>.

        9.3     <u>Effect of Termination</u>

        (a)     Upon the termination of this Agreement in accordance with <u>Section 9.2</u> hereof, and except as set forth in this <u>Section 9.3</u>, the Parties shall be relieved of any further obligations or liability under this Agreement other than obligations or liabilities for any intentional and willful breaches of this Agreement by such Person occurring prior to such termination.

        (b)     Notwithstanding anything to the contrary contained herein, the provisions of this <u>Section 9.3</u>, <u>Section 8.6</u> and <u>ARTICLE XI</u> shall survive any termination of this Agreement.

**ARTICLE X**
**TAX MATTERS**

        10.1     <u>Filing of Returns</u>. In connection with the preparation and filing of Tax Returns as of and after the Closing Date, Purchaser and Sellers shall cooperate and exchange information as reasonably required to accomplish the matters contemplated by this <u>ARTICLE X</u>.Transaction Taxes. Purchaser shall bear and be responsible for paying any sales, use, stamp, transfer, documentary, registration, business and occupation and other similar Taxes (including related penalties (civil or criminal), additions to Tax and interest) imposed by any Governmental Authority with respect to the transfer of the Purchased Assets to Purchaser ("***Transaction Taxes***"), regardless of whether any Tax authority seeks to collect such Taxes from Sellers or Purchaser. Purchaser shall also be responsible for (i) administering the timely payment of such Transaction Taxes directly to the correct Tax authorities, (ii) defending or pursuing any proceedings related thereto, and (iii) paying any expenses related thereto. Sellers shall give prompt written notice to Purchaser of any proposed adjustment or assessment of any Transaction Taxes with respect to the Transactions. In any proceedings, whether formal or informal, Sellers shall permit Purchaser to participate and control the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents required to allow such participation.

        10.3     <u>Tax Claims</u>. To the extent there are any Tax Costs incurred by Sellers in connection with recovery of any amount under <u>Section 2.1(s)</u>, Purchaser shall, within a reasonable amount of time after reasonable documentation of such Tax Costs is provided to Purchaser, pay over to Sellers from any such amount so recovered an amount equal to such Tax Costs; provided, however, that the total amount paid under this <u>Section 10.3</u> as Tax Costs to Sellers shall not exceed the value of any refunds or credits with respect to any Taxes actually received in cash by Purchaser with respect to the assets acquired by Purchaser set out in <u>Section 2.1(s)</u>.

        10.4     <u>Tax Prorations</u>. As to any Purchased Assets acquired by Purchaser, Sellers and Purchaser shall apportion the liability for real and personal property Taxes and ad valorem Taxes ("***Periodic Taxes***") for all Tax periods including but not beginning or ending on the Closing Date (the "***Proration Periods***"). The Periodic Taxes described in this <u>Section 10.4</u> shall be apportioned between Sellers and Purchaser as of the Closing Date, with Purchaser liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the

- 45 -

numerator of which is the number of days remaining in the Proration Period including and after the Closing Date, and the denominator of which is the total number of days covered by such Proration Period.  Sellers shall be liable for that portion of the Periodic Taxes for the Proration Period for which Purchaser is not liable under the preceding sentence.  Purchaser and Sellers shall pay or be reimbursed for real and personal property Taxes (including instances in which such property Taxes have been paid before the Closing Date) on this prorated basis.  Each Party shall make any payments due to another Party under this <u>Section 10.4</u> by wire transfer of immediately available funds with five (5) Business Days of receiving notice of such obligation.  The Party responsible for paying a Tax described in this <u>Section 10.4</u> shall be responsible for administering the payment of (and any reimbursement for) such Tax.  For purposes of this <u>Section 10.4</u>, the Proration Period for ad valorem Taxes and real and personal property Taxes shall be the fiscal period for which such taxes were assessed by the relevant Tax authority.

     10.5   <u>Provision of Tax Forms</u>. Sellers agree to provide, before the Closing Date, any forms or other documentation reasonably requested by Purchaser to reduce or eliminate any withholding Taxes that could be imposed on any of the transactions contemplated by this Agreement.

