**EXHIBIT A**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**NEW BENEVIS HOLDCO, INC.**

**AND**

**LT SMILE CORPORATION,**

**BENEVIS HOLDING CORP.,**

**BENEVIS CORP.,**

**BENEVIS AFFILIATES, LLC,**

**BENEVIS, LLC,**

**AND**

**BENEVIS INFORMATICS, LLC**

**August 2, 2020**

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND INTERPRETATION.................................................2
    1.1      Definitions .................................................................................2
    1.2      Interpretation ............................................................................13

ARTICLE II PURCHASE AND SALE OF ASSETS..............................................13
    2.1      Purchased Assets ......................................................................13
    2.2      Retained Assets ........................................................................16

ARTICLE III ASSUMPTION OF LIABILITIES ..................................................17
    3.1      Assumed Liabilities ..................................................................17
    3.2      Retained Liabilities ..................................................................18

ARTICLE IV CONSIDERATION ........................................................................19
    4.1      Purchase Price ..........................................................................19
    4.2      Allocation of Purchase Price ....................................................19
    4.3      Cure Costs ................................................................................19

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS..............19
    5.1      Organization and Good Standing. .............................................19
    5.2      Power; Authority; Enforceability .............................................20
    5.3      Title to Assets ..........................................................................20
    5.4      Noncontravention; Governmental Filings .................................21
    5.5      Litigation .................................................................................21
    5.6      Permits .....................................................................................21
    5.7      Intellectual Property Rights .....................................................21
    5.8      Compliance with Laws .............................................................22
    5.9      Healthcare Regulatory Matters .................................................22
    5.10    Employees ................................................................................25
    5.11    Employee Benefit Plans ...........................................................26
    5.12    Real Property ...........................................................................27
    5.13    Contracts ..................................................................................27
    5.14    Environmental Matters .............................................................28
    5.15    Insurance ..................................................................................28
    5.16    Brokers or Finders ...................................................................28
    5.17    No Implied or Other Representations or Warranties..................28

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER.......29
    6.1      Organization and Good Standing ..............................................29
    6.2      Power; Authority; Enforceability .............................................29
    6.3      Consents ...................................................................................30
    6.4      No Conflicts .............................................................................30
    6.5      Litigation .................................................................................30
    6.6      Brokers or Finders ...................................................................31

6.7 Financing ...................................................................................................31
6.8 Purchaser's Investigation ..........................................................................31

ARTICLE VII CONDITIONS TO CLOSING .........................................................31
7.1 Conditions to Obligations of All Parties ...................................................31
7.2 Conditions to Purchaser's Obligations .....................................................32
7.3 Conditions to Sellers' Obligations ............................................................33

ARTICLE VIII COVENANTS ................................................................................34
8.1 Conduct of the Business ...........................................................................34
8.2 Access .......................................................................................................36
8.3 Bankruptcy Court Matters ........................................................................37
8.4 Employee Matters .....................................................................................38
8.5 Publicity ....................................................................................................41
8.6 Expenses ...................................................................................................41
8.7 Further Assurances ...................................................................................41
8.8 Governmental Approvals ..........................................................................41
8.9 Notice of Certain Matters .........................................................................42
8.10 Bulk Transfer Laws ..................................................................................42
8.11 Insurance ..................................................................................................42

ARTICLE IX CLOSING AND TERMINATION ....................................................43
9.1 Closing ......................................................................................................43
9.2 Termination ...............................................................................................43
9.3 Effect of Termination ...............................................................................45

ARTICLE X TAX MATTERS .................................................................................45
10.1 Filing of Returns ......................................................................................45
10.2 Transaction Taxes .....................................................................................45
10.3 Tax Claims ................................................................................................45
10.4 Tax Prorations ..........................................................................................45
10.5 Provision of Tax Forms ............................................................................46

ARTICLE XI GENERAL PROVISIONS ...............................................................46
11.1 Bankruptcy Court Approval .....................................................................46
11.2 Notices ......................................................................................................46
11.3 Survival of Representations, Warranties, Covenants and Agreements ...........47
11.4 Binding Effect ..........................................................................................47
11.5 Headings ...................................................................................................47
11.6 Exhibits and Schedules ............................................................................47
11.7 Counterparts .............................................................................................47
11.8 Governing Law/Jurisdiction .....................................................................48
11.9 WAIVER OF JURY TRIAL ....................................................................48
11.10 Waivers .....................................................................................................48
11.11 Pronouns ...................................................................................................48
11.12 Modification ..............................................................................................48
11.13 Successors/Assignment .............................................................................48

11.14    Entire Agreement ................................................................................49
11.15    Severability.........................................................................................49
11.16    No Third Party Beneficiaries...............................................................49
11.17    Non-Recourse .....................................................................................49
11.18    Negotiated Agreement ........................................................................49
11.19    Specific Performance ..........................................................................49

**EXHIBITS**

Exhibit A – Bill of Sale and Assignment and Assumption Agreement
Exhibit B – IP Assignment Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***") is dated as of August 2, 2020, by and among LT Smile Corporation, a Delaware corporation, Benevis Holding Corp., a Delaware corporation, Benevis Corp., a Delaware corporation, Benevis Affiliates, LLC, a Delaware limited liability company, Benevis, LLC, a Delaware limited liability company, and Benevis Informatics, LLC, a Delaware limited liability company (collectively, "***Sellers***" and each a "***Seller***"), and New Benevis Holdco, Inc., a Delaware corporation, or its designees or assignees ("***Purchaser***"). Purchaser and Sellers are also referred to herein individually as a "***Party***," and, collectively, as the "***Parties***."

## RECITALS

WHEREAS, Sellers intend to become debtors-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "***Bankruptcy Code***"), by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "***Bankruptcy Case***") (such filing date, the "***Petition Date***"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***");

WHEREAS, in connection with the Bankruptcy Case, the Purchaser shall credit bid on a dollar-for-dollar basis a portion of the outstanding Purchaser Secured Claims pursuant to Section 363 of the Bankruptcy Code;

WHEREAS, Sellers and Purchaser are entering into this Agreement subject to the final approval by the Bankruptcy Court;

WHEREAS, Sellers are engaged in the business of providing dental practice support services to the Supported Entities (as defined herein) (the "***Business***");

WHEREAS, subject to the approval of the Bankruptcy Court, Sellers desire to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser desires to purchase, acquire, and assume from Sellers pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, as contemplated by this Agreement and the Ancillary Agreements (together with the other transactions contemplated hereby and thereby, the "***Transactions***"); and

WHEREAS, Sellers, as debtors and debtors-in-possession, will continue in the possession of its assets and in the management of the Business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1    Definitions. When used in this Agreement, the following terms in all of their tenses shall have the meanings assigned to them below or elsewhere in this Agreement as indicated below:

"**Accounts Receivable**" means all accounts, rights to payment and notes and other amounts receivable (whether current or non-current) otherwise arising from the conduct of the Business, including receivables from credit card processors and the sale of gift cards.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Agreement**" is defined in the Preamble.

"**Alternative Transaction**" means a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the Purchased Assets to another purchaser or purchasers other than the Purchaser.

"**Assumed Contracts**" is defined in Section 2.1(e).

"**Assumed Liabilities**" is defined in Section 3.1.

"**Assumed Seller Plans**" is defined in Section 2.1(t).

"**Avoidance Actions**" means any claim, right, or cause of action arising under chapter 5 of the Bankruptcy Code and any analogous state law claims related to the Purchased Assets or the Business.

"**Bankruptcy Case**" is defined in the Recitals.

"**Bankruptcy Code**" is defined in the Recitals.

"**Bankruptcy Court**" is defined in the Recitals and includes such other courts exercising competent jurisdiction over the Bankruptcy Case involving Sellers.

"**Bidding Procedures**" means the bidding procedures for the solicitation and submission of bids for a sale, reorganization, or other disposition of Sellers or all or substantially all of their assets approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, which shall be in form and substance acceptable to Purchaser.

"**Bidding Procedures Motion**" means the motion seeking entry of the Bidding Procedures Order.

"***Bidding Procedures Order***" means an order of the Bankruptcy Court approving the Bidding Procedures, which shall be in form and substance acceptable to Purchaser in its reasonable discretion.

"***Bill of Sale and Assignment and Assumption Agreement***" means a Bill of Sale and Assignment and Assumption Agreement executed by Purchaser and Sellers, in substantially the form of Exhibit A.

"***Business***" is defined in the Recitals.

"***Business Continuity Agreement***" or "***BCA***" is defined in Section 5.9(i).

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"***Business Employee***" means each Person who is, or could be considered to be, employed by Sellers.

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" and "***Closing Date***" are defined in Section 9.1.

"***COBRA***" means the continuation coverage provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as codified in Code Section 4980B and ERISA Sections 601 et seq., as amended from time to time, and the regulations and other guidance promulgated thereunder and any other similar provisions of state or local law.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Contract***" means any written commitment, understanding, instrument, lease, sub-lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, commitment, note, bond, franchise, guarantee, indemnity, instrument, promise or other arrangement evidencing or creating any legally binding obligation, whether written or oral (including all amendments, side-letters, supplements and modifications of any of the foregoing and all rights and interests arising thereunder or in connection therewith).

"***Contracting Parties***" is defined in Section 11.17.

"***Controlled Group Liability***" means any and all Liabilities (i) under Title IV of ERISA; (ii) under Section 302, 303, or 4068(a) of ERISA; (iii) under Section 412, 430 or 4971 of the Code; (iv) under Section 436 of the Code or Section 206(g) of ERISA; (v) as a result of the failure to comply with the continuation coverage requirements of ERISA Sections 601 *et seq.,* and Section 4980B of the Code or the group health requirements of Sections 701 *et seq.,* of ERISA and Sections 9801 *et seq.,* of the Code; (vi) for violation of HIPAA or the Patient Protection and Affordable Care Act of 2010, as amended; (vii) as a result of a failure to comply with the requirements of Section 414(t) of the Code; or (viii) under corresponding or similar provisions of any non-U.S. Law.

"***Credit Bid Amount***" is defined in <u>Section 4.1</u>.

"***Cure Costs***" means, with respect to the Assumed Contracts, all amounts, including pre-petition amounts, required to be paid or otherwise satisfied pursuant to the Bankruptcy Code in order to cure Sellers' monetary defaults under such Assumed Contracts at the time of the assumption thereof by and assignment to Purchaser as provided hereunder.

"***Dentist Partner***" is defined in <u>Section 5.9(i).</u>

"***DIP Facility***" means the debtor-in-possession financing facility provided to Sellers under that certain Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of August 2, 2020, by and among Benevis Holding Corp., LT Smile Corporation, the other loan parties party thereto, the banks and financial institutions or entities from time to time party thereto and BMO Harris Bank, N.A., as administrative agent and the DIP Orders, each as authorized by the Bankruptcy Court.

"***DIP Order***" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing.

"***Encumbrances***" means any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting right (in the case of any security or equity interest), transfer right, right to receipt of income or exercise of any other attribute of ownership.

"***Environmental Laws***" means all applicable federal, state, local, municipal and foreign Laws concerning public or human health and safety (as it relates to exposure to Hazardous Substances), endangered or threatened species, pollution, or protection of the environment (including ambient air, soil, surface water or groundwater or subsurface strata), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, release, threatened release, control, or cleanup of, or exposures to, any Hazardous Substances (including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any regulations promulgated thereunder, and analogous state Laws).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means any Person (whether or not incorporated) which, together with the Seller, is (or at any relevant time was) required to be treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"***Excluded Employee Liabilities***" means the following liabilities of Sellers or any of their respective Affiliates relating to any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof:  (i) any liability arising at any time under or in connection with any Seller Plan (other than any Assumed Seller Plan); (ii) any liability that constitutes a Pre-Closing COBRA Liability or a Pre-Closing WARN Act Liability; (iii) any Controlled Group Liability; (iv) any liability arising in connection with the actual or prospective employment or engagement, the retention and/or discharge by Sellers or any of their respective Affiliates of any current or former Business

Employee or other service provider of Sellers or any of their respective Affiliates; (v) any employment, labor, compensation, pension, employee welfare and employee-benefits-related liabilities relating to any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, including but not limited to all liabilities related to or arising out of claims made by any such Person (a) for any statutory or common law severance or other separation benefits, (b) for any contractual or other severance or separation benefits and any other legally-mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a judgment of a court, tribunal or other authority having jurisdiction over the Parties), (c) with respect to any unfair labor practice, (d) under any state unemployment compensation or workers' compensation Law, (e) under any federal or state employment Law or other Law relating to employment, discrimination, classification, immigration, or (f) relating to any obligation to inform or consult with employees or other service providers, employee representatives, unions, works councils or other employee representative bodies in connection with the Transactions, in each case (I) associated with any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, arising at any time, and (II) associated with any Transferred Employee, arising on or prior to the Closing Date.

"***Government Program***" means any health care reimbursement program funded, in whole or in part, by a Governmental Authority of the United States or any state of the United States, under which any Seller or Supported Entity has received or is receiving reimbursement for the provision of medical services, including, without limitation, any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), state Medicaid programs, state CHIP programs, TRICARE, Medicaid managed care and similar or successor programs with or for the benefit of any Governmental Authority, and such other similar federal, state or local reimbursement or governmental programs for which a Seller or Supported Entity is eligible and in which such Seller or Supported Entity participates.

"***Governmental Approvals***" means any approval, consent, Permit, license, waiver, or other authorization issued, granted, given or otherwise made available by or under any Governmental Authority or pursuant to any Law.

