**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BENEVIS CORP., *et al.*,[1] | § | Case No. 20-33918 (MI) |
| | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**
**[Related Docket Nos. 15, 51]**

The Official Committee of Unsecured Creditors (the "Committee") of Benevis Corp. and the other above-captioned debtors (the "Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (the "Objection") to the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Dkt. No. 15, the "DIP Motion").[2] In support of its Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as follows: Benevis Corp. (0242); LT Smile Corporation (2818); Benevis Holding Corp. (0222); Benevis Affiliates, LLC (7420); Benevis, LLC (5524); Benevis Informatics, LLC (7833). The address of the Debtors' headquarters is 1090 Northchase Parkway S.E., Suite 150, Marietta, GA 30067.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion or Order granting the relief sought in the DIP Motion on an interim basis (Dkt. No. 51, the "Interim Order"), as applicable.

## PRELIMINARY STATEMENT

1. New Mountain Finance Corporation ("New Mountain") is the Debtors' primary prepetition secured lender, its proposed DIP Lender, its controlling equity holder, and its stalking horse bidder. The Debtors have obtained on an interim basis and now seek on a final basis extraordinary relief (the "Proposed DIP Financing") that serves New Mountain's interests at the expense of all other creditors, particularly unsecured creditors. Through its Milestones and other burdensome features, the Proposed DIP Financing would ram through a rushed and incomplete sales process and artificially augment and insulate New Mountain's stalking horse credit bid. Given the firm control New Mountain already has over these cases, the Proposed DIP Financing should be viewed with special scrutiny, and all efforts should be directed toward ensuring a competitive sale process.

2. Though the Proposed DIP Financing suggests $25 million in availability, the Approved Budget shows the Debtors will not borrow anything close to $25 million. The DIP Milestones require that the proposed sale close on September 18, 2020. The Approved Budget attached to the DIP Motion shows DIP draws totaling $1,602,000 from the Petition Date until September 18, 2020. Based on their discussions with the Debtors and the DIP Lenders, the Committee understands that the Debtors have borrowed $1.5 million to date. It is also the Committee's understanding that the Debtors do not intend to make any further draws under the Proposed DIP Financing until immediately prior to the closing of the sale of their assets, when a draw will be made to fund the Wind Down Amount contemplated by the Stalking Horse Agreement that would fund the costs to wind down the estate, including an amount estimated in good faith by the Debtors and acceptable to the Purchaser to pay allowed unpaid administrative expenses, and to fund the orderly liquidation, dismissal or conversion of these cases. See Stalking Horse Agreement, § 1.1. The current Approved Budget does not accurately reflect the draws on

the DIP Financing and does not anticipate the funding of this Wind Down Amount. The entry of a final order approving this motion should be conditioned first on the Debtors providing the Court with a revised, acceptable Approved Budget that shows both the draws made to date under the Proposed DIP Financing and also the amount budgeted for the Wind Down Amount. The Committee suspects that these draws will come nowhere comes close to the $25 million to be approved under the Final DIP Order. And these minimal draws come at great expense: the DIP Agreement has a 3% closing fee, which based on a $25 million DIP commitment, is $750,000.

3. The Debtors also offer little justification for the roll-up of the $5 million "Rescue Financing" which, given the limited draws that will be made on the Proposed DIP Financing, seems especially inappropriate in this instance. Nothing in the Bankruptcy Code authorizes this feature of the Proposed DIP Financing, and courts have uniformly disfavored roll-ups because they "immediately remove an important tool from the debtor's arsenal, the ability to cram down the secured lender." 2 COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 44.06[2] (Richard Levin & Henry J. Sommer, eds.). Aside from the roll-up, the Proposed DIP Financing removes the avoidance action proceeds from the reach of the Debtors' unsecured creditors. If New Mountain's credit bid succeeds, avoidance actions will likely be the only source available for any distribution to unsecured creditors.