**ARTICLE XI**
**<u>GENERAL PROVISIONS</u>**

     11.1   <u>Bankruptcy Court Approval</u>. This Agreement and the transactions contemplated hereby are contingent upon the Bankruptcy Court's entry of the Bid Procedures Order and of the Sale Order.

     11.2   <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via electronic mail to the e-mail address set out below if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service (with confirmation) to the respective Parties at the applicable address set forth below, unless another address has been previously specified in writing, or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid,  to the respective Parties at  the applicable address set forth below, unless another address has been previously specified in writing:

     If to Purchaser, to:

     New Benevis Holdco, Inc.
     c/o New Mountain Finance Corporation
     787 Seventh Avenue, 49th Floor
     New York, New York 10019
     Attention: Josh Porter; Vignesh Aier
     Email: jporter@newmountaincapital.com; VAier@newmountaincapital.com

     With a copy to:

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attention: David M. Hillman, Esq.; Steven M. Peck, Esq.
E-mail: dhillman@proskauer.com; speck@proskauer.com

If to Sellers, to:

Benevis
1090 Northchase Parkway, Suite 150
Marietta, Georgia 30067
Attn: Jerry Perchik
E-mail: jperchik@benevis.com

With a copy to:

Jackson Walker L.L.P.
1401 McKinney St #1900
Houston, Texas 77010
Attn: Elizabeth C. Freeman, Esq.
E-mail: efreeman@jw.com

11.3    Survival of Representations, Warranties, Covenants and Agreements.  All representations and warranties made by Sellers in this Agreement shall terminate on the Closing Date upon the purchase of the Purchased Assets by Purchaser, and neither Sellers nor their respective Affiliates shall have any liability after the Closing Date for any breach of any representation or warranty.  Except as specifically set forth otherwise in the Agreement, all covenants and agreements of Sellers shall lapse at, and be of no further force and effect following, the Closing.

11.4    Binding Effect. Except as may be otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any trustee, responsible Person, estate administrator, representative or similar Person appointed for or in connection with the Bankruptcy Case or in any subsequent case under the Bankruptcy Code in which any Seller is a debtor.  Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder.

11.5    Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

11.6    Exhibits and Schedules. The Exhibits and Schedules referred to in this Agreement shall be deemed to be an integral part of this Agreement.

11.7    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same

document. Any signature delivered by a Party via facsimile or delivered electronically in PDF format shall be deemed to be an original signature hereto.

  11.8 <u>Governing Law/Jurisdiction</u>. Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement or the Transaction Documents or the negotiation, execution or performance of this Agreement or the Transaction Documents (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement as an inducement to enter this Agreement) shall be governed by and construed under New York law, without regard to conflict of laws principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement or the Transaction Documents shall be brought against any of the Parties exclusively in the Bankruptcy Court, or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, in the courts of the State of Texas, Harris County, or, if it has or can acquire jurisdiction, in the United States District Court located in Harris County, and each of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

  11.9 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

  11.10 <u>Waivers</u>. Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the Party waiving compliance.  No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

  11.11 <u>Pronouns</u>. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require.

  11.12 <u>Modification</u>. No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by all of the Parties and which specifically refers to this Agreement.

  11.13 <u>Successors/Assignment</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Purchaser may assign any and all of its rights, title and interest in this Agreement to its designee, affiliate or assignee at its sole election.  No assignment by any Seller of this Agreement or any right or obligation hereunder may be made without the prior written consent of the Purchaser, and any assignment attempted without such consent will be void *ab initio*.

11.14 <u>Entire Agreement</u>. This Agreement, including the Schedules and Exhibits hereto, and the other agreements and documents referred to in this Agreement or delivered hereunder are the exclusive statement of the agreement among the Parties concerning the subject matter hereof. All negotiations among the Parties are merged into this Agreement, and there are no representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder.

11.15 <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term hereof, then to the maximum extent permitted by Law, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

11.16 <u>No Third Party Beneficiaries</u>. No provision of this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder.