"***Governmental Authority***" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"***Hazardous Substances***" means any pollutant, contaminant, chemical, hazardous material, substance or waste defined, listed or classified as a "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under, or otherwise regulated under any Environmental Law, including petroleum and petroleum-derived substances, products, by products and wastes, asbestos, urea, formaldehyde and lead based paint or lead-containing materials.

"*Health Care Laws*" means all applicable Laws of any Governmental Authority or Government Program relating to dentistry or health care, including without limitation, Titles XI, XVIII and XIX of the Social Security Act (42 U.S.C. § 1301 et seq., 42 U.S.C. § 1395 et seq. and 42 U.S.C. § 1396 et seq., respectively); TRICARE (10 U.S.C. Section 1071 et seq.); provisions of HIPAA unrelated to privacy, security or breach of unsecured PHI; the Occupational Safety and Health Act, and all federal, state and local laws and regulatory schemes governing workplace safety and/or the operation of dental practices; the federal false claims Laws; false representations Laws; insurance fraud Laws; debarment and exclusion Laws; other similar and applicable Laws relating to false and deceptive trade practices, including the Exclusion Law (42 U.S.C. § 1320a-7), the Civil Monetary Penalties Law (42 U.S.C. §§ 1320a-7a and 1320a-7b), the civil False Claims Act (31 U.S.C. §3729 et seq.), the Program Fraud Civil Remedies Act (31 U.S.C. § 3801 et seq.) and the Federal Health Care Fraud Law (18 U.S.C. § 1347); the federal anti-kickback statute (42 U.S.C. §1320a 7 et seq.) and all other provisions of the Medicare/Medicaid fraud and abuse Laws; the Stark Law (42 U.S.C. §1395nn); the Controlled Substances Act (CSA) Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 801 et seq. and all regulations promulgated thereunder) and state controlled substance Laws); the Patient Protection and Affordable Care Act of 2010 as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152) and the regulations promulgated thereunder; the Consolidated Omnibus Budget Reconciliation Act of 1985; any Laws promulgated by any applicable state regarding dentists, dental assistants, nurses, hygienists, dental technicians or assistants, the practice of dentistry as defined in any applicable state where the Sellers and Supported Entities operate, prescribing, dispensing or administration of drugs, operation of dental spas; state anti-kickback Law; state dentist self-referral Law and facility licensing Laws, and certification requirements and related Laws; professional licensing Laws; fee-splitting Laws; corporate practice of dentistry Laws; Laws governing the use, handling, control, storage, transportation, and maintenance of controlled substances, pharmaceuticals or drugs; state insurance Laws and Laws governing the offering of discount dental plans; OSHA and state workplace laws related to the operation of dental practices; quality and safety Laws, rules or regulations relating to the regulation, provision or administration of, or payment for, health care products or services; the Clinical Laboratory Improvement Amendments of 1988 (Public Law 100- 578) and any state Laws concerning the operation of a clinical or dental laboratory; any Laws related to clinical personnel supervision and delegated authority; any Laws related to advertising and marketing; any Laws related to office-based medical and dental procedures, including anesthesia requirements; any Laws concerning the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; or any other Law or regulation of any Governmental Authority which regulates kickbacks, fraud and abuse, Government Programs, claims processing, dental record documentation requirements, the hiring of employees or acquisition of services or products from those who have been excluded from Government Programs or any other aspect of providing dental care, each of the foregoing as may heretofore have been amended from time to time.

"*Health Care Permit*" means any and all licenses, permits, authorizations, approvals, franchises, registrations, accreditations, certificates of need, consents, supplier or provider numbers, qualifications, operating authority, and/or any other permit or permission which are legally required for the operation of the business of the Sellers and Supported Entities as currently conducted, in each case that are issued or enforced by a Governmental Authority with jurisdiction over any Health Care Law.

"**_Healthcare Regulatory Consents_**" means in respect of Purchaser or any Seller, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses, Permits or Health Care Permits of any Governmental Authority as shall be required or desirable to be obtained with respect to the operation of the Business and such notifications to any Governmental Authority as shall be required to be given by such party in order for it to consummate the Transactions in compliance with all applicable Health Care Laws. Such consents shall include the approval of Purchaser to operate the Business.

"**_Improvements_**" means all leasehold improvements located, placed, constructed or installed on or under any parcel of Leased Real Property (but only to the extent the related Real Property Leases constitute Assumed Contracts), including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration and cooling systems, facilities, lines, installations and conduits.

"**_Insurance Policies_**" is defined in <u>Section 5.15</u>.

"**_Intellectual Property_**" means any (a) trademarks and service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, including all applications, registrations and renewals of any of the foregoing, together with the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications, registrations and renewals of any of the foregoing, and works of authorship, whether or not copyrightable; (c) trade secrets, confidential know-how, discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information; (d) patents and patent applications; (e) Software; (f) websites, internet domain name registrations and social media account or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto; and (g) all other intellectual and industrial property rights and assets, and all rights, interests and protections that are associated with any of the foregoing.

"**_Intellectual Property Rights_**" means all rights in, to, arising out of, or associated with any Intellectual Property in any jurisdiction throughout the world.

"**_IP Assignment Agreement_**" means the IP Assignment Agreement, executed by Purchaser and Sellers, in substantially the form of Exhibit B.

"**_Knowledge of Sellers_**" or any other similar knowledge qualification in this Agreement means, as to a particular matter, the actual knowledge of the following individuals, after reasonable investigation and inquiry: Dale Mayfield, Scott Hornbuckle, Scott Mell, and Jerry Perchik.

"**_Law_**" means any federal, state, provincial, territorial, local, municipal, foreign, international, or multinational statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law enacted, adopted, promulgated, issued, applied by or administered or enforced by or on behalf of, any Governmental Authority or other similar authority.

"**_Leased Real Property_**" means all material real property leased by any Seller or Supported Entity and used in connection with the Business.

"**_Legal Proceeding_**" means any judicial, administrative or arbitral action, investigation, litigation, suit, proceeding (public or private), cause of action, examination, dispute, charge, hearing, audit, assessment, inquiry or claim by or before any Governmental Authority, and any appeal from any of the foregoing.

"**_liability_**" means any liability, damage, fine, fee, penalty, settlement, cost, expense, Tax, debt or obligation of any kind, character, or description, whether known or unknown, asserted or unasserted, matured or unmatured, liquidated or unliquidated, disputed or undisputed, accrued or unaccrued, due or to become due, fixed, absolute, contingent or otherwise, whenever or however arising and regardless of when asserted and by whom.

"**_Lien_**" means any lien (statutory or otherwise), mortgage, hypothecation, deed of trust, right of use or possession, right of setoff, successor liability, servitude, encroachment, restriction or restrictive covenant, charge, covenant, condition, easement, adverse claim, demand, encumbrance, limitation, security interest, preference, priority, right of first refusal, option, pledge, title defect, or restriction, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"**_Material Adverse Effect_**" means any event, occurrence, fact, condition, development or change that (a) has, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets and/or the Assumed Liabilities or (b) has, or would reasonably be expected to prevent, materially delay, or materially impair the ability of the Sellers to consummate the Transactions, except, in each case, to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions or the public announcement thereof; (ii) changes or conditions affecting the dental services or dental management service industries generally in the geographic regions in which the Business operates; (iii) changes in national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index or any changes in currency exchange rates); (v) changes in Law (or other binding directives or determination issued or made by or agreements with or consents of any Governmental Authority) or in GAAP or interpretations thereof; or (vi) changes arising in connection with any earthquake, flood, hurricane, tornado or other act of God (but excluding any pandemic, other than the current public health crisis caused by the novel coronavirus known as COVID-19 or any escalation or worsening thereof), except, in the case of the foregoing clauses (ii), (iii), (iv), (v) and (vi), to the extent such event, occurrence, fact, condition, development or change has a disproportionate effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased

Assets and/or the Assumed Liabilities, in each case, relative to other participants in the dental services or dental management service industries.

"***Multiemployer Plan***" means a "multiemployer plan" (as defined in Section 3(37) of ERISA).

"***Non-Party Affiliates***" is defined in <u>Section 11.17</u>.

"***Omitted Contract***" is defined in the last paragraph of <u>Section 2.1</u>.

"***Order***" shall mean any order, judgment, injunction, award, decree or writ of any Governmental Authority.

"***Ordinary Course of Business***" means substantially the same manner in which the Business is conducted by Sellers immediately prior to the Petition Date, consistent with past practice.

"***Organizational Documents***" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"***Party***" and "***Parties***" are defined in the Preamble.

"***Periodic Taxes***" is defined in <u>Section 10.4</u>.

"***Permits***" means all approvals, authorizations, permits, provider numbers, certificates of need, certificates of exemption, licenses, franchises, approvals, authorizations, accreditations, registrations, certificates and consents required to be obtained from Governmental Authorities.

"***Permitted Liens***" has the meaning set forth in the DIP Facility.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Personal Information***" means personally identifiable information of Sellers' employees, other personnel, agents, officers, directors, contractors, patients, potential and prospective patients, suppliers, and/or other Persons, which information may include name, address, other contact information, persistent identifier, financial account information, heath or medical information, insurance information, social security number, tax ID number, driver's license, mother's maiden name, date of birth, password, PIN number, employee ID number, payroll records, salary information or other human resources records and information, personal identification number or code, other account information and/or account activity information, other information or data that can be used for identity theft (including that which is not personally identifiable) or to identify a

particular natural person, computer, device or software, and any other sensitive information regarding such Persons.

"***Petition Date***" is defined in the Recitals.

"***Practitioner***" is defined in Section 5.9(c).

"***Pre-Closing COBRA Liability***" means any liability arising under COBRA related to a qualifying event occurring on or prior to the Closing Date in respect of any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, in any case who does not become a Transferred Employee.

"***Pre-Closing WARN Act Liability***" means any liability arising under the WARN Act, in any case arising on or prior to the Closing Date.

"***Pre-Petition Facility***" means the pre-Petition Date financing facility provided to the debtors under that certain Credit Agreement, dated as of March 15, 2018, by and among Benevis Holding Corp., LT Smile Corporation, the other loan parties party thereto, the banks and financial institutions or entities from time to time party thereto and BMO Harris Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

"***Program***" is defined in Section 5.9(c),

"***Proration Periods***" is defined in Section 10.4.

"***Purchase Price***" is defined in Section 4.1

"***Purchased Assets***" is defined in Section 2.1.

"***Purchaser***" is defined in the Preamble.

"***Purchaser Documents***" is defined in Section 6.2.

"***Purchaser Fundamental Representations***" means the representations in Section 6.2 (Power; Authority; Enforceability) and Section 6.6 (Brokers or Finders).

"***Purchaser Secured Claims***" means the aggregate amount of (a) all obligations owing by Sellers as of the Closing under the DIP Facility, including any unpaid principal, interest, fees, and costs and (b) all obligations, less $10 million, owing by Sellers as of the Closing under the Pre-Petition Facility, including any unpaid principal, interest, fees and costs.

"***Real Property Leases***" has the meaning set forth in Section 5.12(b).

"***Registered Transferred Intellectual Property Rights***" is defined in Section 5.7(a).

"***Retained Assets***" is defined in Section 2.2.

"**_Retained Contracts_**" means all Contracts to which any Seller is a party and which are not Assumed Contracts.

"**_Retained Liabilities_**" is defined in Section 3.2.

"**_Sale Hearing_**" means the hearing conducted by the Bankruptcy Court to approve the Transactions or an Alternative Transaction.

"**_Sale Motion_**" means the motion, in form and substance reasonably acceptable to Sellers and Purchaser, filed by Sellers pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to obtain entry of the Sale Order.

"**_Sale Order_**" means the final order of the Bankruptcy Court (a "**_Final Order_**"), to be issued by the Bankruptcy Court pursuant to sections 363, 365 and, to the extent possible, section 1146(c), of the Bankruptcy Code in a form and substance acceptable to Purchaser, (i) approving this Agreement and the Transactions, (ii) approving the sale of the Purchased Assets to Purchaser free and clear of all Liens, Claims, interests and Encumbrances pursuant to section 363(f) of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, (iii) approving the assumption and assignment to Purchaser of the Assumed Contracts, in each case, on the terms and subject to the conditions set forth in this Agreement, (iv) mutual releases between and among Purchaser and the Sellers and (v) finding that (A) Purchaser purchased the Purchased Assets for reasonably equivalent value, (B) the sale of the Purchased Assets was negotiated at arm's length, and (C) Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

"**_Seller Documents_**" is defined in Section 5.2.

"**_Seller Fundamental Representations_**" means the representations in Section 5.1 (Organization and Good Standing), Section 5.2 (Power; Authority; Enforceability), Section 5.3 (Title to Assets), clause (a) of Section 5.4 (Noncontravention; Governmental Filings) and Section 5.16 (Brokers or Finders).

"**_Seller Plan_**" means each "employee benefit plan" (as defined in ERISA § 3(3), whether or not subject to ERISA) or other benefit or compensation plan, program, policy, practice, contract, agreement, or arrangement providing for retirement, medical, dental, vision, prescription drug, employee assistance, wellness, severance, vacation, termination pay, workers' compensation, disability, death, hospitalization, relocation, cafeteria, dependent care, commuter or transportation, adoption assistance, tuition reimbursement, relocation, retention, change of control, deferred compensation, short-term incentive, long-term incentive, performance awards, stock or stock-related awards, fringe benefits or other employee benefits of any kind maintained, sponsored, or contributed or required to be contributed to by Sellers or any of their respective ERISA Affiliates or with respect to which Sellers or any of their respective ERISA Affiliate have, or could reasonably be expected to have, any liability, other than governmental plans, programs, agreements or arrangements, or any plans, programs, agreements or arrangements mandated by a Governmental Authority or by applicable Law.