4. In sum, the Proposed DIP Financing combines an oversized DIP Facility and an unnecessary roll-up with a tight sale timeline while imposing liens on avoidance actions, which may be general unsecured creditors sole source of distributions in this case. It propels these cases toward an outcome that benefits New Mountain, the Debtors' owner and prepetition lender, at the expense of unsecured creditors and a competitive sales process. In light of the substantial leverage that New Mountain already enjoys in the impending sale process, it does not need these additional

and unnecessary advantages, and the Debtors have failed to justify the terms and size of the DIP Facility as being necessary or appropriate under the circumstances.

5. For these reasons, the Court should deny final approval of the DIP Motion—or at least require critical modifications to the Proposed DIP Financing that are consistent with the revised proposed order approving a modified DIP Facility prepared by the Committee and attached hereto. *See* **Exhibit A** (clean version of revised proposed order) and **Exhibit B** (blackline showing proposed revisions as compared to the proposed order submitted by the Debtors).

## OBJECTION

### I. THE DEBTORS MUST PROVIDE THE COURT WITH AN UPDATED APPROVED BUDGET

6. As noted above, the current Approved Budget, attached hereto as Exhibit C, does not contemplate the funding of the Wind Down Amount. Prior to entry of a final order approving this motion, the Debtors should provide the Court and the parties with a revised Approved Budget that truly shows the proposed draws to be made from the Proposed DIP Financing. As it stands, the current draft of the Approved Budget only shows $1,602,000 drawn between the Petition Date and the closing of the sale. If this is the true amount to be drawn on the DIP, then the Approved Budget shows that the Proposed DIP Financing is unnecessary and the Debtors can fund the case through the Lenders' proposed sale closing deadline, September 18, 2020 (nine days from the date of this objection) through cash collateral. If, however, they instead plan to use the Proposed DIP Facility to fund the Wind Down Amount and intend to make a draw to fund this prior to the September 18, 2020 sale closing, then they need to provide the Court with the updated Approved Budget and parties should be allowed an opportunity to object to this new budget.

7. The filing of a revised Approved Budget will also help the Court assess the 3% closing fees currently imposed by the Proposed DIP Financing. If this fee is assessed against $25

million total loan, that would total $750,000. That amount certainly is unacceptable given the $1,602,000 in draws the Approved Budget shows will be made prior to the closing of the sale. In addition to the need to see an updated Approved Budget, the

## II. THE ROLL-UP OF PREPETITION OBLIGATIONS SHOULD NOT BE APPROVED

11. The Proposed DIP Financing consists of $25 million of new-money loans and $5 million of Prepetition Obligations, which shall roll up and convert on a cashless dollar-for-dollar basis into loans under the DIP Facility upon entry of the Interim Order (the "Roll-Up"). DIP Mot., ¶ 1(a); *see also* Interim Order, ¶ I, 2. The latter "loan" is not a loan at all—instead, the Debtors have merely agreed to convert $5 million of prepetition "rescue financing" (*see* DIP Mot., ¶ 12) into "a postpetition administrative claim." DIP Mot., ¶ 21.

12. Thus, while the Debtors' estates gain no additional liquidity from the roll-up "loan," New Mountain gains the right to demand to be paid another $5 million in cash on what would otherwise be prepetition secured claims before any chapter 11 plan can be confirmed in these cases. *See* 11 U.S.C. § 1129(a)(9)(A). The proposed Roll-Up is improper because the Bankruptcy Code does not normally permit a debtor to pay favored prepetition creditors prior to plan confirmation; furthermore, the proposed Roll-Up is especially problematic here where (1) the Roll-Up would take effect immediately, even though the Debtors do not immediately need—and may never need—the full amount of the proposed new-money loans, (2) the Roll-Up buttresses and insulates the New Mountain credit bid, thereby likely precluding a competitive auction for the Debtors' assets, as discussed in more detail below, and (3) the Debtors have an actionable path to finance their chapter 11 cases without the Roll-Up.