11.17 <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort, at law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Transaction Documents may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (each a "***Contracting Party***"). In no event shall any Contracting Party have any shared or vicarious liability for the actions or omissions of any other Person. Except as otherwise set forth in this Agreement, no Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("***Non-Party Affiliates***"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Transaction Documents or based on, in respect of, or by reason of this Agreement or the Transaction Documents or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates.

11.18 <u>Negotiated Agreement</u>. Each of Sellers and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its Representatives drafted such provision.

11.19 <u>Specific Performance</u>. The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy, even if available. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the Parties' obligations to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law,

or in equity, or otherwise. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to post any bond or other security in connection with any such Order.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first written above.

**PURCHASER:**

NEW BENEVIS HOLDCO, INC.

By: _____

Name:   Josh Porter

Title:    President and Treasurer

*Signature Page to Asset Purchase Agreement*

**SELLERS:**

LT SMILE CORPORATION

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS HOLDING CORP.

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS CORP.

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS AFFILIATES, LLC

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS, LLC

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS INFORMATICS, LLC

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


*Signature Page to Asset Purchase Agreement*

**<u>EXHIBIT C</u>**

**POST-EMERGENCE TERM SHEET**

(Not filed on the docket)

## EXHIBIT D

### FORM OF TRANSFER AGREEMENT

## [FORM OF] TRANSFER AGREEMENT

This Transfer Agreement (the "<u>Transfer Agreement</u>") to the Restructuring Support Agreement, dated as of August [2], 2020 (together with all exhibits, schedules, and attachments hereto, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "<u>Agreement</u>"), by and among the Company Parties (as defined therein) and (ii) the Consenting Lenders (as defined therein), is executed and delivered by _____ (the "<u>Transferee</u>") as of _____, 2020. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>. The Transferee hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Transfer Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof). The Transferee shall hereafter be deemed to be a "<u>Consenting [FO] / [LO] Lender</u>," a "<u>Consenting Lender</u>," and a "<u>Party</u>" for all purposes under the Agreement and with respect to any and all Claims held by such Transferee.

2. <u>Representations and Warranties</u>. With respect to the aggregate principal amount of the [Prepetition Loans][DIP Loans] set forth below its name on the signature page hereto, the Transferee hereby makes the representations and warranties of the Consenting Lenders set forth in <u>Sections 11</u> and <u>12</u> of the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

4. <u>Notices</u>.   All notices and other communications given or made pursuant to the Agreement shall be sent to the Transferee at the address set forth below.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Transferee has caused this Transfer Agreement to be executed as of _____, 2020.

[TRANSFEREE]

By:_____
Name:
Title

Address for Notices:

Name of Transferor:                             _____

Principal Amount of Prepetition Loans:      $_____

Principal Amount of DIP Loans:      $_____

**<u>EXHIBIT E</u>**

**MILESTONES**

MILESTONES

The Loan Parties shall be required to comply with the following items set forth in this Annex A within the timeframes set forth below:

1. Commence the Cases in the Bankruptcy Court with respect to each of the Loan Parties and file all first day" pleadings and "first day" orders no later than the Petition Date;

2. on the Petition Date, file the DIP Motion, the 363 Sale Motion, the Bidding Procedures Motion and other "first day" pleadings and "first day" orders with the Bankruptcy Court;

3. on or before August 5, 2020, the Interim DIP Order shall have been entered by the Bankruptcy Court;

4. on or before August 24, 2020, the Bidding Procedures Order shall have been entered by the Bankruptcy Court;

5. on or before September 1, 2020, the Final DIP Order shall have been entered by the Bankruptcy Court;

6. on or before September 10, 2020, the initial bids for the Loan Parties' assets shall be due pursuant to the Bidding Procedures Order;

7. on or before September 14, 2020, hold an auction for the sale of the Loan Parties' assets pursuant to the Bidding Procedures Order;

8. on or before September 16, 2020, obtain entry of the order authorizing a 363 Sale Transaction; and

9. on or before September 18, 2020, consummate a 363 Sale Transaction.