"**_Sellers_**" is defined in the Preamble.

"***Software***" means any and all computer programs, including operating system and applications software, firmware, computerized implementations of algorithms, program interfaces and other code, whether in source code or object code form (including all of the foregoing that is installed on computer hardware), including data files, databases, and related protocols, specifications, and all available documentation, including user manuals, relating to the foregoing.

"***Supported Entities***" is defined in <u>Section 5.1(c)</u>.

"***Tax***" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"***Tax Costs***" means (i) all out of pocket costs of Sellers in recovering any refunds or credits with respect to any Taxes of any Seller, any Affiliate of any Seller, or the Business, and (ii) any amounts demanded by the Internal Revenue Service as payroll Tax liabilities, together with any related fees, costs, penalties and interest, but only to the extent attributable to time periods prior to the Closing.

"***Tax Returns***" means any return, report or declaration filed with or submitted to any Governmental Authority in connection with the assessment, collection or payment of any Tax.

"***Termination Date***" is defined in <u>Section 9.2(d)(i)</u>.

"***Transactions***" is defined in Recitals

"***Transaction Documents***" means the Bidding Procedures Order, the Sale Order, the Bills of Sale and Assignment and Assumption Agreements, the IP Assignment Agreement, and the other agreements, certificates, and instruments executed and delivered in connection with this Agreement or any of the foregoing (or the Transactions).

"***Transaction Taxes***" is defined in <u>Section 10.2</u>.

"***Transferred Employee***" is defined in <u>Section 8.4(a)</u>.

"***Transferred Intellectual Property Rights***" means all Intellectual Property Rights owned by any Seller and used in the operation of the Business.

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act, as amended and any similar state or local "mass layoff" or "plant closing" Laws.

"***Welfare Claims***" is defined in <u>Section 8.4(c)</u>.

"***Wind Down Amount***" means an amount of cash estimated in good faith by Sellers and acceptable to Purchaser, as necessary to fund (i) all accrued, unpaid and allowed administrative

expense claims in the Bankruptcy Case, and (ii) an orderly liquidation, dismissal or conversion of the Bankruptcy Cases and the dissolution of the Sellers to be used in accordance with a budget determined with the consent of Purchaser (to be finalized prior to the Sale Hearing and attached as an exhibit to the Sale Order); provided, that to the extent there is any residual amount remaining after the payment of the items set forth in (i) – (ii), such amounts shall be promptly delivered to Purchaser. In the event the Sellers have insufficient cash on hand to fund the Wind Down Amount, Purchaser shall have no obligation to fund any shortfall.

      1.2    <u>Interpretation</u>. When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated.  Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation."  Unless otherwise indicated, all references to dollars refer to United States dollars. The Parties acknowledge that both Purchaser on the one hand, and Sellers on the other hand, have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

      2.1    <u>Purchased Assets</u>. Subject to the terms and conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, free and clear of all Liens except the Permitted Liens, and Purchaser shall purchase, all right, title and interest of Sellers in and to all assets, properties, claims and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) wherever located and whether now existing or hereafter acquired (other than the Retained Assets) (collectively, the "***Purchased Assets***"), including the following:

      (a)    All cash, bank deposits, certificates of deposit, and cash equivalents (including all undeposited checks, marketable securities and short term investments) of Sellers, except to the extent such amounts are necessary to fund the Wind Down Amount;

      (b)    All bank accounts of Sellers other than accounts established for the retention of the Wind Down Amount, safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts);

      (c)    All tangible personal property owned or leased by Sellers, wherever located, including, but not limited to, all machinery, equipment, tools, fixtures, parts, supplies, furniture, furnishings, motor vehicles, inventory, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure and telephone systems (including any of the foregoing property that is subject to a finance lease, but only to the extent that Purchaser assumes such finance lease as an Assumed Contract);

(d)     The Transferred Intellectual Property Rights and all other manuals, instructions, documents and protocols relating thereto, including those listed on Schedule 2.1(d), including (A) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Sellers with respect to the Transferred Intellectual Property Rights; and (B) claims and causes of action with respect to the Transferred Intellectual Property Rights accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation or other violation thereof, and rights to protection of interests therein under the Laws of all jurisdictions;

(e)     All of the Contracts and Real Property Leases that are listed on Schedule 2.1(e) (along with the Cure Costs associated with each), and all Leased Real Property associated with such Real Property Leases, and all rights of any kind relating to any of the foregoing, including rights to payments thereunder (collectively, the "***Assumed Contracts***") (and in each case, all Avoidance Actions related thereto), subject to the amendment of Schedule 2.1(e) as contemplated pursuant to the last paragraph of this Section 2.1.

(f)     All Permits listed on Schedule 2.1(f), but only to the extent such Permits may be transferred under applicable Law;

(g)     All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Business or any Purchased Assets;

(h)     All rights with respect to prepaid expenses, credits, advance payments, security, deposits, charges, sums, and any cash collateral used to secure surety bonds, performance bonds or other transactional assurances to the extent related to the Business or any Purchased Assets, including without limitation, any deposits made by the Sellers to any third parties;

(i)     Originals, or where not available or to the extent retained by Sellers for Tax purposes, copies, of all books and records, files and papers including books of account, ledgers and general, financial and accounting records, supplier lists, production data, quality control records and procedures, patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), strategic plans, internal financial statements and marketing and promotional surveys, material and research, documentation relating to the Transferred Intellectual Property Rights, and other similar documents and records, that relate to the Business or the Purchased Assets;

(j)     Copies of all Tax records;

(k)     All rights to any Legal Proceedings, credits, allowances, rebates, or rights of setoff (other than against Sellers or any of their Affiliates) or claim of any nature available to or being pursued by Sellers arising out of or relating to the Business or any of the Purchased Assets or Assumed Liabilities, whether arising by way of counterclaim or otherwise, including but not limited to (i) claims for breach of contract, or breach of fiduciary duty or tort claims and (ii) all of Sellers' claims or causes of action, including those vested in any Seller under Sections 541, 542, 544, 545, 547, 548 and 549 (and, to the extent applicable for remedies, Sections 550 and 551) of the Bankruptcy Code;

(l)      All Accounts Receivable (whether billed or unbilled), and any security, claim, remedy or other rights related to such Accounts Receivable or to the collectability thereof;

(m)      All Improvements;

(n)      All rights to the telephone and facsimile numbers and email addresses used by Sellers;

(o)      All Insurance Policies that may be transferred or assigned to Purchaser, except to the extent included as a Retained Asset on Schedule 2.2(c), including but not limited to the rights to make, administer and settle claims under any such Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), and (ii) the amount of, and all rights to any insurance proceeds received by Sellers under any such Insurance Policies after the date hereof in respect of any loss, liability, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities.

(p)      All rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties (including, any non-disclosure or confidentiality, non-compete or non-solicitation agreements entered into in connection with an Auction (as defined in the Bidding Procedures Order)), in each case, which relate to the Business or any of the Purchased Assets or Assumed Liabilities;

(q)      All unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to the Business or any Purchased Asset or Assumed Liability, including any item of real property, personal property or equipment;

(r)      All employee and personnel records, including all current employment eligibility verification form and related records, documents and papers, of the Transferred Employees;

(s)      Any assets, attributes and claims against any Person for refunds or credits with respect to any Taxes, net of any offsets by Governmental Authorities;

(t)      All rights in or under the Seller Plans that are maintained, sponsored, or contributed or required to be contributed to by Sellers for the benefit of any Transferred Employee, as set forth on Schedule 2.1(t) (each, an "*Assumed Seller Plan*"), including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith; provided that, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(t) after the date hereof but no later than (i) with respect to health and welfare Seller Plans, the later of (i) thirty (30) days following the date hereof and (ii) five (5) Business Days following the grant or denial of the consents contemplated by Section 7.2(h) and (ii) with respect to other Seller Plans, thirty (30) days following the date hereof in order to (x) add any Seller Plan to such Schedule 2.1(t) and it shall be automatically included as an Assumed Seller Plan for purposes of this Agreement or (ii) remove any Assumed Seller Plan from such Schedule 2.1(t) and it shall be automatically deemed a Retained Asset for purposes of this Agreement;

(u)      All equity interests of Benevis LLC Protected Cell Series 2019-10 (a series of Maple Shade Assurance, LLC) (the "**Benevis Protected Cell Series**"), provided that, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, at any time prior to the date that is the later of (i) thirty (30) days following the date hereof and (ii) five (5) days following the grant or denial of the consents contemplated by Section 7.2(g), amend or revise this Section 2.1(u) to remove such equity interests of the Benevis Protected Cell Series from the Purchased Assets and it shall be automatically deemed a Retained Asset for purposes of this Agreement; and

(v)      All goodwill, patient and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the assets described in the foregoing clauses, the Assumed Liabilities and/or the Business.

Notwithstanding anything in this Agreement to the contrary, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(e) (i) at any time prior to the Closing Date, in order to add any Contract to such Schedule 2.1(e) and it shall be automatically included as an Assumed Contract for purposes of this Agreement, or remove any Contract to such Schedule 2.1(e) and it shall be automatically be deemed a Retained Contract for purposes of this Agreement, and (ii) at any time after the Closing Date to remove any Contract from such Schedule 2.1(e) in the event that after Closing, (A) the Bankruptcy Court determines (or the parties otherwise agree) that the actual Cure Costs exceed the estimated Cure Costs listed on Schedule 5.13(a), or (B) a timely filed objection to a Cure Cost or to Purchaser's assumption and assignment of a Contract is not resolved, and such removed Contract shall be automatically deemed a Retained Contract for purposes of this Agreement; provided that Purchaser has notified Sellers in writing of the removal of any such Contract no later than thirty (30) days following the determination of the actual Cure Cost of such Contract. Furthermore, if it is discovered that a Contract should have been listed on Schedule 5.13(a) but was omitted therefrom (an "**Omitted Contract**"), Sellers shall, promptly following discovery thereof (but in no event later than three (3) Business Days after such discovery), (x) notify Purchaser in writing of such Omitted Contract and the corresponding related Cure Costs thereof (if any) and (y) if requested by Purchaser in writing, file a motion with the Bankruptcy Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract in accordance with this Section 2.1 (provided that no Omitted Contract shall be assumed by and assigned to Purchaser unless such Omitted Contract shall be accepted at such time in writing by Purchaser as an Assumed Contract).  With respect to each Assumed Contract, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract to the applicable counterparty to such Assumed Contract.

2.2      Retained Assets. Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include any of the following assets, properties or rights (collectively, the "**Retained Assets**"):

(a)      The Wind Down Amount;

(b)      All rights of Sellers under this Agreement, the Transaction Documents or the Retained Contracts;

(c)        (i) All Insurance Policies of each Seller set forth on <u>Schedule 2.2(c)</u>, and all credits, premium refunds, proceeds, causes of action or rights arising thereunder in respect of any loss, liability, destruction or condemnation of any Retained Assets occurring prior to, on or after the Closing or relating to any Retained Liabilities, (ii) any and all insurance refunds or claims made under any Insurance Policies relating to the Purchased Assets or the Assumed Liabilities on or before the Closing Date, and (iii) the amount of, and all rights to any insurance proceeds under any Insurance Policies received by either the Sellers or Purchaser after the date hereof in respect of the loss, destruction or condemnation of any Retained Assets occurring prior to, on or after the Closing or relating to any Retained Liabilities;

(d)        The Organizational Documents, minute books, qualifications to conduct business as a foreign corporation or limited liability company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, personnel records, stock records and Tax Returns of Sellers and other similar books and records, financial records, books of account, bank and brokerage records and statements and any other books and records which Sellers are prohibited from disclosing or transferring to Purchaser under applicable Law or are required by applicable Law to retain;

(e)        All shares of capital stock or other equity interests issued in or issued by a Seller;

(f)        All nontransferable Permits;

(g)        All Contracts of Sellers other than the Assumed Contracts;

(h)        All Seller Plans and any assets of any Seller Plan or any right, title or interest in any of the assets thereof or relating thereto (other than Assumed Seller Plans);

(i)        All Avoidance Actions that are not otherwise Purchased Assets as described in <u>Section 2.1</u>; and

(j)        The assets, properties and rights specifically set forth on <u>Schedule 2.2(j)</u>.

### ARTICLE III
### ASSUMPTION OF LIABILITIES

3.1        <u>Assumed Liabilities</u>. Purchaser shall assume no obligation or other liability of any Seller, or of any predecessor or any Affiliate of any Seller, other than the obligations and other liabilities explicitly set forth in this <u>Section 3.1</u>. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective as of the Closing Date, to assume, pay, perform and discharge when due (subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities are owed), only the following liabilities, responsibilities and obligations of Sellers existing as of the Closing Date (collectively, the "***Assumed Liabilities***"):

(a)        All of Sellers' liabilities, responsibilities and obligations under the Assumed Contracts;

(b)     All claims, liabilities, responsibilities, obligations, costs and expenses arising in any way out of the operation of the Business or the ownership or operation of the Purchased Assets but solely to the extent first arising on or after the Closing Date, including, without limitation, any and all Taxes arising out of or attributable to the operation or ownership of the Purchased Assets and the Business so long as such Taxes have both arisen and become due and payable following the Closing Date; and

(c)     All Cure Costs, subject to the last paragraph of <u>Section 2.1</u>.