### A. The Bankruptcy Code Does Not Permit Debtors to Use Postpetition Financing to Refinance Prepetition Debt.

13. Roll-ups are not authorized by the Bankruptcy Code, and courts in the Fifth Circuit

have cast an especially jaundiced eye on the practice. Indeed, in support of their argument that roll-ups are "routinely made," the Debtors cited only two cases, both from outside the Fifth Circuit. DIP Mot., ¶ 21 (citing *In re Energy Fut. Hold. Corp.*, 2015 WL 729666, *7 (D. Del. Feb. 19, 2015); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 510–11 (Bankr. D. Del. 2010)). The Committee is aware of only one case in which *this* Court allowed a roll-up over a disfavored creditor's objection: in *In re ATP Oil & Gas*, which ultimately converted to a case under Chapter 7, the Court allowed a roll-up after a 12-hour first-day hearing on the basis that no other funding was available. *See* Hr'g Tr. 53:20–54:2, *In re ATP Oil & Gas Corp.*, Case No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) [Dkt. No. 186] ("I don't like it [the roll-up] at all, but if the proof at the end of the day is . . . without the available monies, the Debtor fails and the Debtor is better off not failing rather than liquidating, then I'm going to do it. . . . I hate doing the roll up, but if they prove it, they prove it and I'm going to do it.").

14. No provision of the Bankruptcy Code expressly authorizes the use of postpetition debt to refinance prepetition debt. Section 364 of the Bankruptcy Code authorizes the granting of liens or of superpriority administrative status only for ***postpetition*** "obtaining of credit or incurring of debt." 11 U.S.C. § 364(c), (d). *See Shapiro v. Saybrook Mfg. Co.* (*In re Saybrook Mfg. Co.*), 963 F.2d 1490, 1495 (11th Cir. 1992) ("[S]ections 364(c) & (d) . . . do not authorize the granting of liens to secure pre-petition loans."); *In re Ellingsen MacLean Oil Co.*, 834 F.2d 599, 601 (6th Cir. 1987) ("The express language of this subsection [364(c)] suggests that the priority or lien granted thereunder is limited to securing the newly incurred debt authorized by that provision."). In the absence of authorization under Section 364, the sole potential source of authority for a bankruptcy court to allow a roll-up is the court's equitable powers, codified in Section 105(a) of the Bankruptcy Code. However, it is undisputed that a bankruptcy court's equitable powers are

limited: a court may not "override explicit mandates of other sections of the Bankruptcy Code," *Law v. Siegel*, 571 U.S. 415, 421 (2014) (internal citations omitted), or "create substantive rights that are unavailable under applicable law." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).

15. In this Circuit, a leading case on pre-confirmation payments on account of prepetition debt is *In re Oxford Management, Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993). In *Oxford Management*, the Fifth Circuit reversed the bankruptcy court's authorization for the payment of prepetition rent, stating that no "specific provision of the Code . . . would allow the payment of post-petition funds to satisfy pre-petition claims." Following *Oxford Management*, lower courts in this Circuit have approved payments on prepetition claims only in exceptional circumstances. For example, in *In re Equalnet Communications Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2001), the court, while acknowledging the "general rule of nonpayment" established by *Oxford Management,* approved certain payments to prepetition creditors based on "the presence of a legal or factual inevitability of payment." Applying the same logic, the court in *In re CoServ, L.L.C.*, 273 B.R. 487, 500–01 (Bankr. N.D. Tex. 2002), refused to approve certain proposed payments of prepetition debt on the grounds that the debtor had failed to show that "no alternative" existed.