3.2     <u>Retained Liabilities</u>. Notwithstanding anything to the contrary in this Agreement or the Transaction Documents, Purchaser shall not assume or be obligated for any liabilities, Claim, Encumbrance or obligations of any and every kind whatsoever, direct or indirect, known or unknown, absolute or contingent, or whatever nature, whether presently in existence or arising hereafter, not expressly assumed by Purchaser under <u>Section 3.1</u> and shall under no circumstances be liable or responsible for any liabilities (other than the Assumed Liabilities) of any Seller, or any predecessor or Affiliate thereof, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place prior to the Closing. Purchaser shall not be a successor in interest to any of the Sellers for any purpose and is not answerable for any successor liability Claims. Sellers shall retain all liabilities, responsibilities and obligations of Sellers not specifically included in the Assumed Liabilities (all such liabilities, responsibilities and obligations not being assumed being herein referred to, collectively, as the "***Retained Liabilities***"). For the avoidance of doubt, the Retained Liabilities shall include, without limitation each of the following items:

(a)     Any liability which is not expressly listed as an Assumed Liability in <u>Section 3.1</u>, including any Claims under Section 503 and 507 of the Bankruptcy Code;

(b)     Any liabilities of any of the Sellers not related to the operation of the Business or the Purchased Assets;

(c)     Any and all liabilities for Taxes, except as otherwise provided in <u>Section 3.1(b)</u> or <u>ARTICLE X</u>;

(d)     Any liabilities relating to or arising out of the Retained Assets;

(e)     Any liabilities in respect of any Retained Contracts, including any liabilities arising out of the rejection of any such Contracts pursuant to section 365 of the Bankruptcy Code;

(f)     Any liabilities to any current or former equityholder or Affiliate of any Seller;

(g)     Any liabilities relating to investigations, Claims or other Legal Proceedings (including any workers' compensation matters and all liabilities arising in connection therewith) which arise out of, relate to or otherwise are in respect of (i) the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing Date, and/or (ii) any violation of any applicable Law or Order by any of the Sellers (or their respective Affiliates);

(h)     Any liabilities arising from the ownership or operation of the Business and/or the Purchased Assets prior to the Closing, including, (i) in respect of indebtedness (including arising under any intercompany loan arrangements or promissory notes), and (ii) all accounts payable (including vendor trade payables) that are not Assumed Liabilities pursuant to Section 3.1(a);

(i)     Any Excluded Employee Liability, except with respect to such liabilities arising under an Assumed Contract;

(j)     Any costs, fees, commissions, expenses and other liabilities owing to any broker, investment banker, financial or restructuring advisor, outside counsel, auditing firm or consultant retained by or on behalf of any Seller (or any of its Affiliates), whether relating to or arising out of the Transactions or otherwise, except as otherwise permitted in the DIP Order;

(k)     Any liability of any Seller with respect to any Lien (except Permitted Liens) (including with respect to the Business and/or the Purchased Assets, to the extent arising out of or relating to the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing); and

(l)     Any liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of any Seller (or any of its Affiliates) (including with respect to any breach of fiduciary obligations by same).

## ARTICLE IV
## CONSIDERATION

4.1     Purchase Price. The total consideration to be paid by Purchaser to Sellers for the Purchased Assets (the "***Purchase Price***") is: (a) a credit bid on a dollar-for-dollar basis of the Purchaser Secured Claims (the "***Credit Bid Amount***"); (b) the payment by Purchaser of the Cure Costs, and (c) the assumption by Purchaser of the Assumed Liabilities.

4.2     Allocation of Purchase Price. The Purchase Price will be allocated for Tax purposes among the Purchased Assets in accordance with Section 1060 of the Code, as determined by Purchaser after consultation with Sellers, and Purchaser shall deliver to Sellers the allocation within one hundred (100) days after Closing. Purchaser and Sellers shall not take any positions that are inconsistent with this allocation unless required to do so by applicable Law.

4.3     Cure Costs. Purchaser shall as promptly as reasonably practicable or thereafter upon assumption of the applicable Assumed Contract, pay all Cure Costs associated therewith (if any).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing, as follows:

5.1     Organization and Good Standing.

(a)     Each of LT Smile Holdings, LLC, Benevis Affiliates, LLC, Benevis, LLC, and Benevis Informatics, LLC are limited liability companies duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)     Each of LT Smile Corporation, Benevis Holding Corp., and Benevis Corp. are corporations duly organized, validly existing and in good standing under the laws of the State of Delaware.

(c)     Schedule 5.1(c) sets forth a list of each of the professional corporations or organizations to which the Sellers provide any management services (the "***Supported Entities***"), the state where each Supported Entity is incorporated or organized, and each state in which each Supported Entity is authorized to do business. Each shareholder of the Supported Entities is duly licensed to practice dentistry in the states set forth next to such shareholder's name on Schedule 5.1(c).

(d)     Each Seller and Supported Entity is, and to Seller's Knowledge the Benevis Protected Cell Series is, duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the ownership of Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (a) would not adversely affect the ability of a Seller to carry out its obligations under this Agreement or the Transaction Documents and to consummate the Transactions, and (b) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, the Purchased Assets or the Assumed Liabilities.

5.2     Power; Authority; Enforceability. Each Seller has full corporate or limited liability company power, as applicable, to:  (a) own, lease and operate the Purchased Assets and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) execute, deliver and perform this Agreement, the Transaction Documents and all other agreements and documents to be executed and delivered by such Seller in connection herewith (the "***Seller Documents***"), subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.  All requisite actions to approve, execute, deliver and perform this Agreement and the Seller Documents have been taken by Sellers. This Agreement and each of the Seller Documents have been duly executed and delivered by such Seller and constitute binding obligations of such Seller, enforceable against each such Seller, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting creditors' rights generally and by principles of equity.

5.3     Title to Assets. Sellers have or will have as of immediately prior to the Closing good and valid title to, or, in the case of leased or subleased Purchased Assets (including the Leased Real Property), valid and subsisting leasehold interests in, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens). Upon consummation of the Transactions at the Closing and subject to the entry of the Sale Order, Seller will convey such title to or rights to use, all of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens) to Purchaser.  Except for the Retained Assets, the Purchased Assets constitute all

of the assets, rights, interests, claims and properties used in (to the extent Sellers hold rights, title and interest in such tangible personal property) or held for use in the conduct of the Business, or otherwise necessary for Purchaser to conduct and operate the Business immediately after the Closing in all material respects as presently conducted by Sellers.  All tangible Purchased Assets are located on the Leased Real Property.

5.4     Noncontravention; Governmental Filings. Subject to the entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement and the Transaction Documents and the consummation of the Transactions do not and will not (a) violate any Seller's Organizational Documents or (b) assuming compliance with the matters referred to in the last sentence of this Section 5.4, to the Knowledge of Sellers, violate any applicable Law (including, for the avoidance of doubt, with respect to the assignment and assumption of the equity interests of the Benevis Protected Cell Series, subject to Section 2.1(u)). Subject to the entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement, the Transaction Documents and the consummation of the Transactions by Sellers require any action by or in respect of, notification to or filing with, any Governmental Authority other than (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (ii) Healthcare Regulatory Consents (if any).

5.5     Litigation. Except as disclosed on Schedule 5.5, as of the date hereof, there are no Legal Proceedings pending against or, to the Knowledge of Sellers, threatened in writing against any Seller, or manager, director, officer or key employee of any Seller or Supported Entity involving, relating to or affecting, the Purchased Assets, Assumed Liabilities or the Business before any Governmental Authority which (a) if determined adversely to any such Seller or Supported Entity, would be, individually or in the aggregate, material with respect to the Purchased Assets, Assumed Liabilities or the Business, or (b) questions the validity of this Agreement, any Transaction Document or the Transactions, or in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

5.6     Permits. Schedule 5.6 sets forth a complete and correct list of all Permits required to own the Purchased Assets and conduct and operate the Business in a manner consistent with the current practices of Sellers in the Ordinary Course of Business.  Except as set forth on Schedule 5.6, (a) each Seller and to the Knowledge of Seller, each Supported Entity (if applicable) has obtained and is in material compliance with the terms and requirements of each Permit and (b) each such Permit is valid and is presently in full force and effect; and no written notice of revocation, modification, refusal to renew or violation of any Permit has been received from any Governmental Authority and no Legal Proceeding is pending (or threatened) seeking to revoke, suspend, modify, cancel or limit any such Permit. The provisions of this Section 5.6 shall not be deemed to apply to Health Care Laws and Health Care Permits or to any matters covered by Section 5.9.

5.7     Intellectual Property Rights.

(a)     Schedule 5.7(a) sets forth all Transferred Intellectual Property Rights that are registered with any Governmental Authority or authorized registrar or for which an application for registration with any Governmental Authority or authorized registrar has been filed as of the date hereof, in each instance enumerating the applicable application number, registration number,

title, date of filing, date of issuance, and owner (collectively, the "**Registered Transferred Intellectual Property Rights**"). To the Knowledge of Sellers, all Registered Transferred Intellectual Property Rights is subsisting and in full force and effect.

(b)     A Seller is the sole and exclusive legal, beneficial, and with respect to Registered Transferred Intellectual Property Rights, record owner of all right, title and interest in and to the Transferred Intellectual Property Rights, free and clear of all Liens (except Permitted Liens). To the Knowledge of Sellers, all of the Transferred Intellectual Property Rights are valid and enforceable, and constitute all of the Intellectual Property Rights owned, used or held for use by any Seller in connection with the Business or otherwise necessary to operate the Business as presently conducted by the Sellers (and as conducted in the Ordinary Course of Business).

(c)     Except as disclosed on Schedule 5.7(c), to the Knowledge of Sellers, (i) the conduct of the Business by Sellers as currently conducted (including the products and services sold or provided by Sellers) does not infringe, misappropriate or otherwise violate any Person's Intellectual Property Rights, and no such claims are pending or threatened in writing against any Seller, and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property Rights included in the Purchased Assets, and no such claims are pending or threatened in writing against any Person by any Seller.

(d)     To the Knowledge of the Sellers, (i) no Seller has experienced any material failures, disruptions, unauthorized intrusions or breaches of its information technology or telecommunications networks, nor any material loss, theft or unauthorized access to or use of any personal information held by or on behalf of such Seller, and (ii) each Seller has implemented industry standard security measures to protect the security of its information technology and telecommunications networks and systems and the privacy and security of any material data or personal information stored thereon.

5.8     Compliance with Laws. Each Seller and to the Knowledge of Sellers, each Supported Entity is, and for the past six (6) years has been, in compliance and has not been in violation of any Law (other than Healthcare Laws) applicable to the Purchased Assets, the Assumed Liabilities or the conduct of the Business, except for violations or instances of non-compliance, which do not or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, the Purchased Assets or the Assumed Liabilities.

5.9     Healthcare Regulatory Matters.

(a)     Except as set forth on Schedule 5.9(a), each Seller and, to the Knowledge of Sellers, each Supported Entity is and has at all times been in compliance in all material respects with all Health Care Laws.  Except as set forth on Schedule 5.9(a), to the Knowledge of Sellers, there has been no threatened material legal proceedings or actions relating to non-compliance by, or liability of, the Sellers or any Supported Entity under any Health Care Law.  Except as set forth on Schedule 5.9(a), no Seller and to the Knowledge of Sellers, no Supported Entity has (a) been the subject of any inspection, investigation, survey, audit, monitoring or other form of review by any Governmental Authority in the last four (4) years, except in the Ordinary Course of Business; or (b) been served with or received any search warrant, subpoena, civil investigation demand, or

contact letter by or from any Governmental Authority with regard to any alleged or actual violation of applicable Health Care Laws by any Seller or Supported Entity.

(b)     Schedule 5.9(b) sets forth a complete list of the material Health Care Permits of the Sellers and to the Knowledge of Sellers, each of the Supported Entities.  Each Seller and to the Knowledge of Sellers, each Supported Entity owns, holds, and possesses, and has at all times owned, held and possessed, all material Health Care Permits required for the conduct of its business as presently conducted.  No Seller and to the Knowledge of Sellers, no Supported Entity has received written notice that any Governmental Authority is considering limiting, suspending, terminating, adversely amending or revoking any such Health Care Permit.  All such Health Care Permits are, and have at all times been, valid and in full force and effect and Sellers and to the Knowledge of Sellers, the Supported Entities are in material compliance with the terms and conditions of all such Health Care Permits.

(c)     Except as set forth on Schedule 5.9(c), to the Knowledge of Sellers, the Supported Entities and each licensed professional or other individual employed by or contracted with the Supported Entities who otherwise provides health care services through the Supported Entities (the "*Practitioners*") are, and have been, during the past four (4) years, in material compliance with the requirements of participation and coverage of, and where applicable are parties to valid supplier or other participation agreements for payment by, Medicaid, any other state or Government Programs, any private insurance company, health maintenance organization, preferred provider organization, managed care organization or government contracting agency (collectively, the "*Programs*") to the extent they bill or receive reimbursement from a particular Program in connection with services provided as an employee or agent of the Sellers and Supported Entities.  Within the past four (4) years, no Seller and to the Knowledge of Sellers, no Supported Entity has received any written notice from any Program that such Program is to be cancelled or modified in a manner materially adverse to the Sellers and Supported Entities.

(d)     No Seller and to the Knowledge of Sellers, no Supported Entity nor any Practitioner: (a) is, or was a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, (b) has any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (c) except as set forth on Schedule 5.9(d), has ever received any subpoena, or been indicted or charged or investigated in connection with any material violation of any Health Care Law, or (d) is or was excluded or debarred from any Program.