16. The argument against approving a roll-up has become even stronger since *Oxford Management*, *Equalnet Communications* and *CoServ* were decided because any such approval must now contend with the recent Supreme Court decision striking down priority-violating distributions. *See Czyzewski v. Jevic Holding Co.*, 580 U.S. ___, 137 S. Ct. 973 (2017). In its opinion, the Supreme Court specifically mentioned roll-ups as an example of a priority-violating payment that may be justified only where it "preserve[s] the debtors as a going concern," "make[s] the disfavored creditors better off," "promote[s] the possibility of a confirmable plan," "restore[s]

the *status quo ante*," or "protect[s] reliance interests." 137 S. Ct. at 986.[3] None of those justifications apply here: the Debtors have ample cash on hand and thus alternative financing options; the Roll-Up will put the estates and unsecured creditors in a worse position and will make confirmation more difficult; the Roll-Up alters the *status quo* by improving New Mountain's position; and there are no reliance interests to protect.

**B. The Roll-Up Is Especially Inappropriate in These Cases.**

17. Even though a non-consensual roll-up may be justified in rare circumstances, no such justification exists in these cases. The Debtors' Approved Budget shows draws on the DIP Loan prior to the closing of a sale of the Debtors' assets totaling less than the $5 million Roll-Up. Even if the Approved Budget were modified to show additional draws prior to the closing of any sale, including the proposed Wind Down Amount, those amounts would have to be significant to provide any basis for the $5 million Roll-Up.

## IV. AVOIDANCE ACTION PROCEEDS SHOULD BE EXCLUDED FROM THE DIP COLLATERAL.

18. The Proposed DIP Financing makes the proceeds of all avoidance actions part of the DIP Collateral, or alternatively part of the adequate protection for the Prepetition Secured Parties. *See* Interim Order ¶¶ 6, 14. That is yet another inappropriate feature of the Proposed DIP Financing that should not be approved.

19. Avoidance actions and their proceeds are creatures of bankruptcy law designed to ensure equitable distribution. *See, e.g.*, *Cullen Ctr. Bank & Trust v. Hensley* (*In re Criswell*), 102 F.3d 1411, 1414 (5th Cir. 1997) (noting that Congress enacted avoiding powers to "facilitat[e] the

[3] The Supreme Court favorably cited the landmark decision in *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004), which requires a bankruptcy court to make a finding that a counter-statutory pre-plan distribution will ***improve*** the situation of disfavored creditors.

prime bankruptcy policy of equality of distribution among creditors of the debtor."). Accordingly, numerous courts have restricted a debtor's ability to pledge avoidance actions and proceeds as collateral. The primary reason for such a restriction, as recognized by the Fifth Circuit, is that avoidance actions and their proceeds are to be reserved for unsecured creditors. *See Gaudet v. Babin* (*In re Zedda*), 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the [unsecured] creditors.") (internal citations omitted); *McFarland v. Leyh* (*In re Tex. Gen. Petrol. Corp.*), 52 F.3d 1330, 1335–36 (5th Cir. 1995) ("'[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits.' . . . The proceeds recovered in avoidance actions should not benefit the reorganized debtor; rather, the proceeds should benefit the unsecured creditors."); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery* (*In re Cybergenics Corp.*), 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of estate, but are essentially rights held by estate for benefit of unsecured creditors); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm L.P. IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("any recovery [under avoidance powers] is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.").

20. Moreover, the Debtors have not provided "specific reasons" or the "extraordinary showing" necessary to grant a lien on the proceeds of avoidance actions, as this Court's Procedures for Complex Chapter 11 Cases require. *See* Procedures at ¶¶ 21.d., 22. The DIP Motion's conclusory statement that the terms of the DIP Facility "are fair and reasonable and are the most favorable terms the Debtors could obtain under the circumstances" (DIP Mot. at ¶ 21) is hardly a "specific reason" to approve an extraordinary lien.

21. The Prepetition Secured Parties and the DIP Secured Parties should not receive liens on, and/or superpriority claims to, what could be a potentially significant source of recovery for unsecured creditors, particularly given the DIP Facility's artificial augmentation of New Mountain's credit bid and the Prepetition Secured Parties' status as potential defendants in these very same actions.