(e)     No Seller nor any of its directors, managers, officers or employees and to the Knowledge of Sellers, no Supported Entity nor any of its directors, managers, officers, employees or Practitioners, has engaged in any of the following during the last four (4) years:  (a) knowingly and willfully soliciting, paying, or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (i) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Government Program, or (ii) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Program; (b) presenting or causing to be presented a claim for reimbursement for services that is for an item or service that was known or should have

- 23 -

been known to be (i) not provided as claimed, or (ii) false or fraudulent; or (c) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation of a material fact or omitting a material fact required to be stated therein, or necessary to make the statements contained therein not misleading, with respect to information required to be provided under 42 U.S.C. §1320a-3.

(f)     To the Knowledge of Sellers, each Practitioner is, and has been in the last four (4) years, duly licensed to practice in the state in which he or she provides services and, each such Practitioner who is or was permitted by law to dispense or prescribe drugs has been during the last four (4) years and is validly registered with the United States Drug Enforcement Administration under the Controlled Substances Act.  To the Knowledge of Sellers, no event has occurred during such period and no fact, circumstance or condition exists that has or reasonably may be expected to result in the denial, loss, revocation, or rescission of or to such professional licenses.

(g)     Each Seller and to the Knowledge of Sellers, each Supported Entity has instituted a compliance program designed to promote compliance with all applicable Health Care Laws applicable to the operations of Sellers and the Supported Entities, and to detect, prevent and address violations of such Laws that includes policies, procedures and training (including on HIPAA and other relevant matters). Sellers operate in material compliance with such compliance program.

(h)     To the Knowledge of Sellers, all billing practices and billings by the Supported Entities for services, including billings to all Government Programs and other Programs, have been true and correct in all material respects and in material compliance with all applicable Health Care Laws. To the Knowledge of Sellers, Schedule 5.9(h) sets forth all notices, subpoenas and material correspondence related to billing, utilization, reimbursement or other government or third party audits or investigations targeted at the Supported Entities, currently in process, other than such correspondence received in the Ordinary Course of Business.  To the Knowledge of Sellers, except as permitted by Law, none of the Supported Entities have waived or discounted patient responsibility for any services provided by any of the Supported Entities or have engaged in any "balance billing" unless permitted contractually and by Law.  Except as set forth in Schedule 5.9(h), to the Knowledge of Sellers, no Program or Government Program has requested, asserted or threatened any material recoupment, refund, or set-off from any Supported Entity.  To the Knowledge of Sellers, no Supported Entity has received an overpayment by any Governmental Authority, including any intermediary or carrier, which has not been timely repaid to such Government Program, and all material undisputed refunds, discounts and adjustments that such Supported Entity has identified, and been obligated to pay under applicable Law pertaining to Governmental Programs or any applicable Health Care Laws, have been repaid. Except as set forth on Schedule 5.9(h), to the Knowledge of Sellers, no Supported Entity has retained any overpayment from any Program.

(i)     Schedule 5.9(i) sets forth a complete and correct list of all business continuity agreements ("**Business Continuity Agreements**" or "**BCAs**") among (i) each Supported Entity, (ii) certain Practitioners who own equity interests in a Supported Entity and (iii) certain other Practitioners who own equity interests in such Supported Entity (collectively, the "**Dentist Partners**").  Except as set forth on Schedule 5.9(i), for the last four (4) years, to the Knowledge of

the Sellers, each BCA is valid and enforceable and none of the Dentist Partners have given written notice of, and to the Knowledge of Sellers, none of the Dentist Partners have orally expressed plans to act in contravention of the BCAs or any other ancillary agreements related to the operations of a Supported Entity, in any manner which would reasonably be expected to have a Material Adverse Effect.

5.10    Employees.

(a)    Schedule 5.10 sets forth a complete and correct list of all Business Employees as of the date hereof, including each Business Employee's (a) annual compensation or rate of pay, as applicable (as of the date hereof), (b) employment agreement (if any), (c) employment location (city and state), (d) title or employment position, (e) date of hire or, if applicable, date of rehire, (f) applicable paymaster/payroll entity, and (g) the amount of accrued but unused vacation or paid time off as of the date hereof, with each such individual identified as (i) salaried or hourly, (ii) exempt or nonexempt, (iii) union or nonunion, (iv) full-time or part-time, (v) temporary, regular or leased/staffing agency and (vi) active or inactive (with the reason for such inactive status specified, e.g., leave of absence, FMLA, disability, layoff, etc.).

(b)    (i) Neither Sellers nor any of their respective Affiliates is, or has ever been, a party to or bound by any union collective bargaining agreements or other labor contracts covering any Business Employee, there are no unions or similar labor organizations representing or purporting to represent or, to the Knowledge of Sellers, attempting to represent, any Business Employee and no Business Employee is attempting, or has attempted, to form a union or similar labor organization; (ii) neither Sellers nor any of their respective Affiliates are experiencing or have experienced in the three (3) years prior to the date of this Agreement, any material labor disputes or work stoppages due to labor disputes in connection with their business and operations and there is not currently, and has not been in the three (3) years prior to the date of this Agreement, any labor strike, dispute, slow down or stoppage actually pending or, threatened against Sellers or any of their respective Affiliates; (iii) neither Sellers nor any of their respective Affiliates have in the three (3) years prior to the date of this Agreement engaged in any unfair labor practices within the meaning of the National Labor Relations Act with respect to its employees or other individuals who provide services that support the business and operations; (iv) neither Sellers nor any of their respective Affiliates have (A) in the ninety (90) days preceding the date of this Agreement implemented any mass layoffs, plant closings or shutdowns as defined under the WARN Act or (B) incurred any liability or obligation under the WARN Act that remains unpaid or unsatisfied; (v) there are no pending employment discrimination, employee health and safety, unfair labor practice, wage and hour, unemployment compensation, worker's compensation, immigration, union grievance or other employment-related claims, citations, proceedings or, to the Knowledge of Sellers, investigations or allegations against Sellers, any of the Supported Entities or any of their respective Affiliates; and (vi) Sellers and their respective Affiliates have complied in all material respects with all applicable legal requirements relating to employment and employment practices, including all legal requirements respecting terms and conditions of employment, wages, hours, classification of employees, including for minimum wage, overtime, and independent contractor purposes, discrimination in employment, immigration, occupational health and safety, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations and collective bargaining and are not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing. To the Knowledge of

- 25 -

Sellers, in the last four (4) years, no allegations of sexual or other unlawful harassment or discrimination have been made against (i) any officer of Sellers or any of the Supported Entities or (ii) any Business Employee receiving annualized total compensation of $150,000 or more. Sellers, the Supported Entities and their respective Affiliates have correctly classified each of its respective service providers as "partners", "employees" or "independent contractors" and as "exempt" or "non-exempt" for all purposes and has properly reported all compensation paid to such service providers for all purposes.

5.11    <u>Employee Benefit Plans</u>.

(a)    <u>Schedule 5.11(a)</u> contains a complete and accurate list of all Seller Plans. Seller has provided to, or made available to, Purchaser true, correct and complete copies of each Seller Plan (including all plan documents and amendments thereto) including (i) each plan document, and in the case of an unwritten plan, a written description thereof, (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the most recently filed annual report (Form 5500 and all schedules thereto), (v) the most recent Internal Revenue Service determination or opinion letter, (vi) the most recent summary annual report, actuarial report, financial statement and trustee report and (vii) any material correspondence with a Governmental Authority. There are no pending or, to the Knowledge of Sellers, threatened claims, litigation or other proceedings with respect to any Seller Plan, other than ordinary and usual claims for benefits by participants and beneficiaries.

(b)    Each Seller Plan (and any related trust or other funding vehicle) has been established, maintained, funded, operated and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws and there has been no written notice issued by any Governmental Authority questioning or challenging such compliance, and there are no audits, examinations, investigations or other legal proceedings (other than non-material routine claims for benefits) pending, or, to the knowledge of Sellers, threatened, involving any such Seller Plan or the assets of any such Seller Plan.  Except as could not be reasonably expected to result in any material liability, no Seller Plan is subject to any audit, investigation, or examination by any Governmental Authority and no such actions are pending or, to the knowledge of Sellers, threatened with respect to any Seller Plan.

(c)    Each Seller Plan which is intended to be qualified within the meaning of Code Section 401(a) is so qualified and has received, or timely requested, a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and its trust is exempt from federal taxation under Code Section 501(a), and to the knowledge of Sellers nothing has occurred that is reasonably likely to adversely affect the qualified status of such Seller Plan.

(d)    Except as set forth on <u>Schedule 5.11(d)</u>, none of Sellers or any of their respective ERISA Affiliates maintains, sponsors, contributes to or is required to contribute to, or has ever maintained, sponsored, contributed to or been required to contribute to: (i) any Multiemployer Plan, (ii) any pension plan subject to Title IV of ERISA, Part 3 of Title I of ERISA or Section 412 of the Code, (iii) any "multiple employer plan" as defined in Section 413(c) of the

Code, (iv) any multiple employer welfare arrangement as defined in Section 3(40) of ERISA, (v) a voluntary employee benefit association under Section 501(c)(9) of the Code, or (vi) any plan which provides, or under which Sellers or any of their respective ERISA Affiliate thereof has any liability to provide, retiree or post-employment life insurance, medical, severance or other employee welfare benefits to any participant, except as required by Section 4980B of the Code or any similar applicable Law and at the sole expense of the applicable participant.

(e)     Neither Sellers nor any of their respective ERISA Affiliates sponsor, maintain, or contribute to, or otherwise have any liability with respect to, any Seller Plan that may not be terminated by Sellers or any of their respective ERISA Affiliates in their sole discretion at any time without material liability.

(f)     Neither the execution nor the delivery of this Agreement or any other document related to the Transaction or other agreement by Sellers or their respective Affiliates, nor the consummation of the Transactions, either alone or in combination with another event, will (i) entitle any Business Employee to any payment; (ii) increase the amount of compensation or benefits due to any Business Employee; (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefits; (iv) result in any obligation or other liability to or obligation or commitment by Purchaser or any of its Affiliates to any Business Employee; or (v) result in any "parachute payment" within the meaning of Code Section 280G or any similar foreign, state or local Laws. No current or former Business Employee or other service provider of the Sellers has a right to receive a gross-up payment with respect to any excise Taxes that may be imposed upon such individual pursuant to Code Section 409A or Code Section 4999 or otherwise.

5.12    Real Property.

(a)     The Leased Real Property constitutes all of the real property (whether leased, subleased or licensed) used by Sellers and the Supported Entities in connection with the Business.   Sellers and the Supported Entities do not own any real property which is used in connection with the Business.

(b)     Schedule 5.12(b) lists each lease or sublease, including all amendments, modifications or supplements thereof, pursuant to which a Seller or Supported Entity occupies any Leased Real Property (collectively, the "***Real Property Leases***").   Sellers have delivered (or otherwise made available) to the Purchaser a true, correct and complete copy of each Real Property Lease, in each case, as amended or otherwise modified and in effect, together with extension notices, lease summaries, notices or memoranda of lease, estoppel certificates and subordination, non-disturbance and attornment agreements related thereto.

5.13    Contracts.

(a)     Schedule 5.13(a) sets forth a list of all executory Contracts and other Contracts material to the Business (including the Real Property Leases) to which any Seller is a party or by which any Seller, the Business or the Purchased Assets are bound or to which the Assumed Liabilities relate, including any Contract under which any Seller continues to have any obligation or liability as of the date of this Agreement, and Sellers' good faith estimate of the Cure

Costs associated with each. Sellers have made available to Purchaser or its Representatives true, complete and correct copies of all material Contracts (including any amendments thereto).

(b)     Other than the obligation to pay Cure Costs (if any) set forth on Schedule 5.13(a), or as a result of (i) rejection by Sellers in the Bankruptcy Cases, (ii) the automatic stay under the Bankruptcy Code, (iii) any consequence of any of the foregoing, and except as set forth on Schedule 5.13(b), with respect to each such Contract no Seller nor, to the Knowledge of Sellers, any Supported Entity that is party thereto, as applicable, or any third party is in default or breach with respect to any obligation to be performed under any such material Contract, except for any breach or default, individually or in the aggregate, that would not reasonably be expected to be material to the Business, the Purchased Assets, or the Assumed Liabilities. Each such Contract is valid, binding and in full force and effect, enforceable against all applicable Sellers (or any Supported Entity that is party thereto, as applicable) and, to the Knowledge of Sellers, enforceable against the other party or parties thereto, in each case, in accordance with the terms thereof (except (A) as enforcement may be limited by applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, equitable subordination or similar Laws of general application and other Laws affecting creditors' rights generally and (B) insofar as the availability of equitable remedies may be limited by applicable Law).

5.14    Environmental Matters.  Except as set forth on Schedule 5.14, to the Knowledge of Sellers, Sellers are in compliance in all material respects with all applicable Environmental Laws with respect to the Leased Real Property. No Seller is the subject of any outstanding liability in respect of violations of Environmental Laws or any Release of a Hazardous Substances by any Seller. The Sellers have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business, subject to renewal of such Permits in the ordinary course of business.

5.15    Insurance. Schedule 5.15 sets forth a true and complete list of the insurance policies (collectively, the "***Insurance Policies***") maintained by each Seller that cover (or relate to) the Business, the Purchased Assets and/or the Assumed Liabilities. Each of the Insurance Policies are in full force and effect and all premiums due thereon as of the date hereof have been paid. Except as set forth on Schedule 5.15, there are no claims, by or with respect to any Seller pending under any of the Insurance Policies or disputes with insurers with respect thereto. Sellers have made available to Purchaser true, complete and accurate copies of all Insurance Policies. Sellers have not received any written notice of cancellation or non-renewal of, or material reduction of coverage with respect to, any such Insurance Policy.