## III. THE PROPOSED WAIVERS OF SECTIONS 506(C) AND 552(B) RIGHTS ARE INAPPROPRIATE

22. The Proposed DIP Financing contains other inappropriate features. For instance, it waives the estates' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code (Interim Order, ¶¶ K, 47) as well as this Court's statutory right to apply the "equities of the case" exception under section 552(b) of the Bankruptcy Code. *Id.*, ¶¶ K, 49. These features of the Proposed DIP Financing should not be approved.

### A. The Debtors' Section 506(c) Surcharge Rights Must Be Preserved.

23. Section 506(c) of the Bankruptcy Code permits a debtor to recover, for the benefit of its estate and unsecured creditors, the "reasonable, necessary costs and expenses of preserving, or disposing of, [a secured creditor's collateral] to the extent of any benefit" to such creditor. 11 U.S.C. § 506(c); s*ee also Borrego Springs Bank, N.A. v. Skuna River Lumber, L.L.C.* (*In re Skuna River Lumber, LLC*), 564 F.3d 353, 355 (5th Cir. 2009) ("[S]ection 506(c) of the Bankruptcy Code . . . allows administrative expenses to be surcharged against a creditor's collateral[.]").

24. "[T]he underlying purpose of 11 U.S.C. § 506(c) is that the secured creditor should pay for the benefit it received." *First Servs. Grp., Inc. v. O'Connell* (*In re Ceron*), 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009) (citation omitted); s*ee also Southwest Sec., FSB v. Segner* (*In re Domistyle, Inc.*), 811 F.3d 691, 696 (5th Cir. 2015) (stating that "a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the

cost") (citation omitted); *Precision Steel Shearing, Inc. v. Fremont Fin. Corp.* (*In re Visual Indus., Inc.*), 57 F.3d 321, 325 (3d Cir. 1995) (stating that section "506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant" who has expended money to preserve or dispose of the secured creditor's collateral by enabling a debtor to recover such costs from the secured creditor or its collateral). Waiving the section 506(c) surcharge rights presents a serious risk that the costs of preserving the Prepetition Collateral and DIP Collateral will be borne solely by the unsecured creditors. Such a result contravenes the essential purpose of section 506(c). This Court should reject this prospective waiver of an important statutory right at the outset of these cases, thereby preventing the Prepetition Secured Parties and the DIP Secured Parties from receiving a windfall at the estates' expense.

25. Such a rejection would be consistent with the decisions reached by other courts. *See, e.g.*, *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A.* (*In re Lockwood Corp.*), 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (holding provision in DIP order purporting to immunize DIP lender from section 506(c) surcharge to be unenforceable); *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("The debtor and secured creditor do not constitute a legislature. They have no right to implement a private agreement that effectively changes the bankruptcy law with regard to the statutory rights of third parties. . . . This court can discern no basis to allow a secured creditor to avoid [the] application [of section 506(c)]."); *McAlpine v. Comerica Bank-Detroit* (*In re Brown Bros., Inc.*), 136 B.R. 470, 474 (Bankr. W.D. Mich. 1991) (finding section 506(c) waiver "not enforceable in light of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper disposal").

**B. The Section 552(b) "Equities of the Case" Exception Must Be Preserved.**

26. The proposed final order would also eliminate this Court's statutory right to apply

the "equities of the case" exception under section 552(b) of the Bankruptcy Code. *See* Interim Order ¶ 49 (making waiver of the exception subject to entry of final order). This proposed waiver is similarly inappropriate.