5.16    Brokers or Finders. Except as set forth on Schedule 5.16, Sellers have not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

5.17    No Implied or Other Representations or Warranties. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLERS AND ANY OF THEIR RESPECTIVE AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR

IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE PURCHASED ASSETS, AND IT IS UNDERSTOOD THAT EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, PURCHASER TAKES ALL OF SUCH PROPERTIES AND ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.  NEITHER SELLERS NOR ANY STOCKHOLDERS, MEMBERS, EMPLOYEES, MANAGERS, DIRECTORS, OFFICERS OR REPRESENTATIVES OF SELLERS HAVE MADE, AND SHALL NOT BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES IN ANY PRESENTATION OF THE BUSINESS OF SELLERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREIN, AND NO STATEMENT MADE IN ANY SUCH PRESENTATION SHALL BE DEEMED A REPRESENTATION OR WARRANTY HEREUNDER OR OTHERWISE.  IT IS EXPRESSLY UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS, PREDICTIONS OR FORWARD-LOOKING STATEMENTS CONTAINED IN ANY DATA, FINANCIAL INFORMATION, MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS ARE NOT AND SHALL NOT BE DEEMED TO BE OR INCLUDE PRESENTATIONS OR WARRANTIES OF SELLERS OR OF ANY STOCKHOLDER, MEMBER, EMPLOYEE, MANAGER, DIRECTOR, OFFICER, OR REPRESENTATIVE OF SELLERS.

## ARTICLE VI
## <u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>

Purchaser hereby represents and warrants to Sellers, as of the date hereof and as of the Closing, as follows:

6.1     <u>Organization and Good Standing</u>. Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

6.2     <u>Power; Authority; Enforceability</u>. Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "***Purchaser Documents***"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser, including approval of its board of directors and stockholders (as applicable), necessary for it to validly execute and deliver, this Agreement and each Purchaser Document.  This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by the Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a legal proceeding at law or in equity).  None of the execution

and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

6.3     Consents.

(a)     Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents (if any), (ii) approvals under applicable Laws, if any, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect on the Business or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Transactions.

(b)     The execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will not conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Transactions.

6.4     No Conflicts. No action taken by or on behalf of Purchaser in connection herewith, including, but not limited to, the execution, delivery and performance of this Agreement, and each other agreement and document delivered by it in connection herewith, and consummation of the Transactions, (a) gives rise to a right of termination or acceleration under any Contract to which Purchaser is a party or by which Purchaser is bound; (b) conflicts with or violates (i) any Law; (ii) Purchaser's Organizational Documents; or (iii) any Order to which Purchaser is subject; or (c) constitutes an event which, after notice or lapse of time or both, could result in any of the foregoing, except as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay Purchaser's ability to consummate the Transactions.

6.5     Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened in writing against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions. Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions.

6.6     Brokers or Finders. Purchaser has not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

6.7     Financing. Purchaser has or will have as of the Closing Date adequate cash on hand to enable it to fulfill its obligations under this Agreement.  Purchaser acknowledges and agrees that Purchaser's obligations under this agreement are not contingent on obtaining adequate financing.

6.8     Purchaser's Investigation. Purchaser represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets.  Notwithstanding anything in this Agreement to the contrary, Purchaser acknowledges that it is accepting the Purchased Assets in their present condition and with their present operating capabilities. Purchaser acknowledges that Sellers make no warranty, express or implied or written or oral, as to the condition of the Purchased Assets or as to the accuracy or completeness of any information regarding any Seller, the Business, any Purchased Asset, any Retained Asset, any Assumed Liability, any Retained Liability or the Transactions, including any data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business, the Purchased Assets, the Assumed Liabilities and the Transactions, except as expressly set forth in this Agreement.  Purchaser has not relied upon, and Sellers shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Business or the Purchased Assets, except as may be contained in this Agreement.  Purchaser has inspected, or waived its right to inspect, the Purchased Assets for all purposes and satisfied itself as to their condition.  Purchaser is relying solely upon its own inspection of the Purchased Assets, and Purchaser shall accept all of the same in their "as-is" and "where-is" condition.  Purchaser acknowledges that the representations and warranties of Sellers contained in this Agreement constitute the sole and exclusive representations and warranties of Sellers to Purchaser in connection with this Agreement and the Transactions, and Purchaser acknowledges that all other representations and warranties, including all warranties of merchantability or fitness for a particular purpose, are specifically disclaimed and may not be relied upon or serve as a basis for a claim against any Seller.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     Conditions to Obligations of All Parties. The obligation of each Party to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by each Party:

(a)     The Bankruptcy Court shall have issued an Order approving the Bid Procedures Order.

(b)     The Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order.

(c)      There shall be no Order of any nature which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions.

(d)      All Healthcare Regulatory Consents shall have been obtained.

7.2      <u>Conditions to Purchaser's Obligations</u>. The obligation of Purchaser to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waiveable) by Purchaser:

(a)      Each of the Seller Fundamental Representations shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such Seller Fundamental Representations speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except such inaccuracies that, individually or in the aggregate, are de minimis and (ii) all other representations and warranties of Sellers contained in this Agreement or any Transaction Document (but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein) shall be true and correct in all respects at and as of the date hereof and as of the Closing Date as though made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except where the failure of such representations and warranties which are the subject of this clause (ii) to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      Sellers shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

(c)      Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(d)      All Permits set forth on <u>Schedule 2.1(f)</u> shall have been transferred to Purchaser as legal and beneficial holder thereof, or, if any Permit is not transferable, a replacement permit or license (as applicable), on substantially similar terms shall have been issued to Purchaser.

(e)      Each Seller shall have delivered to, or caused to be delivered to, Purchaser the following documents, duly executed by such Seller (where appropriate):

(i)      A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)      A duly executed counterpart of the IP Assignment Agreement;

(iii)      A certificate, dated the Closing Date and signed by an authorized officer of such Seller, certifying (A) that the conditions contained in <u>Sections 7.2(a)</u> and <u>(b)</u> have been satisfied, (B) that attached thereto are true and complete copies of all resolutions adopted by the board of directors or managers, as applicable, of such Seller

authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby and (C) the names and signatures of the officers of such Seller authorized to sign this Agreement and the other documents to be delivered hereunder;

(iv)     A copy of the Sale Order;

(v)      Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement;

(f)      Cash, in an amount equal to the Wind Down Amount, shall be retained in an account designated by Sellers, which is a Retained Asset.

(g)      Sellers shall not have applied for, incurred or otherwise received any assistance from the Department of Health and Human Services or any other Governmental Authority in the form of indebtedness, grants or any other form under the Public Health and Social Services Emergency Fund of the Coronavirus Aid Relief and Economic Security (CARES) Act, the Paycheck Protection Program and the Health Care Enhancement Act, or other similar legislation in connection with COVID-19, except as set forth on Schedule 7.2(g).

(h)      If Purchaser has not exercised its right to remove the equity interests of the Benevis Protected Cell Series from the Purchased Assets pursuant to Section 2.1(u), then Sellers shall have (i) obtained all required consents from the applicable parties (including Maple Shade Assurance LLC and Berkley Life and Health Insurance Company), and (ii) made all necessary filings with the applicable Governmental Authority and shall have obtained all Governmental Approvals, in each case for the continued use, operation and management by Purchaser of Benevis Protected Cell Series.

7.3     Conditions to Sellers' Obligations. The obligation of each Seller to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waiveable) by Sellers:

(a)      (i) Each of the Purchaser Fundamental Representations shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such Purchaser Fundamental Representations speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), and (ii) all other representations and warranties of Purchaser contained in this Agreement or the Transaction Documents (but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein) shall be true and correct in all respects at and as of the date hereof and as of the Closing Date as though made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except for such failure to be so true and correct that, individually or in the aggregate, have not had, and would not reasonable be expected to have, a Material Adverse Effect on the ability of Purchaser to consummate the Transactions.

(b)     Purchaser shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c)     Purchaser shall deliver a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Purchased Assets.

(d)     Purchaser shall have delivered to, or caused to be delivered, to Sellers the following documents, duly executed by Purchaser (where appropriate):

(i)     A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)     A duly executed counterpart of the IP Assignment Agreement;

(iii)     A certificate, dated the Closing Date and signed by an authorized officer of Purchaser, certifying (A) that the conditions contained in Sections 7.3(a) and (b) have been satisfied, (B) that attached thereto are true and complete copies of all resolutions adopted by the board of directors or managers of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby and (C) the names and signatures of the officers of Purchaser authorized to sign this Agreement and the other documents to be delivered hereunder; and

(iv)     Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## ARTICLE VIII
## COVENANTS

8.1     Conduct of the Business.

(a)     From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.2 and the Closing Date, except as expressly set forth on Schedule 8.1(a), Sellers agree to, and agree to use commercially reasonable efforts to cause the Supported Entities to, with respect to the Business: (i) conduct the Business (including the operation thereof) in the Ordinary Course of Business; (ii) use commercially reasonable efforts to preserve the goodwill and present business relationships (contractual or otherwise) with all Supported Entities, customers, patients, suppliers, resellers, employees, licensors, distributors and others having business relationships with the Business; (iii) use their commercially reasonable efforts to keep available the services of the Business' (including the Supported Entities') current officers, directors, employees and consultants; (iv) use their commercially reasonable efforts to preserve and maintain (consistent with past practice) in all material respects the Business' present properties and its tangible and intangible assets (including all of the Purchased Assets); (v)  comply in all

material respects with all applicable Laws and material Contracts; (vi) pay all applicable Taxes as such Taxes become due and payable; and (vii) maintain all existing Permits.

(b)     From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.2 and the Closing Date, except (i) in the Ordinary Course of Business, (ii) as required by applicable Law, (iii) as required by the Bankruptcy Court or this Agreement, (iv) as disclosed on Schedule 8.1(b), or (v) with the prior written consent of Purchaser, Sellers will not, and will use commercially reasonable efforts to cause the Supported Entities not to, with respect to the Business:

(i)     acquire a material amount of assets from (or the equity interests of) any other Person, or sell, lease, license, transfer, encumber or otherwise dispose of any Purchased Assets;

(ii)     modify, amend, supplement or terminate any Assumed Contract;

(iii)     fail to maintain and keep in full force and effect all existing insurance policies for the benefit of the Business or the Purchased Assets (including the Insurance Policies), other than such insurance policies that expire by their terms (in which event Sellers shall use reasonable best efforts to renew or replace such insurance policies) or changes to such insurance policies made in the Ordinary Course of Business;

(iv)     except to the extent required by the terms of the applicable Seller Plan as in effect on the date hereof (excluding any discretionary actions permitted under any Seller Plan), (i) increase the salary, bonus or severance arrangements of any employee or other service provider receiving annualized total compensation of $150,000 or more; (ii) adopt, enter into, amend or terminate any Seller Plan (including any employee benefit plan or arrangement which would be a Seller Plan if entered into as of the date hereof); (iii) exercise any discretion to accelerate the vesting or payment of any compensation or benefit under any Seller Plan; (iv) grant any loan to, increase the compensation or benefits of or pay any material bonus to any employee or other service provider; (v) grant any severance, change of control, retention, termination or similar compensation or benefits to any employee or other service provider; (vi) pay to any employee or other service provider any benefit or amount not required under any Seller Plan as in effect on the date of this Agreement; (vii) hire or terminate the employment of any employee receiving annualized total compensation of $150,000 or more; (viii) transfer the employment of any employee from a status in which such employee would have been a Business Employee to a status in which such employee will not be a Business Employee; or (ix) transfer the employment of any employee from a status in which such employee would not have been a Business Employee to a status in which such employee will be a Business Employee;

(v)     make, revoke or change any Tax election, file any amended Tax Return, revoke or change any Tax accounting method, enter into any closing agreement within the meaning of Section 7121 of the Code, request any Tax ruling with or from a Governmental Authority, surrender any right to claim a Tax refund, offset or other reduction in Tax liability, consent to any extension or waiver of limitations period applicable to any Tax claim or assessment, or settle any Tax proceeding;

(vi)     change any financial accounting policies or procedures or any methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(vii)    (A) materially accelerate collection of notes or Accounts Receivable in advance of their regular due dates or the dates when the same would have been collected in the Ordinary Course of Business; (B) materially delay or accelerate payment of any account payable in advance of its due date or the date such liability would have been paid in the Ordinary Course of Business; (C) make any material changes to cash management policies; or (D) materially delay or postpone the repair or maintenance of the Purchased Assets (including any of the Leased Real Property).

(viii)   adopt any amendments to the Organizational Documents of any Seller;

(ix)     form any new subsidiary of any Seller;

(x)      waive, release, assign, settle or compromise any material pending or threatened Legal Proceeding;

(xi)     demolish or remove any Improvement on the Leased Real Property or erect Improvements on the Leased Real Property or any portion thereof;

(xii)    make or enter into any new commitment for capital expenditures (except as permitted pursuant to the DIP Facility);

(xiii)   subject any of the Purchased Assets to any Lien, except for permitted post-petition liens and any Lien secured and granted pursuant to the DIP Order or a cash collateral order;

(xiv)    take any action with respect to the Purchased Assets, the Assumed Liabilities or the Business relating to, as a result of, or on the basis of, the COVID-19 pandemic, except to the extent required by applicable Law;

(xv)     take any action that would reasonably be expected to cause the failure of any condition contained in Section 7.2 (other than actions taken by Sellers in connection with the discharge of their fiduciary duties during the Bankruptcy Cases); or

(xvi)    agree or commit to do any of the foregoing.