27. Section 552(b) of the Bankruptcy Code permits a court to refuse, based on the "equities of the case," to extend a prepetition lien to postpetition "proceeds, products, offspring, or profits" of prepetition collateral. 11 U.S.C. § 552(b). This statutory provision "is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code, which favors giving debtors a 'fresh start.'" *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 409–10 (Bankr. N.D. Tex. 2003) (finding that, based on the equities of the case, secured creditor's lien did not extend to all cash generated postpetition because a portion of such cash constituted proceeds of unencumbered assets); *see also In re Village Props, Ltd.*, 723 F.2d 441, 444 (5th Cir. 1984) (stating that legislative history regarding the "equities of the case" exception "indicates its purpose was to cover cases where an expenditure of the estate's funds increases the value of [a secured creditor's] collateral) (citation omitted); *Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc.* (*In re Photo Promotion Assocs., Inc.*), 61 B.R. 936, 939 (Bankr. S.D.N.Y. 2000) ("The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral.") (internal citation omitted).

28. The section 552(b) "equities of the case" exception is a statutory right that the Bankruptcy Code confers on a court, and by extension, on all parties in interest. Permitting the Debtors to unilaterally waive such a right is inappropriate. If the Debtors will be using unencumbered assets to enhance the value of the Prepetition Collateral postpetition, unsecured

creditors should retain the right to argue that any increased value inures to their benefit, rather than to the benefit of the Prepetition Secured Parties. *See, e.g.*, *In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make. If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it."). This Court should not foreclose the right of the parties in interest to seek to use this exception at the outset of these cases.[4]

## V. OTHER OBJECTIONABLE PROVISIONS

29. The Committee also objects to the provisions referenced below and requests that the Final DIP Order be amended accordingly. The Committee notes that by objecting to these provisions in bullet point format, the Committee is not suggesting that these objections are either technical or minor in nature.

- The Marshaling Waiver Should Not be Permitted. The Debtors should not waive any rights with respect to the marshaling doctrine in the Final DIP Order. *See* Interim Order, ¶ 48. Such rights should be preserved for the Committee. Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237 (1963). There is no justification whatsoever for the broad scope of the marshaling waiver. The DIP Lenders and prepetition secured lenders, as applicable, should be required to exhaust all other collateral before seeking satisfaction from unencumbered assets (which should, in any event, exclude avoidance actions and the proceeds from such actions), the value of which would otherwise be available for the benefit of unsecured creditors.

- Stipulations, Indemnifications, Release and forward-looking waivers should be scaled back. The stipulations (*see* Interim Order, ¶¶ G, 44), releases (*see* Id., ¶¶ H, 44, 51), indemnification (*see* Id., ¶ 38), and all other forward-looking waivers are overbroad and should be stricken. Also, any prospective ruling as to a DIP Lenders'

[4] The Committee is not requesting a prospective application of the "equities of the case" exception, but merely requests that the Court preserve the parties' right to seek, and for the Court to make, a determination as to whether such exception applies at a later time.

future actions should be stricken (i.e., pertaining to actions constituting a responsible person). At the very least, the Releases should not be construed to release any individuals who serve both as officers, directors, or control persons of the Debtors and in some capacity with the Released Parties from any claims the Debtors and their estates may have against those individuals based on their role(s) with the Debtors. In addition, the release of claims related to the Stock Purchase Agreements are unjustified and should be stricken. Finally, any Replacement Liens must have the same validity and perfected status as the Prepetition Liens. Such Replacement Liens cannot "cure" or otherwise improve the perfected status of the Prepetition Liens. *See* Interim Order at ¶ 20.

- Exercise of Remedies is Overreaching. The exercise of remedies language is overreaching and handcuffs the Committee if the DIP Lenders ever allege the occurrence of an Event of Default. To remedy this language: (i) the DIP Agent should not be allowed to take any action during the Remedies Notice Period; and (ii) the DIP Agent should only be allowed to exercise its rights and remedies upon the expiration of the Remedies Notice Period, which should be extended to a period of five (5) business days. Moreover, during the Remedies Notice Period, the Debtors "and the Committee" shall be entitled to seek an emergency hearing with the Court "for any reason." Finally, the Committee should have seven (7) business days' notice before any hearing on a request by the DIP Agent or the DIP Lenders for a Termination Enforcement Order. *See* Interim Order, ¶¶ 30-32.