8.2     Access. From the date hereof until the Closing Date, Sellers shall provide Purchaser and its representatives reasonable access, during normal business hours upon reasonable advance notice, to Sellers' personnel, facilities and all books and records and such other information and Persons relating to the Business as Purchaser may reasonably request in such a manner as not to interfere with the conduct of the Business.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to disclose any information to Purchaser if such disclosure would (x) jeopardize any attorney-client or other privilege; or (y) contravene any applicable Law or fiduciary duty.

8.3     Bankruptcy Court Matters.

(a)     Bankruptcy Court Filings.

(i)     Sale Order and Bidding Procedures Order. Seller shall seek entry of the Sale Order, the Bidding Procedures Order, and any other necessary orders by the Bankruptcy Court to consummate the Closing as soon as reasonably practicable following the execution of this Agreement. Purchaser and Sellers understand and agree that the Transaction is subject to approval by the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and Bidding Procedures Order, including a finding of adequate assurance of future performance by Purchaser, and furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(ii)     Sellers shall file such motions or pleadings as may be appropriate or necessary to: (A) assume and assign the Assumed Contracts, and (B) subject to the consent of the Purchaser, determine the amount of the Cure Costs; provided that nothing herein shall preclude Sellers, subject to Purchaser's prior written consent, from filing such motions to reject any Contracts or Leases that are not listed on Schedule 2.1(e) or that have been designated for rejection by Purchaser.

(iii)     Sellers shall (A) consistent with their respective obligations as fiduciaries under the Bankruptcy Code, cooperate with Purchaser concerning the Bidding Procedures Order, the Sale Order, and any other orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement, and (B) use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to this Agreement or the transactions contemplated hereby, in advance of the proposed filing date so as to permit the Purchaser sufficient time to review and comment on such drafts and, with respect to all provisions that impact the Purchaser or relate to the transactions contemplated by this Agreement, such pleadings and proposed orders shall be in form and substance acceptable to the Purchaser and materially consistent with this Agreement. Sellers shall give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

(b)     On the Petition Date, Sellers shall file with the Bankruptcy Court the Bidding Procedures Motion, together with a substantially final form of this Agreement. Sellers shall promptly serve true and correct copies of all applicable pleadings and notices in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable order of the Bankruptcy Court.

8.4    <u>Employee Matters.</u>

(a)    <u>Employees</u>. Purchaser shall offer employment commencing as of the Closing Date to the active Business Employees who are employed as of immediately prior to Closing, on an at-will basis. Each Business Employee who is offered and accepts such offers of employment with Purchaser based on the initial terms and conditions set by Purchaser and further then actually commences employment with Purchaser will become a "***Transferred Employee***", with such employment to be effective as of 12:01 a.m. on the Closing Date. Sellers shall terminate, or shall cause to be terminated, effective as of immediately prior to 12:01 a.m. on the Closing Date, the employment of all Transferred Employees. Sellers will reasonably cooperate with any reasonable requests by Purchaser in order to facilitate the offers of employment and delivery of such offers.  Purchaser shall have no obligations, liabilities or responsibilities with respect to any Business Employees who do not become Transferred Employees, and Purchaser shall not be required to maintain any minimum benefit or compensation levels or prevent any change in the employee benefits provided to any Transferred Employees, except as required by Law.  Except as set forth in <u>Section 8.4(b)</u> and <u>Section 8.4(c)</u>, Purchaser shall have no liability whatsoever for, and Sellers shall retain and hold Purchaser harmless and indemnify Purchaser with respect to, any and all liabilities (including statutory or contractual severance benefits) with respect to, (i) any compensation or other obligations owing or purported to be owing to any current or former Business Employee or other service provider by any Seller or any Supported Entity, including any severance (including statutory or contractual severance benefits), separation pay, change of control payments or benefits, retention payments or any other payments or benefits arising in connection with the termination of such employee's employment by or such service provider's services to any Seller or any of their respective Affiliates (whether occurring or arising prior to, upon or after the Closing Date) or (ii) any cause of action under the WARN Act by any past or present Business Employee or other service provider (whether or not a Transferred Employee) in connection with such employee's employment with or such service provider's services to any Seller or any of their respective Affiliates (or any other "employment loss" or similar action identified in the WARN Act).  As soon as reasonably practicable following Purchaser's request, and in any event no later than five (5) Business Days prior to the Closing Date, Sellers shall provide Purchaser with a written schedule of each "employment loss" (as defined in the WARN Act) experienced by any Business Employee during the ninety (90) day period prior to the Closing Date (including the location of employment of such employee, and the reason for the employment loss) and such other information as Purchaser may reasonably request to determine whether any actions taken by Sellers prior to, upon or after the Closing Date, or any actions taken by Purchaser upon or after the Closing Date, is reasonably likely to require the delivery of notice or payment in lieu of notice (under the WARN Act or otherwise) to any individuals. Sellers and Purchaser intend that the Transactions shall not constitute a severance or termination of employment of any Business Employee prior to or upon the Closing for purposes of any severance or termination benefit plan, program, policy, agreement or arrangement of Sellers, and that Transferred Employees shall have continuous and uninterrupted employment immediately before and immediately after the Closing.

(b)    Sellers and Purchaser hereby agree to follow the standard procedure for employment Tax withholding as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35. Accordingly, Sellers shall have employment tax reporting responsibilities for the wages and other compensation paid by or on behalf of Sellers to Business Employees and Purchaser shall have

employment tax reporting responsibilities for the wages and other compensation paid by or on behalf of Purchaser to Transferred Employees.

(c)     Sellers shall be liable for all workers' compensation short- and long-term disability, medical, prescription drug, dental, vision, life insurance, accidental death and dismemberment and other welfare benefit claims ("***Welfare Claims***") incurred (i) at any time by the Business Employees and their eligible dependents who are not Transferred Employees, or (ii) on or prior to the Closing Date by the Transferred Employees and their eligible dependents. With respect to Welfare Claims incurred after the Closing Date by the Transferred Employees and their eligible dependents, Purchaser shall be solely responsible. For these purposes, a Welfare Claim shall be deemed to be incurred: (A) in the case of workers' compensation and short-term disability benefits, at the time of the injury, sickness or other event giving rise to the claim for such benefits; (B) in the case of medical, prescription, drug, dental or vision benefits, at the time the professional services, equipment or prescription drugs covered by the applicable plan are obtained; (C) in the case of life insurance benefits, upon death; and (D) in the case of accidental death and dismemberment benefits, at the time of the accident. In the case of workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained on or prior to the Closing Date, including injuries sustained after the Closing Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Closing Date or arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Sellers' facilities and which are alleged to have been sustained or contracted on or prior to the Closing Date, such workers' compensation claims shall be deemed to be incurred prior to the Closing Date.

(d)     Sellers shall be solely responsible for compliance with the requirements of Section 4980B of the Code and Part 6 of Subtitle I of ERISA, including provision of continuation coverage (within the meaning of COBRA), with respect to all Business Employees, and their respective eligible spouses and dependents, for whom a qualifying event (within the meaning of COBRA) occurs at any time on or prior to the Closing Date (including qualifying events that occur in connection with the Transactions). Purchaser shall be responsible for compliance with such health care continuation requirements with respect to all Transferred Employees and their respective eligible spouses and dependents for whom a qualifying event (within the meaning of COBRA) occurs after the Closing Date.

(e)     For purposes of determining the number of vacation days to which each Transferred Employee shall be entitled during the calendar year in which the Closing Date occurs, Purchaser shall assume and honor all vacation days accrued or earned but not yet taken by such Transferred Employee as of the Closing Date that are not cashed out in connection with such Transferred Employee's termination of employment with Sellers. To the extent that a Transferred Employee is entitled under applicable Law to be paid for any vacation days accrued or earned but not yet taken by such Transferred Employee as of the Closing Date, the applicable Sellers shall pay to each Transferred Employee all amounts in respect of vacation days and other paid time off accrued but not taken by such Transferred Employee on or prior to the Closing Date and Purchaser shall have no obligation to honor such accrued vacation days or paid time off after the Closing Date.

(f)     The Parties shall reasonably cooperate in good faith to assign to the Purchaser all Assumed Seller Plans, including all related pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith, in each case effective as of the Closing. If the Purchaser's assumption of one or more Assumed Seller Plans is not practicable, the Parties shall reasonably cooperate in good faith to permit the transfer of the applicable assets of the applicable Seller Plan(s) related to the Transferred Employees to the corresponding Purchaser employee benefit plan(s) in accordance with the intent of this Agreement. The Parties shall cooperate in good faith to enter into such amendments to this Agreement as are necessary to effectuate the actions contemplated pursuant to this <u>Section 8.4(f)</u>.

(g)     If requested by Purchaser in a writing delivered to the Sellers following the date hereof and no later than thirty (30) days following the date hereof, Sellers shall adopt resolutions to terminate, effective as of no later than the day before the Closing Date, any Seller Plan that is a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (a "<u>Seller 401(k) Plan</u>"). Sellers shall provide Purchaser with a copy of the resolutions and any plan amendments, notices and other documents prepared to effectuate the termination of the Seller 401(k) Plans in advance and give Purchaser a reasonable opportunity to comment on such documents in advance (which comments shall be considered in good faith), and prior to the Closing Date, Sellers shall provide Purchaser with the final documentation evidencing that the Seller 401(k) Plans have been terminated effective as of no later than the day before the Closing Date.

(h)     Following the date of this Agreement, Sellers and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this <u>Section 8.4</u>, including (i) exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverages and any information that is reasonably necessary to affect their respective Tax withholding, accounting and reporting obligations under applicable Law, (ii) in obtaining any governmental approvals required hereunder, (iii) in responding to reasonable questions posed by employees, labor unions, employee representatives or any other persons or entities, (iv) providing offers of employment to the Business Employees and (v) transferring to Purchaser, no later than the Closing Date, all employee records, including all current employment eligibility verification form and related records, documents and papers, of the Transferred Employees.

(i)     The Parties shall reasonably cooperate in good faith with respect to any communications to Business Employees regarding the Transactions.  Sellers will provide Purchaser with a reasonable opportunity to review and comment on any communications intended for the Business Employees that it desires or has to send to Business Employees prior to the Closing Date.  Purchaser will provide Sellers with a reasonable opportunity to review and comment on any communications intended for the Business Employees (including regarding its offers of employment) that it desires or has to send to Business Employees prior to the Closing Date.

(j)     The Parties acknowledge and agree that all provisions contained in this <u>Section 8.4</u> are included for the sole benefit of the parties to this Agreement, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employee or former employee of Sellers (including the Business Employees), any participant in any employee benefit plan maintained by any of the

Parties, or any dependent or beneficiary thereof, or (ii) to continued employment with any of the Parties or any of their respective Affiliates.  Nothing in this Agreement shall affect the right of the Parties or any of their respective Affiliates to terminate the employment of its employees.  Nothing contained in this <u>Section 8.4</u> is intended to be or shall be considered to be an amendment or adoption of any Seller Plan or any other plan, program, Contract, arrangement or policy of the Parties or any of their respective Affiliates. In addition, nothing contained in this <u>Section 8.4</u> shall interfere with the Parties' or any of their respective Affiliates' right to amend, modify or terminate any Seller Plan in accordance with its provisions or to terminate the employment of any employee of Sellers (including the Business Employees).

8.5     <u>Publicity</u>. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

8.6     <u>Expenses</u>. Except to the extent otherwise specifically provided in this Agreement, each Party shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.

8.7     <u>Further Assurances</u>.

(a)     Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, each Seller agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions. Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to further transfer and assign to Purchaser all of the Purchased Assets, and to vest in Purchaser good and marketable title to each of the Purchased Assets.

(b)     Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, Purchaser agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions. Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to cause Purchaser to assume the Assumed Liabilities in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

8.8     <u>Governmental Approvals</u>.  Sellers and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or any Transferred Intellectual Property Rights

included in the Purchased Assets, in connection with the Transaction including without limitation, the Healthcare Regulatory Consents, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers. Each Party shall, as promptly as possible, (i) make, or cause or to be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, Orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be required to take or agree to take any action, including entering into any consent decree, hold, Order or other arrangements, that would (i) require or result in the sale, divestiture or other direct or other disposition of any assets or businesses of Purchaser or any of its Affiliates or (ii) limit Purchaser's or any of its Affiliates' freedom of action with respect to, or its or their ability to retain, consolidate or control, the Purchased Assets or any assets or businesses of Purchaser or any of its Affiliates.

8.9    Notice of Certain Matters. Sellers and Purchaser will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which any Seller has Knowledge or Purchaser has knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in ARTICLE VII not to be satisfied as of any date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 8.9 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

8.10    Bulk Transfer Laws. The Parties hereby waive (a) compliance with the provisions of any so-called bulk sales or bulk transfer law of any jurisdiction in connection with the sale of any or all of the Purchased Assets to Purchaser hereunder and (b) all claims related to the non-compliance therewith.