- Application of Collateral Sales. Any proceeds and/or paydowns from collateral sales and insurance proceeds should be subject to disgorgement or any other remedy fashioned by the Court in the event of a successful Challenge. Furthermore, to the extent that references to proceeds includes proceeds from the Debtors' directors' and officers' insurance policies, the Committee objects to any such inclusion. Lastly, Prepetition Obligations should not be repaid until after the Challenge Period Termination Date elapses. *See* Interim Order at ¶ 21.

- Amendments and Approved Budget. The Committee should be provided with three (3) calendar days' written notice of "non-material" amendments to the DIP Documents and five (5) business days' written notice of any material amendment, and during such period, as applicable, the Committee should be able to object to any such amendment. *See* Interim DIP Order at ¶ 16. In addition, the Committee should receive updated budgets and have five (5) business days' written notice of any modification of the Approved Budget. During such period, as applicable, the Committee should be able to object to any such amendment. *See* Interim Order at ¶ 17. Finally, the Committee should receive the Approved Variance Report at the same time as the DIP Agent and the Prepetition Agent, and the Debtors should provide the Committee with reasonable access to the Debtors' books and records and other information. *See* Interim Order at ¶¶ 18, 22.

- Milestones are Too Onerous. The DIP Motion proposes certain Milestones that contemplate an accelerated and overly aggressive sales process for the Debtors'

assets. *See* Interim Order at ¶ 29. As mentioned, this expedited process benefits New Mountain and virtually precludes a competitive auction. This Court should therefore extend the Milestones in order to help ensure a more robust marketing-and-sale process for the Debtors' assets.

- Credit Bidding. With regard to credit bidding, a party making a credit bid on any asset pool that includes unencumbered assets should have to pay cash for any such unencumbered assets. *See* Interim Order at ¶ 39.

- Lender Liability. The findings and restrictions on potential lender liability claims (Interim Order, ¶ 46) constitutes a premature release of such claims, especially given New Mountain's prepetition status as the Debtors' controlling equity holder. The Committee and its professionals need more time to assess the Prepetition Secured Parties' activities before all lender liability claims may be released or restricted as set forth in the Interim Order.

## RESERVATION OF RIGHTS

30. This Objection is without prejudice to, and the Committee hereby fully reserves, its right to raise additional arguments in respect of the proposed DIP Financing and any final order approving the DIP Motion. The Objection is also without prejudice to the Committee's right to seek other appropriate relief, including reconsideration of the relief granted in the Interim Order.

[Remainder of Page Intentionally Left Blank]

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) denying the proposed DIP Financing on a final basis or, alternatively, entering an order in the form set forth on Exhibit A approving the DIP Financing on a final basis according to the terms of such order, (ii) granting such other and further relief as the Court deems just.

Dated: September 9, 2020.

Respectfully submitted,

*/s/ W. Steven Bryant*
W. Steven Bryant
Texas Bar. No. 24027413
Federal I.D. No. 32913
LOCKE LORD LLP
600 Congress Avenue, Ste. 2200
Austin, Texas 78701
Telephone: (512) 305-4726
Fax: (512) 305-4800
sbryant@lockelord.com

-and-

Philip G. Eisenberg
Texas Bar Number 24033923
LOCKE LORD LLP
600 Travis Street, Suite 2800
Houston, TX 77002
Telephone: 713-226-1200
Facsimile: 713-226-3717
peisenberg@lockelord.com

-and-

Aaron C. Smith (pro hac vice)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 443-0460
Facsimile: (312) 896-6460
asmith@lockelord.com
*Proposed Counsel for the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

I certify that, on September 9, 2020, a true and correct copy of the foregoing *Objection* was served via ECF on all parties who receive service in this Bankruptcy Case via electronic case filing and, for those parties on the attached Service List who do not receive service via ECF, on September 10, 2020 by regular United States mail, postage prepaid.

*/s/ W. Steven Bryant*
W. Steven Bryant



83510030v.5