8.11    Insurance.

(a)    To the extent that any of Purchaser's rights to insurance under the Insurance Policies (including those listed as a Retained Asset on Schedule 2.2(a)), or to proceeds therefrom, relating to the damage, destruction, taking or other impairment of any of the Purchased Assets or to liabilities arising from Assumed Liabilities, including insurance for pre-Closing occurrences, direct property loss and business interruption or other time element losses, are not transferable or assignable, then as promptly as practicable following receipt of a written request from Purchaser, Sellers shall use their commercially reasonable efforts to pursue recovery on all such claims; in its own name or as attorney-in-fact for Purchaser, including but not limited to the rights to make, administer and settle claims under any Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), subject to direction and control by Purchaser; provided, however, that Purchaser shall, within five (5) calendar days after receipt of written request therefor, reimburse Sellers and any of their Affiliates for any documented out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this Section

8.11.  Purchaser and Sellers shall cooperate in the making and recovery of any such claims for insurance proceeds.  Upon the receipt by Sellers of any such insurance proceeds or condemnation proceeds relating thereto, Sellers shall as promptly as practicable pay Purchaser such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any damage, destruction, other impairment or other time element losses or liability arising from, any Assumed Liabilities actually suffered or incurred by Purchaser, or the costs of repair borne by Purchaser, in each case in excess of any losses, damages, costs and expenses or other amounts borne by Sellers or any of its Affiliates in connection with such claims).  Additionally, Purchaser shall pay the amount of any deductibles, self-insured retentions, co-insurance or similar expenses (other than increases in premiums) that would otherwise be borne by Sellers or any of its Affiliates as a result of any such claims.

(b)     To the extent any Insurance Policy (including but not limited to those policies listed on Schedule 2.2(a)), provides "occurrence based" liability insurance, Sellers shall request that, prior to the Closing, Purchaser be added as an additional insured, on a primary and noncontributory basis for claims or loss arising from or relating to the Purchased Assets and Assumed Liabilities, under such Insurance Policy for the current policy year and the preceding six (6) policy years.  Additionally, to the extent any Insurance Policy (including but not limited to those policies listed on Schedule 2.2(a)), provides "claims made" liability insurance coverage, Sellers shall request that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Purchased Assets and Assumed Liabilities from the current policy year and the preceding six (6) policy years for as many years following the Closing as Sellers' insurance carriers are willing to agree.  Purchaser shall, within five (5) calendar days after receipt of written request therefor, reimburse Sellers and any of their Affiliates for any documented out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this Section 8.11.

## ARTICLE IX
## CLOSING AND TERMINATION

9.1     Closing. The closing (the "***Closing***") of the Transactions shall be held on or within three Business Days after the conditions set forth in ARTICLE VII are or, if legally permissible, waived (other than those conditions that by their nature are to be satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver) (or such other date as the Parties may agree in writing), remotely via the electronic exchange of documents and signature pages or at such other time or place as Purchaser and Sellers may agree.  The date on which the Closing occurs is referred to as the "***Closing Date***."

9.2     Termination. This Agreement and the Transactions may not be terminated prior to the Closing except as follows:

(a)     Upon the mutual written consent of Sellers and Purchaser;

(b)     By Sellers if Sellers are not then in material breach of any provision of this Agreement that would give rise to the failure of a condition set forth in Section 7.1 or Section 7.3, and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Purchaser pursuant to this Agreement that would, either

individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.3</u> and such breach, inaccuracy or failure to perform is not curable or has not been cured within fifteen (15) days' written notice thereof to Purchaser;

(c)     By Purchaser if:

(i)     Purchaser is not then in material breach of any provision of this Agreement that would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.2</u> and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would, either individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.2</u> and such breach is not curable or has not been cured within fifteen (15) days' written notice thereof to Sellers;

(ii)     as a result of an Order of the Bankruptcy Court, (i) the Bankruptcy Cases are converted to chapter 7 and a chapter 7 trustee is appointed with respect to Sellers or (ii) the Bidding Procedures are modified or amended in a manner not acceptable to Purchaser;

(iii)     Sellers (i) withdraw, or seek to withdraw, the Sale Motion, or (ii) announce or file a plan or other transaction, or seek to file a plan or other transaction, contemplating reorganization or sale of all or any part of any Seller under the Bankruptcy Code that does not comply with the terms and conditions of this Agreement; or

(iv)     Sellers fail to comply with the DIP Order or DIP Facility (subject to any cure or grace periods contained therein).

(d)     By either Sellers or Purchaser if:

(i)     the Closing shall not have been consummated on or before September 18, 2020 (or such later date as mutually agreed by Sellers and Purchaser) (the "***Termination Date***"); provided that by written notice to Sellers, Purchaser may, in its sole discretion, extend the Termination Date by thirty (30) calendar days; provided, further, that neither party shall have the right to terminate this Agreement pursuant to this <u>Section 9.2(d)(i)</u> if the Closing shall not have occurred on or prior to the Termination Date due to such party's failure to perform any covenants or breach of any representation or warranty of such party set forth in this Agreement; or

(ii)     there shall be a final non-appealable Order of any nature which is in effect and has the effect of making the Transactions illegal, otherwise restraining or prohibiting consummation of the Transactions or causing any of the Transactions to be rescinded following completion thereof;

(e)     Automatically, if Sellers close or consummate an Alternative Transaction or the Bankruptcy Court enters an Order approving such Alternative Transaction;

The Party desiring to terminate this Agreement pursuant to this <u>Section 9.2</u> (other than pursuant to <u>Section 9.2(a)</u> or <u>Section 9.2(e)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 11.2</u>.

       9.3     <u>Effect of Termination</u>

       (a)     Upon the termination of this Agreement in accordance with <u>Section 9.2</u> hereof, and except as set forth in this <u>Section 9.3</u>, the Parties shall be relieved of any further obligations or liability under this Agreement other than obligations or liabilities for any intentional and willful breaches of this Agreement by such Person occurring prior to such termination.

       (b)     Notwithstanding anything to the contrary contained herein, the provisions of this <u>Section 9.3</u>, <u>Section 8.6</u> and <u>ARTICLE XI</u> shall survive any termination of this Agreement.

## ARTICLE X
## TAX MATTERS

       10.1     <u>Filing of Returns</u>. In connection with the preparation and filing of Tax Returns as of and after the Closing Date, Purchaser and Sellers shall cooperate and exchange information as reasonably required to accomplish the matters contemplated by this <u>ARTICLE X</u>.Transaction Taxes. Purchaser shall bear and be responsible for paying any sales, use, stamp, transfer, documentary, registration, business and occupation and other similar Taxes (including related penalties (civil or criminal), additions to Tax and interest) imposed by any Governmental Authority with respect to the transfer of the Purchased Assets to Purchaser ("***Transaction Taxes***"), regardless of whether any Tax authority seeks to collect such Taxes from Sellers or Purchaser. Purchaser shall also be responsible for (i) administering the timely payment of such Transaction Taxes directly to the correct Tax authorities, (ii) defending or pursuing any proceedings related thereto, and (iii) paying any expenses related thereto. Sellers shall give prompt written notice to Purchaser of any proposed adjustment or assessment of any Transaction Taxes with respect to the Transactions. In any proceedings, whether formal or informal, Sellers shall permit Purchaser to participate and control the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents required to allow such participation.

       10.3     <u>Tax Claims</u>. To the extent there are any Tax Costs incurred by Sellers in connection with recovery of any amount under <u>Section 2.1(s)</u>, Purchaser shall, within a reasonable amount of time after reasonable documentation of such Tax Costs is provided to Purchaser, pay over to Sellers from any such amount so recovered an amount equal to such Tax Costs; provided, however, that the total amount paid under this <u>Section 10.3</u> as Tax Costs to Sellers shall not exceed the value of any refunds or credits with respect to any Taxes actually received in cash by Purchaser with respect to the assets acquired by Purchaser set out in <u>Section 2.1(s)</u>.

       10.4     <u>Tax Prorations</u>. As to any Purchased Assets acquired by Purchaser, Sellers and Purchaser shall apportion the liability for real and personal property Taxes and ad valorem Taxes ("***Periodic Taxes***") for all Tax periods including but not beginning or ending on the Closing Date (the "***Proration Periods***"). The Periodic Taxes described in this <u>Section 10.4</u> shall be apportioned between Sellers and Purchaser as of the Closing Date, with Purchaser liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the

numerator of which is the number of days remaining in the Proration Period including and after the Closing Date, and the denominator of which is the total number of days covered by such Proration Period.  Sellers shall be liable for that portion of the Periodic Taxes for the Proration Period for which Purchaser is not liable under the preceding sentence.  Purchaser and Sellers shall pay or be reimbursed for real and personal property Taxes (including instances in which such property Taxes have been paid before the Closing Date) on this prorated basis.  Each Party shall make any payments due to another Party under this <u>Section 10.4</u> by wire transfer of immediately available funds with five (5) Business Days of receiving notice of such obligation.  The Party responsible for paying a Tax described in this <u>Section 10.4</u> shall be responsible for administering the payment of (and any reimbursement for) such Tax.  For purposes of this <u>Section 10.4</u>, the Proration Period for ad valorem Taxes and real and personal property Taxes shall be the fiscal period for which such taxes were assessed by the relevant Tax authority.

10.5   <u>Provision of Tax Forms</u>.  Sellers agree to provide, before the Closing Date, any forms or other documentation reasonably requested by Purchaser to reduce or eliminate any withholding Taxes that could be imposed on any of the transactions contemplated by this Agreement.

## ARTICLE XI
## GENERAL PROVISIONS

11.1   <u>Bankruptcy Court Approval</u>.  This Agreement and the transactions contemplated hereby are contingent upon the Bankruptcy Court's entry of the Bid Procedures Order and of the Sale Order.

11.2   <u>Notices</u>.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via electronic mail to the e-mail address set out below if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service (with confirmation) to the respective Parties at the applicable address set forth below, unless another address has been previously specified in writing, or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid,  to the respective Parties at  the applicable address set forth below, unless another address has been previously specified in writing:

If to Purchaser, to:

New Benevis Holdco, Inc.
c/o New Mountain Finance Corporation
787 Seventh Avenue, 49th Floor
New York, New York 10019
Attention: Josh Porter; Vignesh Aier
Email: jporter@newmountaincapital.com; VAier@newmountaincapital.com

With a copy to:

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attention: David M. Hillman, Esq.; Steven M. Peck, Esq.
E-mail: dhillman@proskauer.com; speck@proskauer.com

If to Sellers, to:

Benevis
1090 Northchase Parkway, Suite 150
Marietta, Georgia 30067
Attn: Jerry Perchik
E-mail: jperchik@benevis.com

With a copy to:

Jackson Walker L.L.P.
1401 McKinney St #1900
Houston, Texas 77010
Attn: Elizabeth C. Freeman, Esq.
E-mail: efreeman@jw.com

11.3    Survival of Representations, Warranties, Covenants and Agreements. All representations and warranties made by Sellers in this Agreement shall terminate on the Closing Date upon the purchase of the Purchased Assets by Purchaser, and neither Sellers nor their respective Affiliates shall have any liability after the Closing Date for any breach of any representation or warranty. Except as specifically set forth otherwise in the Agreement, all covenants and agreements of Sellers shall lapse at, and be of no further force and effect following, the Closing.

11.4    Binding Effect. Except as may be otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any trustee, responsible Person, estate administrator, representative or similar Person appointed for or in connection with the Bankruptcy Case or in any subsequent case under the Bankruptcy Code in which any Seller is a debtor. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder.

11.5    Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

11.6    Exhibits and Schedules. The Exhibits and Schedules referred to in this Agreement shall be deemed to be an integral part of this Agreement.

11.7    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same

document. Any signature delivered by a Party via facsimile or delivered electronically in PDF format shall be deemed to be an original signature hereto.

11.8    Governing Law/Jurisdiction. Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement or the Transaction Documents or the negotiation, execution or performance of this Agreement or the Transaction Documents (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement as an inducement to enter this Agreement) shall be governed by and construed under New York law, without regard to conflict of laws principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement or the Transaction Documents shall be brought against any of the Parties exclusively in the Bankruptcy Court, or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, in the courts of the State of Texas, Harris County, or, if it has or can acquire jurisdiction, in the United States District Court located in Harris County, and each of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

11.9    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

11.10    Waivers. Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the Party waiving compliance.  No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

11.11    Pronouns. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require.

11.12    Modification. No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by all of the Parties and which specifically refers to this Agreement.

11.13    Successors/Assignment. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Purchaser may assign any and all of its rights, title and interest in this Agreement to its designee, affiliate or assignee at its sole election.  No assignment by any Seller of this Agreement or any right or obligation hereunder may be made without the prior written consent of the Purchaser, and any assignment attempted without such consent will be void *ab initio*.

11.14  Entire Agreement. This Agreement, including the Schedules and Exhibits hereto, and the other agreements and documents referred to in this Agreement or delivered hereunder are the exclusive statement of the agreement among the Parties concerning the subject matter hereof. All negotiations among the Parties are merged into this Agreement, and there are no representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder.

11.15  Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term hereof, then to the maximum extent permitted by Law, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

11.16  No Third Party Beneficiaries. No provision of this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder.

11.17  Non-Recourse. All claims or causes of action (whether in contract or in tort, at law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Transaction Documents may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (each a "*Contracting Party*"). In no event shall any Contracting Party have any shared or vicarious liability for the actions or omissions of any other Person. Except as otherwise set forth in this Agreement, no Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("*Non-Party Affiliates*"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Transaction Documents or based on, in respect of, or by reason of this Agreement or the Transaction Documents or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates.

11.18  Negotiated Agreement. Each of Sellers and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its Representatives drafted such provision.

11.19  Specific Performance. The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy, even if available. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the Parties' obligations to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law,

or in equity, or otherwise. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to post any bond or other security in connection with any such Order.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first written above.

**PURCHASER:**

NEW BENEVIS HOLDCO, INC.

By: _____

Name:   Josh Porter

Title:    President and Treasurer

*Signature Page to Asset Purchase Agreement*

**SELLERS:**

LT SMILE CORPORATION

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS HOLDING CORP.

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS CORP.

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS AFFILIATES, LLC

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS, LLC

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


BENEVIS INFORMATICS, LLC

By: _____
Name: Scott Mell
Title: Chief Restructuring Officer


*Signature Page to Asset Purchase Agreement*